**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-20505-CR-ZLOCH**

**UNITED STATES OF AMERICA**

**vs.**

**ROGER ROUSSEAU**

     **Defendant.**

_____/

**THE GOVERNMENT'S RESPONSE IN OPPOSITION TO**
**DEFENDANT ROUSSEAU'S MOTION FOR BILL OF PARTICULARS**

   The United States, by and through the undersigned Trial Attorney, hereby opposes Defendant Rousseau's Motion For Bill of Particulars. [*See* DE #154]. Because the indictment and discovery in this case puts Defendant Rousseau on notice of the charges against him, allows him to prepare for trial, and enables him to plead double jeopardy in the event of a later prosecution for the same offense, his Motion should be denied.

**FACTUAL BACKGROUND**

   On July 11, 2013, a grand jury sitting in the Southern District of Florida returned a 13-count indictment, charging seven defendants – including Defendant Rousseau – with conspiracy to commit health care fraud, health care fraud, and making false statements related to health care matters. Defendant Rousseau was charged in Counts 1-3 of the indictment with conspiracy to commit health care fraud (18 U.S.C. § 1349: Count 1) and health care fraud (18 U.S.C. § 1347:

1

Counts 2-3).  The statutory maximum sentence Defendant Rousseau faces for these crimes is 30 years' imprisonment.

From approximately July 2004 through approximately February 2011, Defendant Rousseau served as the Medical Director and attending psychiatrist for Health Care Solutions Network ("HCSN"), a defunct community mental health center that purported to provide intensive mental health treatment, known as partial hospitalization program ("PHP") treatment, to Medicare and Medicaid beneficiaries in Miami, Florida and Hendersonville, North Carolina.

The fraud scheme centered on the admission of ineligible Medicare and Medicaid beneficiaries and the routine fabrication of their HCSN PHP medical records.  In Miami, HCSN paid illegal health care kickbacks to owners of assisted living facilities ("ALF") to induce them to refer patients to HCSN's PHP.  The residents of the ALFs consisted of elderly patients, many of whom suffered from a type of dementia, typically Alzheimer's disease, as well as mental retardation, which prevented them from benefitting from PHP services.  HCSN also paid illegal health care kickbacks to induce Miami-Dade County hospitals to refer patients to HCSN. Medicare data revealed that Defendant Rousseau was the rendering physician for more than 95% of the patients who were admitted into HCSN's PHP.  Specifically, Defendant Rousseau was the attending physician for 1,057 of the 1,106 patients admitted into HCSN-EAST's PHP from November 16, 2004 through February 11, 2011.

Medicare requires that, to qualify for the PHP benefit, the services must be reasonable and necessary for the diagnosis or active treatment of the individual's condition.  The program must be reasonably expected to improve or maintain the condition and functional level of the patient and to prevent relapse or hospitalization.  Thus, PHP services are not appropriate for

patients with progressive dementia and other cognitive deficits.  The program must have been prescribed by a physician, furnished under the general supervision of a physician, and delivered under an established plan of treatment that met Medicare requirements.  The false claims submitted to Medicare and Medicaid by HCSN were supported by the routine fabrication of PHP medical records related to (1) PHP patient admissions, (2) treatment, and (3) extension of PHP treatment, in order to maximize HCSN's billing.

Since May 2012, thirteen co-conspirators, including HCSN personnel and assisted living facility owners, have pleaded guilty for their respective roles in the HCSN scheme and each of these co-conspirators are cooperating with the government.  In total, HCSN fraudulently billed Medicare and Medicaid approximately $63,745,275, from which HCSN received payments totaling approximately $28,092,283.

## ARGUMENT

### I.   LEGAL STANDARD

Federal Rule of Criminal Procedure 7(f) provides as follows:

> The court may direct the government to file a bill of particulars.
> The defendant may move for a bill of particulars before or within
> 10 days after arraignment or at a later time if the court permits.
> The government may amend a bill of particulars subject to such
> conditions as justice requires.

