UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA

vs.

ROGER ROUSSEAU,
DORIS CRABTREE,
ANGELA SALAFIA,
LILIANA MARKS,
ALINA FONTS, and
BLANCA RUIZ,

        Defendants.
_____/

**GOVERNMENT'S TRIAL BRIEF**

**I.      Facts To Be Presented At Trial**

The Government submits that the evidence at trial will establish the following facts:

The Scheme

Defendants Roger ROUSSEAU, Doris CRABTREE, Angela SALAFIA, Liliana MARKS, Alina FONTS, and Blanca RUIZ (collectively, the "Defendants") conspired with Armando "Manny" Gonzalez, John Thoen, Paul Thomas Layman, and others to submit false claims to Medicare and Florida Medicaid for psychiatric partial hospitalization program (PHP) services that were not medically necessary, and in many cases, not rendered. The conspiracy lasted from November 2004 to March 2011 and took place at a series of Community Mental Health Centers ("CMHCs") called Health Care Solutions Network ("HCSN"). In total, Defendants and their co-conspirators caused the submission of more than $63 million in claims for PHP services to Medicare and Florida Medicaid, and they received more than $28 million.

PHP services generally consist of intensive mental health care services, such as individual and group psychotherapy, for patients who are in an acute phase of their illness. Patients are typically referred to a legitimate PHP program either (a) by a hospital after full inpatient hospitalization for severe mental illness or (b) by a doctor who is trying to prevent full inpatient hospitalization for a severely mentally ill patient whom the doctor has been treating. *See, e.g.,* Local Coverage Determination (LCD) for Psychiatric Partial Hospitalization Program (L28973) (Florida); Local Coverage Determination (LCD) for Psychiatric Partial Hospitalization Program (PHP) (L31582) (North Carolina).[1]  Because of their intensive nature—PHP services

---

[1] For example, LCD L31582 (covering North Carolina) provides in relevant part: "Psychiatric partial hospitalization is a distinct and organized intensive psychiatric outpatient treatment … designed to provide patients with profound or disabling mental health conditions an individualized, coordinated, intensive, comprehensive, and multidisciplinary treatment program not provided in a regular outpatient setting. Partial hospitalization services are furnished by a

typically involve treatment five to six days a week, with treatment lasting up to six hours per day—Medicare and Medicaid reimburse for such services at a high rate.

HCSN operated at three different offices, two in Miami, Florida (HCSN-East and HCSN-West) (collectively HCSN-FL) and one in North Carolina (HCSN-NC).  Gonzalez was the President and CEO of HCSN.  HCSN first began operating in Miami in November 2004.  In Miami, Gonzalez and others obtained patients for HCSN by paying illegal health care kickbacks to owners of Assisted Living Facilities (ALFs) to induce them to refer their residents to HCSN.  HCSN kept these patients in the PHP for excessive periods of time without raising "red flags" with Medicare by recycling patients between the HCSN facilities and readmitting patients immediately after they were discharged from other PHPs, including American Therapeutic Corporation ("ATC").  That HCSN and ATC were sharing patients was widely known at the HCSN locations in Miami.

Not surprisingly, a large percentage of the patients in Miami did not need the PHP services HCSN purported to provide.  This required HCSN to employ staff (doctors, therapists, and general administrators) who were willing to, and did, falsify the medical records of patients to make it appear as if they needed PHP services.  The process began with Defendant Roger ROUSSEAU, M.D., the HCSN Medical Director.  ROUSSEAU was the attending physician for 96% of the patients who were admitted into HCSN-East, despite rarely being present during the patient admission process and, in many cases, never meeting the patients prior to their admission.  Rather, staff with inadequate training in PHP services, including Defendants RUIZ and FONTS, conducted the intake process.  Many of HCSN's patients only attended part of the treatment, but HCSN staff falsified records to make it appear as if these individuals had perfect attendance.  In

---

hospital or community mental health center (CMHC) to patients with acute mental illness in order to avoid inpatient care …."

2

addition, HCSN billed Medicare for patients who never attended HCSN at all. Specifically, HCSN therapists—including Defendants FONTS, RUIZ, MARKS, CRABTREE, and SALAFIA—simply made up medical records for these individuals to make it appear as if they did attend treatment.

