```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION
               CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,              NOVEMBER 7, 2014
                                       4:22 P.M.
                    Plaintiff,



       vs.



ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 1 THROUGH 26
```

---

```
                          DAY 4
           EXCERPT OF CRIMINAL JURY TRIAL
   (DIRECT EXAMINATION OF RUBEN A. BUSQUETS BY MR. GOODYEAR)
        BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

```
 1                        I  N  D  E  X

 2     Certificate ----------------------------------------- 26

 3


 4


 5                      W I T N E S S
       ON BEHALF OF THE GOVERNMENT:                        PAGE
 6     RUBEN A. BUSQUETS
       DIRECT EXAMINATION BY MR. GOODYEAR                     3
 7


 8


 9


10


11


12                    E X H I B I T S
       GOVERNMENT EX. NO.:                    OFFERED ADMITTED
13     200 -                                     5        5

14


15


16


17


18


19


20


21


22


23


24


25
```

```
 1        (Before Jury, 4:22 p.m.)
 2             THE COURT:  All right.  Welcome back, everyone, and
 3    please be seated.
 4             Who is the government's next witness?
 5             MR. GOODYEAR:  The government calls Ruben Busquets.
 6             THE COURT:  He needs the services of the interpreter?
 7             MR. GOODYEAR:  Yes, Your Honor.
 8             THE COURT:  Okay.  Would you get a chair for the
 9    interpreter?  Thank you.
10             RUBEN A. BUSQUETS, GOVERNMENT WITNESS, SWORN
11                         DIRECT EXAMINATION
12             THE COURT:  Can you get her the handheld mike?
13             COURT REPORTER:  Could you please state your full
14    name, spell your last name for the record, and please use the
15    microphone.
16             THE WITNESS:  Ruben A. Busquets.
17             THE COURT:  Mr. Goodyear.
18                         DIRECT EXAMINATION
19    BY MR. GOODYEAR:
20    Q.  Mr. Busquets, have you pled guilty to a crime?
21    A.  Yes, sir.
22    Q.  What crime?
23    A.  Conspiracy to commit Medicare fraud.
24    Q.  And what was your role in that conspiracy?
25    A.  I was a therapist at this center for which I was accused.
```

1  Q.  And have you entered into a plea agreement with the

2  government?

3  A.  Yes, sir.

4  Q.  Let's pull up Government's Exhibit 200 which has not yet

5  been admitted.  Mr. Busquets, is this a copy of your plea

6  agreement?

7  A.  Yes, sir.

8          MR. GOODYEAR:  Your Honor, I move Government's

9  Exhibit 200 into evidence and I ask that it be published to the

10  jury.

11          THE COURT:  All right.

12  BY MR. GOODYEAR:

13  Q.  Mr. Busquets, what did you promise to do under this plea

14  agreement?

15  A.  To tell the truth and to cooperate with the government in

16  order to get a resolution in my case.

17  Q.  And is there anything you're hoping to get out of telling

18  the truth and cooperating?

19  A.  Yes, sir.

20  Q.  And what's that?

21  A.  A sentence reduction.

22  Q.  Have you been sentenced yet?

23  A.  No, sir.

24  Q.  When did you start working at Health Care Solutions,

25  Mr. Busquets?

1   A.   End of 2006.  I don't recall the exact date.

2   Q.   Were there two different periods of time when you worked at

3   Health Care Solutions?

4   A.   Yes, sir.

5   Q.   Okay.  I'd like to talk first about the first period of

6   time when you worked there, okay?

7   A.   Yes, sir.

8   Q.   And so starting in sort of the end of 2006, about how long

9   did that period of employment at Health Care Solutions last?

10  A.   I was there approximately from the end of 2006 to about the

11  beginning of 2008.

12  Q.   And which location were you working at during that period

13  of time?

14  A.   That is what was known as the area West.

15  Q.   And what did you do at Health Care Solutions West?

16  A.   Therapist.

17  Q.   What was your first day like at Health Care Solutions West?

18  A.   Well, the very first day I came into the place, it was

19  about 9:00 a.m., and I was to have an interview with the

20  program director at the place.  Should I go ahead and tell you

21  everything that happened that first day?

22  Q.   Tell me everything that happened your first day, please.

23          MR. HERMIDA:  Objection, calls for a narrative.

24          THE COURT:  Sustained.

25  BY MR. GOODYEAR:

1  Q.  What happened?  Did you have an interview your first day?

2  A.  Yes, sir, I did.  I did have the interview that very first

3  day.

4  Q.  And were you hired?

5  A.  Yes, sir, I was hired.

6  Q.  Okay.  Did there come a time when you witnessed fighting

7  between patients at Health Care Solutions West?

8  A.  Yes, sir.

9  Q.  When did that happen?

10  A.  It was the very first day as I went inside the place, as I

11  had actually just entered before I even had the interview, it

12  was two patients, female patients, who got into a fight, and

13  either one or the other broke a piece of equipment, a stereo or

14  a radio that was there.

15  Q.  As time went on, did -- was there fighting between patients

16  other times at Health Care Solutions West?

17  A.  Yes, sir, there were some.

18  Q.  How many times?

19  A.  I wouldn't be able to tell you exactly, but there were

