IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,                  NOVEMBER 18, 2014
                                           11:13 A.M.
                    Plaintiff,


        vs.


ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 1 THROUGH 55
_____

DAY 10
EXCERPT OF CRIMINAL JURY TRIAL
(CROSS-EXAMINATION OF SARAH DA SILVA KELLER BY MR. LEVIN)
BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Mr. A. Brendan Stewart, AUSA
                        Mr. Justin Goodyear, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC  20530


FOR THE DEFENDANT:      Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                        800 Brickell Avenue
                        Suite 1400
                        Miami, Florida  33131


FOR THE DEFENDANT:      Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)        LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                        1221 Brickell Avenue # 900
                        Miami, Florida  33131

```
APPEARANCES (continued):


FOR THE DEFENDANT:      Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)        LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                        55 Merrick Way
                        Suite 212
                        Coral Gables, Florida  33134


FOR THE DEFENDANT:      Mr. Frank A. Prieto, Esq.
(Liliana Marks)         LAW OFFICE OF FRANK A. PRIETO, P.A.
                        One Northeast 2nd Avenue
                        Suite 200
                        Miami, Florida  33132


FOR THE DEFENDANT:      Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)           LAW OFFICES OF JUAN DE JESUS GONZALEZ
                        10631 N. Kendall Drive
                        Suite 150
                        Miami, Florida  33176


FOR THE DEFENDANT:      Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)           LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                        Courthouse Tower
                        40 NW 3rd Street
                        Suite 200
                        Miami, Florida  33128


COURT REPORTER:         Carly L. Horenkamp, RMR, CRR
                        U.S. DISTRICT COURT
                        400 N. Miami Avenue, Room 12-3
                        Miami, Florida  33128
                        (305) 523-5138
```

3

```
1                    I  N  D  E  X

2    Certificate ------------------------------------- 55

3

4

5                    W I T N E S S
     ON BEHALF OF THE GOVERNMENT:                    PAGE
6    SARAH DA SILVA KELLER
     CROSS-EXAMINATION BY MR. LEVIN                     4
7

8

9

10

11

12

13

14                   E X H I B I T S
15   DEFENDANT RUIZ EX. NO.:              OFFERED ADMITTED
     1-J -                                  24      24
16   1-K -                                  25      25
     1-O -                                   4       5
17   1-R -                                  48      48
     1-S -                                  48      48
18   1-T -                                  48      48
     1-U -                                  48      48
19   1-V -                                  19      19
     1-W -                                  27      27
20

21

22

23

24

25
```

```
 1           (Before Jury, 11:13 a.m.)
 2               THE COURT:  Mr. Levin.
 3                         CROSS-EXAMINATION
 4    BY MR. LEVIN:
 5    Q.  Good morning, ma'am.
 6    A.  Good morning.
 7    Q.  Now, you've testified in a court of law before, have you
 8    not?
 9    A.  Yes.  Have I testified before?
10    Q.  Right.
11    A.  Yes, yes.
12    Q.  And I know you were rather emotional on your direct
13    examination, but your tears seem to have subsided since the
14    defense attorneys got up here and started asking you questions.
15    A.  Well, during the break, I was able to recuperate.  I think
16    it's very difficult for me to talk about my responsibility and
17    then what I did, it's very hard for me to accept, and that's
18    why I get emotional, because it's hard to -- it's hard to
19    admit.
20    Q.  Let me bring you back to happier times.
21               MR. LEVIN:  Your Honor, pursuant to stipulation, I
22    would be introducing into evidence Defense Exhibit 1-O.
23               THE COURT:  Give me a second.
24               MR. LEVIN:  Yes, Your Honor.
25               THE COURT:  Okay.  So 1-O of Defendant Ruiz will be
```

1    received in evidence.

2              MR. LEVIN:  Permission to publish?

3              THE COURT:  Yes.

4    BY MR. LEVIN:

5    Q.  Who is that?

6    A.  That's me, and she was like a medical assistant.  She would

7    help in the kitchen and with the patients.

8    Q.  And that's you?

9    A.  Yes, it is.

10   Q.  And you were 21 back then?

11   A.  I was 21, yeah, when I started.

12   Q.  Where did you grow up, ma'am?

13   A.  In Miami.

14   Q.  You come from a religious background, correct?

15   A.  Yes, I do.

16   Q.  And you got this job through your aunt, who was Armando

17   Gonzalez's housekeeper?

18   A.  Yes.

19   Q.  And have you -- had you met Mr. Gonzalez before you went to

20   work there?

21   A.  No.

22   Q.  Now, you met with the agents in this case, as Mr. Rabin

23   brought out, a number of times, about seven times; is that

24   correct?

25   A.  I don't remember an exact number, but yes, I've met with

```
 1    them.
 2    Q.  Well, let's just go through the dates again, just so it's
 3    real clear.  December 14th of 2011, correct?  Does that sound
 4    about right?
 5    A.  Yes.
 6    Q.  And then a week later on the 21st, 2011, right?
 7    A.  Yes.  I don't remember exact dates, but I know I met with
 8    them in December of 2011.
 9    Q.  Okay.  And then again January 11th of 2012, a couple of
10    weeks after that?
11    A.  Okay.  I mean, like I said, I don't remember exact dates.
12    Q.  Okay.  But it's about seven times, right?
13    A.  Yes, I believe.
14    Q.  All right.  And it wasn't until -- as Mr. Gonzalez brought
15    out, it wasn't until November the 9th of 2014, which was about
16    six days after this trial began, when you told the agents that
17    my client was present for some kind of a prayer session,
18    correct?
19    A.  Yes, yes, correct.
20    Q.  And you met with Special Agent Cox, right?
21    A.  I've met with him before.
22    Q.  I'm asking you on that day, on November the 9th, 2014,
23    approximately nine days ago --
24    A.  Yes.
25    Q.  -- you met with Special Agent Cox, correct?
```

1    A.  Yes.

2    Q.  And you had met with him before, correct?

3    A.  Yes.

4    Q.  You met with him a number of times before, right?

5    A.  I don't remember how many times before.

6    Q.  But you've already indicated that you met with the agents

7    at least seven times, right?

8    A.  Yes.

9    Q.  Starting as early as December of 2011, right?

10   A.  Yes.

11   Q.  And it wasn't until nine days ago that you told them that

12   my client, Blanca Ruiz, was present for a prayer session,

13   correct?

14   A.  Yes.

15   Q.  In fact, you thought my client's name was Barbara back in

16   2011, did you not?

17   A.  That was the first day that I went in -- I can -- I can

18   explain that.  That was the first day that I went in and it was

19   very overwhelming.  I went in without any representation.  I

20   was extremely overwhelmed, extremely emotional.  And when they

21   showed me the pictures, I did identify her as Barbara.  When I

22   was driving home, I remembered, hold on, that is not Barbara,

23   that is Blanca.  I called and, you know, once I had an

24   attorney, and we met again.  I explained to them, listen, I

25   misidentified her, this is not Barbara, this is Blanca.

1    So I apologize for that, but it wasn't that I didn't know

2    who she was.  It was just that I was extremely overwhelmed at

3    the time.

4    Q.  So you met with them twice before you actually identified a

5    picture and identified it was Barbara, correct?

6    A.  I don't remember which time after that it was.  I thought

7    it was the time after, but I guess I'm not correct.

8    Q.  So after you got the lawyer is when you were able to get

9    yourself together.  Is that what you're suggesting to the jury?

