```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION
                CASE NO. 13-20505-CR-SCOLA
```

UNITED STATES OF AMERICA,              NOVEMBER 7, 2014
                                       9:18 A.M.
                    Plaintiff,


        vs.



ROGER ROUSSEAU, et al.,

                    Defendants.       PAGES 1 THROUGH 56
_____

```
                          DAY 5
             EXCERPT OF CRIMINAL JURY TRIAL
      (DIRECT EXAMINATION OF GEMA PAMPIN BY MR. GOODYEAR)
       BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
              UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5147
```

1             **I   N   D   E   X**

2   *Certificate* ----------------------------------------- 56

3

4

5                 **W I T N E S S**

    ON BEHALF OF THE GOVERNMENT:                      PAGE
6   GEMA PAMPIN
    DIRECT EXAMINATION BY MR. GOODYEAR                  4

7

8

9

10

11

12

                    **E X H I B I T S**
13  GOVERNMENT EX. NO.:                      OFFERED ADMITTED
    208  -                                      5        5
14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1        (No Jury, 9:18 a.m.)
 2             THE COURT:  Bring in the jury, please.
 3        (Jury Present.)
 4             THE COURT:  Good morning, everyone.
 5             Welcome back and please be seated.  So everybody is
 6   here.  All right.  Who is the next witness for the government?
 7             MR. GOODYEAR:  The government calls Gema Pampin.
 8             COURTROOM DEPUTY:  Ma'am, please raise your right hand
 9   to be sworn.
10             GEMA PAMPIN, GOVERNMENT WITNESS, SWORN
11             COURTROOM DEPUTY:  Please use the microphone.  Please
12   state your full name and spell your last name for the record.
13             THE WITNESS:  Gema Pampin, the last name is spelled
14   P-A-M-P-I-N.
15             THE COURT:  Can you move a couple of feet to your
16   right and move the microphone over there, too, so it's easier
17   for people to see you?
18             THE WITNESS:  Is that okay there?
19             THE COURT:  All right.  Go ahead.
20                          DIRECT EXAMINATION
21   BY MR. GOODYEAR:
22   Q.  Ms. Pampin, have you pled guilty to a crime related to
23   Health Care Solutions Network?
24   A.  Yes, I have.
25   Q.  What crime?
```

1   A.  Conspiracy to commit health care fraud.

2   Q.  And what did you do as part of that conspiracy?

3   A.  I fabricated documents for Health Care Solutions Network.

4   Q.  Have you ever entered into a plea agreement with the

5   government?

6   A.  Yes, I have.

7           MR. GOODYEAR:  Could I pull up now GX-208, please,

8   which has not yet been admitted.

9   BY MR. GOODYEAR:

10  Q.  Is there -- do you see a document on your screen?

11  A.  No, I do not -- now I do.

12  Q.  What document is this?

13  A.  This is my plea agreement.

14          MR. GOODYEAR:  Your Honor, I would move the admission

15  of GX-208 and ask that it be published to the jury.

16          THE COURT:  All right.  That will be received in

17  evidence and you can publish it.

18          MR. GOODYEAR:  Could we go to page 4 of Exhibit 208,

19  please?  And could we pull up the first sentence of

20  paragraph 7, please?

21  BY MR. GOODYEAR:

22  Q.  Ms. Pampin, do you see where it says:  The defendant shall

23  cooperate with law enforcement officials, attorneys with the

24  United States Department of Justice and United States

25  Attorney's Office for the Southern District of Florida and with

1    federal regulatory officials charged with regulating or

2    overseeing the Medicare program by providing full, complete and

3    truthful information regarding her knowledge, conduct and

4    actions while involved in health care and providing active

5    cooperation in ongoing investigations if requested to do so?

6        Do you see that part?

7    A.  Yes, I do.

8    Q.  And is that consistent with your understanding of your

9    obligations under this agreement?

10   A.  Yes, it is.

11   Q.  What do you hope to gain, if anything, by testifying here

12   today?

13   A.  I hope to gain a reduction in my sentence.

14   Q.  And who ultimately determines your sentence?

15   A.  Judge Altonaga.

16   Q.  Did you ever work at Health Care Solutions Network?

17   A.  Yes, I did.

18   Q.  Which branch of Health Care Solutions?

19   A.  The East location.

20   Q.  And from when to when did you work in the East?

21   A.  From 2005 to February 2011.

22   Q.  Please tell me about your first day at Health Care

23   Solutions.

24   A.  My first day -- I was not given an exact time of arrival --

25   I arrived around 8:30 in the morning.  There were no patients

1    or any staff at the location.  Around 9:15, 9:30, patients and

2    staff started to arrive.  Around 10:00 in the morning, Mr. Paul

3    Layman, which was the coordinator, clinical coordinator at the

4    time, arrived.

5    Q.  Were you able to get into the building before Mr. Layman

6    arrived?

7    A.  No.  He had the key.  He came with the key and he opened

8    the facility and allowed everybody in at 10:00 in the morning.

9    Q.  What position had you been hired for?

10   A.  I was hired to do -- complete assessments for new patients.

11   Q.  And does anything stand out to you about what you were

12   asked to do on your first day?

13   A.  Yes.  On my first day I was asked to fabricate documents

14   for -- the company was in -- under a Medicare audit or review

15   at that moment, so I was asked to fabricate documents for that.

16   Q.  Who asked you to do that?

17   A.  Dana Gonzalez.

18   Q.  And what types of documents were you asked to fabricate?

19   A.  Initial psychiatric evaluations, initial assessments,

20   biopsychosocial assessments, treatment plans, initial treatment

21   plans, treatment plan reviews, and group psychotherapy notes.

22   Q.  And did you fabricate those types of documents on your

23   first day at Health Care Solutions?

24   A.  Yes, I did, sir.

25   Q.  And did you continue to do that throughout your employment

1    at Health Care Solutions?

2    A.  Yes, I did.

3    Q.  Had you ever fabricated documents at a health care facility

4    before?

5    A.  Yes, I had.

6    Q.  And while you were at Health Care Solutions, did you

7    fabricate documents for therapists at Health Care Solutions to

8    use at other facilities?

9    A.  Yes, I did.

10   Q.  Why did you do all that?

11   A.  To get extra money.  I created the documents for the fraud

12   to be completed and to get money.

13   Q.  Okay.  While you were working at Health Care Solutions

14   East, were you in one building the whole time, or did Health

15   Care Solutions East change buildings while you were employed

16   there?

17   A.  It changed buildings, yes.  There were two.

18   Q.  Where was the first location?

19   A.  The first location was on -- the actual physical address?

20   Q.  Yeah.

21   A.  Was on U.S. 1 and 150-some street.  I don't remember

22   exactly.

23   Q.  And where was the second location?

24   A.  The second location was on U.S. -- off of U.S. 1 and

25   197th --

```
1    Q.  Okay.

2    A.  -- off of Marlin Road.

3    Q.  Okay.

4    A.  Uh-huh.

5    Q.  Okay.  About when did that move take place?

6    A.  I would say about a year after, possibly, maybe not even a

7    year after.

8    Q.  A year after you started?

9    A.  Yes.

10   Q.  Did -- did both locations have glass doors for the therapy

11   rooms?

12   A.  Yes, they did.

13   Q.  And so were you able to see the patients and see what they

14   were doing during therapy?

