```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF FLORIDA
                  MIAMI DIVISION
          CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,           NOVEMBER 10, 2014
                                    11:44 A.M.
              Plaintiff,



     vs.



ROGER ROUSSEAU, et al.,

              Defendants.      PAGES 1 THROUGH 43
```

---

```
                        DAY 6
             EXCERPT OF CRIMINAL JURY TRIAL
     (DIRECT EXAMINATION OF DANA GONZALEZ BY MR. MEDINA)
        BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5147
```

1               **I  N  D  E  X**

2    *Certificate* ----------------------------------------------- 43

3

4                       **W I T N E S S**

5    ON BEHALF OF THE GOVERNMENT:                         PAGE
     DANA GONZALEZ
6    DIRECT EXAMINATION BY MR. MEDINA                          4

7

8

9

10

11                    **E X H I B I T S**
     GOVERNMENT EX. NO.:                      OFFERED ADMITTED
12   202  -                                      7        7

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Before Jury, 11:44 a.m.)

2           THE COURT:  Who is your next witness?

3           MR. MEDINA:  The United States calls Dana Gonzalez.

4           THE WITNESS:  May I leave?

5           THE COURT:  Yes.  Does she need the interpreter?

6           MR. MEDINA:  No, Your Honor.

7            DANA GONZALEZ, GOVERNMENT WITNESS, SWORN

8           COURT REPORTER:  Please state your full name, spell

9     your last name for the record, and use the microphone, please.

10          THE WITNESS:  Dana Gonzalez, G-O-N-Z-A-L-E-Z.

11          THE COURT:  Can you move a couple of feet to your

12    right?  You can just slide to your right.  And you could move

13    the microphone over there also.  It just makes it easier for

14    people to see you with all the equipment.

15          THE WITNESS:  Okay.

16          MR. MEDINA:  May I proceed, Your Honor?

17          THE COURT:  All right.  Go ahead, Mr. Medina.

18                        DIRECT EXAMINATION

19    BY MR. MEDINA:

20    Q.  Ms. Gonzalez, are you a doctor?

21    A.  No.

22    Q.  Have you ever been a doctor?

23    A.  No.

24    Q.  How about a nurse?

25    A.  No.

1    Q.  Ms. Gonzalez, have you ever been a licensed therapist?

2    A.  No.

3    Q.  Where do you currently live?

4    A.  Here at FDC, jail, Miami.

5    Q.  Is FDC a jail?

6    A.  Uh-huh.

7    Q.  Is that what you said?

8    A.  Correct, yeah.

9    Q.  Please tell the jury why you are there.

10   A.  Because I was convicted for Medicare fraud last year.

11   Q.  Now, you said you were convicted.  Did you plead guilty to

12   conspiracy to commit health care fraud?

13   A.  Yes, conspiracy, yes.

14   Q.  And just in general terms, please tell the jury what you

15   did that made you guilty.

16   A.  Well, basically I was hired by this company, Health Care

17   Solutions, to fabricate paperwork and all types of documents to

18   make sure the patients met criteria for billing purposes so we

19   could bill Medicare.

20   Q.  When you said that patients had to meet criteria to bill

21   Medicare, what do you mean by that?

22   A.  Well, there was a criteria to be admitted to the program

23   and not just because you had a mental diagnosis.  You were --

24   you know, you qualified for the service, there had to be a

25   crisis for them to qualify, and that's basically what I did.  I

1    fabricated, you know, the trigger or the stressor for the

2    client.

3    Q.   And we'll talk about stressors in a moment.

4    A.   Okay.

5    Q.   Now, you said you worked at a company called Health Care

6    Solutions Network.  Was that a company in Miami or also in

7    North Carolina?

8    A.   Well, there were two in Miami and one in North Carolina,

9    and I worked in all three basically.

10   Q.   You worked at all three locations, correct?

11   A.   Alternating, yes.

12   Q.   Now, did you commit fraud alone or with others,

13   Ms. Gonzalez?

14   A.   Along with everybody else, yes.

15   Q.   Does that include therapists?

16   A.   Therapists, doctors, yes, nurses, everybody, yeah.

17   Q.   Now, as a result of your guilty plea, did you enter a plea

18   agreement with the United States?

19   A.   Yes.  Yes, I did.

20   Q.   I'm showing you what's been marked as Government

21   Exhibit 202, which has not been admitted into evidence.  Do you

22   recognize Government Exhibit 202?

23   A.   Yes.

24   Q.   What is that?

25   A.   My plea agreement.

```
 1           MR. MEDINA:  The government moves into evidence

 2   Exhibit 202 and would request permission to publish.

 3           THE COURT:  All right.  Exhibit 202 will be received

 4   in evidence.

 5           MR. MEDINA:  Ms. Zaferis, please zoom in to

 6   paragraph 7, which will be found on page 4 of Government

 7   Exhibit 202.

 8   BY MR. MEDINA:

 9   Q.  Now, without getting into this paragraph, have you read

10   this before?

11   A.  Yes.

12   Q.  Now, are you aware that you have certain obligations under

13   your plea agreement?

14   A.  Yes, I do.

15   Q.  And what are those obligations?

16   A.  Basically, I went over with them with my lawyer at the

17   time, and simple, cooperate with the government and say the

18   truth at all times.

19   Q.  Now, if you give false, misleading, or exaggerating

20   information to the government, what could happen?

21   A.  Could probably get another charge, and my plea will just go

22   away.

23           MR. LEVIN:  Your Honor, could you have the witness

24   keep her voice up?  I'm having difficulty hearing her.

25           THE COURT:  Yes.  Can you --
```

1      THE WITNESS:  Okay.

2    BY MR. MEDINA:

3    Q.  Now, have you been sentenced, Ms. Gonzalez?

4    A.  Yes.

5    Q.  What have you been sentenced to?

6    A.  Seventy months.

7    Q.  And who determined your sentence?

8    A.  Judge Cecilia Altonaga.

9    Q.  That's a federal district judge right here in Miami?

10   A.  Yes, correct.

11   Q.  Now, by testifying today, what if anything do you hope to

12   gain?

