```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
                        MIAMI DIVISION
                 CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,              NOVEMBER 10, 2014
                                       5:15 P.M.
                Plaintiff,


     vs.


ROGER ROUSSEAU, et al.,

                Defendants.     PAGES 1 THROUGH 16
```

---

```
                           DAY 6
                EXCERPT OF CRIMINAL JURY TRIAL
       (DIRECT EXAMINATION OF ALEXANDRA HAYNES BY MR. MEDINA)
           BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC  20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:      Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)        LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                        55 Merrick Way
                        Suite 212
                        Coral Gables, Florida   33134


FOR THE DEFENDANT:      Mr. Frank A. Prieto, Esq.
(Liliana Marks)         LAW OFFICE OF FRANK A. PRIETO, P.A.
                        One Northeast 2nd Avenue
                        Suite 200
                        Miami, Florida   33132


FOR THE DEFENDANT:      Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)           LAW OFFICES OF JUAN DE JESUS GONZALEZ
                        10631 N Kendall Drive
                        Suite 150
                        Miami, Florida   33176


FOR THE DEFENDANT:      Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)           LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                        Courthouse Tower
                        40 NW 3rd Street
                        Suite 200
                        Miami, Florida   33128


COURT REPORTER:         Carly L. Horenkamp, RMR, CRR
                        U.S. DISTRICT COURT
                        400 N. Miami Avenue, Room 12-3
                        Miami, Florida   33128
                        (305) 523-5147
```

```
 1                        I N D E X

 2    Certificate ----------------------------------------- 16

 3

 4

 5                         W I T N E S S
      ON BEHALF OF THE GOVERNMENT:                         PAGE
 6    ALEXANDRA HAYNES
      DIRECT EXAMINATION BY MR. MEDINA                        4
 7

 8

 9

10

11
                           E X H I B I T S
12    GOVERNMENT EX. NO.:                         OFFERED ADMITTED
      203 -                                          15       15
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (Before Jury, 5:15 p.m.)
2                ALEXANDRA HAYNES, GOVERNMENT WITNESS, SWORN
3            COURT REPORTER:  You may be seated.  Please state your
4    name for the record, spell your last name, and please use the
5    microphone.
6            THE WITNESS:  Alexandra Haynes, H-A-Y-N-E-S.
7            THE COURT:  All right.  Go ahead.
8                           DIRECT EXAMINATION
9    BY MR. MEDINA:
10   Q.  Ms. Haynes, how old are you?
11   A.  I am 38 years old.
12   Q.  And do you have any college degrees?
13   A.  I have a master's degree.
14   Q.  When did you earn your master's degree?
15   A.  In 2000.
16           THE COURT:  Can you move the microphone a little bit
17   closer to you, please?
18   BY MR. MEDINA:
19   Q.  Can you repeat that, Ms. Haynes?
20   A.  In 2000.
21   Q.  And what is your master's degree for?
22   A.  In -- it's a master's degree in psychology.
23   Q.  Now, have you ever been a licensed medical doctor?
24   A.  No, sir, I have not.
25   Q.  How about a registered nurse?

1  A. No, sir, I have not.
2  Q. At any point in time, Ms. Haynes, have you ever been a
3  licensed mental health therapist?
4  A. No, sir, I have not.
5  Q. Now, Ms. Haynes, have you ever been convicted of a crime?
6  A. Yes, sir, I have.
7  Q. What crime was that?
8  A. Conspiracy to commit Medicare fraud.
9  Q. And did you plead guilty to conspiracy?
10 A. Yes, sir, I did.
11 Q. Why did you plead guilty?
12 A. Because I was guilty.
13 Q. Can you please tell the jury what your role was in the
14 conspiracy?
15 A. I aided in fabricating charts. I did the intake work, the
16 biopsychosocials, treatment plan reviews, discharge summaries.
17 I helped with the entire intake process. All of that was
18 fabricated to try to tell a story about the patient that wasn't
19 really happening.