Fed. R. Crim. P. 7(f).  A bill of particulars "supplements an indictment by providing the defendant with information *necessary* for trial preparation."  *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986).  "Generalized discovery, however, is not an appropriate function of a bill of particulars and is not a proper purpose in seeking the bill."  *Id*.  "To allow the bill of particulars to serve as a wholesale discovery device would actually frustrate the federal

discovery rule." *Id.* at 1442.  Whether to grant a bill of particulars is within the discretion of the Court.  *See United States v. Cole*, 755 F.2d 748,760-61 (11th Cir. 1985); *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981).

As the Eleventh Circuit explained, the purpose of a bill of particulars is to "inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *Cole*, 755 F.2d at 760.  Indeed, "a bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery, and it is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Roberts*, 174 Fed. Appx. 475, 477, 2006 WL 827293, *2 (11th Cir. 2006).  Nor is a defendant entitled to a bill of particulars with respect to the defendant's own conversations and actions. *See Cole*, 755 F.2d at 760-61 (noting that defendants "could hardly have been surprised by the government's proof at trial" by testimony regarding conversations the defendant participated in and activities that he witnessed).

## II.    DEFENDANT ROUSSEAU'S MOTION SHOULD BE DENIED

The government respectfully submits that the indictment and the discovery discussed above has "inform[ed] [Defendant Rousseau] of the charge[s] against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *Cole*, 755 F.2d at 760.  The indictment itself tracks the language of the statute, an important factor in the Court's consideration.  *Id*.  Further, the government's discovery efforts have been significant.  For

instance, on July 31, 2013, the government produced 15 CDs, corresponding to the government's first response to the standing discovery order. A cover letter accompanied this production, identifying the materials contained on each CD and inviting all parties to review evidence housed at the Health Care Fraud Facility in Miramar, Florida. The government also agreed to produce a preliminary exhibit list in October and to meet with counsel to highlight materials it believes are important in this case.

On September 9, 2013, counsel for the government and counsel for Defendant Rousseau met for the first time to discuss the case and address any issues surrounding discovery. The government provided counsel with the names of cooperators who routinely fabricated HCSN patient medical records with Defendant Rousseau and proffered information regarding the government's proof as to the counts charged against Defendant Rousseau in the indictment. Additionally, the government, as promised, identified materials it believed were relevant to its prosecution of Defendant Rousseau, significantly limiting the universe of documents for counsel to review to prepare for trial.

The government also produced indices to Defendant Rousseau and his co-defendants related to HCSN PHP patient and administrative records, and agreed to provide law enforcement interview reports (i.e., FBI 302s and HHS-OIG OI3s) sixty days before trial. To the extent Defendant Rousseau seeks a Bill of Particulars requiring the government to identify "the particular patient records" which defendant Rousseau falsified over the course of the seven year criminal fraud conspiracy, any such request should be denied. The defendant is not entitled to use a bill of particulars "to determine in advance the government's proof." *Elso*, 2010 U.S. Dist. LEXIS 144563 at *84 (S.D. Fla. Dec. 17, 2010). Nevertheless, Defendant Rousseau and the

other co-defendants will know sufficiently in advance of trial the documents and information the government intends to rely upon to prove its case.

## <u>CONCLUSION</u>

For the reasons listed above, the government respectfully requests that Defendant Rousseau's Motion for Bill of Particulars be denied.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     /s/ *Allan J. Medina*
        Allan J. Medina
        Court ID No. A5501748
        Trial Attorney
        United States Department of Justice
        Criminal Division, Fraud Section
        1400 New York Ave., NW
        Eighth Floor
        Washington, DC 20005
        Tel: (202) 257-6537
        Fax: (202) 514-6118
        Email:  Allan.Medina@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on October 25, 2013, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.


<u>s/ *Allan J. Medina*</u>
Allan J. Medina
Trial Attorney
Criminal Division, Fraud Section