The "therapy" provided during these sessions routinely fell short of regulatory and medical standards. The admitted patients included individuals with dementia, Alzheimer's, mental retardation, or other severe conditions. These patients, who would at times soil themselves, sleep, or be completely non-communicative, were not appropriate patients for PHP, because their severe conditions prevented them and others in their groups from benefitting from the therapy. Therapists resorted to showing movies, reading fairy-tale stories like Cinderella, and leading games of Hangman. Of course, had Medicare been informed of these practices, or the unsuitability of the patients for PHP, it would not have reimbursed HCSN for the sessions. Consequently, the therapists were told to, and did, falsify the notes describing the sessions.

When Medicare placed HCSN's locations in Miami under review, Gonzalez and others at HCSN decided to open a location in Hendersonville, North Carolina in approximately December 2008. In order to further the fraudulent scheme, Gonzalez brought many of the key players in Miami to North Carolina, and used those who remained behind to support the North Carolina branch of the fraud. As with HCSN-FL, HCSN-NC staff admitted patients who did not need PHP services, and falsified medical records to make it appear as if they did. Instead of real treatment, the staff at HCSN-NC often showed movies and had outdoor barbeques, but HCSN billed these activities as PHP services, and falsified files to make it appear as if real PHP services had been provided. On days when patients did not appear, or missed part of a day of treatment, office staff created medical records that made it appear as if the patients were present for the

entire day.  Therapists in Miami who had never met or interacted with patients in North Carolina created fake medical records, including treatment plans, physician certifications, and progress notes, to reflect therapy given to North Carolina patients.  Defendant FONTS, for example, created fake medical records in Miami for use at HCSN-NC.

**II.**     **The Charges:  Health Care Fraud, Conspiracy, False Statements**

In Count One of the Superseding Indictment, the Defendants are charged with conspiracy to commit health care fraud.  The elements of this offense are:  (1) two or more persons in some way agreed to try to accomplish a shared and unlawful plan, as charged in the Indictment; and (2) the defendant knew the unlawful purpose of the plan and willfully joined in it.  See Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Offense Instruction 13.1 (2010 Edition), Offense Instruction 53 (2010 Edition).

A conspiracy brought under Title 18, United States Code, Section 1349 does not require proof of an overt act.  See 18 U.S.C. § 1349; Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Offense Instruction 53 (2010 Edition) ("No overt act is required by Section 1349, and Congress's omission of that requirement (which is specifically included in 18 U.S.C. § 371) has been held by both the Supreme Court and the Eleventh Circuit to mean that it has dispensed with such a requirement.").

Title 18, United States Code, Section 1347 makes it a Federal offense for anyone, in connection with the delivery of any health care benefits, items, or services, to knowingly and willfully execute, or attempt to execute, a scheme or artifice: (1) to defraud any health care benefit program; or (2) to obtain, by means of materially false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.  See 18 U.S.C. § 1347.

The elements of a violation of Tile 18, United States Code, Section 1347 are: (1) the Defendant knowingly executed, or attempted to execute, a scheme or artifice to defraud a health care benefit program, or to obtain money or property owned by, or under the custody or control of, a health care benefit program by means of false or fraudulent pretenses, representations, or promises; (2) the false or fraudulent pretenses, representations, or promises related to a material fact; (3) the Defendant acted willfully and intended to defraud; and (4) the Defendant did so in connection with the delivery of or payment for health care benefits, items, or services.  See Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Offense Instruction 53 (2010 Edition).

In Counts Two through Five, defendants ROUSSEAU and FONTS are separately charged each with two substantive counts of health care fraud under Section 1347.

In Counts Six through Thirteen, defendants CRABTREE, SALAFIA, and MARKS are each charged with two counts of making false statements relating to health care matters in violation of Tile 18, United States Code, Section 1035.  The elements of this offense are:  that a defendant knowingly and willfully: (1) falsified, concealed, or covered up by any trick, scheme, or device a material fact; or (2) made any materially false, fictitious, or fraudulent statements or representations, or made or used a materially false writing or document and knew the materially false writing or document contained a materially false, fictitious, or fraudulent statement or entry—in connection with the delivery of or payment for health care benefits, items, or services involving a health care benefit program.