20  some.  There were several.  There were quite a lot.

21  Q.  Did you get any training from Health Care Solutions before

22  you started working there?

23  A.  No, sir.

24  Q.  Did you proceed to conduct group therapy sessions at Health

25  Care Solutions West?

1    A.  Yes, sir.

2    Q.  What was your impression about the patients at Health Care

3    Solutions?

4    A.  Well, some of the patients would fall asleep and they did

5    not qualify to be actually there, and some of the other

6    patients, yes, they were very active.

7    Q.  What are group therapy notes?

8    A.  That is the report that you prepare per hour for the group

9    therapy patients.

10   Q.  So did you prepare group therapy notes for the group

11   therapy sessions you conducted at Health Care Solutions West?

12   A.  Yes, sir.

13   Q.  Did you ever document fighting in your group therapy

14   session in the notes you prepared at Health Care Solutions

15   West?

16   A.  No, sir.

17   Q.  Did you ever document sleeping by patients in your therapy

18   sessions in the notes you prepared in the West?

19   A.  No, sir.

20   Q.  Was there ever a time where you documented something in a

21   group therapy note and it was returned to you with comments or

22   marks on the note?

23   A.  Yes, sir.

24   Q.  What happened that time?

25   A.  When I made notes that the patients were either falling

1  asleep or that the patients were very hostile, the notes were

2  returned indicating that nothing like that could be found in

3  the notes.

4  Q.  Would specific words like sleeping be crossed out in the

5  notes that were returned to you?

6  A.  Yes, sir.

7  Q.  And who was returning these notes to you with these

8  markings?

9  A.  The program director.

10  Q.  Who was that?

11  A.  John Thoen.

12  Q.  What did you do the first time you had a group therapy note

13  returned to you with a markup like that?

14  A.  I asked why the notes could not be written like that.

15  Q.  Whom did you ask that question?

16  A.  To John Thoen.

17  Q.  What did Mr. Thoen say?

18  A.  That that did not do anything to promote the patients

19  remaining there and that if the notes were written like that,

20  the patients would have to be discharged and they would not be

21  able to bill for them.

22  Q.  So what did you start doing after having a conversation

23  like that with John Thoen?

24  A.  After that I tried to avoid making comments like that in

25  the notes that I would make.

1    Q.   Were you -- were you allowed to write in your notes that

2    patients were actually benefiting from the therapy?

3    A.   Generally, that was not something that was written in

4    there, that the patients were benefiting greatly from the

5    therapy.

6    Q.   And why was that?

7    A.   Because sometimes if you wrote that the patient was

8    benefiting from the therapy, they would have to be discharged

9    and they would not be able to bill for the patient.  During the

10   first four weeks, you would not write that the patient was

11   benefiting even if the patient was benefiting from the therapy,

12   and so it would continue until the eighth week when the patient

13   would be able to be discharged.

14   Q.   So did you stop writing in your notes things like patient

15   was sleeping or things like patient is benefiting from therapy

16   in the first four weeks?

17   A.   Yes, sir.

18   Q.   And did you stop writing those things even though things

19   like that were happening in your group therapy sessions?

20   A.   Yes, sir.

21   Q.   Were you a therapist in the West at the same time as Alina

22   Fonts?

23   A.   Yes, sir.

24   Q.   Did she have similar types of patients to yours?

25   A.   Yes, sir, and the groups would rotate.

1    Q.   So you in fact shared patients with her.

2    A.   Yes, sir.  The therapists would rotate with each group.

3    Q.   Based on your experience at Health Care Solutions West, if

4    Alina Fonts had submitted notes that described patients

5    sleeping or patients making progress --

6              MR. HERMIDA:  Objection as to form, leading.

7              MR. GONZALEZ:  I object.

8              THE COURT:  Overruled.

9    BY MR. GOODYEAR:

10   Q.   -- would she have been able to continue working at Health

11   Care Solutions?

12   A.   I don't believe so, sir.

13   Q.   Who is Blanca Ruiz?

14   A.   It was the person in charge of intakes and assessments at

15   the West office.

16   Q.   Did you review -- did you work at Health Care Solutions

17   West at the same time as her?

18   A.   Yes, sir.

19   Q.   And did you review intake documents prepared by Blanca

20   Ruiz?

21   A.   Yes, sir, it was in -- they were in the charts.

22   Q.   And were those intake documents accurate?

23   A.   I don't remember exactly, but -- I don't remember exactly

24   for each patient.

25   Q.   Did there come a time when you left Health Care Solutions

1    West?

2    A.  Yes, sir.

3    Q.  Why did you leave the West?

4    A.  Because I had a conflict -- well, excuse me.  For three

5    reasons.

6    Q.  Can you please explain those three reasons?

7    A.  The first one is that I had a conflict with John Layman.

8    He was the person in charge of paying.  If you did not hand in

9    the notes in 24 hours, you would not receive a check.

10       The second was that I felt already tired of being there and