10   A.  Well, no, that's when I was able to communicate with them

11   again.

12   Q.  By the way, we've never met before, have we?

13   A.  No, we have not.

14   Q.  But we've spoken, haven't we?

15   A.  You called me.

16   Q.  I did.

17   A.  Yes.

18   Q.  And I asked to speak to you.  And what did you say?

19   A.  I said, I don't think you should be contacting me directly

20   because you should have been contacting my attorney.

21   Q.  I didn't know who your attorney was.

22   A.  I didn't know that you didn't know.

23   Q.  You wouldn't speak to me.

24   A.  I thought it would have been on file.  I don't know how

25   this -- how this works.

1    Q.  But you wouldn't speak to me, right?

2    A.  No, I would not.

3    Q.  Why wouldn't you speak with me?

4    A.  Because I've learned from the first time that I'm not going

5    to speak to anybody without representation.

6    Q.  Now, how many children do you have?

7    A.  I have two and I have a stepdaughter.

8    Q.  And how old is your oldest child?

9    A.  He is 10.  He'll be 11 in January.

10   Q.  So when you started working there, you had a baby?

11   A.  Yes, I did.

12   Q.  And you were -- it was a rather emotional time for you back

13   at that time, was it not?

14   A.  Yes, very emotional.

15   Q.  You were having problems with your -- the father of your

16   child, right?

17   A.  Still do.

18   Q.  And you were -- it was a constant source of distraction for

19   you, was it not?

20   A.  There were times where I got emotional at work.  I don't

21   think it was a distraction.  It wasn't an everyday distraction,

22   no.  There were a couple of times where I did get emotional at

23   work.

24   Q.  Are you on medication?

25   A.  No, I'm not on medication.  I only take medication on

1    occasion when I have a migraine.

2    Q.  Right.  Back in 2006, were you on antidepressants or any

3    other kind of medications?

4    A.  No, absolutely not.

5    Q.  Did you seek any kind of psychiatric care?

6    A.  No.

7    Q.  And the problems that you were having with the father of

8    your child was related to child support?

9    A.  Yes.

10   Q.  And his right to visit your child?

11   A.  We would argue about when he would come or sometimes he

12   would just disappear, not come, things like that.  Just

13   visitation, I guess, you know, every other weekend type of

14   situations.

15   Q.  Now, you're friends with a woman named Lisset Maza,

16   correct?

17   A.  Was, yes.

18   Q.  Was.  You're no longer friends?

19   A.  We no longer communicate for a very long time.

20   Q.  She was a very good friend of yours, wasn't she?

21   A.  She helped me.

22   Q.  She helped you when your mom passed?

23   A.  Well, she was -- my mom passed when I was 17.  I began

24   working when I was 21.  Those were things that I held onto.

25   The passing of my mom is unexplainable, so I remember I would

1   get emotional at times with her.  I believe she also lost her

2   mom and she would talk to me about it and try to help me cope

3   with it.

4   Q.  That's when you became friends, correct?

5   A.  Yes, that's when I became close with her.

6   Q.  And she worked at Health Care Solutions, did she not?

7   A.  Yes, she did.

8   Q.  And she worked at the West location with you?

9   A.  Yes, she did.

10   Q.  And how long did she work there for?

11   A.  I don't know.  She was there before me and then she left a

12   little bit before I left.

13   Q.  She never got in trouble, did she?

14   A.  I don't know.  I have no idea of what's going on with her.

15   I promise you, I do not know.  I do not know.  I do not look up

16   anybody, I do not seek to see what anybody has -- is going

17   through or has gone through.  I don't know.

18   Q.  You know she didn't get indicted in connection with this

19   case.

20   A.  I don't know.  And I have not asked.

21   Q.  But you know that she went and opened her own PHP, right?

22   A.  I do know that, yes.

23   Q.  When was the last time you spoke to her?

24   A.  Oh, many years ago.  I don't even know.  Before I even got

25   married.  I've been married almost six years.  I haven't talked

```
 1    to her in a very long time.

 2    Q.  Now, there was a census sheet that was one of your

 3    obligations, one of your jobs, right?

 4    A.  The admissions and discharges?

 5    Q.  No, a census sheet.  You know what a census sheet is?

 6    A.  Where the admissions and the discharges are?  Is that what

 7    you're talking about?  Or are you talking about the sign-in

 8    sheets?

 9    Q.  Right.  Admissions and discharges.

10    A.  Yes.

11    Q.  That was one of your responsibilities, correct?

12    A.  For a time period.

13    Q.  And you did that with John Thoen?

14    A.  Yes, he did it.

15    Q.  And Mr. Gonzalez.

16    A.  Well, he would oversee it.  He didn't really do it.

17    Q.  Right.  Now, you ultimately sent billing spreadsheets to

18    the biller, right?

19    A.  Yes.

20    Q.  And you kind of guessed that this person, the biller,

21    Donna -- do you know her last name?

22    A.  Hmm.  I don't remember.

23    Q.  You kind of guessed where she lived?

24    A.  I know it was up north.  Something with an S, I think.

25    Q.  Well, do you remember speaking to the agents --
```

1  A.  I know it's area code 239.  I remember that.

2  Q.  Okay.  You said Sarasota on direct examination.  Do you

3  remember that?

4  A.  'Cause that's -- it's an S and that's the one I think of,

5  but I know -- I remember the area code was 239.

6  Q.  Right.  But you said it's something with an S moments

7  ago --

8  A.  Yes.

9  Q.  -- right?

10  A.  I think so, yes.

11  Q.  Okay.  And you remember meeting with the agents on December

12  the 19th of 2011, correct?

13  A.  I know I met with them in December, yes.

14  Q.  And do you remember telling them that the biller was named

15  Donna and was located in Fort Myers?

16  A.  Oh, okay.  I don't know.  I just know it's an area code 239

17  and I don't know why S comes to mind.

18  Q.  You don't know why you guessed that it was Sarasota, right?

19  A.  I don't know.  It's too much information.

20  Q.  And you don't know why you guessed it was Fort Myers back

21  in December of 2011, right?

22  A.  I know it's area code 239.  I don't remember the exact

23  city.

24  Q.  But back in December of 2011, you said Fort Myers to the

25  agent, did you not?

1   A.  I don't remember.

2   Q.  Perhaps if I showed you a report, it might refresh your

3   recollection.

4   A.  I mean, yes, you can show me.

5           MR. LEVIN:  May I approach, Your Honor?

6           THE COURT:  Yes.

7           MR. LEVIN:  One moment, Your Honor.

8   A.  Yes, I see that I said Fort Myers.

9   BY MR. LEVIN:

10  Q.  So today you said it's Sarasota, then you said it was Fort

11  Myers, and now, really all you remember is that it was area

12  code 239.

13  A.  I know that it was area code 239 because I remember dialing

14  that number over and over again.  I just couldn't remember the

15  city.

16  Q.  So why did you tell them Fort Myers?

17  A.  Because that's what I remembered at the time.  That's what

18  came to my mind.  I don't remember the city.  I just know that

19  it's 239.

20  Q.  But on direct examination, you remembered the city of

21  Sarasota.

22  A.  That's what I stated, but I don't -- I don't remember the

23  city.  I didn't think it was that much of a -- I don't know.  I

24  just -- I didn't know the city.  I didn't remember the city.  I

25  just know that it's area code 239.