15   A.  Yes, I was.

16   Q.  How did the patients at Health Care Solutions East appear

17   to you?

18   A.  The patients were -- the majority were disorganized,

19   disoriented, had Alzheimer's.  They were patients with mental

20   retardation, patients also that were actively hallucinating and

21   delusional, patients that would soil themselves and urinate

22   every day.

23   Q.  Did all the patients know where they were at any given

24   time?

25   A.  No, not all of them, no.
```

1    Q.  Did patients have difficulty communicating?

2    A.  Yes, they did.  A lot of times they didn't know where they

3    were.  They didn't know the day.  They thought they were at

4    work.

5    Q.  What do you remember about the patients' attire?

6    A.  The patient attire?

7    Q.  The way they were dressed.

8    A.  Uh-huh.  There were moments that they were not dressed

9    appropriately for weather, they would -- if it was cold, they

10   weren't wearing sweaters, maybe wearing shorts.

11   Q.  Do you remember -- do you remember an incident that

12   happened to a plant in Alina Feas's office?

13   A.  Yes.  That was in the second location, yes.  One of the

14   patients went into her office and there was a fake plant in her

15   office and urinated inside the plant.

16   Q.  Were these patients' conditions obvious to a casual

17   observer?

18   A.  Yes, they were.

19   Q.  Did people at Health Care Solutions East talk about whether

20   PHP services -- do you know what PHP services are?

21   A.  Yes.

22   Q.  That stands for partial hospitalization program?

23   A.  Partial hospitalization program, yes.

24   Q.  Did people at Health Care Solutions East talk about whether

25   PHP services were appropriate for patients with the conditions

1    like the ones you just described?

2    A.   Yes.  We would have discussions about that, yes.

3    Q.   And what did they say?

4    A.   That the patients did not meet criteria.  I mean --

5    Q.   Who participated in discussions like that?

6    A.   The therapists and myself.

7    Q.   Which therapists?

8    A.   Liliana Marks, Doris Crabtree, Angela Salafia, myself, Dana

9    Gonzalez, Alina Feas.  There were many other therapists that

10   went through there as well.  Do you want me to name them all

11   or...

12   Q.   Sure.

13   A.   I mean, there was Reina Encio, Lisset Maza, Mariela

14   Ensaugurat I think was the last name, I'm not sure.  I'm trying

15   to think of all.  Amy Grant.  I mean, there were many

16   therapists that would -- that would work there throughout the

17   years.

18   Q.   Did Roger Rousseau participate in discussions about those

19   topics?

20            MR. RABIN:  Objection, leading.

21            THE COURT:  Overruled.

22   A.   May I answer?

23   BY MR. GOODYEAR:

24   Q.   You can answer.

25   A.   Yes, we did discuss with Dr. Rousseau that the patients did

1    not meet criteria.

2    Q.   Was there a low functioning group of patients for the group

3    therapy sessions?

4    A.   Yes, there was.

5    Q.   For a majority of the time you were there, who ran the low

6    functioning group?

7    A.   Angela Salafia.

8    Q.   What were the patients like in the low functioning group?

9    A.   Patients that were not sure where they were, the day that

10   it was, sometimes they couldn't recall their name, they would

11   soil themselves.

12   Q.   What -- were the patients -- were all the patients in that

13   group communicative?

14   A.   Not all of them, no.

15   Q.   When Angela Salafia first started working, was she licensed

16   to provide therapy?

17   A.   No, she was not.

18   Q.   What did that mean for you?

19   A.   That meant for me specifically I had to cosign her notes

20   since I had my license at the time.  So I would cosign her

21   notes, which meant I was supposed to sit -- to kind of

22   supervise her sessions.  I needed to sit in there in case she

23   needed me.  I needed to sit in for at least 15, 20 minutes of

24   each session.

25   Q.   Is that called over-the-shoulder supervision?

1    A.   Yes, it is.

2    Q.   And you were supposed to do that and be present in her

3    sessions for at least 15 to 20 minutes each session?

4    A.   Yes, I was.

5    Q.   Did you do that?

6    A.   No, I did not.

7    Q.   Does anything stand out in your memory about the kinds of

8    things Salafia would do in her therapy sessions?

9    A.   Yes.

10   Q.   What?

11   A.   There were movies that were played throughout the sessions.

12   Q.   What kinds of movies?

13   A.   Hollywood movies or Disney animated movies.  There were

14   also games played for like to trigger memory or games like --

15   not games necessarily, but music that was being played to

16   trigger movies and things just to trigger -- to trigger memory,

17   sorry.  Also childhood things trigger -- just to trigger

18   childhood memories and just memories in general since they

19   didn't have that.

20   Q.   What are group therapy notes?

21   A.   Group therapy notes, those are the notes that are made for

22   the actual sessions.  Each session requires a group therapy

23   note.

24   Q.   And they're written by the therapist who conducted the

25   session?

1    A.   Yes, they are.

2    Q.   And what are they supposed to describe?

3    A.   They're supposed to describe the mental status of the

4    patient, their appearance, what was discussed in the group

5    session, if they -- whatever they said.  There should be a

6    quote in each note as well.

7    Q.   Why is there supposed to be a quote in each note?

8    A.   Well, it kind of demonstrates what the patient was able to

9    get out of it, what they understood from the session, what

10   benefit they may have gotten --

11   Q.   Did --

12   A.   -- or what they were dealing with that day.  Sorry.

13   Q.   No, go ahead.

14   A.   No, that's okay.

15   Q.   All done?

16   A.   Yes.

17   Q.   Did Angela Salafia write group therapy notes about her

18   group therapy sessions?

19   A.   She wrote group therapy notes.

20   Q.   Did you have a chance to review those group therapy notes?

21   A.   Yes, I did.

22   Q.   Were those -- were those notes accurate?

23   A.   No, they were not.

24   Q.   Why not?

25   A.   They did not state what was actually occurring in the

1  group, and the quote was not the actual quote the patient said.

2  Q.  Did those notes describe things like watching animated

3  movies?

4  A.  No.

5         MR. GOODYEAR:  Let's pull up Government's Exhibit 174,

6  please, and if we could go to page -- it's previously admitted.

7  If we could go to page 16, please.

8  BY MR. GOODYEAR:

9  Q.  Who is that?

10  A.  I believe that's Dulce de la Torre.

11  Q.  Okay.  If we could go to page 114 of the exhibit, please.

12  And what is this document, Ms. Pampin?

13  A.  This is a psychotherapy group note.

14  Q.  Is that your signature at the bottom?

15  A.  Yes, it is.

16  Q.  And is that Angela Salafia's signature above that?

17  A.  Yes, it is.

18         MR. GOODYEAR:  Okay.  And if we could enlarge the top

19  portion that has the name of the patient, the date.