13   A.  A sentence reduction.

14   Q.  And who is going to ultimately determine whether you get a

15   sentence reduction?

16   A.  Judge Altonaga.

17   Q.  So Judge Altonaga has the last word; is that correct?

18   A.  Absolutely, yeah.

19   Q.  Now, prior to your arrest, Ms. Gonzalez, were you

20   interviewed in North Carolina?

21   A.  Yes, two agents.

22   Q.  By two agents?

23   A.  Uh-huh.

24   Q.  During that interview, were you entirely truthful?

25   A.  No, I wasn't.

```
1    Q.  Why not?

2    A.  Basically they showed up on my house and I was scared.  I

3    denied everything when they asked me and I -- at the time I

4    didn't have a lawyer and they -- you know, you always hear,

5    don't talk to the police when you don't have a lawyer, so I

6    denied everything.

7    Q.  Now, after you signed the plea agreement, which is

8    Government Exhibit 202, did you inform the government that you

9    committed fraud at other partial hospitalization programs

10   besides Health Care Solutions Network?

11   A.  Yes, I did.

12   Q.  And can you still be charged for what you did at those

13   other partial hospitalization programs?

14   A.  Yes.

15   Q.  Has the government made any promises to you whatsoever?

16   A.  No, none.

17   Q.  Who is Omar Govin?

18   A.  He was my -- he is my ex-husband.

19   Q.  Now, did Mr. Govin fabricate and falsify documents along

20   with you and others at Health Care Solutions Network?

21   A.  Yes, he did.

22   Q.  And did the government make any promises to you about

23   whether or not Mr. Govin could be charged for his role in the

24   Health Care Solutions Network fraud?

25   A.  No, no promises, you know, about him either, so...
```

1    Q.   Now, I want to talk about how your role began at Health

2    Care Solutions Network, okay?

3    A.   Okay.

4    Q.   All right.  I'm showing you what's been admitted into

5    evidence as Government Exhibit 305.  Do you recognize the

6    person shown in this photo?

7    A.   Yes, Armando Gonzalez, the owner.

8    Q.   And he was the owner of Health Care Solutions Network?

9    A.   Yes.

10   Q.   All right.  In or around April 2005, did you have an

11   opportunity to interview for a position with Mr. Armando

12   Gonzalez?

13   A.   Yes, I did, in April 2005.

14   Q.   Now, before we get into the interview, you're not related

15   in any way to Mr. Gonzalez; is that right?

16   A.   No.  No.

17   Q.   Where did the interview take place?

18   A.   At the East office, the first office on the third floor,

19   can't quite remember the address right now.

20   Q.   Now, what position were you interviewing for at the time,

21   in April 2005?

22   A.   Basically to do the screenings and admission paperwork.  It

23   was basically to do paperwork, but I was told I might do groups

24   as well.

25   Q.   Now, I'm going to talk about the screening and paperworks

1    in a moment, but what do you recall, if anything, being

2    discussed during this interview with Mr. Gonzalez?

3    A.   He basically told me that they were in review, the clinic

4    was under review, the PHP, and he said he needed someone to

5    start working as soon as possible, to start, you know, doing

6    the paperwork because they had a deadline.  And he asked me

7    when I can start -- I could start, and I told him the next day.

8    Q.   So you started the next day after the interview in

9    April 2005?

10   A.   Uh-huh, yes.

11   Q.   Now, you talked about documentation, like screenings.  Do

12   you recall that?

13   A.   Yes.

14   Q.   What types of documents are we talking about that Armando

15   Gonzalez was asking you to create?

16   A.   Well, the names of the documents?

17   Q.   Yes.

18   A.   The screenings, biopsychosocials, treatment plans, and then

19   also the doctors' paperwork, which was the psychiatric

20   evaluation, M.D. notes, discharge summaries.  And sometimes if

21   we needed to fix notes, meaning make corrections to the notes,

22   I also had to do that.  Treatment plans, TPRs, it's a lot of

23   paperwork.

24   Q.   Now, you mentioned something called a review.  What is a

25   review?

1    A.   Okay.   The center, from time to time, was put under review,

2    which means Medicare would request a certain percentage of

3    charts.   Let's say you're in 30 percent review, you have 100,

4    so you send 30 to Medicare.   So when the center went on review,

5    that's when I was hired.

6    Q.   Now, in April 2005 when you were asked to create documents

7    like the screenings, the biopsychosocials, the treatment plans,

8    the psych evaluations, were they accurate or inaccurate?

9    A.   They were basically nonexistent.   Some of them were not in

10   the charts, and the ones that were there we had to fix -- I had

11   to fix.

12   Q.   Now, were these for claims that had already been submitted

13   to Medicare?

14   A.   Some of them, yes.

15   Q.   Approximately how long, Ms. Gonzalez, did you work at

16   Health Care Solutions Network in Miami?

17   A.   Until sometime August, September 2010.

18   Q.   And were you working primarily in the East location?

19   A.   Yes.

20           MR. MEDINA:   You can take down the photo.

21   BY MR. MEDINA:

22   Q.   Who is Dr. Roger Rousseau?

23   A.   He was the medical director at Health Care Solutions.

24   Q.   Now, was he the medical director in April 2005 when you

25   started working at Health Care Solutions Network East?

13

1  A.  No.  I remember there was another doctor, and then soon

2  after he took over.

3  Q.  From April 2005 through 2010 who was responsible for

4  creating the initial psych evaluations at Health Care Solutions

5  Network East?

6  A.  I was, along with Gema Pampin.

7  Q.  Did Dr. Rousseau create any initial psych evaluation at the

8  East location?

9  A.  No.

10 Q.  Did Dr. Rousseau create any documentation like physician

11 progress notes?