20 Q. Now, Ms. Haynes, where did you commit these crimes?
21 A. At Health Care Solutions Network.
22 Q. And did you commit the crimes at Health Care Solutions
23 Network in Florida and also North Carolina?
24 A. Yes, in both locations.
25 Q. Now, before you were interviewed by the government, before

```
 1    you were arrested, did you lie during your first interview?
 2    A.   Yes, sir, I did.
 3    Q.   Why was that?
 4    A.   I was afraid.  I was afraid of being caught.
 5    Q.   Now, did you enter eventually into a plea agreement with
 6    the government?
 7    A.   Yes, sir, I did.
 8              MR. MEDINA:  Ms. Zaferis, can you please pull up
 9    Government Exhibit 202, which is not in evidence.
10              THE COURT:  202?
11              MR. MEDINA:  202 -- oh, 203.
12              THE COURT:  203, I think.
13              MR. MEDINA:  Correct.  Thank you, Your Honor.
14    BY MR. MEDINA:
15    Q.   Ms. Haynes, do you recognize Government Exhibit 203?
16    A.   Yes, sir, I do.
17    Q.   And what is that?
18    A.   It is my plea agreement.
19    Q.   Now, as a general matter, what were your obligations under
20    the terms of the plea agreement?
21    A.   To be -- to be truthful and tell everything that I knew
22    that had happened at Health Care Solutions while I worked
23    there.
24    Q.   And Ms. Haynes, have you been sentenced in your case?
25    A.   Yes, sir, I have.
```

1  Q.  What was your sentence?
2  A.  I was sentenced to 70 months.
3  Q.  Is that 70 months in prison?
4  A.  Yes, sir.
5  Q.  Who determined your sentence, Ms. Haynes?
6  A.  Judge Altonaga.
7  Q.  Now, by testifying, Ms. Haynes, what if anything do you
8  hope to gain?
9  A.  I hope to be able to go home sooner to my children.
10 Q.  Who is going to make that determination?  Who ultimately
11 makes that decision at the end of the day?
12 A.  Judge Altonaga.
13 Q.  Now, prior to working at Health Care Solutions Network,
14 Ms. Haynes, did you also work at a company called Homestead
15 Behavioral?
16 A.  Yes, sir, I did.
17 Q.  And was that a PHP?
18 A.  Yes, it was.
19 Q.  Did there come a point in time where you committed fraud at
20 Homestead Behavioral?
21 A.  Yes, I did.
22 Q.  And what did you do?
23 A.  I sat in on a partial hospitalization group.  I conducted
24 that group knowing that I was not licensed to do so.
25 Q.  Did you also commit fraud and tell the government about it

1   at RNS Community Mental Health Center?
2   A. Yes, sir, I did.
3   Q. And what did you do there?
4   A. At RNS I did intake paperwork, like I did at Health Care,
5   and I also ran the groups on Saturday mornings, again not
6   knowing that I was licensed.
7   Q. Now, Ms. Haynes, has the government made any promises to
8   you whatsoever about being charged with additional health care
9   fraud crimes?
10   A. No, sir, they have not.
11   Q. Has the government made any promises to you whatsoever?
12   A. No.
13   Q. Now, I want to take you to the fall of 2006. Did you have
14   an opportunity to meet an individual by the name of Armando
15   Gonzalez?
16   A. Yes, I did.
17   Q. And who referred you to him?
18   A. Dana Gonzalez.
19   Q. At the time, in the fall of 2006, how many locations did
20   Health Care Solutions Network have?
21   A. There were two. There was the East location and the West
22   location.
23   Q. And when you met with Mr. Gonzalez, where was that, which
24   location?
25   A. At the West location.

1  Q. Now, did you later have an opportunity to go to the East
2  location for your first day?
3  A. Yes, I did.
4  Q. Can you please describe to the jury what you saw on that
5  first day?
6  A. I arrived at about 8 o'clock in the morning standard
7  starting time, and I walked in and it was a very chaotic
8  atmosphere. I had worked at a few other partial
9  hospitalizations at that point, but when I walked into this
10 one, I thought it strange, one, because it was in a strip mall
11 right off of U.S. 1 and I thought that was an odd location.