### III. Anticipated Legal Issues

#### A. Evidence of Defendants' Awareness of, and Benefit From, the Shuffling of Patients Between ATC and the HCSN Locations Should Be Admitted

At least some Defendants were aware that patients were frequently shuffled between ATC and the HCSN locations. During an interview with the FBI, Defendant MARKS stated that she recognized the faces of patients that were at ATC also being admitted into HCSN. Moreover, Defendants MARKS and CRABTREE were employed by both ATC and HCSN simultaneously. From 2005 to 2010, MARKS earned $179,260 from HCSN and $234,774 from ATC. During a six-week period from late January 2010 to early March 2010, CRABTREE earned $10,080 from ATC and $10,140 from HCSN.

The Government has indicted various individuals in connection with a similar health care fraud scheme at ATC. See United States v. Duran, 10-cr-20767-JLK. However, the Government does not seek to use evidence of a crime committed at ATC to prove MARKS's, CRABTREE's, or any other Defendant's "character in order to show that [they] acted in accordance with [that] character." Fed. R. Evid. 404(b). Instead, the Government simply intends to introduce evidence of the Defendants' awareness that patients were being shuffled between ATC and the HCSN locations, and the financial benefit they received from this arrangement. Defendants' awareness of patient recycling helps establish that they knew that patients were not benefitting from their treatment and were not appropriate patients for PHP. The funds received by MARKS and CRABTREE from both locations help establish their motivation to continue creating false group notes that were ultimately relied upon by Medicare and Medicaid—in other words, their intent to defraud. If Medicare knew the truth about the patients being treated (and the patients being billed for but *not* treated), HCSN might shut down, the cycle of shuffling

patients between HCSN and ATC might end, and their income from both sources might decline or vanish. Consequently, this evidence should be admitted.

### B. Defendants' Reactions to Other Arrests Are Admissible as Evidence of Consciousness of Guilt

The Government anticipates that Gema Pampin, a former HCSN intake specialist, and Ruben Busquets, a former HCSN therapist, will testify that certain of the Defendants expressed concern about the Government's indictment of individuals for health care fraud at PHP's. The Government first indicted HCSN personnel in April 2012 in a case that preceded this matter. See United States v. Gonzalez (12-cr-20291). In response to arrests in that matter or in the ATC case, Defendants MARKS and CRABTREE alternately expressed concern that the Government might carry out similar arrests at HCSN, or sought to re-assure each other by asserting that the authorities would only pursue those who "stole the most money." These comments demonstrate MARKS's and CRABTREE's consciousness of guilt, and as such testimony recounting their comments should be admitted. See United States v. Wright, 392 F.3d 1269, 1277-78 (11th Cir. 2004) (noting that evidence of consciousness of guilt is evidence of "guilt itself" and thus admissible); United States v. Arrington, No. 1:09-cr-00078 2012 U.S. Dist. LEXIS 44944, at *4 (M.D. Pa. Mar. 28, 2012) (holding that evidence "that Defendant left the state upon the arrest of his alleged co-conspirators" can be used to prove consciousness of guilt and is admissible).

### C. Rebekah Paone's Testimony Is Proper Lay Witness Testimony

The Government intends to call Rebekah Paone, a former Fraud Investigator for Safeguard Services, which investigates health care providers on behalf of Medicare. Paone will describe an onsite audit of HCSN that she conducted in August 2010, including her preparations for the audit, what she witnessed at HCSN, and the actions she took based on her findings. Paone will also describe the Local Coverage Determinations (LCD's) as the program instructions

governing reimbursement for PHP services and explain that Medicare will not pay providers for such services if these rules are not followed.  She will walk through the provisions of the LCD's, and will read or summarize relevant portions for the jury.

Under Eleventh Circuit law, Paone's testimony is lay witness testimony under Federal Rule of Evidence 701.  Paone was an employee of Safeguard Services for approximately four years, and will provide the jury with knowledge gained through her experience investigating the allegedly fraudulent activities of companies that were billing the Medicare program.  Fraudulently submitted Medicare claims are the basis of this prosecution.  This testimony is proper and important to the jury's understanding of the crime.