11   I wanted to leave because they were saying that they were going

12   to cut down on the amount of therapists because the groups were

13   growing smaller.

14       And the third one was that I wanted to seek employment

15   closer to my house in Miami.

16   Q.  What did you do after leaving Health Care Solutions West?

17   A.  I worked as a therapist for a company.

18   Q.  And did there come a time when you returned to Health Care

19   Solutions?

20   A.  Yes, sir.

21   Q.  When was that?

22   A.  It must have been towards the end of 2009, beginning of

23   2010.

24   Q.  And which location were you hired to work at this time?

25   A.  In the East.

13

1  Q.  What type of group did you lead at Health Care Solutions

2  East?

3  A.  Excuse me?

4  Q.  What type of patients were in your group at Health Care

5  Solutions East?

6  A.  Low function.

7  Q.  What was your impression of the patients in the East?

8  A.  Most of my patients and most of the patients in general did

9  not meet criteria to be there.

10  Q.  What about them made it so they didn't meet criteria?

11  A.  Because they were patients that, first of all, kept falling

12  asleep, they could not interact with the work group, and they

13  derived no benefit from being there.  Many patients could not

14  handle themselves on their own.  Other patients were very

15  psychotic at a very high level.

16  Q.  In the East, were notes also sent back to you if you

17  described conditions like that?

18  A.  Yes, sir.

19  Q.  In addition to getting notes sent -- sorry, strike that.

20      Were they sent back to you in the same way with markings on

21  them, crossed out words?

22  A.  Yes, sir, sometimes they did.

23  Q.  Who was doing the marking up and the crossing out in the

24  East?

25  A.  The director whose name was Alina Faes.

1  Q.  Would Alina Faes also just talk to you directly about your

2  notes and how they had to be changed?

3  A.  Yes, sir.

4  Q.  What kinds of things were you told needed to be changed

5  about your notes in the East?

6  A.  That we could not write that the patients were not

7  participating in the group; that the patients were not deriving

8  any benefit and could not improve with the group therapy; and

9  that the patients could not interact with the other patients in

10  the therapy group, that they could not interact with other

11  people.

12  Q.  And did you make those changes?  Did you keep things like

13  that out of your notes?

14  A.  Yes, sir.

15  Q.  And when you submitted notes that kept things like that

16  out, were those notes accurate?

17  A.  No, sir.

18  Q.  Why did you do that?

19  A.  Because of the money that they paid there.

20  Q.  Did Lisset Palmero or Alina Faes ask you to create

21  fabricated therapy notes for patients who were in fact absent

22  from group?

23  A.  Yes, sir.

24  Q.  What would they -- did they both do that?

25  A.  Yes, sir.

1    Q.  And what would they say when they asked you to do that?

2    A.  Generally, they would say the patient with the notes here

3    cannot be -- can I explain?

4    Q.  Yes.

5    A.  Well, here, the notes were not handed in every 24 hours.

6    Generally, more time could ensue or could go by.  Three or four

7    days could go by without handing the notes in.  Also, the

8    groups were very large.  The groups could have even 16 people,

9    but they would also say, for example, when they took the

10   assistant's notes, this patient comes every day, so please

11   write notes for him.

12   Q.  So would Alina Faes or Lisset Palmero come to you and say,

13   So-and-so is absent today -- was absent yesterday, but please

14   go ahead and write a note for that person?

15           MR. PRIETO:  Objection, leading, Judge.

16           THE COURT:  Overruled.

17   A.  Yes, sir, but generally speaking, it would not be from

18   yesterday's meeting, but two or three days or even more time

19   before.

20   BY MR. GOODYEAR:

21   Q.  And were there some times when a patient would be absent,

22   but you would not be asked to write a group therapy note for

23   that patient for that day?

24   A.  Excuse me, I did not understand the question.

25   Q.  Were there times when a patient had been absent from your

1    group therapy session, but no one asked you to write a group

2    therapy note for that patient for that day?

3    A.   Yes, sir.

4    Q.   So sometimes when a patient was absent, someone would come

5    ask you to write a note.  Sometimes no one would ask you to do

6    that.

7    A.   Yes, sir.

8    Q.   And when you were asked to write a note about group therapy

9    for a patient who had not been there on that day, would you go

10   ahead and do it?

11   A.   Yes, sir.

12   Q.   Who is Angela Salafia?

13   A.   A therapist who worked with me at the East center.

14   Q.   And who is Doris Crabtree?

15   A.   Another therapist who worked with me.

16   Q.   And the same for Liliana Marks?

17   A.   Yes, sir.

18   Q.   Based on your experience, could Salafia, Marks, and

19   Crabtree have submitted accurate group therapy notes at the

20   East and kept their jobs?

21   A.   No, sir.

22   Q.   Did your wife work at Health Care Solutions?

23            MR. HERMIDA:  Your Honor, could we go sidebar?

24            THE COURT:  No.

25   BY MR. GOODYEAR:

```
 1    Q.  I'm sorry, I didn't hear the answer.

 2    A.  I did not hear what you said.  Excuse me.

 3    Q.  Did your wife work at Health Care Solutions?

 4    A.  Yes, sir.

 5    Q.  And what was her name?

 6    A.  Rosa Bermudez.

 7    Q.  Was she a therapist?

 8    A.  Yes, sir.

 9    Q.  Did she also submit inaccurate group therapy notes?

10    A.  Yes, sir.

11    Q.  Has anyone from the government made you any promises about

12    whether or not the government will indict your wife?

13    A.  No, sir.

14    Q.  Was there a daily morning meeting at Health Care Solutions

15    in the East?

16    A.  Yes, sir.

17    Q.  And who ran that meeting?

18    A.  The director, Alina Faes.

19    Q.  And who else would attend the meeting?

20    A.  All the therapists, the nurse, and the patients'

21    assistants.  All the people who worked there.

22    Q.  Do you recall an instance where you argued with Alina Faes

23    during a morning meeting?

24    A.  Yes, sir.

25    Q.  Did this argument take place in front of the other
```

1  therapists?

2  A.  At the beginning of the argument, yes.

3  Q.  Okay.  What did you say to Feas during this argument?

4  A.  That the program was not being run with the right patients.

5  Q.  What else did you say?

6  A.  I told her that things were not being done well, that

7  things were not working out well, and that in the end this

8  would bring bad things to happen to everyone.

9  Q.  And what did she say in response?

10  A.  She said I did not hold a license as a physician to

11  indicate which patients should be there or not.

12  Q.  Did you tell her there were patients who had dementia and

13  there were patients who weren't benefiting from PHP?

14  A.  Not at that time, but later, yes.

15  Q.  Okay.  Tell me about what happened later.

16  A.  Well, after the therapy was over, I felt bad for what I had

17  said, so I knocked on her door right after the therapy, which

18  ended around 12:45 or 1:00, and so I went and knocked on her

19  door.  She was sitting there in her office, and I said that I

20  wanted to talk to her.  And I just entered, I took two steps

21  into her office, and I told her that there were patients who

22  were really not very well at all, who had dementia and who were

23  not benefiting from the program at all.

24  Q.  Was anyone else -- so this later conversation in her

25  office, was anyone else present for this conversation?

1    A.  Yes, sir.

2    Q.  Who was that?

3    A.  There was Rosa Bermudez, my wife, and behind her was Doris

4    Crabtree, a little further behind.

5    Q.  Were you inside Feas's office for this conversation?

6    A.  Yes, I was inside her office, about two or three steps

7    inside.

8    Q.  And were your wife and Ms. Crabtree sort of just outside

9    the office?

10   A.  They were right at the entrance, at the door to the office.

11   Q.  And were yours and Ms. Feas's voices raised?

12   A.  I raised my voice somewhat, yes.

13   Q.  Okay.  You were explaining what you'd said to Ms. Feas in

14   this conversation and I interrupted you.  Can you please

15   continue explaining what else was said in this conversation in

16   Feas's office.

17   A.  I explained to her what could happen to us, what is

18   actually happening to us now, and I told her that we would all

19   wind up going to jail for this, that everything was working

20   very badly.

21   Q.  What did she say?

22   A.  She said that -- well, she said two things that I will

23   never forget.  Well, she explained that she was going to buy a

24   house in the Dominican Republic or Spain, and if the FBI would

25   come looking for her, she was going to go live in Spain or the

1   Dominican Republic.  And then she said that the owner of the

2   place lived in North Carolina, that he had a lot of contacts in