1    Q.   Is there anything else you want to correct in your

2    testimony?

3    A.   No.

4    Q.   Now, you testified in a prior proceeding in connection with

5    these matters, correct?

6    A.   Yes.

7    Q.   And you were asked questions about the so-called white

8    group, were you not?

9    A.   Yes.

10   Q.   And you were asked what the white group was in that

11   previous proceeding, were you not?

12   A.   Yes.

13   Q.   And you said that that was a list that you created with the

14   patients that were not attending, physically attending the

15   facility, but were being billed for.  Do you remember that?

16   A.   Yes.

17   Q.   How did you become aware of the white group, you were

18   asked.  Do you remember being asked that?

19   A.   Yes.

20   Q.   And you said John Thoen.

21   A.   Yes.

22   Q.   Do you remember that?

23   A.   Yes.

24   Q.   Never mentioned anything about Blanca Ruiz in that prior

25   proceeding.  Not that it was about Blanca Ruiz, but you never

1    mentioned anything about Blanca Ruiz, right?

2    A.  No.  It wasn't about her.

3    Q.  I understand that.  But you did meet with the FBI on

4    February the 20th of 2013, did you not?

5    A.  February the 20th of 2013.  I don't remember exact dates,

6    like I said.

7    Q.  It was one of the seven times that you met with them,

8    right?

9    A.  Yes.

10   Q.  And you were asked questions about the so-called ghost

11   group or white group, right?

12   A.  White group, yes.

13   Q.  Okay.  And the binder for the white group was kept at your

14   desk, you told them, right?

15   A.  Yes.

16   Q.  And on one occasion, John Thoen asked you to forge

17   signatures, right?

18   A.  Yes.

19   Q.  And did you forge signatures?

20   A.  No.  I kept it at my desk and then I went to him and told

21   him that I wasn't going to do it.

22   Q.  But somebody else forged signatures?

23   A.  Yes.

24   Q.  Gema Pampin?

25   A.  I don't know about Gema Pampin.

1    Q.  Donna Gonzalez?

2    A.  Dana?  I don't know about her.

3    Q.  Dana.  Dana Gonzalez?

4    A.  I don't know.

5    Q.  What about Lisset?

6    A.  I don't know.  The...

7    Q.  Were you going to say something?

8    A.  No, no, it's fine.

9    Q.  Okay.  When you were speaking to the agents, you told them

10   that the HCSN employees that you knew were aware of the ghost

11   group were John Thoen, Wondera Eason, Tom Layman, and Anna last

12   name unknown.  Right?

13   A.  That who knew about the white group?

14   Q.  Right.  Who knew about the white group.

15   A.  Everyone knew about the white group.  It was in the binder.

16   Q.  But those were the names that you told them about back in

17   February of 2013.

18   A.  Maybe I didn't name all the administrative staff.

19   Q.  You didn't mention Blanca Ruiz being aware of the white

20   group or ghost group, did you?

21   A.  At that time, I guess I didn't.

22   Q.  And you said that your memory seems to improve with time.

23   You're starting to remember things?

24   A.  Well, just things come to me.

25   Q.  They just come to you now eight years later; is that your

1    testimony, basically?

2    A.   Certain details come to me now, or come to me during -- you

3    know, once I would meet with them, there were things that I was

4    unclear about, and then when I would leave, that I would

5    continue thinking about it, it would come to me.  You know,

6    like when you forget somebody's name and then you leave that

7    person and then you're like, oh, that's their name, things like

8    that.

9    Q.   Like Barbara and Blanca.

10   A.   Exactly.

11   Q.   In truth and in fact, you didn't even know her last name,

12   did you?

13   A.   I couldn't say at the time.

14   Q.   You couldn't, at that time, say her last name.

15   A.   No.  When meeting with the -- with the government,

16   especially the -- you know, the first few times, it was

17   extremely overwhelming.  I was extremely emotional, you know?

18   And things would just come to me later when I was more calm.

19   Q.   Or would things be told to you later?

20   A.   Things were not told to me.  I was asked, but things were

21   not being told to me.

22   Q.   And your testimony is that you were able to come up with

23   the name Blanca Ruiz on your own.

24   A.   Yes.

25   Q.   Nobody corrected you to say, oh, are you talking about

 1    Blanca Ruiz?

 2    A.  No.

 3    Q.  That never happened.

 4    A.  No, they did not tell me her name.

 5    Q.  You testified that Marta, John, and Manny talked about the

 6    spreadsheets.

 7    A.  Yes, and -- yes.

 8    Q.  Anything else you want to say?

 9    A.  No.

10    Q.  Who is Marta?

11    A.  Marta was -- she worked at the East location.  She was like

12    the -- I guess the office manager.

13         MR. LEVIN:  Your Honor, by stipulation, Defendant Ruiz

14    would move into evidence Exhibit 1-V as in Victor.

15         THE COURT:  All right.  That will be received in

16    evidence.

17         MR. LEVIN:  Permission to publish?

18         THE COURT:  You may.

19    BY MR. LEVIN:

20    Q.  Who is the lady in the middle?

21    A.  It looks like Margarita.

22    Q.  Margarita?  Who's Margarita?

23    A.  She was a therapist.

24    Q.  What's her last name?

25    A.  I don't know.  I don't remember.

1  Q.  You worked with her -- that's you on the left, is it not?

2  A.  Yes, it is.

3  Q.  How often did you sit next to her?  Every day?

4  A.  Yes, every day for some time.

5  Q.  For about two years?

6  A.  No.  She came after I started.

7  Q.  When did you start?

8  A.  2006.

9  Q.  When did she come?

10 A.  I don't know, maybe a year, year and a half later.  I'm not

11 sure.

12 Q.  You worked inches away from this lady.

13 A.  Yes.

14 Q.  About 24, to be exact -- or approximately.  You're about

15 two feet away from her, right?

16 A.  Yes.

17 Q.  And all you can identify her as is Martha?

18 A.  Oh, no, no.

19 Q.  Or Margarita?  What did you say her name was?

20 A.  Yeah, this looks like Margarita.

21 Q.  You're not sure who that is?

22 A.  It doesn't look like -- I remember Marta with more of a

23 grayish hair.

24 Q.  So you're saying that that lady who sat next to you for at

25 least a year, you're saying her name is Margarita and you're

1   not even sure if that's her, right?

2   A.  Well, I'm just a little confused because you were

3   mentioning Marta, but this looks like Margarita.

4   Q.  Forget about Marta.  That's my mistake.

5   A.  Oh, okay.  So you were mentioning Margarita.

6   Q.  Forget about Marta.  Yes.  I mentioned Marta.  Who's Marta,

7   by the way?

8   A.  That's who I said was an office manager at the East.  But

9   this doesn't look like Marta, this looks likes Margarita, and

10  she was a therapist at the West.  Yes, at the West.

11  Q.  Okay.  This lady is Margarita?

12  A.  That's who it looks like.  I mean, the picture is a little

13  fuzzy.  And Marta also had hair like this, that's why I'm a

14  little confused, but that looks like Margarita.

15  Q.  Does that help?

16  A.  It still looks fuzzy, but yeah, that looks like Margarita.

17  Q.  Margarita.  What's her last name?

18  A.  I don't remember her last name.

19  Q.  Don't remember her last name.  Sat next to you, two feet

20  away at work for at least a year; would you agree with that?

21  A.  I think it was less than a year.  But we didn't go by last

22  names.