20  BY MR. GOODYEAR:

21  Q.  So who's the patient, what's the therapy session, what's

22  the date here?

23  A.  The date is November 20th, 2007.

24  Q.  And what's the patient name?

25  A.  Dulce de la Torre.

1  Q.   Okay.  And what session on November 20th, 2007, is this

2  group therapy note purporting to describe?

3  A.   It's for symptoms management.

4  Q.   Took place at 11:30 in the day?

5  A.   11:30 a.m. to 12:15 a.m. (sic), yes.

6  Q.   Okay.  So November 20th, 2007.

7       MR. GOODYEAR:  If we could now go down a bit, please,

8  and enlarge the patient response/benefit portion.

9  BY MR. GOODYEAR:

10 Q.   And could you read the last three sentences there, starting

11 with patient needed prompt to respond to the end?

12 A.   Yes.  Patient needed prompt to respond.  Patient stated:  I

13 am afraid of spending more time at the hospital.  Patient was

14 placed for feedback, support was provided -- support was

15 provided and feelings were validated.

16 Q.   So is that supposed to be a quotation?  I am afraid of

17 spending more time at the hospital, is that supposed to be a

18 quotation of what that patient said that day in group therapy?

19 A.   Yes.

20      MR. GOODYEAR:  All right.  If we could split the

21 screen here, so keep this on the left-hand side of the screen

22 and then go to page 96 of the same document.

23 BY MR. GOODYEAR:

24 Q.   And let's look -- again, is that your signature and

25 Ms. Salafia's signature at the bottom?

1    A.  Yes, it is.

2    Q.  And let's look at the top for a moment.  What's the --

3    what's the date on this one?

4    A.  November 27th, 2007.

5    Q.  So seven days later?

6    A.  Yes.

7            MR. GOODYEAR:  Okay.  And let's enlarge that same

8    paragraph that we enlarged before, patient response/benefit.

9    Yeah, let's enlarge both of them side by side, please.

10   BY MR. GOODYEAR:

11   Q.  Okay.  Could you read those last three sentences again from

12   the document on the right this time?

13   A.  Yes.  Patient needed prompt to respond.  Patient stated:  I

14   am afraid of spending more time at the hospital.  Patient was

15   placed for feedback, support was provided and feelings were

16   validated.

17   Q.  Okay.  So it's the same quotation here by the patient seven

18   days later; is that right?

19   A.  Yes, it is.

20   Q.  In fact, is this entire paragraph identical to the

21   paragraph that was written about what happened in group therapy

22   seven days before?

23   A.  Yes, it is.

24           MR. GOODYEAR:  Let's go to page 115, please.

25           Okay.  Let's enlarge the top, please.

1   BY MR. GOODYEAR:

2   Q.  So what's date here?

3   A.  November 20th, 2007.

4   Q.  What's the time for this therapy session?

5   A.  From 10:30 a.m. to 11:15 a.m.

6   Q.  Okay.  And let's look at that same paragraph here.  And if

7   we could read those last three sentences again starting with

8   patient stated, please.

9   A.  Patient stated:  I don't have much confidence on myself

10  anymore.  Therapist offered support and patient was receptive.

11  Feelings were validated.

12          MR. GOODYEAR:  If we could go to page 97, please, on

13  the right-hand side of the screen.  And let's enlarge the date

14  and time.

15  BY MR. GOODYEAR:

16  Q.  So was this sort of the same thing again, seven days later,

17  about the same time therapy session as the document we just

18  looked at, 10:30 a.m.?

19  A.  Yes.  This is November 27th, 2007, and the session is for

20  10:30 a.m. to 11:15 a.m.

21          MR. GOODYEAR:  Okay.  Let's look at patient

22  response/benefit.  Enlarge both of them, please.

23  BY MR. GOODYEAR:

24  Q.  And again, does this have the same quotation from the

25  patient?

1  A.  Yes, it does.

2  Q.  I don't have much confidence on myself anymore?

3  A.  Uh-huh.

4  Q.  And in fact, is the whole paragraph identical to what was

5  written seven days before?

6  A.  Yes, it is.

7          MR. GOODYEAR:  Let's go to Bates 116, please.  Let's

8  enlarge the top.

9  BY MR. GOODYEAR:

10  Q.  November 20th, 2007.

11  A.  Uh-huh.

12  Q.  This is a group at 9:30 a.m.?

13  A.  Yes, it is.

14          MR. GOODYEAR:  Let's enlarge patient benefit, please.

15  BY MR. GOODYEAR:

16  Q.  And just what's the quotation here?

17  A.  Sometimes change is difficult for me.  Do you want me to

18  read the rest or --

19  Q.  No, that's fine.

20          MR. GOODYEAR:  And then if we could go to page 98,

21  please, and enlarge the top.

22  BY MR. GOODYEAR:

23  Q.  And what's the date and starting time for this purported

24  session?

25  A.  The date is November 27th, 2007, and the time is 9:30 a.m.

1    to 10:15 a.m.

2          MR. GOODYEAR:  And let's enlarge patient

3    response/benefit.

4    BY MR. GOODYEAR:

5    Q.  And is it the same quotation?

6    A.  Yes, sometimes change is difficult for me.

7    Q.  And is it in fact entirely the same, the entire paragraph?

8    A.  Yes, it is.

9          MR. GOODYEAR:  Okay.  We can get rid of that.

10   BY MR. GOODYEAR:

11   Q.  What do you remember about the patients in Doris Crabtree's

12   group?

13   A.  Patients in Doris -- in Doris's group were supposed to be a

14   little bit considered higher -- a little bit higher

15   functioning, but they were patients that also did not meet

16   criteria for PHP.  They did not have the severity of symptoms

17   for treatment at that level of care.  There were also some

18   patients that sometimes were a little bit confused of where

19   they were.

20   Q.  Did Marks show Hollywood movies in her therapy sessions?

21   A.  Yes, she did.

22   Q.  Okay.  Let's -- I'm sorry.  I wanted to move on to talk

23   about Liliana Marks' group.  Did Liliana Marks show Hollywood

24   movies in her therapy sessions?

25   A.  Yes, she did.

1    Q.  Do you remember a specific one?

2    A.  I remember *The Soloist*.

3    Q.  Is there a specific patient in Liliana Marks' group who

4    stands out in your recollection?

5    A.  There was a patient -- I don't recall the name of the

6    patient, but there was a patient that was so disoriented and

7    that he would also masturbate, touch himself in the group.

8    Q.  During the group therapy session.

9    A.  (No audible response.)

10   Q.  Did you ever have occasion to review the notes that Marks

11   and Crabtree were creating about their group therapy sessions?

12   A.  Yes, I did.

13   Q.  Why did you have occasion to review those notes?

14   A.  Well, when the documents had to be prepared to be submitted

15   for Medicare audits or reviews, I would have to look at them.

16   And also at times Armando would ask us to assist in -- in

17   making sure that medical records was doing their part in

18   ensuring that all of the documents were there in the chart.  So

19   we would also review them.

20   Q.  Okay.  Were the notes that Marks and Crabtree prepared

21   accurate?

22   A.  No, they were not.

23   Q.  Why not?

24   A.  They did not specify when movies were being played, or they

25   did not actually say the actual state of the patient.