12 A.  No.

13 Q.  Who did?

14 A.  I did, along with Gema.

15 Q.  Now, why did you, Gema Pampin, create initial psych

16 evaluations and physician progress notes?

17 A.  Basically, we were the ones interviewing the patient, and

18 since the doctor was not there we did the paperwork, and then

19 he came back and he signed it.

20 Q.  Before we get into that, Ms. Gonzalez, who is Milly?

21 A.  That was Dr. Rousseau, he had a personal secretary at his

22 private office.

23 Q.  And are you aware if Milly would come to the office?

24 A.  Yes, come --

25 Q.  And why would she come there?

1  A.  To Health Care Solutions, she would come from time to time.

2  She picked up psychiatric evaluations and basically the names

3  of the clients that were admitted, some of them that were

4  admitted.

5  Q.  Now, I want to show you what's already been admitted into

6  evidence as Government Exhibit 303.  Do you recognize the

7  person in Government Exhibit 303?

8  A.  Yes, Alina Faes, Dr. Alina Faes.

9  Q.  And was she the clinical director at the East location?

10  A.  Yes.

11  Q.  Now, are you aware if Alina Faes was a psychologist or a

12  psychiatrist?

13  A.  Psychologist.

14  Q.  For the documents that you and Gema Pampin created, the

15  initial psych evaluations and the physician progress notes, was

16  it required that Dr. Rousseau sign them?

17  A.  Absolutely.  He was the only one who could sign a

18  psychiatric evaluation.  Only a psychiatrist could, I mean --

19       MR. MEDINA:  You can take down the photo.

20  BY MR. MEDINA:

21  Q.  Now, a moment ago you said that Dr. Rousseau was rarely

22  there; is that correct?

23  A.  About two, three times a month.

24  Q.  Okay.  Let's talk about when he decided to show up, okay?

25       MR. RABIN:  Objection to the form.

1    THE COURT:  Sustained.

2  BY MR. MEDINA:

3  Q.  Please describe to the jury, Ms. Gonzalez, what happened

4  when Dr. Rousseau would show up at the East location.

5  A.  He basically came in, said hello, went to Dr. Feas' office,

6  sat there.  That's when Gema and I would try to bring as many

7  charts as we could from medical records.  We had a cart and

8  sometimes just piles of charts so that he could start signing.

9  They would discuss issues and, you know, about the program,

10  admissions, oh, my God, how many patients or how many

11  discharges, how's everything, basically while he was signing

12  the documents.

13  Q.  I want to break that down, Ms. Gonzalez.  You said that you

14  and Gema Pampin would see Dr. Rousseau when he would show up?

15  A.  Yes.

16  Q.  And you said that you would bring him documents to sign.

17  A.  Yes.

18  Q.  Approximately, on average, on approximation, how many

19  documents would you have Dr. Rousseau sign?

20  A.  As far as charts, 30, 40, as many as we could get in.  And

21  then if we had some like paperwork, paper clip, we would try to

22  have it -- you know, have it signed as well, as many -- as much

23  as possible.

24  Q.  Now, when you say "charts," what do you mean by charts that

25  you brought Dr. Rousseau to sign in front of you?

1    A.   The patient files, they were either on a plastic binder --

2    those are -- those were the active patients.  And the closed

3    ones, they were just files because they were ready to be put

4    in -- you know, back in medical records.  So as many as we

5    could, between 30, 40, as many --

6    Q.   Ms. Gonzalez, why were there so many documents for

7    Dr. Rousseau to sign?

8    A.   Okay.  On average we had anywhere from 60, 80, sometimes it

9    got to 100 patients.  So if you multiply that -- okay, let's

10   say one psychiatric evaluation per patient, one M.D. note per

11   week per patient, discharge summaries, treatment plans -- there

12   was a master treatment but then there were TPRs, which were

13   like weekly treatment plan reviews, he had to sign those too.

14   About medication changes, he had to sign those forms too.  So

15   it was tons of paperwork.  Multiply that by 80 clients a week,

16   so -- plus the admissions.

17   Q.   Now, when you would bring -- you and Gema Pampin would

18   bring 30, 40 or so charts at a time, what would Dr. Rousseau

19   say, if anything?

20   A.   He didn't say much.  He just started signing.  They had

21   like a red sticky so he knew which ones were the documents that

22   he needed to sign, because these files were like this big

23   (indicating).  So there were stickies, and he would just flip

24   the pages and sign the documents.

25   Q.   When you say "this big," are we talking about six inches,

1    five inches, less?

2    A.   Four, five inches sometimes.

3    Q.   And did you observe Dr. Rousseau signing the charts?

4    A.   Yeah.

5    Q.   Did he ever say, I'm not comfortable with signing the

6    physician progress notes?

7    A.   No.

8    Q.   What about, I'm not comfortable for signing these initial

9    psych evaluations?

10   A.   No.

11   Q.   Ms. Gonzalez, did you ever forge Dr. Rousseau's signature?

12   A.   Yes.

13   Q.   Why did you have to do that?

14   A.   The problem is, when we are -- were under review,

15   especially under review, there was a deadline.  They gave us a

16   certain date by which the charts had to be at Medicare.  We

17   tried to get in touch with him or even told Manny sometimes,

18   Dr. Feas, but if he didn't show up, I just went ahead and did

19   his signature real quick so -- because after that we had to --

20   after everything was in order, we had to make copies, keep a

21   copy and send a copy to Medicare.  So we were in a hurry, and

22   he wouldn't answer the phone call or show up, and so we went --

23   I went ahead and I signed it for him.

24   Q.   Now, did you also use a stamp with Dr. Rousseau's

25   signature?