12 And when I walked in, there was -- there was hardly any
13 supervision for these patients. There were a lot of very
14 elderly patients that were there. Some of them were trying to
15 leave, trying to get home. I did not see really any staff when
16 I first walked in.
17     I was supposed to meet with Alina Faes, who was the
18 clinical coordinator there that day, and it took a little while
19 for her to be located.
20     I noticed that there was no privacy in the group rooms nor
21 in the offices. There's a lot of glass in the doors as well as
22 in the walls in between offices, so you could see a lot, and I
23 just didn't sense that there was much staff there and I was
24 wondering why that -- there was no receptionist. Later, I
25 found out that they were all in the back kind of having their

1  morning coffee, that sort of thing, while patients were kind of
2  roaming around freely.  And eventually Ms. Feas did come up to
3  the front to meet with me.
4  Q.  Now, were you eventually trained to perform your duties at
5  Health Care Solutions Network?
6  A.  Yes, I was.  On that first day, actually, Ms. Feas was not
7  expecting me, so she directed me over back to the West
8  location, where I was supposed to meet with John Thoen, who
9  would tell me what I was supposed to do.  When I arrived there,
10 he wanted me to work on some charts.  He wanted to be able to
11 review what type of documentation I could do.  Now, he was
12 aware that I was familiar with all of these types of paperwork
13 that were needed, but he wanted to know that I could write them
14 to the standard that Armando Gonzalez wanted.
15      He introduced me to Hortensia, who worked there, as well as
16 Blanca Ruiz, and said that, you know, they would be able to
17 help me.  They were both very welcoming, very friendly.  They
18 said, you know, that they'd been there for a little while.  If
19 there was anything that I needed, that they could help me be
20 oriented, find my way around that office.
21 Q.  So after John Thoen introduced you to Hortensia and Blanca
22 Ruiz, what did they tell you you needed to do in the chart?
23 A.  They told me that I needed to go through some charts that
24 they -- that had been provided to me by -- from the medical
25 records, and I was to go through them.  If things were

1   missing -- mostly at that time I think we were focusing on the
2   treatment plan reviews.  Throughout the two weeks that I was
3   there, it was everything, but they wanted me to see if there
4   was stuff missing, for me to write it up, and then I was to
5   turn it in to Hortensia so that she and John Thoen could review
6   it and make sure that it was up to their standards.
7   Q.  You said "up to their standards."  What do you mean by
8   that?
9   A.  Every location that I worked at had a different kind of
10  writing style, and I think John's concern, and ultimately
11  Armando Gonzalez's main concern, was that I could fabricate
12  them so that when these notes were turned in to Medicare, they
13  wouldn't be questioned.  That they were written appropriately,
14  that they matched the entire record from beginning to end, and
15  that they didn't have to always be watching over me.  They
16  wanted to know that I could produce these fabricated charts
17  that were embellished from beginning to end and be able to
18  match everything in the chart.
19          MR. LEVIN:  Your Honor, can we have the prosecutor
20  distinguish the "they"?  She keeps referring to "they."
21          THE COURT:  Okay.
22  BY MR. MEDINA:
23  Q.  When you're referring to "they," who are you referring to?
24  A.  When I refer to "they," I'm referring to Armando Gonzalez,
25  John Thoen, and Hortensia at the time.

1          THE COURT:  Can you move the microphone a little bit
2    closer, please?
3          THE WITNESS:  Yes, sir.
4    BY MR. MEDINA:
5    Q.  Now, who shared an office with Hortensia at the West
6    location in this fall of 2006 time frame?
7    A.  Blanca Ruiz.
8    Q.  And how long did you spend at the West location training to
9    create fake paperwork?
10   A.  I was there approximately two weeks.
11   Q.  And how often would you observe Blanca Ruiz meeting with
12   patients?
13   A.  I never saw her meeting with patients.  She was usually
14   there in the office while I was there.
15   Q.  Now, did Blanca Ruiz, yes or no, ever talk about Armando
16   Gonzalez?
17   A.  Yes, she did.
18   Q.  What did she say to you?
19   A.  She told me that she admired him and that she also knew
20   that there was a mutual respect between the two of them, that
21   he valued her as an employee.  She did state that he valued her
22   because she was willing to work for him.  She was willing to do
23   what he wanted to be done.  You know, that she wouldn't really
24   question him.  She was loyal to the employer that she was
25   working for at the time.