The Eleventh Circuit has not addressed the particular issue of whether a Medicare witness may testify without being qualified as an expert, although Courts in the Southern District of Florida have routinely allowed this kind of testimony.  The Eleventh Circuit has, however, addressed the same issue in other contexts.  In Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co. Ltd., the Eleventh Circuit made a clear delineation between expert testimony that is specialized knowledge subject to Rule 702 and testimony of "witnesses based upon their particularized knowledge garnered from years of experience within the field," finding the latter category to fall properly within Rule 701's provision for lay witness testimony.  320 F.3d 1213, 1223 (11th Cir. 2003); see also U.S. Specialty Insurance Co. v. Burd, 2012 WL 2382866, at *3 (11th Cir. June 26, 2012); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993) ("As we have recognized previously, '[t]he modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination.'") (citations omitted).  The Tampa Bay Shipbuilding Court held that testimony by company employees and officers containing information that was a learned as part

8

of their job functions at the company was properly lay witness testimony, helpful to the trier of fact, and relevant to the issues presented in the case. 320 F.3d at 1223.

The Eleventh Circuit relied on Tampa Bay Shipbuilding in a recent mortgage fraud case in which employees of the victim lending institutions testified as lay witnesses. United States v. Hill, 643 F.3d 807 (11th Cir. 2011). The Hill Court held that representatives of the victim lending institutions, all of whom were involved in mortgage and loan approval for their respective companies, provided proper lay witness testimony about whether the disclosure of misrepresentations in some of the fraudulent loan applications would have had any effect on their decision to approve the mortgage or loan. Id. at 842 ("Most of the lay witnesses who answered hypothetical questions in this case did not do so based on any 'scientific, technical or other specialized knowledge,' but instead based their testimony on their personal experiences as officers of financial institutions with knowledge of their companies' policies and of the specific transactions at issue.").

Paone was an employee of Safeguard Services, which investigates possible Medicare fraud on behalf of Medicare, the ultimate victim. Her position makes her analogous to the loan officers in Hill, She has personal experience and knowledge of the victim's policies and the specific types of transactions at issue. Similar to the Hill loan officers, Paone will provide the jury with information about whether and when Medicare would pay claims for reimbursement and on what information Medicare would base its decisions. The defendant is charged with conspiring to defraud Medicare, so a basic understanding of Medicare's procedures and processes is a necessary ingredient for the jury's consideration. A portion of Paone's testimony will include reading directly from the LCDs or paraphrasing from the LCDs. By doing so, her

9

testimony will provide the jury with some general background information about the Medicare program, and how it processes claims and conducts audits.

### D. The Opinion of the Government's Expert Witness, Patrick Triplett, Concerning Adherence to Standards of Care Should Be Admitted

The Government intends to call Patrick Triplett, an Assistant Professor of Psychiatry and Behavioral Sciences at Johns Hopkins School of Medicine. Professor Triplett will testify concerning appropriate PHP practices. Specifically, Professor Triplett will explain that several of the practices engaged in by Defendants in this case—including admitting patients with psychological conditions such as Alzheimer's Disease that inhibit the usefulness of group therapy, playing games like Hangman during group therapy sessions, and failing to have treatment team meetings led by a medical doctor (in this case Defendant ROUSSEAU)—were serious deviations from appropriate standards of care.

Expert testimony showing divergence from a standard of care has repeatedly been admitted to help establish guilt in criminal health care cases. In United States v. Johnston, 322 Fed. Appx. 660 (11th Cir. 2009), a doctor had prescribed excessive amounts of painkillers to undercover agents without performing complete medical exams. Id. at 662-64. Government medical experts testified that the doctor's having prescribed painkillers despite "red flags" raised by the undercover agents—such as traveling a long distance to see the doctor or the lack of previous medical tests—supported their conclusions that the doctor "acted outside the scope of professional practice." Id. at 664. The Eleventh Circuit held that it was not plain error to "admit[] the red flag evidence and permit[] the experts to give opinions based in part on such evidence." See also United States v. McLean, 715 F.3d 129  (4th Cir. 2013) (denying challenge based on sufficiency of evidence in case charging doctor with billing Medicare and Medicaid for medically unnecessary procedures where government experts provided opinion testimony on the