3   politics and that no one was going to touch him.  They was just

4   going to give him a little pat in his hand.  Well, and I told

5   her that it was really stupid to say something like that

6   because they would go looking for her wherever she went, from

7   Haiti to Spain, also going through the Dominican Republic, and

8   that they would be arrested even if they were in North Carolina

9   or wherever they were.

10  Q.   Was this conversation in English or Spanish?

11  A.   In Spanish.

12  Q.   Does Doris Crabtree speak Spanish?

13  A.   Yes, sir.

14  Q.   How do you know?

15  A.   She spoke to me often, many times in Spanish.

16  Q.   The following morning, did you relate this conversation to

17  anyone else?

18  A.   Yes, to the group, when we were in the meeting before Alina

19  Faes arrived.

20  Q.   So I understand Alina Faes had not -- so I understand Alina

21  Faes had not yet arrived.  Who else was there when you related

22  the conversation from before?

23  A.   Part of the therapists were there.  Also, the two girls who

24  worked at the front desk, Gema Pampin and Dana.  And -- and my

25  comment to them was that we had a boss there who was committing

1    the greatest stupidity in the world.

2    Q.   You said part of the therapists were there.  Do you recall

3    that any therapist was not there specifically?

4    A.   Are you speaking of the ones who are here now or --

5    Q.   Yes.  Of the three therapists who are -- strike that.

6         Of the three people who were therapists in the East who are

7    defendants in this case, do you recall specifically that any of

8    them was not there?

9    A.   Yes, sir.

10   Q.   Who?

11   A.   Could you give me a moment, please?

12   Q.   Sure.

13   A.   Angela Salafia was not there because she was not working

14   with us any longer.

15   Q.   How do you remember that?

16   A.   Because that was at the time when the inspections for

17   Medicare were happening and she was not working there anymore

18   and I was working with some of those groups.

19   Q.   But other than your recollection that Salafia was not

20   there, do you recall generally that the therapists were in

21   attendance at this morning meeting?

22   A.   Yes, sir.

23   Q.   When did you leave --

24            THE COURT:  I was waiting for you to finish that

25   episode.  It went about ten minutes longer than I was hoping,

1    but, okay, so I told you we would stop early today, we've had a

2    long week, so let's stop for today.  Monday we are in session.

3    I have no other matters except for this trial, so we're going

4    to start at 9 o'clock on Monday morning.  So have a safe trip

5    home, have a good weekend, and we'll see everybody at 9 o'clock

6    on Monday.

7          (Jury not present.)

8          THE COURT:  All right.  We're here in open court

9    outside the presence of the jurors.  The attorneys and the

10   defendants are here.  Are there any other matters we can take

11   up before we recess?

12         MR. GONZALEZ:  Judge, I have a logistical matter that

13   I wanted to bring to the Court's attention.  I have absolutely

14   no view of the defendant -- of any of the witnesses' faces at

15   all from here.  I don't think anybody else can see anything

16   that's going on over there.

17         THE COURT:  Okay.  You want me to build a loft over

18   the weekend?

19         MR. GONZALEZ:  I was going to suggest that, something

20   like that, but I think that might take a little time.

21         THE COURT:  You've been sitting behind the

22   prosecutor's table the whole trial --

23         MR. GONZALEZ:  I was thinking maybe if you could like

24   pipe in the -- the view of the witnesses that the interpreters

25   are getting over on one of our monitors, I could sit with my