23  Q.  40 hours a week, five days a week, you don't know her last

24  name.  She sat two feet away from you.

25  A.  I don't recall her last name.

1   Q.  Now, this is you on the left, right?

2   A.  Yes, it is.

3   Q.  Do you remember you had some problems remembering in your

4   debriefing whether or not you had a laptop or a desktop?

5   A.  Yes.

6   Q.  Does that help you refresh your recollection as to whether

7   you used a laptop or a desktop?

8   A.  I said I didn't remember it being a desktop, that I was

9   pretty sure it was a laptop.  That's what I remember.

10  Q.  You're working on a laptop there, right?

11  A.  Yes, I am.

12  Q.  And what's behind you there?

13  A.  The white board.

14  Q.  Let me show you what's in evidence as Blanca Ruiz's

15  Exhibit 1-A.  Do you recognize that?

16  A.  Yes.  I think -- I think this is the first location.  I

17  think this was the first West location.

18  Q.  Did you work there?

19  A.  Yes.

20  Q.  Now, you said that the West came under review at some point

21  in time, right?

22  A.  Yes.

23  Q.  And that there was an office that was set up to do the

24  review?

25  A.  Yes.

1  Q.  And you said that Blanca just stayed at her desk and did

2  her work, correct?

3  A.  Blanca did not work on the review in that office that was

4  set up.  She had her own desk in the office where -- in that

5  same office that we previously just saw.  She's just at a

6  different angle.

7  Q.  (Photo shown on ELMO.)

8  A.  In that office.

9  Q.  She stayed in this office.

10  A.  Yes.

11  Q.  So when the review office was set up, I think you said it

12  might have been the -- I don't know what you said, in the

13  kitchen maybe?

14  A.  No.  It was by the kitchen.  There was -- it was like a

15  warehouse, so it was like in the garage area.

16  Q.  Okay.

17  A.  There was like an office set up there.

18  Q.  Blanca did not participate in the review, right?

19  A.  I know she did biopsychosocials.

20  Q.  She stayed in this office at her desk, correct?

21  A.  She stayed at that office at her desk and there was an

22  office set up for the review as well, because Alina Fonts

23  didn't have a desk, didn't have an office.  Neither did Gema or

24  Dana have an office in that facility.

25  Q.  Did you not testify on direct examination that when you

```
 1   went into the office to do the reviews, Blanca stayed at her
 2   desk?
 3   A.  Yeah, she stayed at her desk.
 4   Q.  Thank you.
 5        MR. LEVIN:  Your Honor, by stipulation, we would move
 6   into evidence Blanca Ruiz's Exhibit 1-J.
 7        THE COURT:  All right.  That's in evidence.
 8        MR. LEVIN:  Permission to publish.
 9        THE COURT:  Yes.
10   BY MR. LEVIN:
11   Q.  Ma'am, do you recognize this paragraph?
12   A.  Those are two -- I don't recognize so much the lady on the
13   right, but she was a patient, the one sitting.
14   Q.  Right.  The one sitting is a patient?
15   A.  Yes.
16   Q.  What about the one to her left?
17   A.  I don't recall her face very much.
18   Q.  But you recognize the lady sitting as a patient?
19   A.  Yes.
20   Q.  Did you have any interaction with her?
21   A.  I had interaction getting their -- you know, the consents
22   signed.
23   Q.  I can't hear you, ma'am.
24   A.  I had interaction with the patients getting the consent
25   forms signed.
```

```
 1    Q.  Do you have a specific recollection of meeting with that
 2    woman?
 3    A.  She looks familiar to me, like I know she's a patient.  I
 4    just can't see, you know, a picture in my mind where I'm
 5    getting her consents.  But it very well could have.
 6    Q.  Was she a proper patient for a partial hospitalization
 7    program?
 8    A.  I don't recall.
 9         MR. LEVIN:  Your Honor, by stipulation, Blanca Ruiz
10    would move into evidence 1-K.
11         THE COURT:  Okay.
12         MR. LEVIN:  Permission to publish.
13         THE COURT:  Yes.
14    BY MR. LEVIN:
15    Q.  Do you recognize this photograph?
16    A.  I recognize the people.  I don't recognize when it was
17    taken.
18    Q.  Okay.  Who is this lady here?
19    A.  She is a nurse.
20    Q.  And what's her name?
21    A.  Marielena, Mariela, something like that.
22    Q.  Can you -- can you repeat that?  I'm sorry.
23    A.  Mariela or Marielena, something of that nature.
24    Q.  Okay.  Mariela or Marielena.
25    A.  Yes.
```

1    Q.  You don't know her last name.

2    A.  We didn't go by last names.

3    Q.  So you didn't go by last names, so how is it that you

4    ascertained Blanca Ruiz's last name?

5    A.  Blanca is somebody that I was very close to.  I know her

6    last name.

7    Q.  But you're saying that at work, you didn't go by last

8    names.

9    A.  No.

10   Q.  And what about this gentleman here?

11   A.  John.

12   Q.  John?

13   A.  John, yes.

14   Q.  Do you know his last name?

15   A.  John Thoen.

16   Q.  So you know John Thoen's last name?

17   A.  Yes.

18   Q.  You know his last name from the various meetings you've had

19   with the agents, correct?

20   A.  No, I just -- I know John Thoen.  There were certain people

21   that I was closer to that, you know, I knew, you know, on a --

22   pretty much on a personal level, and they're just the people

23   that you're closer to and you end up knowing more about them.

24        Mariela was -- or Marielena was there during the morning

25   times.  You know, she was a nurse.  She wasn't in the same

1    office.  John Thoen was somebody that I interacted with daily.

2    You know, it's just certain people you know a little more

3    about.

4            MR. LEVIN:  Your Honor, by stipulation, I'd move into

5    evidence Ruiz Exhibit 1-W.

6            THE COURT:  Okay.

7            MR. LEVIN:  Permission to publish.

8            THE COURT:  Yes.

9    BY MR. LEVIN:

10   Q.  Do you recognize the individuals depicted in this photo?

11   A.  Hortensia and Walter.

12   Q.  Hortensia is this -- the lady there?

13   A.  Yes.

14   Q.  And this is Walter?

15   A.  Yes.

16   Q.  Do you know either of their last names?

17   A.  Hortensia, I can't remember.  Walter, I can't remember at

18   this time.  I'm sorry.

19   Q.  Now, Hortensia, she wasn't charged in connection with this

20   case, was she?

21   A.  I'm sorry?

22   Q.  She wasn't charged in connection with this case, was she?

23   A.  I don't know.

24   Q.  You don't know who was charged in this case, right?

25   A.  Only the people that -- the only people I know of is the

```
 1   people that I have -- like Wondera, John Thoen, and we were

 2   arrested at the same time.  I know Manny, but I don't know

 3   everybody that was or the people that haven't been or weren't,

 4   I don't know.

 5   Q.  What about Anna de la Nuez?

 6   A.  Anna?

 7   Q.  Anna.

 8   A.  I know Anna.

 9   Q.  How do you know her?

10   A.  She worked in the same office as Blanca and I.

11   Q.  She wasn't arrested in this case, was she?

12   A.  I don't know.

13   Q.  You don't know that either?

14   A.  I don't know.

15   Q.  Okay.  Now, your understanding with regard to your plea

16   agreement is if you don't tell the truth, you can be charged?

17   A.  Yes.

18   Q.  Charged with what?

19   A.  Not telling the truth.

20   Q.  Okay.  Perjury?

21   A.  Yeah.  Is that what it's called?

22   Q.  Do you have a lawyer?

23   A.  Yes.

24   Q.  Did your lawyer counsel you?  Did your lawyer counsel you?

25   A.  Yes.
```

1  Q.  Did your lawyer give you legal advice?

2          MR. STEWART:  Objection, Your Honor.

3  BY MR. LEVIN:

4  Q.  I'm not asking what the advice was.  I'm asking whether she

5  got counsel.