1            MR. GOODYEAR:  Let's call up Government's Exhibit 110,

2      please, and go to page 2.  This is previously admitted.

3      BY MR. GOODYEAR:

4      Q.  Who's that?

5      A.  Steven Abbott.

6      Q.  Tell me about Steven Abbott.

7      A.  Steven Abbott was a patient, a mental health patient for

8      many years, but he was always actively hallucinating and

9      delusional.

10          He believed he belonged to some kind of police force or

11     military.  He would always drop off little notes with codes on

12     our -- he would go by our desks and drop off little notes and

13     kind of tell us to not tell anybody what was happening and that

14     they were coded, just things that he would make up, but he

15     would tell us that it was like a code.

16     Q.  Would he come out and do that on your desk or other

17     people's desks during group therapy sessions?

18     A.  Yes, at times, yes.

19     Q.  Whose group was he in?

20     A.  Liliana Marks.

21     Q.  Tell me about Pedro Llaguno.

22     A.  Pedro Llaguno?  I thought that was coming up on -- okay.

23     He was a patient.  I believe he was an attorney at one point.

24     He was a patient that -- he continued getting worse from the

25     time he was there.  He came to a point where he could not

1    remember his name or even sign his name.  He had to sign with

2    an X, and even his speech was affected.  He couldn't remember

3    the words or express what he needed to say.

4    Q.  Whose group was he in?

5    A.  Doris Crabtree.

6         MR. GOODYEAR:  Let's pull up Government's Exhibit 106,

7    please, and go to page 2.

8    BY MR. GOODYEAR:

9    Q.  Do you recognize this patient?

10   A.  Yes, Ondina Fuentes.

11        COURT REPORTER:  Is this admitted?

12        MR. GOODYEAR:  It's been admitted, yeah.  Thank you.

13   BY MR. GOODYEAR:

14   Q.  Who is this?

15   A.  Ondina Fuentes.

16   Q.  Tell me about Ondina Fuentes.

17   A.  Ondina probably was a patient that was in the program the

18   longest.  She was -- always had multiple admissions since I

19   first started there in 2005, a patient that may have had

20   symptoms of a mental illness, but definitely not to a degree to

21   receive treatment at a partial hospitalization program.

22   Q.  Whose group was she in?

23   A.  Doris Crabtree.

24   Q.  And tell me about Odeila Almanza.

25   A.  Odeila Almanza, another patient as well, completely

1    disoriented.  She believed she was at work every day.  She

2    would knock on everybody's office asking if she was going to

3    get her paycheck at some point.  She just -- she wasn't sure

4    where she was or the day or anything.

5    Q.  Did -- okay.  Did you ever see a group therapy note that

6    described conditions like the ones you were just describing,

7    patients asking for their paycheck, patients handing off notes

8    with secret codes because they believed they were a police

9    officer?

10   A.  No.

11   Q.  Did any of the defendants who were therapists in the East

12   ever refuse to sign a group therapy note because it was

13   inaccurate in their opinion?

14   A.  No.

15   Q.  Did any of the therapists in the East ever express any

16   reluctance to write up therapy notes that didn't describe the

17   patients' actual conditions?

18   A.  No.

19   Q.  I think you referred to this before, but did you often see

20   patients who would be admitted at Health Care Solutions East

21   and then be admitted soon after in Health Care Solutions West?

22          MR. PRIETO:  Objection, Judge, it's leading.

23          THE COURT:  Overruled.

24   BY MR. GOODYEAR:

25   Q.  And then admitted again at Health Care Solutions East?

1   A.   Yes.   The patients were recycled from one location to the

2   other.

3   Q.   Why was that done?

4   A.   Just I guess another way to maintain patients, having

5   enough patients, enough of a census to continue fabricating

6   documents and for the fraud to continue.

7   Q.   Why not just discharge them from the East and then readmit

8   them soon thereafter in the East?

9   A.   That way we could continue billing in another location, but

10   still continue billing for that patient and getting money for

11   that patient.

12   Q.   But why could you continue billing in another location, but

13   you couldn't just continue billing if you readmitted them soon

14   thereafter in the same location?

15   A.   Oh, it would be too obvious, the fraud would be too obvious

16   that it's occurring.   It would be a red flag for Medicare.

17   Q.   Was there discussion among Health Care Solutions staff

18   about the recycling of patients?

19   A.   Yes, there was.

20   Q.   What was said about that?

21   A.   We would comment on that it was too soon, they were coming

22   back too soon, that we were concerned as well that this could

23   also be a red flag since it was another location but still had

24   the same name.   So yes, there was concern over that and

25   discussions.

1    Q.  Who participated in conversations like those?

2    A.  Myself, Dana Gonzalez, Alina Feas, the therapists as well,

3    Doris Crabtree, Angela Salafia, Liliana Marks.

4    Q.  Now, you said before that you also prepared fabricated

5    group therapy notes; is that right?

6    A.  Yes, I did.

7    Q.  In what types of situations would you prepare fabricated

8    group therapy notes?

9    A.  The documents that were being prepared to sent -- to be

10   sent for a Medicare review.  I would be -- I would fabricate

11   documents and notes to match whatever storyline we had made up

12   with -- we had made up for in the assessments.

13   Q.  For a specific patient?

14   A.  Yes, for each patient.

15           MR. GOODYEAR:  Okay.  Let's pull up Government's

16   Exhibit 14, which has been previously admitted, and go to

17   page 1094, please.  And if we could go -- yeah, to that fourth

18   check, please.

19   BY MR. GOODYEAR:

20   Q.  And it's a little -- can you read it or would you like just

21   the check blown up?

22   A.  I think I can read it, yes.

23           THE COURT:  Hold on a second.  Let's blow it up so

24   everyone --

25           MR. GOODYEAR:  Okay.

1    THE COURT:  -- whether she can read or not, so

2  everyone can read it.

3    MR. GOODYEAR:  Can we blow up just the check on the

4  left, please?  That's great.

5  BY MR. GOODYEAR:

6  Q.  So what is this?

7  A.  It is a paycheck for me, for Gema Pampin.

8  Q.  For what amount?

9  A.  For $1,015.

10  Q.  And is it from Health Care Solutions?

11  A.  Yes, it is.

12  Q.  Dated October 16th, 2009?

13  A.  Yes.

14  Q.  And on the bottom on the left it says "notes and review."

15  Do you see that?

16  A.  Yes, I do.

17  Q.  What does that refer to?

18  A.  For group notes that I created and for documents that were

19  submitted for review, for Medicare review.

20  Q.  Were you paid extra beyond your base salary for notes that

21  you -- for fabricated notes that you created?

22  A.  Yes, I was.

23  Q.  Was there a rate that you were paid on a per-note basis?

24  A.  A dollar twenty-five.