1    A.  Yes, I did, but that came after.

2    Q.  And tell us about that.  How did it come about?

3    A.  I guess it was management, you know, since he wasn't

4    available, they came up with the idea of a stamp, which they

5    brought.  I remember, it was John Thoen.  He was one of the

6    clinical coordinators, and he brought the stamp and it was

7    discussed and everybody agreed that, you know, it should be

8    kept under lock and key, but we could use it instead of having

9    to forge his signature.

10   Q.  When you say "everybody agreed," what do you mean by that?

11   Who do you mean?

12   A.  I mean, it was understood everybody -- it was used by

13   medical records, Dr. Feas, myself.  Everybody saw me using the

14   stamp in my office or in medical records.  And that was better

15   than having to forge his signature.  It was a stamp that we

16   used all the time.

17   Q.  Did Dr. Rousseau ever observe you stamping documents?

18   A.  If he got there while we were doing it, yeah, it happened

19   from time to time.  I mean, rarely, because if we -- whenever

20   he got there, then we tried to get his signature.  But when he

21   left there were ten charts, then we would just go ahead and

22   start, you know, stamping them.

23   Q.  Ms. Gonzalez, these times when you had to sign

24   Dr. Rousseau's signature or use Dr. Rousseau's stamp, was it

25   ever because you had fear that Dr. Rousseau wouldn't sign what

1    documents you created?

2    A.   No.  No, it was just we were trying to get them out of the

3    way.  I mean, medical records was like a small room, and

4    sometimes there were charts on the floor and piles of charts,

5    that we were just trying to get them out of the way and file

6    them back in the cabinet.

7    Q.   Now, I want to talk about the patients first for a moment.

8    On average, how long would the patients stay at Health Care

9    Solutions Network?

10   A.   Anywhere from eight to twelve, sixteen weeks.

11   Q.   And were there certain times when patients would be

12   discharged from the East and go to the West?

13   A.   Absolutely, yeah.

14   Q.   Are you aware of who was responsible for creating the

15   documentation, like the screenings, biopsychosocials, similar

16   to you and Gema Pampin at the West location?

17   A.   They were the therapists.  I understand it was Alina Fonts

18   and Hortensia at one point as well.

19   Q.   Doing the same documentation that you were doing for the

20   West location?

21   A.   Uh-huh.

22   Q.   Did you have discussions with Alina Fonts or Blanca Ruiz

23   about patients recycling from East to the West?

24   A.   Mostly when we were under review, because we wanted to make

25   sure that the screenings and the stressors, that everything

1    matched for admission purposes, so we would go over that and

2    ask questions.

3    Q.   Explain to the jury, what do you mean by making sure that,

4    for the review purposes, about the patients.

5    A.   Okay.  If the patient had been in our office in the East a

6    month ago and then they were admitted to the West, and then

7    that patient was under review, let's say we had to send that

8    chart to Medicare, we wanted to make sure the biopsychosocial,

9    the screening, the demographic information, you know, as far as

10   how many brothers and sisters, are they dead, where are you

11   from, all that was in order, you know, to make sure that when

12   they received the information, everything matched.

13   Q.   And these are discussions you'd have with Blanca Ruiz and

14   Alina Fonts who were at the West location?

15   A.   Yeah.  Even I remembered, like diagnosis, make sure if it's

16   a major depression here, it's the same diagnosis at the other

17   place.

18   Q.   And why was that necessary?

19   A.   I mean, you don't want to change the diagnosis in the

20   middle of treatment or say someone is major depression and show

21   that over here they're bipolar.  You want to stick to the same

22   diagnosis.

23   Q.   Do you recall a patient by the name of Steven Abbott?

24   A.   Yes.

25   Q.   What do you remember about Mr. Abbott?

1  A.  He was young, American.  He was in Liliana Marks' group,

2  very paranoid, hallucinating.  He would come in and out of

3  group a lot.  He was hard to redirect.  Schizophrenia, I

4  believe, was his diagnosis.

5  Q.  And when you said that Mr. Abbott would come in and out of

6  group a lot, how do you know that?

7  A.  He was very anxious.  He was actively hallucinating,

8  talking to himself, and Gema and I would have to redirect,

9  sometimes the drivers, make sure he didn't leave the program,

10  go out the door.  So he would go to the kitchen, go to the

11  bathroom, come back, come in, sit down, get up.  It was -- he

12  was very anxious.

13  Q.  Are you aware if he ever handed you or Dana or Gema Pampin

14  notes?

15  A.  It was letters that he pretended he was -- he thought he

16  was in the military, and he would give us little notes and

17  papers, that there were secret operations and he gave them to

18  us for us to mail and things like that, and --

19  Q.  Did that happen during group sessions, Ms. Gonzalez?

20  A.  Yeah.

21  Q.  Who was Ondina Duenas?

22  A.  She was a patient from Doris's group, I believe.

23  Q.  And what do you recall about Ms. Duenas?

24  A.  I believe she was Cuban, heavy-set lady, in a wheelchair,

25  very depressed, cried a lot.  She came to the program, she was

1    like one of those patients that came and was discharged and

2    readmitted and discharged.

3    Q.  And explain that.  What do you mean by that?

4    A.  Ondina, she really enjoyed the program, and even though she

5    didn't meet criteria, was one that was always there.  So we

6    would discharge her and readmit her in three weeks or -- three,

7    four weeks, and then keep her for --

8         MR. GONZALEZ:  Your Honor --

9    A.  -- another two, three weeks.

10        MR. GONZALEZ:  -- I object to the term "we."  I really

11   don't understand what that is.

12        THE COURT:  Don't make speaking objections.

13        MR. GONZALEZ:  Okay.  I object to the term "we."

14        THE COURT:  Sustained.

15   A.  Do you want me to explain?

16   BY MR. MEDINA:

17   Q.  Who would admit the patients at Health Care Solutions

18   Network?

19   A.  It was basically Lis that was in charge of that, Lisset

20   Palmero.  She was the administrator and she was the one who

21   kept track of discharge dates.  So, you know, after a few weeks

22   she would either call the assisted living facility or the

23   client, see if they wanted to come back to the program.  So she

24   basically kept track of that.  And Ondina was always willing to

25   come back to the program, so...