1   Q.  Did you have an opportunity, Ms. Haynes, to observe the
2   patients who were at the West location?
3   A.  No, sir, I did not.  I did not ever see patients there.
4   Q.  You never saw patients there?
5   A.  No.  I knew that they were there, but I myself never met
6   with them there.
7   Q.  Now, after training in October 2006 at the West location,
8   did you go back to the East?
9   A.  Yes.
10  Q.  How long approximately did you work at the East location
11  starting in the fall of 2006?
12  A.  I was there about a year.  I left there in October of 2007.
13  Q.  And, in general, what were your day-to-day responsibilities
14  at the East location?
15  A.  There, I was supposed to continue with the paperwork, to
16  work on the charts.  When the reviews came up, that was a
17  priority.  And at times to sit in on groups if therapists were
18  called out for meetings with Mr. Gonzalez or with Ms. Feas.
19  Q.  Now, I want to talk about those three groups in a moment,
20  but at the time in the fall of 2006, who was the medical
21  director?
22  A.  Dr. Rousseau.
23  Q.  Approximately how long did it take, Ms. Haynes, before you
24  even met Dr. Rousseau?
25  A.  It took several weeks.  I was either at the end of my first

1  month or beginning of my second month when I first met him.
2  Q. And when Dr. Rousseau did show up, what would happen?
3  A. He would come in. He was very polite, always very -- very
4  nice towards the staff. He would come in, meet with Armando
5  Gonzalez if he was there, and then he would come in and ask us
6  how our day was going. And if we had anything for him to sign,
7  we would come to him. We would bring him our paperwork and he
8  would sign it. So if I had like, say, a stack of treatment
9  plan reviews, I would bring it with -- with me and he would
10 sign them for me.
11 Q. Approximately how many documents would you have him sign at
12 one sitting?
13 A. Anywhere from, I don't know, 20 to upwards almost a hundred
14 maybe. It would just depend on the time frame, if we were on
15 review, what I needed signed, but it was always several -- many
16 documents.
17 Q. Now, were you the only person who would come and have
18 documents signed by Dr. Rousseau?
19 A. No, sir, I was not.
20 Q. Who else did?
21 A. Dana Gonzalez, Gema Pampin. Sometimes the medical records
22 coordinator, if she knew things were missing from charts, she
23 would also go to him as well.
24         THE COURT: All right. Let's break here. It's almost
25 5:30. Remember, we are not in session tomorrow. Tomorrow is

```
 1   Veterans Day.  But we are going to resume -- I have no other
 2   hearings except for this trial on Wednesday, so we'll get
 3   started at 9 o'clock on Wednesday.  All right?  So enjoy the
 4   holiday tomorrow.  So everybody be back Wednesday at 9 o'clock.
 5        (Jury not present.)
 6             THE COURT:  All right.  We'll see everybody Wednesday
 7   morning at 9 o'clock.
 8             MR. MEDINA:  Your Honor?
 9             THE COURT:  Yes.
10             MR. MEDINA:  We didn't move Government Exhibit 203
11   into evidence.
12             THE COURT:  Right.
13             MR. MEDINA:  If there's no objection to do so, can we
14   go ahead and do that?  It's the plea agreement.
15             THE COURT:  All right.  Exhibit 203 will be received
16   in evidence.
17             MR. MEDINA:  Thank you, Your Honor.
18        (Proceedings adjourned at 5:29 p.m.)
19                            *   *   *   *   *
20
21
22
23
24
25
```

16

1  UNITED STATES OF AMERICA                             )
                                                       ) ss:
2  SOUTHERN DISTRICT OF FLORIDA                         )

3

4                    C E R T I F I C A T E

5       I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 10th day of November, 2014, in the above-mentioned

10 court; and that the foregoing transcript is a true, correct,

11 and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13 pages 1 - 16.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 16th day of November, 2014.

16

17

                          /s/ Carly Horenkamp
18                        _____

                          Carly L. Horenkamp, RMR, CRR
19                        Certified Shorthand Reporter

20

21

22

23

24

25