standard of care for performing stent procedures); United States v. Feingold, 454 F.3d 1001, 1006-07 (9th Cir. 2006) (holding that medical expert testimony regarding standard of care was properly admitted in a case concerning opiate distribution, and stating, "only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal"). Here, the Government's expert testimony is relevant and should be admitted for the same reason. It will establish that neither Defendants' intake decisions nor the "therapy" they provided conformed to accepted professional standards of mental health care. Consequently, repeatedly billing Medicare and Medicaid for these treatments constituted fraud.

      **E.    Although Potential Bruton Issues Are Presented By Statements of Certain Defendants, a Defendant Will Lose the Ability to Suppress a Co-Defendant's Statements Based on Bruton Should That Co-Defendant Testify**

Multiple Defendants implicated both themselves and certain co-defendants in statements made to Federal agents. Certain of these statements may raise issues under Bruton v United States, 391 U.S. 123 (1968). In that case, "the Supreme Court held that the Confrontation Clause was violated by the admission of a co-defendant's confession that inculpated the defendant at their joint trial." United States v. Samson, 540 Fed. Appx. 927, 932 (11th Cir. 2013). Notably, "only those statements by a non-testifying co-defendant that directly inculpate or powerfully incriminate the defendant give rise to a constitutional violation." Id. (quotation marks omitted).

The Government will provide counsel for the Defendants with information on exactly which statements of Defendants the Government intends to introduce at trial. Defense counsel can then respond by objecting to any statements they believe raise Bruton issues for their clients. For now, the Government notes that a Defendant may only pursue a Bruton challenge based on a statement of a "non-testifying" Defendant. Samson, 540 Fed. Appx. at 932. Should any

Defendant elect to testify at trial, no Co-Defendant would have a basis for a Bruton challenge concerning a prior statement of that testifying Defendant.  See United States v. Horton, 522 Fed. Appx. 456, 461 (11th Cir. 2013) (noting that "there was no Bruton error" where the objecting defendant's "codefendant testified at trial and [the objecting defendant] had the opportunity to cross-examine her").

> **F.     The Court Should Preclude the Use of Law Enforcement Agent Interview Reports For Impeachment Of Government Witnesses**
>
> > 1.   Interview Reports Are Not Statements Of The Witness Under The Jencks Act

In order to provide for full and fair cross-examination, the Jencks Act requires that after a witness for the United States testifies on direct examination, the government must provide the defense with any statements made by the witness that relates to the subject of his or her testimony.  18 U.S.C. § 3500.  A statement within the meaning of the Jencks Act is defined as "a written statement made by said witness and signed or otherwise adopted and approved by him"; a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously"; or a statement made by a witness to the grand jury.  18 U.S.C. § 3500(e).

Defense counsel may not use interview reports prepared by government agents to cross-examine witnesses that were the subjects of these memoranda.  In Palermo v. United States, the Supreme Court held that because the Jencks Act is meant to restrict the defendant's use of discoverable statements to impeachment, 360 U.S. 343, 349 (1959), "only those statements which could properly be called the witness' own words should be made available to the defense." Id. at 352.  The Court went on to elaborate that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." Id. at 352-53.

Consistent with Palermo, interview reports are not discoverable under the Jencks Act because they are not statements of the witness within the meaning of subsection (e)(1) of the statute. Although an exception may be made where a witness has reviewed and adopted the information in the interview report—which was not the practice in this case—this adoption requirement "clearly is not met when the [writer] does not read back, or the witness does not read, what the [writer] has written." Goldberg v. United States, 425 U.S. 94, 110 n. 19 (1976). Moreover, because the interview reports are written after interviews are completed and reflect the thought processes and interpretations of the agent, they do not constitute a contemporary and substantially verbatim recital of the witness's statement under subsection (e)(2) of the Jenks Act.