```
 1    client --
 2            THE COURT:  They have a picture of the witness?
 3            MR. GONZALEZ:  Yeah, they get a video of the witness
 4    so that they can see their face.  That way it would avoid
 5    having to build a loft and --
 6            THE COURT:  I've already asked that for you.
 7            MR. GONZALEZ:  Pardon me?
 8            THE COURT:  I've already asked for that to be done for
 9    you.
10            MR. GONZALEZ:  Okay.
11            THE COURT:  Okay?
12            MR. GONZALEZ:  I think some of the tech people might
13    be able to help us out with that, Judge.
14            THE COURT:  I just said I've already asked for it to
15    be done for you.  Anything else?
16            MR. HERMIDA:  One other thing, Judge.
17            THE COURT:  Microphone.
18            MR. HERMIDA:  Your Honor, Rick Hermida on behalf of
19    Angela Salafia.  The reason why I wanted to go sidebar is
20    because we could not determine whether Dr. Busquets had
21    answered no, I don't know, or no, sir when he was asked if the
22    other therapists wrote notes with certain accurate
23    descriptions, would they have been able to keep their jobs?
24            THE COURT:  Right.
25            MR. HERMIDA:  And I don't -- I couldn't make out
```

1    whether he had said I don't know in Spanish or no, sir in

2    English.  And they're very similar.

3         MR. PALOMINO:  Judge, it sounded to me like he said I

4    don't know because he was speaking in Spanish.  He has not been

5    answering in English.  If he was answering in English, it could

6    have sounded as no, sir, but it was translated as not that I

7    don't know, but it was translated as no, sir.

8         THE COURT:  Well, that's not what I heard.  And he's

9    here now, so let's see if we can take it up again in front of

10   the jury on Monday.

11        So Mr. Busquets, I think the question you were asked

12   was:  Based upon your experience working there, would it have

13   been possible for the other therapists to write notes of their

14   sessions which accurately sets forth what happened and still

15   keep their jobs?  What is your answer to that question?

16        THE WITNESS:  No, sir, they would not have been able

17   to keep their job.

18        THE COURT:  And is that the same answer that you gave

19   earlier in the trial while the jurors were here?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Okay.  And for the record, I speak

22   Spanish, that's what I heard him to say also during the trial.

23   Okay, all right, but I'm glad you brought it up.  Better to

24   have it resolved now.  Have a good weekend everybody.

25        MR. MEDINA:  Your Honor, just since the witness is on

1   the stand, we'd ask him to be instructed not to talk to any

2   lawyers or --

3           THE COURT:  All right.  Mr. Busquets, since you

4   started your testimony, you're not allowed to speak to anybody

5   about your testimony, okay?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  Okay.

8           MR. MEDINA:  Thank you, Your Honor.

9           THE INTERPRETER:  Your Honor, question from the

10   witness.  Not even with the prosecutors?

11           THE COURT:  Not even with the prosecutors.  You can

12   discuss arrangements how to get here and back, those kind of

13   things, but not the substance of your testimony.

14           THE WITNESS:  Okay.

15       (Proceedings adjourned at 5:12 p.m.)

16                       *   *   *   *   *

1  UNITED STATES OF AMERICA                              )
                                                         ) ss:
2  SOUTHERN DISTRICT OF FLORIDA                          )

3

4                    C E R T I F I C A T E

5      I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 7th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 1 - 26.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 13th day of November, 2014.

16

17

18                      /s/ Carly Horenkamp

19                      Carly L. Horenkamp, RMR, CRR
                        Certified Shorthand Reporter

20

21

22

23

24

25