6          MR. STEWART:  Same objection.

7          MR. MEDINA:  Objection.

8          THE COURT:  Overruled.

9  BY MR. LEVIN:

10  Q.  Did you get counsel from your lawyer?

11  A.  Yes.

12  Q.  Okay.  You've had this lawyer since, what, your third

13  meeting with the FBI?

14  A.  She came in after my first meeting.  I don't remember

15  exactly what meeting she started attending with me.

16  Q.  Well, you previously testified that after your first couple

17  of meetings when you were extremely nervous, you then got a

18  lawyer and then that's when you started to feel more collected.

19  A.  I did.

20  Q.  That's my word.

21  A.  I had another lawyer previous to Brittney.

22  Q.  Oh, you had one lawyer before Brittney.

23  A.  Yes, that went with me, you know, the other time that I had

24  to go, and then I switched to Brittney.

25  Q.  When you say Brittney, you're talking about Brittney -- is

1   it Horstman?

2   A.  Horstman.

3   Q.  Horstman.  When did you leave Health Care Solutions?

4   A.  2008.

5   Q.  Now, who is Marta?

6   A.  We're talking about Marta now?  Marta?

7   Q.  Who was she?

8   A.  She was the, like, office manager at the East location.

9   Q.  And she trained you, did she not?

10  A.  To do the billing spreadsheet.

11  Q.  Right.  Did she train you to fabricate the billing

12  spreadsheet?

13  A.  She told me I had to put a 3 for everyone unless they were

14  in the hospital, to put an H.

15  Q.  She was never charged either, was she?

16  A.  I don't know.

17  Q.  What about Lisset Palmero, did you have a relationship with

18  her?

19  A.  She replaced Marta, yes.

20  Q.  How did you get along with her?

21  A.  Okay, I guess.

22  Q.  You said that -- give me one second.  Did you say that

23  Ms. Ruiz was a supervisor of therapists?

24  A.  For a short time -- sorry, for a short time when they were

25  getting the North Carolina facility set up, there were times

1    where Manny and John Thoen were both out.  During that time,

2    Blanca would supervise the therapists and Wondera the staff,

3    like the kitchen staff, and she would take responsibility for

4    that.

5    Q.   So Blanca supervised the kitchen staff?

6    A.   No, no, no, no, the therapists.  And then Wondera would

7    supervise the other administrative staff, as well as the

8    kitchen staff and, you know, the medical assistants, the woman

9    in the picture that you previously saw.

10   Q.   So Blanca never supervised any therapists.

11   A.   Yes, she did.

12   Q.   Who did she supervise?

13   A.   Lisset.

14   Q.   Lisset was a therapist?

15   A.   Yes, because there's a Lisset Maza and there's a Lisset

16   Palmero.  Lisset Palmero was from the East location.  Lisset

17   Maza was a therapist at the West location.

18   Q.   Okay.  Who else?

19   A.   (Coughing.)

20   Q.   Do you need some water?

21   A.   No, I have some.  It's just --

22        Lily, Lisset, Ruben, Alina, I think those were the four

23   that were there during that time.

24   Q.   So your testimony is that Blanca Ruiz supervised Ruben

25   Busquets?

1   A.   Yes.  There was a time period, remember, when both of them

2   were out, when John Thoen and Manny were out in North Carolina.

3   Q.   You had indicated that some of the patients soiled

4   themselves?

5   A.   Yes.

6   Q.   That doesn't necessarily mean that they're not PHP

7   eligible, does it?

8   A.   When they're to a point of their health where they're

9   incapable of knowing whether they have to go or not, I think

10   that's where the -- you know, the line is crossed.  These

11   people were so elderly, they just didn't -- they didn't know

12   when they had to go and they would go, you know?  A lot of them

13   would wear diapers.

14   Q.   You're not a psychotherapist, are you?

15   A.   No, I'm not.

16   Q.   You were basically a receptionist, were you not?

17   A.   Yes.

18   Q.   Now, you indicated that Blanca did biopsychosocials?

19   A.   Yes.

20   Q.   And she did them in a room there with a nurse, did she not?

21   A.   I'm sorry?

22   Q.   She did them in a room with a nurse, did she not?

23   A.   No, she did it at her desk.

24   Q.   Did it at her desk.

25   A.   Yes.

1  Q.  Let me show you what's in evidence as Ruiz's Exhibit 1-B.

2  Do you recognize this?

3  A.  Yes.

4  Q.  What is that?

5  A.  A desk.  The desk -- one of the desks in the office where

6  we worked.

7  Q.  Is that where the biopsychosocials took place?

8  A.  No.  Oh, I'm sorry, that's a nursing bed.  This is a

9  nurses' office.

10  Q.  It's a nurses' office, right?

11  A.  Yes.

12  Q.  Did biopsychosocial assessments take place in the nurses'

13  office?

14  A.  No, they did not.

15  Q.  And you're certain of that.

16  A.  Yes.

17  Q.  You're aware that Ms. Ruiz is just an intern, right?

18  A.  I am.

19  Q.  You were aware of it at that time, too, right?

20  A.  Yes, I am.

21  Q.  You talked about Dr. Villamil.  Do you remember that?

22  A.  Yes.

23  Q.  And he would come to the West location every Thursdays?

24  A.  Yes.

25  Q.  And he would sign files, right?

1    A.   I don't know if he would sign files.  I would give him the

2    face sheets for the new admissions.

3    Q.   Okay.  And how long did he stay at the West location?

4    A.   An hour or two.

5    Q.   An hour or two?

6    A.   Yeah.

7    Q.   Did you watch him come in and watch him leave?

8    A.   He would arrive around 9:30, 10:00, and he would leave at

9    like lunchtime, before lunchtime, before the clients'

10   lunchtimes, which I believe, if I'm not mistaken, was like

11   12:00.

12   Q.   What day of the week did he come?

13   A.   Thursdays.

14   Q.   And did you see Ms. Ruiz give him files to sign?

15   A.   I don't recall.

16   Q.   Did you work in the same office with her?

17   A.   Yes.

18   Q.   She was within your sight, right?

19   A.   Yes.

20   Q.   And you don't remember her bringing files for Dr. Villamil

21   to sign?

22   A.   I don't remember.

23   Q.   Do you know what the paparazzi is?

24   A.   A paparazzi?

25   Q.   Right.

1    A.  People that take pictures?

2    Q.  Right.

3    A.  Yes.

4    Q.  Did you ever see any kind of like paparazzi-like procession

5    when Dr. Villamil would come to the office, with people running

6    over to him, getting him to sign files?  Are you looking at the

7    government table for any particular reason?

8    A.  No, I was looking at the lights --

9    Q.  Oh, okay.

10   A.  -- because I'm trying to think of a -- I mean, I don't

11   remember people running to him with files.