25  Q.  One dollar twenty-five cents per note you'd get paid for

1    notes that you created.

2    A.   Yes.

3    Q.   So for this period, did you -- you had created several

4    hundred notes; is that right?

5    A.   Yes, I did.

6    Q.   Did Liliana Marks also work at another PHP at the same time

7    she worked at Health Care Solutions?

8    A.   Yes, she did.

9    Q.   What was the name of that PHP?

10   A.   American Therapeutic.

11   Q.   And what did she do there?

12   A.   As far as I know, she also ran group sessions over there.

13   Q.   Did Dana Gonzalez also work simultaneously at American

14   Therapeutic?

15   A.   Yes, she did.

16   Q.   Did Marks and Gonzalez ever tell you they were recognizing

17   patients from Health Care Solutions and say that they'd

18   recently seen those same patients at American Therapeutic?

19   A.   Yes, they did.

20   Q.   Did you ever work at Health Care Solutions East at the same

21   time as Blanca Ruiz?

22   A.   Yes, I did.

23   Q.   When was that?

24   A.   I don't remember the specific date.

25   Q.   Was it pretty early on when you were --

1    A.   It was early on, early on.  We were already in the second

2    location.  It wasn't in the first location of the East.

3    Q.   Okay.  And for about how long was it that you overlapped

4    with Ruiz?

5    A.   Maybe six -- maybe six months.  I'm not sure.  It wasn't

6    that long.

7    Q.   Did Ruiz prepare documents at Health Care Solutions East?

8    A.   Yes, she did.

9    Q.   What type of documents?

10   A.   Initial assessments, biopsychosocial assessments, treatment

11   plans, treatment plan reviews.

12   Q.   Sort of the same type of documents you were preparing; is

13   that right?

14   A.   Yes.

15   Q.   And you were falsifying those types of documents; is that

16   correct?

17   A.   Yes, I was.

18   Q.   In what types of ways, just -- I didn't ask this before.

19   In what types of ways would you falsify intake documents?

20   A.   Okay.  We would add symptoms to -- say if the diagnosis was

21   major depression, maybe the person didn't have that diagnosis,

22   but we would add symptoms that would justify that diagnosis,

23   such as hopelessness, helplessness, worthlessness, passive

24   death wishes, and then we would try to come up with some kind

25   of storyline as a trigger for those symptoms.

1   Q.   In order to admit the patients who were being referred to

2   Health Care Solutions at that time, would Blanca Ruiz also have

3   had to falsify intake documents?

4   A.   Yes.

5   Q.   We talked a little bit about the patients specifically.

6   What were the conditions like inside the group therapy rooms at

7   Health Care Solutions East?

8   A.   The group rooms were crowded, overcrowded, had too many

9   patients.   It was very difficult for them to get around at

10   times, which is not a therapeutic environment for a mentally

11   ill patient.

12   Q.   Did -- how many patients would often be in a room?

13   A.   Up to 17, up to 20 there was at one point, and not in all

14   the group rooms.   It would alternate.   It would vary.

15   Q.   How many patients were those rooms supposed to hold?

16   A.   A group session should be between 10, possibly 12, but it

17   really should be 10.

18   Q.   Did patients comment on whether they were comfortable in

19   the room?

20   A.   Yes.

21   Q.   What did they say?

22   A.   They said they were very uncomfortable.   They had to leave

23   the group room because they would increase their anxiety to be

24   in that -- such a crowded room, so they would leave the group

25   room often.

1   Q.   Who was Manny Gonzalez -- who was Armando Gonzalez?

2   A.   He was the owner.

3   Q.   Did Armando Gonzalez hire an adviser to consult about the

4   decor and layout of the office?

5   A.   Yes, he did.

6   Q.   What type of adviser was that?

7   A.   I was told he was a feng shui adviser.

8   Q.   What type of changes did that adviser make at Health Care

9   Solutions East?

10   A.   He recommended a red rug be placed at the entrance of the

11   facility, a red bulb as well, and also a pot in the corner with

12   salt in it, and these were things that were supposed to keep

13   Medicare from walking through those doors.

14   Q.   Is that something that he said?

15   A.   Yes.  I was told by Armando that this is what the adviser

16   recommended.

17   Q.   And you said something about these changes in relation to

18   Medicare.  What was it that was said about these changes in

19   Medicare?

20   A.   They were trying to prevent Medicare to walk in the door

21   and see what was happening, see that the patients didn't have

22   any criteria and see the fraudulent business.

23   Q.   So by having better feng shui the offices could keep

24   Medicare away.

25   A.   I'm sorry?

1  Q.  So by having better feng shui, the offices could keep

2  Medicare away?

3  A.  Yes.

4  Q.  Do you -- you talked about a bucket with salts?

5  A.  Uh-huh.

6  Q.  Do you recall anything happening to that bucket with salt?

7  A.  Yes.  The patients would either use it as a trash can or

8  sometimes would even urinate in it.

9  Q.  What would happen for holidays like Thanksgiving and

10  Christmas at Health Care Solutions?

11  A.  Patients would be brought in, usually a group was run or

12  there was a meeting, it was a time to get together and talk

13  about the holiday, and they were given one meal, a holiday

14  meal, and then they were sent home.

15  Q.  But would Health Care Solutions bill Medicare as if three

16  or four groups had taken place on those days?

17  A.  Yes.

18  Q.  But only one actual session had been held, if that, right?

19  A.  Exactly, if that.

20  Q.  Would therapists write up group therapy notes for a full

21  set of sessions for those days?

22  A.  Yes, they would.

23  Q.  Who is Roger Rousseau?

24  A.  He's the psychiatrist and the medical director for Health

25  Care Solutions Network.

1    Q.  Was he the medical -- was he the medical director at Health

2    Care Solutions the entire time you were there?

3    A.  Yes.  There was also another doctor in the beginning that

4    was only there a short time, but he was there the whole time,

5    yes, Dr. Rousseau.

6    Q.  How often would Rousseau come to the facility?

7    A.  Maybe once a week, sometimes it would be a little bit more

8    time would go by, a week and a half, two weeks.

9    Q.  And how long would he stay?

10   A.  About an hour.

11   Q.  How much time would he spend with patients when he came?

12   A.  Not very much time.  It depended if there was a patient

13   that actually was going through something at the time, then he

14   would maybe see that patient for a few minutes.

15   Q.  But in general, what did he spend his time doing when he

16   came to Health Care Solutions?

17   A.  We would give him charts with documents that needed to be

18   signed by him, so he would sign -- be signing documents.

19   Q.  In a typical session where he comes for an hour, hour and a

20   half or so, how many documents would he be signing during those