1  Q.  Did you have discussions with Dr. Rousseau about the fact

2  that patients were being recycled back and forth?

3  A.  Yeah, the issue came -- I mean, that came up throughout the

4  six years I think that I was there.  That was a big concern.  I

5  mean, Medicare, you're sending these charts, you're billing

6  Medicare for these patients and they're being recycled, not

7  only from the East to the West but from other programs?  So

8  that was a concern and we discussed it several times.

9  Q.  With Dr. Rousseau?

10  A.  With Dr. Rousseau, absolutely.

11  Q.  What would Dr. Rousseau say when you raised these concerns

12  about patients being discharged continuously from the East and

13  West and vice versa?

14  A.  Yeah, he was concerned too.  I mean, it was -- everybody

15  was worried, but nobody did anything about it.

16  Q.  Anything ever change?

17  A.  No.

18  Q.  Did Dr. Rousseau express any other concerns with you about

19  what was going on at Health Care Solutions Network?

20  A.  Sometimes he was worried about the length of stay.  This

21  was short -- supposed to be a short program.  I mean, four to

22  six weeks, no more than that.  When these patients stayed for

23  sixteen weeks and fourteen, twelve weeks, three months, so he

24  did say, you know, are they going to get discharged?  But it

25  was not up to us.  I mean, it would have been up to him, but

 1  nobody did anything about it either.

 2  Q.  Ms. Gonzalez, it would be up to Dr. Rousseau.  Why is that?

 3  A.  He was the medical director.  I mean, he was the only one

 4  that had the -- you know, the power to admit a client and

 5  discharge a client.  None of us were doctors, so --

 6          THE COURT:  All right.  It's almost 12:15.  Let's take

 7  our luncheon recess.  We'll come back at 1:45, all right?

 8  1:45.

 9      (Luncheon Recess, 12:15 p.m. to 1:45 p.m.)

10          THE COURT:  All right.  Everybody is here.  Let's

11  bring in the jury.

12      (Jury Present.)

13          THE COURT:  Welcome back, everyone, and please be

14  seated.

15          All right.  Mr. Medina.

16          MR. MEDINA:  Thank you, Your Honor.

17  BY MR. MEDINA:

18  Q.  Ms. Gonzalez, just to be sure, please make sure to speak

19  into the mic so everyone can hear you, okay?

20  A.  Okay.

21  Q.  Before we broke, Ms. Gonzalez, you testified about concerns

22  that you raised with Dr. Rousseau.  Do you recall that?

23  A.  Yes.

24  Q.  And can you just again repeat what concerns you raised with

25  Dr. Rousseau?

1      MR. RABIN:  Objection, asked and answered.

2      THE COURT:  Sustained.

3  BY MR. MEDINA:

4  Q.  Now, with respect to the stamp, do you recall the stamp

5  that was used?

6  A.  Yes.

7  Q.  Are you aware if Dr. Rousseau was present when you in fact

8  were stamping his signature to patient file documents?

9      MR. RABIN:  Objection, asked and answered.

10     THE COURT:  Overruled.

11 BY MR. MEDINA:

12 Q.  Are you aware if Dr. Rousseau was present?

13 A.  Yes.

14 Q.  How are you aware?

15 A.  Because we used to stamp sometimes in medical records while

16 he was there.  Sometimes our office.  I mean, it was -- we were

17 not trying to hide the stamp.  It was right there.  I was at my

18 desk or medical records or Alina's office, Dr. Feas' --

19 Q.  And where was Dr. Rousseau when you were stamping

20 signatures?

21 A.  In medical records.  Sometimes he was sitting down.  He was

22 signing the documents.  And when he got up, I continued with

23 the stamp.  And Mr. Bello was there, Alejandro Bello, and the

24 medical records staff.

25 Q.  Now, I want to talk about some of the mental status

1    evaluations you performed.  Do you recall that?

2    A.   Yes.

3    Q.   What are, first off, mental status evaluations?

4    A.   It's like to find out -- to find out if the patient is

5    oriented to time, place, and person.  So we would do a little

6    bit of that at the beginning, as soon as I met the patient, to

7    see where he was going to -- he or she was going to be placed,

8    what group.

9    Q.   Now, documents at Health Care Solutions Network,

10   screenings, biopsychosocials, group therapy notes, were they

11   accurate or inaccurate?

12   A.   Inaccurate.

13   Q.   Now why, then, was it necessary, Ms. Gonzalez, to sit down

14   with the patient for one of these mental status evaluations?

15   A.   Like I told you, because sometimes we would get like more

16   high functioning patients and they would go into different

17   groups.  So in order to separate and know where they -- which

18   group we were going to place them, the low functioning

19   patients, we wanted to make sure whether they spoke Spanish,

20   English, what was their status.

21   Q.   Did Dr. Rousseau ever conduct mental status evaluations at

22   Health Care Solutions Network?

23   A.   Not really.  Sometimes he did see a patient or two because

24   there was a concern with medication and things like that, but

25   not to do mental status.

1    Q.  Did patients always respond to questions you were asking

2    them during these evaluations?

3    A.  There were some that did, but there were many that didn't.

4    You would ask them their names and they would smile, touch your

5    face some of them.  They didn't know the -- you know, the year.

6    Sometimes some of them thought they were in Cuba.  I mean, it

7    depends.  Some of them did answer my questions.

8    Q.  Are you aware of where a majority of these patients came

9    from at Health Care Solutions Network?

10   A.  Mainly ALFs, assisted living facilities.

11   Q.  And what in general are assisted living facilities,

12   Ms. Gonzalez?

13   A.  Places where they assist them with their living skills.

14   They are placed there.  They help them with their food.  They

15   give them the medication.  Basically, they live there.