The Eleventh Circuit has held that interview reports are generally not discoverable under the Jencks Act. United States v. Jordan, 316 F.3d 1215, 1255 (11th Cir. 2003) (holding that interview reports "are not Jencks Act statements of the witness unless they are (1) substantially verbatim and were contemporaneously recorded, or (2) were signed or otherwise ratified by the witness"). Every Circuit court to address this question has held the same. See, e.g. United States v. Price, 542 F.3d 617, 621 (8th Cir. 2008) (holding that absent evidence that the witnesses "approved or adopted" the interview reports, "these documents are not discoverable under . . . the Jencks Act").

Whether the interview reports produced by the government contain sufficiently extensive verbatim recitation to come within the Jenks Act is a matter of fact to be decided by the trial court. Jordan, 316 F.2d at 1255, citing United States v. Loyd, 743 F.2d 1155, 1566 (11th Cir. 1984). In this case, there are no interview reports that have been "adopted" by the witness such that they can be considered statements of the witness. The interview reports are statements of

government agents recording the substance of a witness interview. Counsel should be precluded from cross-examining a witness about the summary created by another individual.

## 2. Proper Use Of Interview Reports At Trial

Counsel should be limited to using the interview reports consistent with the law and rules of evidence. In particular, the defense should be precluded from introducing the contents of the interview reports to impeach witnesses on the basis of inconsistent statements because the interview reports are not the statements of the witnesses themselves. Moreover, they must be precluded from publishing the contents of the interview reports to the jury, or otherwise suggesting to the jury that the interview report is a statement of the witness. To allow otherwise would subvert the meaning of the Jencks Act and the Supreme Court's decision in Palermo, holding that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." Palermo, 360 U.S. at 350.

The defense is, of course, free to ask a witness whether he or she made a statement that is reflected in an agent interview report. However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the contents of the interview report as a prior inconsistent statement. The Eleventh Circuit made this clear when, citing to Palermo, it held that a law enforcement memorandum of a witness interview could not be used to impeach that witness "unless the witness has subscribed to or otherwise adopted the statement as his own." United States v. Saget, 911 F.2d 902, 910-11 (11th Cir. 1993).[2]

---

[2] See also United States v. Brika, 416 F.3d 514, 529 (6th Cir. 2005) (holding that "such documents [interview reports] have been deemed inadmissible for impeaching witnesses on cross-examination because they represent the "'investigator's selections, interpretations and interpolations.'") (abrogated on other grounds); United States v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"); United States v. Hill,

14

Moreover, the defense may not use the interview report in a way that suggests to the jury that the interview report is a statement of the witness. See United States v. Marks, 816 F.2d 1207, 1210-11 (7th Cir. 1987) (holding that where defense counsel read from an interview report during cross-examination in a way that would "seem authoritative" and potentially confuse the jury, the judge was entitled to require the witness be shown the interview report and given the opportunity to adopt or reject it as a statement, although such a practice was no longer required by the federal rules of evidence).

    Respectfully submitted,

    WIFREDO A. FERRER
    UNITED STATES ATTORNEY

    By:   */s/ Justin Goodyear*
    Justin Goodyear
    Court ID No. A5502023
    Trial Attorney
    Criminal Division, Fraud Section
    1400 New York Avenue, NW
    Eighth Floor
    Washington, DC 20005
    Phone: (202) 307-5797
    E-mail: Justin.Goodyear@usdoj.gov

    Allan J. Medina
    Court ID No. A5501748
    Trial Attorney
    Criminal Division, Fraud Section
    1400 New York Avenue, NW
    Eighth Floor
    Washington, DC 20005
    Phone: (202) 257-6527
    E-mail: Allan.Medina@usdoj.gov

---

526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it").

15

A. Brendan Stewart  
Court ID No. A5501801  
Trial Attorney  
Criminal Division, Fraud Section  
1400 New York Avenue, NW  
Eighth Floor  
Washington, DC 20005  
Phone: (202) 716-1142  
E-mail: Brendan.Stewart@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on October 26, 2014, and sent courtesy copies to counsel on the same date.

*/s/ Justin Goodyear*
Trial Attorney