12   Q.  You don't remember that.

13   A.  No.

14   Q.  And had people --

15   A.  I know that he was in there working.  I mean, he was --

16   when I would walk in there and give him face sheets, I would

17   see files, but I wouldn't see who would go and who would give

18   it to him or -- I mean, his office wasn't where my office was.

19   You would have to go, you know, into another hallway, so --

20   Q.  But the people that would bring him files worked with you,

21   right?

22   A.  I mean, the people -- yeah, I mean, the files that were

23   there were from the facility.

24   Q.  And had there been any kind of like paparazzi procession

25   with people gathering files and running to see Dr. Villamil for

1    his signature, you certainly would have remembered that, right?

2    A.  I remember seeing files on his desk.  I don't know who

3    would put them there or how it would go about.  He would only

4    come on Thursdays, so --

5    Q.  If there was a paparazzi-like procession of people running

6    to meet with Dr. Villamil to sign files, that's something you

7    would have certainly noticed, correct?

8    A.  I didn't see anybody running.  I mean, he was -- it's more

9    like patients wanting to hound him and see him.

10   Q.  Patients.

11   A.  Yeah.

12   Q.  Patients would want to meet with Dr. Villamil.

13   A.  They would request when they would see him.

14   Q.  Now, you recall the day that Ms. Ruiz was fired.

15   A.  Yes, I do.

16   Q.  And she was upset, she was angry, correct?

17   A.  Yes, she was very upset.

18   Q.  And she said that, according to you, she was going to get

19   back at Manny?

20   A.  Yes.

21   Q.  But you don't remember specifically what she said.

22   A.  She didn't say specifics.

23   Q.  You testified about a meeting I believe John Thoen had

24   organized with Mr. Gonzalez advising staff that the West was

25   under review?

1    A.   Yes.

2    Q.   And where did that meeting take place?

3    A.   In that office that we were at, our office.

4    Q.   Where in your office?

5    A.   Right -- he just stood there inside the office.

6    Q.   In the office that you sat?

7    A.   Yes.

8    Q.   Where your desk was?

9    A.   Yes.

10   Q.   And who was present for that meeting?

11   A.   There were therapists there, Alina Fonts, Lisset, Lily,

12   Ruben, Hortensia, Margarita, Blanca, Anna, myself, and I think

13   that's about it.

14   Q.   Are you talking about this office?

15   A.   Yes.

16   Q.   It's not a very big office, is it?

17   A.   No, it's not.   Therapists were actually sitting on the

18   floor.

19   Q.   So there were about 16 people stuffed into this office --

20   A.   Yes.

21   Q.   -- is what you're basically telling us?

22   A.   Yes, and there were therapists sitting on the floor.

23   Q.   And that's certainly something anybody in attendance would

24   remember, right, people sitting on the floor?

25   A.   I remember.

1    Q.  Well, I mean, you'd have to -- if you tried to get up,

2    you'd have to walk over bodies; would you agree with that?

3    A.  Yeah, we -- well, I mean, you're seeing half of the office.

4    There's another half that you're not seeing as well.

5    Q.  Is this the same office in the background?  Is that it?

6    A.  Yes.

7    Q.  Is that the other half we're not seeing?

8    A.  I mean, you're seeing partial of the other half.

9    Q.  All right.  So there are about 16 people in this room,

10   including my client?

11   A.  Yes.

12   Q.  And you have a specific recollection of that day?

13   A.  I remember that day.

14   Q.  Did you ever tell the agents about that meeting?

15   A.  Yes.

16           MR. LEVIN:  One moment, Your Honor.

17   BY MR. LEVIN:

18   Q.  So is nine days ago when, for the first time, you told the

19   agents about the prayer over the files?

20   A.  It wasn't the first time I told them about the prayer.

21   Q.  Didn't you testify before that it was the first time you

22   had told them about praying over the files?

23   A.  That may have been the first time I mentioned Blanca, but

24   it wasn't the first time I mentioned the prayer.

25   Q.  Okay.  So you had told them about the prayer before.

```
1    A.  Yes.

2    Q.  But when you told about them -- when you had told them

3    about the prayer before, Blanca was not there, right?

4    A.  We weren't talking about Blanca at that time.

5    Q.  Well, you were talking about everybody when you were

6    meeting with the FBI, right?

7    A.  During the time that we spoke about it, it was regarding

8    another case that I went to testify for.

9    Q.  Well, they asked you who was present, did they not?

10   A.  I believe so.  I don't remember.

11   Q.  You didn't limit -- you didn't limit it to just whatever

12   you were talking about at that particular time, did you?

13   A.  Well, that was the focus.

14   Q.  Right.  The focus.  Just like nine days ago it was the

15   focus, and that's the very first time you said Blanca was

16   present in some so-called prayer meeting, right?

17   A.  Yes.

18   Q.  Had you been keeping track in this trial in terms of like

19   when it started?  Had your lawyer --

20   A.  What do you mean, when it started --

21   Q.  Yeah.  Do you know when this case started?

22   A.  The case?

23   Q.  This trial, sorry.

24   A.  Like a week ago, week and a half?

25   Q.  How do you know that?
```

1  A.  Because my attorney let me know.

2  Q.  When you testified in a prior proceeding, was your lawyer

3  in the courtroom?

4  A.  I'm sorry?

5  Q.  When you testified in a prior proceeding --

6  A.  No.

7  Q.  You heard the answer -- you heard the question the first

8  time.

9  A.  Well, I didn't hear the first part.  Was my lawyer present

10  during the last time I testified?

11  Q.  Yes.

12  A.  No, she was not.

13  Q.  You had heard my question initially, hadn't you?

14  A.  I didn't hear the beginning of it.

15  Q.  You're taking a little -- you're taking time to think about

16  your answers, right?

17  A.  I'm not taking time.  I didn't hear the first part of the

18  question.

19  Q.  You heard the part "lawyer in the courtroom"?

20  A.  Prior proceeding.

21  Q.  You got the impression, being around Mr. Gonzalez, that he

22  was kind of like a mafia guy.

23  A.  They gave that impression.

24  Q.  Who is "they"?

25  A.  John Thoen and -- pretty much John Thoen.  He would mention

1    that like Manny had connections with people in high places or

2    he had like a cousin that was some form of -- in some form of

3    politics or something.

4    Q.  So -- but was it your impression that he was like a

5    mafioso?  Did you ever use that word before?

6    A.  Yes.  When I -- when I left Health Care Solutions, I didn't

7    want anybody to know because I wasn't sure how -- if he was

8    involved in that or how involved he was.  I just didn't want to

9    take any chances.

10   Q.  The question I asked was:  Did you ever use the word

11   mafioso before.  That was the question I asked.

12   A.  Yes.  I didn't know if he was some type of mafioso.

13   Q.  Ma'am, the question was, have you ever used --

14   A.  Yes.

15   Q.  -- the word mafioso before?

16   A.  Yes, I said yes.

17   Q.  Okay.  Do you recall meeting with the agents in June 7th of

18   2012, describing Mr. Gonzalez as like mafioso?

19   A.  I know I mentioned that.  I don't remember when.

20   Q.  Would you like to review the report to see if it refreshes

21   your recollection?