21   sessions, approximately?

22   A.  Gosh, maybe 50 documents?

23   Q.  And --

24        MR. RABIN:  I'm sorry, I couldn't hear.

25   A.  Maybe 50, maybe a little more.  I mean, I don't know

1    exactly.  It depended on the census at the moment, how many

2    patients were there admitted at the time.  The more patients,

3    the more documents.

4    BY MR. GOODYEAR:

5    Q.  And so let's talk about intake documents.  You prepared --

6    you prepared them in some cases?

7    A.  Yes.

8    Q.  Did Dana Gonzalez also prepare intake documents at Health

9    Care Solutions East?

10   A.  Yes, she did.

11   Q.  Did many of those documents require a doctor's signature?

12   A.  Yes, they did.

13   Q.  Which types of intake documents require a doctor's

14   signature?

15   A.  The psychiatric admission or psychiatric evaluation, the

16   admission order.  The initial treatment plan also required for

17   that initial.  The master treatment plan as well.  And then

18   continually the treatment plan reviews, which were weekly,

19   required a signature, as well as a weekly M.D. note is what we

20   call them, a doctor note.

21   Q.  So would you take documents like that that you had

22   fabricated to Rousseau to sign when he came in?

23   A.  Yes, I would.

24   Q.  And what other types of documents would he be signing

25   during those sessions?

1  A.  There were also recertifications, which there were forms

2  that certified the patient need -- needed a -- continued to

3  need that treatment, that level of care.  Those were done, I

4  believe, once a month, and he had to sign those as well.

5  Q.  Okay.  We're going to talk -- we're going to talk later

6  about a case where the government made some arrests at a

7  different PHP.  We're going to come back to that.  Let me ask

8  you this.  Do you recall a time when the government made

9  arrests at a different PHP?

10  A.  Yes, I do.

11  Q.  Okay.  Before that time -- about when was that, let me ask

12  you that, do you recall?

13  A.  Oh, let me see.  I think it was in -- I believe in 2010.

14  Q.  Okay.

15  A.  Sometime in 2010.

16  Q.  Before that time, did Rousseau ever refuse to sign a

17  document that you brought him or that anyone else brought him,

18  as far as you know?

19  A.  No.

20  Q.  Was there a stamp that was used for his signature?

21  A.  Yes, there was.

22  Q.  Was the stamp in use when you arrived at Health Care

23  Solutions?

24  A.  Yes, it was.

25  Q.  Who would use the signature stamp to sign documents?

1   A.  I would use the stamp.  Dana Gonzalez would use the stamp.

2   John Thoen, who was also like a consultant at that time, would

3   use a stamp.

4   Q.  So was Rousseau aware that you were using a stamp?

5   A.  Yes, he was.

6   Q.  How do you know that Rousseau was aware that you were using

7   the stamp?

8   A.  Well, we would use the stamp.  We would let him know,

9   listen, we had to submit documents and you weren't here to sign

10  so we used the stamp.

11  Q.  Did he indicate to you that he was okay with you doing

12  that?

13  A.  Yes.

14  Q.  Did he ever say anything like, look, go ahead and use the

15  stamp for a patient who very clearly meets the criteria, but if

16  it's a close call, you know, make sure to come to me and talk

17  to me about that?

18          MR. RABIN:  Objection, leading.

19          THE COURT:  Sustained.

20  BY MR. GOODYEAR:

21  Q.  Did he ever give you any guidance about which types of

22  patients to use the stamp for and which not to?

23  A.  No, he did not.

24  Q.  Did he ever put any restrictions on your use of the stamp?

25  A.  No.  There was a time where the stamp was placed -- was

1   taken out of -- it was usually held in medical records where
2   anybody could have access to it, and at one point he did ask
3   that the stamp be placed in Alina Feas' office, so Alina Feas
4   could use it and myself and Dana Gonzalez could use it.
5   Q.  Did you continue using it for -- to sign documents, using
6   the stamp after it had been moved to Feas's office?
7   A.  If we needed it, yes.
8   Q.  And was he aware that you were continuing to do that?
9   A.  Yes.
10  Q.  Apart from using the stamp, did you ever forge Rousseau's
11  signature?
12  A.  Yes, I did.
13  Q.  In what ways did you go about forging Rousseau's signature?
14  A.  Specific, like I would trace -- because I couldn't forge it
15  directly.  I had a hard time doing that.  So I would trace it
16  from another signature.  And also, in the beginning, there were
17  times we would cut a portion of another signature, of another
18  note that he signed, and paste it and make a copy of that.
19  Q.  What were the times when you would trace or cut and paste
20  as opposed to using the stamp?  Was there a reasoning behind
21  that or --
22  A.  We were just trying to find shortcuts as the time -- as the
23  years progressed, and it was quicker to use the tracing; and
24  the stamp also, it was a little more obvious that it was an
25  actual signature.

1   Q.   Okay.  So there were sometimes when documents would be

2   brought to him for his actual signature.

3   A.   Yes.

4   Q.   There were other times when you would, one way or another,

5   fake his signature on the document --

6   A.   Yes.

7   Q.   -- is that right?

8   A.   Yes, that is correct.

9   Q.   What were the times when you would go ahead and fake his

10  signature as opposed to waiting until he came into the office

11  to give it to him?

12  A.   If there were documents that needed to be submitted for the

13  Medicare review or, for example, when joint commission was

14  coming that we were going to have an audit and things needed to

15  be up to date and signed, we would go ahead and -- or submitted

16  to Medicare, then we would go ahead and, if he was not there,

17  we had to falsify it.

18  Q.   So were the documents where you would sort of actively fake

19  his signature, were those ones where there was time pressure or

20  a deadline coming?

21  A.   Yes.

22  Q.   Was there ever a time when you did any of those things to

23  fake his signature where the reason you were doing it was

24  because you were afraid that if you brought it to Rousseau, he

25  would refuse to sign it?

1   A.  No.

2   Q.  I think you talked earlier about use of the stamp.  Did you

3   also tell Rousseau that you were doing these other things to

4   sign for him with your own hands?

5   A.  I don't recall if I specifically told him that I was doing

6   it a different -- you know, falsifying it in a different

7   manner.  He was just aware we were falsifying it, but I'm not

8   sure if I ever said I'm tracing it instead of using a stamp

9   or...

10  Q.  But in general, was he aware that you were doing things to

11  put his signature on the documents?

12          MR. RABIN:  Objection to what he was aware of,

13  foundation.

14          THE COURT:  Overruled.

15  BY MR. GOODYEAR:

16  Q.  You can answer.

17  A.  Yes.

18  Q.  And what would he say when he heard about your having used

19  a stamp or in some way put his signature on a document?

20  A.  He said that that was okay.