16   Q.  And are you aware if kickbacks or bribes were paid to the

17   assisted living facilities?

18   A.  Yes.

19   Q.  Was this openly discussed at Health Care Solutions Network?

20   A.  Absolutely.  It was mainly the administrator, Lisset

21   Palmero --

22   Q.  And --

23   A.  -- the one who handled that.

24   Q.  I'm sorry.

25   A.  No.

1    Q.   Did you ever discuss kickbacks with Liliana Marks or Doris

2    Crabtree or any other therapists at Health Care Solutions

3    Network?

4    A.   I'm sure it came up in front of them, but that's not

5    something I recall talking to them about.

6    Q.   Now, you mentioned group assignments a moment ago.  What

7    were the different groups at Health Care Solutions Network

8    East?

9    A.   There was the first one, Liliana Marks, that was English

10   speaking, and in general it was a little bit more high

11   functioning.  And then Angela's group was low functioning,

12   Spanish.  The rest were Spanish groups for the Spanish

13   speakers.  And Doris were high functioning.  And Ruben was also

14   low functioning.

15   Q.   Now, you testified a moment ago that Ondina Duenas was in

16   whose group?

17   A.   In Doris Crabtree's.

18   Q.   And what about Steven Abbott?

19   A.   Liliana Marks.

20   Q.   Now, was there a low functioning group at Health Care

21   Solutions Network East?

22   A.   Yes.

23            MR. HERMIDA:  Objection, asked and answered.

24            THE COURT:  Overruled.

25   BY MR. MEDINA:

1   Q.  Who was in charge -- was there?

2   A.  Yes.

3   Q.  Who was in charge of the low functioning group at the East

4   location?

5   A.  It was mainly Angela and Ruben.

6   Q.  Is that Angela Salafia?

7   A.  Salafia.

8   Q.  Are you aware of what Angela Salafia did in her low

9   functioning group at the East location?

10  A.  Well, it was not the therapy that we were supposed to

11  provide.  It was mainly listening to music, playing letter

12  games with them on the board.  Like give me the names of five

13  animals that start with the letter A or B, things like that.

14  And sometimes I remem- -- not movies, no.  It was mainly the

15  music, the oldies and things like that, and letter games that I

16  can remember.

17  Q.  Are you aware of any other games that were played?

18  A.  Not really.

19  Q.  Did Doris Crabtree and Liliana Marks ever show movies in

20  their group therapy sessions?

21  A.  Yes.

22  Q.  What types of movies were shown?

23  A.  Just regular movies, like G-rated and comedies mostly.

24  Q.  Speaking of movies, Ms. Gonzalez, please tell the jury what

25  a typical Friday was like at Health Care Solutions Network

1    East.

2    A.   It was more relaxed in the sense that the four groups were

3    not -- it was not the four groups.  We -- it was like pizza day

4    and they brought pizza, soda, movie, and so the patients really

5    enjoyed it because it was not in like therapy group sessions.

6    Q.   Do you recall, Ms. Gonzalez, if Liliana Marks, Doris

7    Crabtree, and Angela Salafia participated in morning meetings

8    at Health Care Solutions East?

9    A.   The flash meetings.

10   Q.   The flash meetings.

11   A.   Uh-huh, and morning meetings.

12   Q.   How often did these meetings occur?

13   A.   The flash meetings, it was like 15 minutes before the

14   group, so 8:30 to 8:45, things like that.

15   Q.   Were they daily, weekly, how often?

16   A.   Daily.  We would meet for like 15 minutes to discuss the

17   prior day's -- any issues from the day before.

18   Q.   Now, before we talk about what happened in these daily

19   meetings, with respect to the groups themselves, are you aware

20   if patients were always on time for their group sessions?

21   A.   No, because we always had an issue with the drivers.  They

22   were coming from so far away, like Broward and Miami Gardens

23   and Homestead, so even though the group said that they started

24   at 9:15, actually there were very few on time.  Most of the

25   patients got there at 10:30, you know, the earliest, because it

1    was a van of 14 -- 12 to 14 patients, and they had to pick them

2    up at different locations, and by the time they got to Health

3    Care Solutions it was 10:30.

4    Q.  Did the notes, group therapy notes, accurately reflect that

5    patients were in fact late?

6    A.  No.

7    Q.  Why not?

8    A.  Because it wouldn't be billable.  I mean, you had to have

9    four notes daily in order for to us bill for that patient,

10   so...

11           MR. MEDINA:  Ms. Zaferis, can you please pull up

12   Government Exhibits 302 and 303 which I believe are admitted

13   into evidence.

14   BY MR. MEDINA:

15   Q.  Ms. Gonzalez, you testified earlier today that you knew

16   that Alina Faes, who is pictured in Government Exhibit 303.  Do

17   you see that?

18   A.  Yes.

19   Q.  On the left-hand side --

20   A.  Yes.

21   Q.  -- on your screen?  Who is shown on Government Exhibit 302?

22   A.  Wendera Eason.

23   Q.  And who is Wendera Eason?

24   A.  She was the medical records for the West, and she also

25   worked in North Carolina.

1    Q.  Did she also participate in morning meetings at the East

2    location with the therapists?

3    A.  No, no.

4            MR. MEDINA:  Ms. Zaferis, you can pull the pictures

5    down.

6    BY MR. MEDINA:

7    Q.  At these meetings, these morning meetings, are you aware if

8    Alina Faes instructed therapists like Doris Crabtree, Liliana

9    Marks, and Angela Salafia to not write certain things in their

10   group therapy notes?

11   A.  Yes.  It was Alina Faes, myself, and Gema also.

12   Q.  And what did you, Dana, and Alina Faes instruct the

13   therapists?

14   A.  Basically to document -- not to document and write quotes

15   like, for example, I'm doing okay, I went out on the weekend,

16   things like that, because the patient is supposed to be in

17   crisis, so you're not supposed to show that they're making

18   progress, that they're going out, spending time with family,

19   eating out and things like that.