22   A.  If you would like me to review it.  I know I've said that.

23   Q.  Okay.  Now, you did your intakes on your laptop?

24   A.  Yes.

25   Q.  And there was a template that was created for the intake?

42

```
 1    A.  After some time.

 2    Q.  There's nothing sinister about a template, right?  There's

 3    nothing wrong with a template, right?

 4    A.  I don't think so.

 5    Q.  Are you working now?

 6    A.  Yes, I am.

 7    Q.  Where do you work?

 8    A.  Aviation.

 9    Q.  Sorry?

10    A.  An aviation company.

11    Q.  You're not in the mental health field anymore?

12    A.  No.

13    Q.  Are you allowed to be in the mental health field?

14    A.  No.

15    Q.  Did you go to school to be a therapist?

16    A.  No.

17    Q.  A speech therapist?

18    A.  Yeah, a speech.  Well, I started.  I couldn't finish.

19    Q.  Couldn't finish because --

20    A.  Of my arrest.

21    Q.  And where did you go -- do your undergrad?

22    A.  I'm sorry?

23    Q.  Where did you do your undergraduate work?

24    A.  In Nova Southeastern University.

25    Q.  And what degree did you earn there?
```

1    A.  A bachelor's in psychology.

2    Q.  Do you know a guy named Alex from HCSN?

3    A.  A driver?

4    Q.  Right, a driver.

5    A.  Yeah, there was a guy named Alex, a driver.

6    Q.  Did he come into your office sometimes to make sure

7    patients wouldn't leave?

8    A.  What do you mean into my office?

9    Q.  Well, did you state on -- during your testimony that

10   certain patients would leave?

11   A.  He would stand by the door, by the front door where the

12   lobby.

13   Q.  Right.  And he would prevent people from leaving, right?

14   A.  Yeah.

15   Q.  So they didn't leave, people didn't leave.  You said before

16   that they left.

17   A.  No, there were times that they would leave if he wasn't

18   there present at the time.  I think it was after a situation

19   that occurred is when they started making a driver -- it wasn't

20   always Alex, it was a driver that would have to stand there --

21   well, sit, they had a chair right by the door -- in order to

22   prevent patients from leaving.

23   Q.  Now, were you married when you were working there?

24   A.  No.

25   Q.  Was your boyfriend the computer guy?

```
1    A.  Yes.

2    Q.  Is this your husband now?

3    A.  Yes.

4    Q.  Mr. Keller?

5    A.  Yes.

6    Q.  What's his first name?

7    A.  Shawn.

8    Q.  So John Keller?

9    A.  No, Shawn.

10   Q.  Excuse me, Shawn Keller, he was the computer guy at HCSN.

11   A.  Well, he would come in on -- you know, occasionally.  He

12   wasn't there like on a daily basis.  Whenever there was any

13   type of -- like the printer wasn't working or, you know, things

14   of that nature.

15   Q.  Did he help create the template?

16   A.  No.

17   Q.  Did he help make the billing spreadsheets?

18   A.  No.

19   Q.  He just fixed computers when they were broken.

20   A.  Exactly.

21           THE COURT:  Do you have more than a minute or two?

22           MR. LEVIN:  Probably not.  Probably not.  I'm winding

23   it up.  I'm wrapping it up.

24           THE COURT:  I have a 1 o'clock hearing, so I have to

25   give my court reporter lunch.
```

1    MR. LEVIN:  I've got two or three questions.

2    THE COURT:  You can have as much time as you want.

3  We'll just do it after lunch.

4    MR. LEVIN:  I'll just do it after lunch.  I don't want

5  to -- I'll do it after lunch.  That's fine.

6    THE COURT:  So are you all getting pizza today?  So

7  you want to come back at 1:30 instead of 1:45 or do you still

8  want 1:45?  You pick.

9    JUROR:  1:30.

10    THE COURT:  One voice said 1:30.  All right.  See

11  everybody back at 1:30.

12    (Jury not present.)

13    THE COURT:  Please be seated, everyone.  We're here in

14  open court outside the presence of the jurors, but everybody

15  else is here.  If Mr. Levin finishes in a few minutes, how much

16  redirect do you have?

17    MR. STEWART:  I guess it would depend on the final

18  questions, but at this point in time, we don't have any

19  redirect.

20    The witness is actually still here, Your Honor.

21    THE COURT:  Okay.  And she can hear the schedule.

22    MR. STEWART:  That's fine.  Of course.

23    THE COURT:  And then you're going to be resting?

24    MR. MEDINA:  That's correct, Your Honor.

25    THE COURT:  All right.  And how long do you think it's

1    going to take to argue the Rule 29s?

2            MR. RABIN:  I anticipate they'll be brief.

3            MR. PALOMINO:  Very brief.

4            THE COURT:  Okay.  And if we have an evident --

5            MR. GONZALEZ:  (Cross-talking) if I have to argue, it

6    will be, which I don't think I should, but --

7            THE COURT:  If we have an evidentiary hearing on the

8    issue relating to Ms. Feas, who would be called at that

9    hearing?

10           MR. RABIN:  I would call Ms. Feas, Mr. Weintraub, and

11   Mr. Medina.

12           THE COURT:  Mr. Weintraub is her lawyer?

13           MR. RABIN:  Correct.

14           THE COURT:  Where is he?  He's here, okay.  So we can

15   do that right after -- and how long is that hearing going to

16   take?

17           MR. RABIN:  I have some documents to introduce and

18   testimony of Ms. Feas.  I anticipate probably we could do it

19   within an hour.

20           THE COURT:  When you say Ms. Feas -- first you said

21   Ms. Feas, Mr. Weintraub, and Mr. Medina, and then just now, you

22   said Ms. Feas.  So are you going to put on all three witnesses?

23           MR. RABIN:  Right.  But I don't believe any of them

24   are going to be extremely long.

25           THE COURT:  I know.  But in your estimate, you said

1    Ms. Feas is an hour.  You mean all three witnesses, an hour?

2             MR. RABIN:  I'm saying all three because the issue is

3    relatively narrowly defined, so I believe I can probably put on

4    everything I need to put on within an hour.

5             THE COURT:  And do you agree with that time estimate,

6    Mr. Medina?  Are there any other witnesses you would be calling

7    on that issue?

8             MR. MEDINA:  No, Your Honor.  No other witnesses.

9             THE COURT:  Does anybody have any case law they want

10   to give me now so when I have the hearing, I know what --

11            MR. RABIN:  Absolutely.

12            THE COURT:  -- questions are relevant or not relevant

13   so I can look at those over lunch?

14            MR. RABIN:  Absolutely.  We have case law for the

15   Court.

16            MR. MEDINA:  Your Honor --

17            THE COURT:  I'm going to have several cases myself,

18   but let me just -- give me whatever you want me to consider and

19   I'll read it over lunch.

20            MR. RABIN:  Okay.  Perfect.

21            THE COURT:  Okay.  All right.  We'll see everybody

22   back at 1:30 -- well, that's not true.  Carly and I will be

23   back at 1:00.

24       (Recess, 12:12 p.m. to 1:35 p.m.)

25            MR. STEWART:  Your Honor, would you like the witness

1    to return to the stand at this time?

2          THE COURT:  Yes.

3      (Jury Present.)

4          THE COURT:  All right.  Welcome back, everyone, and

5    please be seated.

6          All right.  Mr. Levin.

7          MR. LEVIN:  May it please the Court.

8          Ladies and gentlemen, good afternoon.

9    BY MR. LEVIN:

10    Q.  Ma'am, just a few more questions.

11          MR. LEVIN:  Your Honor, by stipulation, Blanca Ruiz

12    would move into evidence Exhibit 1-S as in Sam.