21  Q.  Did he also see documents that had his name forged on them?

22  A.  Yes.

23  Q.  Did he see documents that had his name where the stamp had

24  been used?

25  A.  Yes.

1    Q.   How did he see those documents?

2    A.   Well, when he would come to the office and charts were put

3    in front of him for him to complete additional signatures, he

4    had to go through the chart and there were all kinds of

5    signatures there, so yes, he would come across them.

6    Q.   Let's talk about a patient chart for a moment.  A patient

7    chart, it's a pretty thick document; is that right?

8    A.   Yes.

9    Q.   Hundreds of pages in a patient chart?

10   A.   Yes.

11   Q.   And so were a lot of the documents that were brought to him

12   for his signature individual patients -- individual pages

13   within a larger patient chart?

14   A.   Yes, they were within the chart.

15   Q.   Would there be tags or something indicating to him where he

16   should be signing?

17   A.   Yes, there was a red tag.

18   Q.   But when these patient charts were brought to him, did the

19   charts themselves contain documents that included his

20   signatures from previous documents that were created at Health

21   Care Solutions?

22   A.   Yes.

23   Q.   And would they include instances where those signatures

24   were created by you or by someone else --

25   A.   Yes.

1   Q.   -- either through a stamp or through a forgery?

2   A.   Yes.

3   Q.   Did you ever talk to Rousseau about the conditions at

4   Health Care -- at Health Care Solutions?

5   A.   Yes, we did.

6   Q.   What did you discuss with him?

7   A.   Discussed the patients, that they did not meet criteria,

8   that they were just getting more severe.  We were -- myself and

9   the other therapists as well were concerned about this, so we

10  did talk to him about it on several occasions.  We discussed it

11  with him.

12  Q.   Who was present for these conversations?

13  A.   Different conversations at times I was there, Dana

14  Gonzalez, Alina Feas.

15  Q.   Did you talk about the groups being too crowded with him?

16  A.   Yes.

17  Q.   Where would these types of conversations take place?

18  A.   Either in my office or in Alina Feas' office, which is the

19  office he would mostly use when he would go there.

20  Q.   Did you discuss recycling with him?

21  A.   I'm sorry?

22  Q.   Did you discuss recycling with him?

23  A.   Yes.

24  Q.   And what would Rousseau say when you had these discussions?

25  A.   He agreed and we told him -- we would ask him to discuss it

1   with Armando Gonzalez and he said he would, but there was never

2   any outcome of that.

3   Q.  Did anything ever change?

4   A.  No.

5         MR. GOODYEAR:  Let's pull up Government's Exhibit 113,

6   please.

7   BY MR. GOODYEAR:

8   Q.  So what is this?

9   A.  This is a face sheet for --

10  Q.  Sorry.  This is page -- well, it's Bates stamp -- Bates

11  stamp ending in 001.  I'm sorry.  Go ahead.

12  A.  It's a face sheet for a Celia Capestany.

13  Q.  Okay.  And is the face sheet often sort of the first page

14  in a patient chart?

15  A.  Yes.  It just has general information such as their

16  address, telephone number, their race, sex, if they're married.

17        MR. GOODYEAR:  Let's go to page 65, please.

18  BY MR. GOODYEAR:

19  Q.  What's this?

20  A.  This is a note indicating that Celia Capestany was absent

21  on July 6, 2010.

22  Q.  And is that your signature at the bottom?

23  A.  Yes, it is.

24  Q.  Why would you be creating a form like this?

25  A.  She was absent that day and probably she was somewhere

1  where we could not bill.  If she was at a doctor's appointment

2  or she was in a hospital, we could not bill because that would

3  be obviously fraud.

4  Q.  But would you ever -- so would you ever have created a form

5  like this if the patient had in fact been at Health Care

6  Solutions?

7  A.  If they had actually been there?

8  Q.  If they had actually been there --

9  A.  No.

10  Q.  -- would you have created a form like this?

11  A.  No.

12          MR. GOODYEAR:  Okay.  Let's go back to the left-hand

13  side of the screen, and then pull up page 56, please, on the

14  right-hand side of the screen.

15  BY MR. GOODYEAR:

16  Q.  And what's this document on the right-hand side of the

17  screen?

18  A.  This is an M.D. note.

19          MR. GOODYEAR:  Let's enlarge the top portion, please.

20  BY MR. GOODYEAR:

21  Q.  What type of document is this?  Sorry, I cut you off.

22  A.  That's okay.

23      It's an M.D. note for Celia Capestany for July 6, 2010.

24  Q.  And what's an M.D. note?

25  A.  It's a note for -- it's supposed to be a time when the

1    doctor met with the patient and the documentation for it.

2           MR. GOODYEAR:  Okay.  Let's go to the bottom of the

3    page and enlarge that, please.

4    BY MR. GOODYEAR:

5    Q.  Does that appear to be Roger Rousseau's signature?

6    A.  Yes, it does.

7    Q.  Do you have a specific recollection of having forged this

8    signature on this day?

9    A.  No, I do not.

10   Q.  If there were, say, time pressure to get this document out,

11   like you said with a Medicare review --

12   A.  Uh-huh.

13   Q.  -- is it possible you or someone else might have forged

14   this signature?

15   A.  Yes, it's possible.

16   Q.  But at this time, July 2010, was Rousseau aware as a

17   general matter that people were either using the stamp or

18   somehow creating a version of his signature to put on

19   documents?

20   A.  Yes, he always was.

21   Q.  Now, but if there were no time pressure to get this

22   document out, and that -- and you were working to get the

23   document out, how would you have gotten his signature on the

24   document?

25   A.  Whenever he came in, whenever he would come into the

1    office, the charts were prepared for him and, you know, flip

2    pages for him to sign.

3              MR. GOODYEAR:  Okay.  So let's go back up to the first

4    paragraph of the document, please.

5    BY MR. GOODYEAR:

6    Q.  And this says -- can you read that first paragraph, please?

7    A.  Sure.  Patient was seen for follow-up today.  Individual

8    medication management with psychotherapy was provided.  Chart

9    was reviewed and case discussed with the treatment staff.

10   Treatment team reports that patient had made steady progress

11   since her admission to the program.  Patient will continue with

12   current plan of care.  Response effect will continue to be

13   observed.  Discharge plans are in place for July 9th, 2010, if

14   stability of mood is maintained.

15   Q.  Okay.  And like you were saying earlier, this document,

16   would it go in the patient chart?

17   A.  Yes, it would.

18   Q.  And if this patient chart were ever put in front of

19   Rousseau in the future, would this be available for him to see,

20   that this document was there with something appearing to be his

21   signature on it?

22   A.  Yes.

23             MR. GOODYEAR:  Let's pull up Government's Exhibit 114,

24   please, and go to page 54.

25   BY MR. GOODYEAR:

```
1    Q.  So who is the patient here?

2    A.  Clara Illas, I believe it says.

3    Q.  And what's the date?

4    A.  July 6, 2010.

5    Q.  And is that your signature at the bottom?

6    A.  Yes, it is.

7    Q.  And this is another patient absence form?

8    A.  Yes, it is.

9         MR. GOODYEAR:  Okay.  So let's move that to the left

10   and pull up page 45 of the same document.

11   BY MR. GOODYEAR:

12   Q.  And does that appear to be Roger Rousseau's signature at

13   the bottom?  Does it look like his signature?

14   A.  Yes, it does.

15   Q.  Same date, July 6, 2010?

16   A.  Yes.

17        MR. GOODYEAR:  Let's zoom in on the top part,

18   including the first paragraph.

19   BY MR. GOODYEAR:

20   Q.  So is this an M.D. note for Clara Illas on July 6, 2010?

21   A.  Yes, it is.

22   Q.  And does it say again patient was seen for follow up today?

23   A.  Yes, it does.

24   Q.  And then a discussion of medication management, chart

25   review, that kind of thing?
```

1    A.  Uh-huh, yes, it does.

2           MR. GOODYEAR:  Let's pull up 116.  Go to page -- the

3    Bates is 248.  The actual page is 70.  Government's 116.  Got

4    it.  Thank you.

5    BY MR. GOODYEAR:

6    Q.  Is this a patient absence form for Norma Lopez dated

7    July 9th, 2010?

8    A.  Yes, it is.

9    Q.  Your signature at the bottom there?

10   A.  Yes, it is.

11          MR. GOODYEAR:  Let's pull up Bates 196 of this page.

12   The actual is 18.

13   BY MR. GOODYEAR:

14   Q.  Does that appear to be Roger Rousseau's signature at the

15   bottom?

16   A.  Yes, it does.

17   Q.  Same date, July 9th, 2010?

18   A.  Yes.

19   Q.  Let's look at the first paragraph.  Patient was referred to

20   this program by her primary care physician.  Upon admission to

21   PHP, the patient was severely depressed and markedly anxious

22   due to major life changes.  Do you see that?

23   A.  Yes.

24          MR. GOODYEAR:  Okay.  And then finally, let's go to

25   Government Exhibit 117, please.  And in this case the Bates --

1  the Bates stamp is 474.  The actual page is 162.

2  BY MR. GOODYEAR:

3  Q.  Is this a patient absence form for Jesus Albuerne?

4  A.  Yes, it is.

5  Q.  Dated July 6, 2010?

6  A.  Yes.

7  Q.  And is that your signature at the bottom?

8  A.  Yes, it is.

9        MR. GOODYEAR:  And if we could pull up page 382.

10  BY MR. GOODYEAR:

11  Q.  And is this an M.D. note for Jesus Albuerne the same date?

12  A.  Yes, it is.

13  Q.  And does that appear to be Roger Rousseau's signature at

14  the bottom?

15  A.  Yes, it does.

16        MR. GOODYEAR:  And if we could pull up the first

17  paragraph, please.

18  BY MR. GOODYEAR:

19  Q.  Patient was seen for follow-up today?

20  A.  Yes.

21        MR. GOODYEAR:  Okay.  We can take those off.

22  BY MR. GOODYEAR:

23  Q.  By the way, did you ever seek treatment from Rousseau?

24  A.  Yes, I did.

25  Q.  For what?

1  A.  I was experiencing some symptoms of depression.  I was

2  crying a lot and dealing with an issue in a relationship and,

3  yes, I did talk to Dr. Rousseau about that.

4  Q.  And what did he do?

5  A.  He recommended that I take a medication just for a

6  short-term, Pristiq.  I just took it for 30 days.  I received

7  samples from his office.  It was never a formal meeting.  It

8  was informal.

9  Q.  Did you also -- did you ever refer your boyfriend to him

10  for a consultation?

11  A.  Yes, I did.

12  Q.  About what?

13  A.  He was dealing with issues of depression as well and

14  alcohol.

15  Q.  Are you familiar with assisted living facilities?

16  A.  Yes, I am.

17  Q.  What portion of the patients at Health Care Solutions came

18  from assisted living facilities?

19  A.  A majority of the patients.

20  Q.  Did you ever hear why assisted living facilities were

21  sending patients to Health Care Solutions?

22  A.  Yes.  It was my understanding they were receiving money or

23  kickbacks for the patients.

24  Q.  How did you come to have that understanding?

25  A.  Conversations I had with Lisset Palmero.

1  Q.  Why was she telling you about this?

2  A.  General discussions about it as well.  She would also

3  receive calls from the ALFs when it was the beginning of the

4  month because they wanted to know when they were going to

5  receive their check or to see where the status -- status was.

6  Q.  Did Rousseau have an assistant named Milly?

7  A.  Yes, he did.

8  Q.  And did she ever come by Health Care Solutions to obtain

9  paperwork concerning Health Care Solutions patients?

10  A.  Yes, she did.

11  Q.  Was there a time frame when that was happening, how often

12  would it happen?

13  A.  She came to the office a couple of times.  I remember in

14  the first location and in the second location in the beginning,

15  the time that we were there, or she would also call.

16  Q.  And she would also call?

17  A.  Right.

18  Q.  Did you have an understanding of why she was coming to get

19  that paperwork about Health Care Solutions patients?

20  A.  It was my understanding to bill for the patients that the

21  doctor had seen.

22  Q.  And what was your basis for that understanding?

23  A.  She would ask about it.  She would request and say I need

24  the patients -- the patient names so that I can bill for it.

25  Q.  Okay.  You talked a little bit earlier about Medicare

1    reviews.  When there was a Medicare review going on, you said

2    you'd prepare fabricated group therapy notes to be sent to

3    Medicare.

4    A.  Yes, I did.

5    Q.  Why did you have to do that?  Wasn't the idea that on a

6    day-to-day basis the therapists would be writing these notes

7    and at any given time you'd have --

8            MR. HERMIDA:  Objection, leading, as to form.

9            THE COURT:  Sustained.

10   BY MR. GOODYEAR:

11   Q.  Why did you have to do that?

12   A.  I'm sorry, could you repeat the question?

13   Q.  Why was there a need to create group therapy notes in

14   response to a Medicare review?

15   A.  If the notes did not match what we were trying to

16   accomplish, I guess, with the storyline we had to come up with

17   or since the documents were just kind of fabricated altogether

18   and they didn't actually say anything -- if, let's say the

19   patient had been there a certain amount of time and they were

20   requesting documents for that, we needed to show that there had

21   been some progress.  So we needed to match -- so the notes had

22   to match whatever we were trying to --

23   Q.  So how --

24   A.  -- the story.

25   Q.  How would you go about creating those fabricated group

1    therapy notes?

2    A.   In my computer at work.  That way --

3    Q.   Were you creating them from scratch, were you creating them

4    some other way?

5    A.   We would create some from scratch.  Other times we had a

6    bank of notes already since there had been so many -- as the

7    years progressed, there were many notes, so sometimes we

8    would -- but the ones for the review, we would actually create.

9    But in general --

10   Q.   And would you fabricate quotations to go in those group

11   therapy notes?

12   A.   Yes, I would.

13   Q.   What kinds of things would you have the patient say?

14   A.   If it was towards the beginning of the treatment, we would

15   have -- they needed to be more severe.  So let's say you need

16   to say, I don't feel like living anymore.  There are days that

17   I'm very tired.  I don't want to get up, get out of bed.  I'm

18   crying all day.

19   Q.   What kinds of things would you have them say later on in

20   their therapy?

21   A.   I'm feeling a little better.  I'm still sad, but I'm

22   dealing with it a little better now.  Or I've learned how to

23   relax a little bit more.

24   Q.   Did you have to be careful not to make the patients seem

25   too depressed?

1    A.   Yes.

2    Q.   Why?

3    A.   If they were too depressed, they needed to be hospitalized,

4    and then they weren't meeting criteria for PHP.

5    Q.   For Medicare reviews, did you present fabricated group

6    therapy notes that you had prepared to the therapists to get

7    their signatures on them?

8    A.   Yes.

9    Q.   And did they sign those fabricated documents?

10   A.   Yes, they did.

11   Q.   And do you recall doing that for each of the three

12   defendants who were therapists in the East who are here today,

13   Salafia, Marks, and Crabtree?

14   A.   Yes, I do.

15   Q.   Did you ever forge the signature of a therapist?

16   A.   If it was a time-sensitive document that needed to go out

17   and they were not there at that moment, yes.

18   Q.   Did that happen often?

19   A.   No.

20   Q.   The therapists were generally there every day, correct?

21   A.   Yes.

22   Q.   So if a therapist was there, would you forge the signature

23   or would you take it to them?

24   A.   Take it to them.

25   Q.   And did a therapist ever refuse to sign something --

1          MR. HERMIDA:  Asked and answered, objection.

2    BY MR. GOODYEAR:

3    Q.  -- that you'd asked them to sign?

4          THE COURT:  Overruled.

5    BY MR. GOODYEAR:

6    Q.  Did a therapist ever refuse to sign something that you

7    asked them to sign?

8    A.  No.

9    Q.  You talked about this before.  Do you recall a time when

10   the government arrested several individuals who worked at a

11   different PHP?

12   A.  Yes.

13   Q.  Okay.  I don't want to go into -- I don't want to spend too

14   much time on this, don't want to go into what the PHP was, but

15   do you recall any conversations within Health Care Solutions

16   about reaction to those arrests?

17   A.  Yes, I do.

18   Q.  What was said in those conversations?

19   A.  We would discuss the concerns that they were going to come

20   to Health Care Solutions as well.  We were concerned that maybe

21   we could be in trouble ourselves and be arrested ourselves.

22   Q.  Who was saying those kinds of things?

23   A.  Myself, Dana Gonzalez, Liliana Marks, Doris Crabtree, Alina

24   Feas, all of us.

25   Q.  And why were people concerned that arrests at a different

1    PHP might mean that Health Care Solutions would be shut down?

2    A.   Because we knew the patients at Health Care Solutions did

3    not meet criteria and that we were committing fraud.

4              MR. GOODYEAR:   Nothing further, Your Honor.

5                        *   *   *   *   *

1    UNITED STATES OF AMERICA                    )
                                                 ) ss:
2    SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 7th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 1 - 56.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 15th day of November, 2014.

16

17

18                        /s/ Carly Horenkamp

19                        Carly L. Horenkamp, RMR, CRR
                          Certified Shorthand Reporter

20

21

22

23

24

25