20   Q.  Did you say not to include that patients were absent in

21   their group therapy notes?

22   A.  Right, right.

23   Q.  Ms. Gonzalez, did you have an opportunity to review

24   therapists like Doris Crabtree, Liliana Marks', and Angela

25   Salafia's group therapy notes?

1    A.   Yes.

2    Q.   Now, why did you need to review these?

3    A.   Especially during review -- if we were not under review,

4    then it wasn't a big deal.  But review, we had to go through

5    the whole chart, make sure everything matched, the notes with

6    the treatment plan review, with the M.D. note for the week,

7    everything had to match.

8    Q.   Were there times where group therapy notes were missing

9    during the review period?

10   A.   Could be, yeah.  It did happen.  From time to time we were

11   missing a note or two and we had to get it in there.

12   Q.   And what would happen in those scenarios?

13   A.   We would ask the therapists for the notes.

14   Q.   And are you aware if Liliana Marks's husband would deliver

15   notes to you?

16   A.   In the afternoon he would bring some notes, but she turned

17   them in, yeah, most of the times.

18   Q.   When you said bring you notes, were they hard copy notes?

19   A.   Yes.

20   Q.   Now, did you ever, during this review process, or at any

21   point in time, talk about copying and pasting going on in their

22   notes?

23   A.   Yeah.  The problem is the notes, when we were on review --

24   and most of the times they were copy/paste and cookie cutter

25   and we didn't really pay attention.  So when review came, we

1  had to make changes and correct those notes and fix them.

2  Q.  And can you explain, did you have those discussions with

3  Liliana Marks?

4  A.  Yeah.  What we would do is pull them out of the chart, let

5  them know these seven notes, ten notes, however many notes, you

6  need to go ahead and change them and add this quote or just

7  mention the fact that the patient was depressed, tearful.  I

8  will give them ideas myself.

9  Q.  Now, at any point in time, did Liliana Marks say, no, I'm

10  not doing that?

11  A.  No.

12  Q.  At any point in time, did Doris Crabtree say I'm not doing

13  that?

14  A.  No.

15  Q.  Are you aware of any point in time Angela Salafia saying,

16  no, I'm not changing my notes?

17  A.  No.

18  Q.  Did you ever, Ms. Gonzalez, have to forge group therapy

19  notes' signatures or group therapists' signatures?

20  A.  I remember I did it for Liliana, because we were on review.

21  And during that period it was the same thing, we were under

22  a lot of stress, we had to -- those notes had to go out, the

23  chart had to go out.

24  Q.  And are you aware if Liliana Marks knew that you forged her

25  signature?

1    A.  Yeah, I told her.

2            MR. PRIETO:  Objection, Judge, speculation.

3            THE COURT:  I'm sorry?

4            MR. PRIETO:  Speculation, Judge.

5            THE COURT:  Overruled.

6    BY MR. MEDINA:

7    Q.  Are you aware whether or not Liliana Marks knew you forged

8    her signature?

9    A.  Yeah, because I told her the next day.

10   Q.  What did you tell Ms. Marks when you forged her signature

11   during that review period?

12   A.  That I had to do it, you know, look at how it came out.

13   The chart just had to leave.  I mean, we had to make copies and

14   it had to be mailed.

15   Q.  And what if anything did Liliana Marks say?

16   A.  I can't re- -- nothing.  I mean, it was fine.

17   Q.  Did there come a point in time, Ms. Gonzalez, that Liliana

18   Marks and Doris Crabtree worked for a company called American

19   Therapeutic Corporation?

20   A.  Yes.

21   Q.  Did Liliana Marks, yes or no, leave Health Care Solutions

22   Network early to go work at American Therapeutic Corporation?

23   A.  Yes.

24   Q.  Who ran Ms. Marks's group when she was gone?

25   A.  Many times I did.

1  Q.  And what did you do with Liliana Marks's group when she was

2  away at American Therapeutic Corporation?

3  A.  Read the newspaper, show them a movie, open topic -- like

4  you choose the topic and let's talk about, you know, something

5  that happened, something on the news, things like that.

6  Q.  Now, who created a group therapy note for those times that

7  Liliana Marks was at American Therapeutic Corporation?

8  A.  I did.

9  Q.  And who signed the notes that were created?

10  A.  Myself and Alina Faes.  She had to cosign because I was a

11  registered intern.  I wasn't fully licensed.

12  Q.  Now, earlier you testified that the fact that patients were

13  recycling between the East and West was openly discussed.  Do

14  you recall that?

15  A.  Yes.

16  Q.  Did you have discussions with Liliana Marks and Doris

17  Crabtree about seeing patients from American Therapeutic

18  Corporation back at Health Care Solutions Network?

19  A.  All the time, uh-huh.

20  Q.  What did you guys discuss in general?

21  A.  I mean, sometimes it was even funny.  The person would be

22  discharged from our program on a Friday, and then Monday comes

23  and they're at American Therapeutics or, you know, vice versa.

24  And we recognized the name, and it's like, oh, my God, I mean,

25  if Medicare -- I mean, isn't this something that Medicare would

1    just pick up like that?  I mean, you're saying Friday that the

2    person met maximum benefit from the program, and then Monday

3    they show up with a crisis at the other center.  So we got

4    concerned.

5    Q.  Now, did there come a point in time in or around 2007 where

6    you had to assist in a review at the West location?

7    A.  Yes.

8    Q.  You worked at the East, though, during that time frame, is

9    that right, primarily?

10   A.  Yes.

11   Q.  Why, then, were you assisting the West location in or

12   around 2007?

13   A.  Well, Gema and I had more experience and the owner asked us

14   to help them in the West.  So that's when we started, you know,

15   getting the charts and getting them ready for review.