13          THE COURT:  All right.  1-S is in evidence.

14          MR. LEVIN:  Also, stipulation 1-T, 1-U, 1-R, and I

15    think V is already in evidence.

16          THE COURT:  B as in boy?

17          MR. LEVIN:  No, V as in victory.

18          THE COURT:  Yes, it is.  All right.  So all those

19    exhibits are in evidence.

20          MR. LEVIN:  Thank you, Your Honor.  Permission to

21    publish.

22          THE COURT:  Yes.

23          MR. LEVIN:  Thank you.

24    BY MR. LEVIN:

25    Q.  Ma'am, we had spoke of this picture earlier.  The gentleman

1   in the back, I don't believe I asked you about him.  Who is
2   that?
3   A.   I don't recall.  I'm trying to figure out who that is.  I
4   believe he was a therapist that was there for a short time.
5   Q.   Do you know his name?
6   A.   I don't.
7   Q.   You believe he was a therapist, I believe you said?
8   A.   Yes, for a short time.  He must have been there for a very
9   short time because I just don't...
10  Q.   I'm sorry?
11  A.   I don't recall.  Like the face looks familiar as a
12  therapist that was there for a -- must have been a short time
13  because I don't recall his name or anything.
14  Q.   Okay.  Let me show you 1-S.  Do you recognize these
15  individuals?
16  A.   I think they're both therapists, but I don't remember
17  neither name.
18  Q.   You think they're both therapists, but you don't remember
19  their names.
20  A.   Oh, no, she was not a therapist.  She was a friend of Manny
21  Gonzalez's wife and she -- she would like buy things for the
22  facility, like food and so forth.  She was not a therapist.
23      And him, I believe he was a therapist, but I do not
24  remember his name.
25  Q.   All right.  So he was a therapist?

1    A.  I don't recall his name.

2    Q.  Okay.  And do you know how long he worked there?

3    A.  It must have been a short time as well.

4    Q.  Must have been a short time as well?

5    A.  Yes, because I don't, like, recall his name.  Like he

6    wasn't someone that I interacted with daily, on a daily basis

7    much time.  If not, I would have remembered his name.

8    Q.  How about the lady sitting in the background, does she look

9    at all familiar?

10    A.  She was one of the like medical assistants and she would

11    help with the kitchen as well.

12    Q.  What was her name?

13    A.  I believe her name is Mayra.  I'm not too sure.

14    Q.  How long did she work there?

15    A.  I don't recall exactly.

16    Q.  Now, this office wasn't like -- it was one floor, right?

17    It was all one floor.

18    A.  Yeah, it was one floor.

19    Q.  It wasn't like there was an upstairs, right?

20    A.  No.

21    Q.  And this lady who worked in the kitchen, that would have

22    been like right next to your office, right?

23    A.  Yes.

24    Q.  And you don't remember her name and you don't know how long

25    she worked there.

1   A.  I mean, I don't recall exact dates.  I believe her name is

2   Mayra.

3   Q.  But you're really guessing right now, aren't you?

4   A.  It's not that I'm guessing.  It's that that's what comes to

5   mind, Mayra.

6   Q.  Who is the gentleman in the forefront?

7   A.  Ruben.

8   Q.  Do you know his last name?

9   A.  Busquets, Busquets, Busquets (pronouncing)?

10  Q.  Are you sure -- you're sure of that, right?

11  A.  I think that's how you pronounce it, Busquets.

12  Q.  Okay.  And the lady seated at the table?

13  A.  Lisset Maza.

14  Q.  And that was a woman that you had befriended approximately

15  four years before you started working there?

16  A.  Before?

17  Q.  Right.

18  A.  No, no, not before.  While I worked there.  I said my mom

19  passed away when I was 17 and those were still things that I

20  was coping with, and she helped me, you know, deal with some --

21  some days I felt emotional and, you know, she would talk to me

22  about it, but I did not befriend her four years prior, no.

23  Q.  Do you remember speaking with the agents on December 21st

24  of 2001?

25  A.  2001?

1   Q.  Excuse me, 2011.

2   A.  I mean, I know I spoke to them in December, like I

3   mentioned.

4   Q.  Right.  Do you remember telling the agent that you

5   established a relationship years ago with Lisset Maza after

6   your mother died?

7   A.  Years ago must have been years ago from 2011, but not years

8   ago prior to my employment there.  I did not know Lisset prior

9   to my employment at Health Care Solutions.

10  Q.  Did you socialize with her?

11  A.  At work?  Yes.

12  Q.  Did you socialize with her after work?

13  A.  I went to a Halloween party because her birthday is near

14  Halloween, I went one time, and we would have lunch together on

15  occasion, but it wasn't like consecutively, you know.  It was

16  once in a while.

17  Q.  What about the lady, referring again to Ruiz's Exhibit 1-T,

18  in the background with the turquoise top?

19  A.  Anna.

20  Q.  What's her last name?

21  A.  De la Nunez?

22  Q.  I'm sorry?

23  A.  De la Nunez?

24  Q.  De la Nunez?

25  A.  I don't -- I am not sure.

```
 1    Q.  And can you tell who this is over here?

 2    A.  Yes, Hortensia.

 3    Q.  And do you know her last name?

 4    A.  No, I'm sorry.

 5    Q.  This lady right here --

 6    A.  Uh-huh.

 7    Q.  -- who is that?

 8    A.  Anna.

 9    Q.  Anna who?

10    A.  I forgot her last name too.

11    Q.  You forgot her last name?

12    A.  Yes.  Let me --

13    Q.  Okay.  Who else can you identify in this picture?

14    A.  Ruben, Blanca.  I don't recall his name.

15    Q.  You don't remember him?

16    A.  I mean, he looks familiar, but I just can't recall his

17    name.  That's the same picture.

18    Q.  Same -- it's a different picture.

19    A.  No, no, I mean, I've seen this picture previously.

20    Q.  Right.

21    A.  Oh, okay.

22    Q.  Is this man, this man?

23    A.  Yes.

24    Q.  And you don't know his name?

25    A.  I don't recall.
```

1    Q.   Now, finally, when you looked at photographs that the FBI

2    showed you, you identified Blanca's photograph as Barbara,

3    right?

4    A.   At first, but then I called and, you know, I explained to

5    them that I -- I was mistaken, that her name was not Barbara,

6    it was Blanca.

7    Q.   Right.  And you also did not know her by her last name at

8    that time.

9    A.   It probably didn't come to me at that time, just like it

10   didn't click to me that her name was Blanca and not Barbara.

11   It's...

12   Q.   So somehow her name came to you.

13   A.   Yes.

14   Q.   And your testimony is that it was not provided to you in

15   any of the seven debriefings that you had with the government.

16   A.   It was not provided to me.

17          MR. LEVIN:   That's all the questions I have.   Thank

18   you, Your Honor.

19                      *   *   *   *   *

20

21

22

23

24

25

```
1   UNITED STATES OF AMERICA                    )
                                                 ) ss:
2   SOUTHERN DISTRICT OF FLORIDA                 )

3

4                   C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6   Reporter in and for the United States District Court for the

7   Southern District of Florida, do hereby certify that I was

8   present at and reported in machine shorthand the proceedings

9   had the 18th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13  pages 1 - 55.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 20th day of November, 2014.

16

17

18                        /s/ Carly Horenkamp

19                        Carly L. Horenkamp, RMR, CRR
                          Certified Shorthand Reporter

20

21

22

23

24

25
```