16   Q.  Now, during times when you would assist in the West

17   location, what if any role did Alina Fonts have during the

18   review process?

19   A.  She was the contact person.  If I had a question about a

20   client, a diagnosis, if there were notes missing, I would

21   contact Alina and get the paperwork from her, ask her for the

22   documents.

23   Q.  Why is it that you, Ms. Gonzalez, are asking Alina Fonts

24   for -- to answer documentation questions for West patients?

25   A.  Okay.  Instead of -- like, she would know who the therapist

1  was that was running that group, and if I needed the screening

2  or if I needed something corrected, she would go to the

3  therapist instead of having me, you know, call each one

4  individually.

5  Q.  Did you and Alina Fonts ever discuss with each other that

6  there was too many copy and pasting going on in the West files.

7  A.  I'm sure it came up, but nothing was done about it.  I

8  mean...

9  Q.  Now, you've been testifying about documents needed to be

10  created for the West review.  Did you also create documents for

11  patients in North Carolina?

12  A.  Mainly notes.  And when I worked there, I did the

13  screenings and all the admission papers.

14  Q.  Now, I'm showing you the check that's included in

15  Government Exhibit 14, which is already in evidence.

16        MR. MEDINA:  Ms. Zaferis, can you please blow up

17  Check 5251?

18  BY MR. MEDINA:

19  Q.  Ms. Gonzalez, do you recognize Check 5251, which is

20  contained in Government Exhibit 14?

21  A.  Yes.

22  Q.  And is this a check from Health Care Solutions Network,

23  Inc., dated March 19, 2010?

24  A.  Yes.

25  Q.  How much money is shown on this check?

1  A.  Eighteen eighty-two thousand?  I can't --

2          MR. MEDINA:  You want to zoom in to the total,

3  Ms. Zaferis, please.

4  A.  3,880 something.

5  BY MR. MEDINA:

6  Q.  Okay.  And who is this check made out to?

7  A.  Myself, Dana Gonzalez.

8          MR. MEDINA:  And Ms. Zaferis, can you please zoom in

9  on the memo line?

10  BY MR. MEDINA:

11  Q.  Now, you said that you created documentation for patients

12  in North Carolina, correct?

13  A.  Yes.

14  Q.  Now, does it -- what do you see at the end of the memo

15  line?

16  A.  It says "notes."

17          MR. MEDINA:  Okay.  You can zoom out, Ms. Zaferis.

18  Thank you.

19  BY MR. MEDINA:

20  Q.  Now, you did in fact work at Health Care Solutions Network

21  North Carolina for a period?

22  A.  I did, yes.

23  Q.  You did.  As a general matter, what if any differences were

24  there between therapists in the North Carolina office versus

25  therapists down at Health Care Solutions East?

1   A.   The therapists in the North Carolina office, they didn't

2   want to do the absent notes, the notes for the patients that

3   were absent, so those were the ones that I was doing when I was

4   here.

5   Q.   Now, did you ever have discussions with Ms. Liliana Marks

6   or Doris Crabtree about the differences in North Carolina

7   versus down in Miami?

8           MR. RABIN:  Objection, relevance.

9           THE COURT:  Overruled.

10  BY MR. MEDINA:

11  Q.   What if any discussions did you have with Doris Crabtree

12  and Liliana Marks about the operations in North Carolina versus

13  Miami?

14  A.   I mean, we were printing these notes at the office, so it

15  was a lot of notes for the patients in North Carolina, so when

16  they asked, we just explained that it was for the absent

17  patients.  They didn't want to do it.

18  Q.   When you say "they didn't want to do it," who --

19  A.   The --

20  Q.   -- are you referring to?

21  A.   I'm sorry.  The therapists, the North Carolina therapists

22  didn't want to do it, and some of them even quit because

23  they -- when they told them they had to do notes for the absent

24  patients, they said no.

25  Q.   Did you discuss the fact that kickbacks weren't paid in

1  North Carolina?

2  A.  Yes, that too.  I mean, the ALFs, they were just happy to

3  send their clients.  You didn't have to like actually pay them

4  to send the patients to the center.

5  Q.  So the ALFs in North Carolina were happy to send their

6  patients versus in Miami?

7  A.  Yeah.  In Miami they would not send them unless you paid

8  them.

9  Q.  Now, Ms. Gonzalez, do you recall a time when the government

10  arrested several individuals from a different partial

11  hospitalization program?

12  A.  Yes.

13  Q.  And without identifying the other partial hospitalization

14  program, do you recall conversations with Liliana Marks and

15  Doris Crabtree?

16  A.  Yes.

17  Q.  What did you discuss?

18  A.  Mainly, oh, my God, look what happened to them.  They had

19  this program going and look at all these offices and the owners

20  were arrested.  Things like that.  I mean, we were in shock.

21  Q.  Did you also have conversations with Liliana Marks and

22  Doris Crabtree after Armando Gonzalez and other Health Care

23  Solutions Network employees were arrested?

24  A.  Yes.  Yes.

25  Q.  And what did you discuss?

1    A.   It was the day that Manny, Armando, was arrested, and we

2    talked about -- you know, we were scared that day.  I remember

3    I was at work -- I was getting ready to go to work, and we were

4    in shock.  I mean, we were not -- that was -- we were scared.

5              MR. MEDINA:  One moment, ma'am.

6         (Off-the-record discussion.)

7              MR. MEDINA:  No further questions, Your Honor.

8                        *   *   *   *   *

1   UNITED STATES OF AMERICA                    )
                                                ) ss:
2   SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6   Reporter in and for the United States District Court for the

7   Southern District of Florida, do hereby certify that I was

8   present at and reported in machine shorthand the proceedings

9   had the 10th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13  pages 1 - 43.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 16th day of November, 2014.

16

17

                    /s/ Carly Horenkamp
18
                    Carly L. Horenkamp, RMR, CRR
19                  Certified Shorthand Reporter

20

21

22

23

24

25