```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
                       MIAMI DIVISION
                 CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,            NOVEMBER 12, 2014
                                     9:12 A.M.
                 Plaintiff,



      vs.



ROGER ROUSSEAU, et al.,

                 Defendants.       PAGES 17 THROUGH 43
_____

                          DAY 7
            EXCERPT OF CRIMINAL JURY TRIAL
  (CONT'D DIRECT EXAMINATION OF ALEXANDRA HAYNES BY MR. MEDINA)
         BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Mr. A. Brendan Stewart, AUSA
                        Mr. Justin Goodyear, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC  20530


FOR THE DEFENDANT:      Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                        800 Brickell Avenue
                        Suite 1400
                        Miami, Florida  33131


FOR THE DEFENDANT:      Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)        LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                        1221 Brickell Avenue # 900
                        Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:      Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)        LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                        55 Merrick Way
                        Suite 212
                        Coral Gables, Florida  33134


FOR THE DEFENDANT:      Mr. Frank A. Prieto, Esq.
(Liliana Marks)         LAW OFFICE OF FRANK A. PRIETO, P.A.
                        One Northeast 2nd Avenue
                        Suite 200
                        Miami, Florida  33132


FOR THE DEFENDANT:      Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)           LAW OFFICES OF JUAN DE JESUS GONZALEZ
                        10631 N Kendall Drive
                        Suite 150
                        Miami, Florida  33176


FOR THE DEFENDANT:      Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)           LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                        Courthouse Tower
                        40 NW 3rd Street
                        Suite 200
                        Miami, Florida  33128


COURT REPORTER:         Carly L. Horenkamp, RMR, CRR
                        U.S. DISTRICT COURT
                        400 N. Miami Avenue, Room 12-3
                        Miami, Florida  33128
                        (305) 523-5147
```

1                        **I  N  D  E  X**

2     *Certificate* ----------------------------------------- 43

3

4

5                      **W I T N E S S**
      ON BEHALF OF THE GOVERNMENT:                        PAGE
6     ALEXANDRA HAYNES
      CONT'D DIRECT EXAMINATION BY MR. MEDINA             20

7

8

9

10

11
                      **E X H I B I T S**
12    GOVERNMENT EX. NO.:                      OFFERED ADMITTED
      70  -                                       36      36
13    71 -                                        36      36
      72 -                                        36      36
14    73 -                                        36      36
      74 -                                        36      36
15

16

17

18

19

20

21

22

23

24

25

1    (Jury Present, 9:12 a.m.)

2        THE COURT:  All right.  Good morning, everyone.

3    Welcome back and please be seated.  When we left off on Monday,

4    we had started the direct examination of Ms. Haynes.  We're

5    going to pick up at that point this morning.

6        Ms. Haynes, I want to remind you you are still under

7    oath from the other day.

8        THE WITNESS:  Yes, sir.

9        MR. MEDINA:  May I proceed?

10        THE COURT:  Yes, sir.

11    ALEXANDRA HAYNES, GOVERNMENT WITNESS, SWORN PREVIOUSLY

12            DIRECT EXAMINATION (Continuing)

13    BY MR. MEDINA:

14    Q.  Good morning, Ms. Haynes.

15    A.  Good morning.

16    Q.  When we left off on Monday, you were testifying about your

17    day-to-day responsibilities at Health Care Solutions East

18    starting in the fall of 2006.  Do you recall that?

19    A.  Yes, sir.

20    Q.  Now, one of the responsibilities you testified about were

21    related to documentation you had to create.  Do you recall

22    that?

23    A.  Yes, sir.

24    Q.  What specifically, what types of documents were you

25    responsible for creating?

1  A.   Specifically, I would do the screenings, the

2  biopsychosocials, master treatment plans, treatment plan

3  reviews, discharge summaries, initial psychiatric evaluations.

4  Q.   During that time frame beginning in fall of 2006, did you

5  ever create any physician progress notes?

6  A.  I believe that I did.

7        MR. RABIN:  Objection, speculation.

8        THE COURT:  Overruled.

9  BY MR. MEDINA:

10  Q.  Now, these documents you created, Ms. Haynes, were they

11  accurate or were they inaccurate?

12  A.  They were inaccurate.  They were all false.

13  Q.  Please explain.

14  A.   I never met with these patients, nor am I a physician nor a

15  licensed person, so a lot of times I would take information

16  gathered from either the group notes or other demographic data

17  that was in the chart and I would put it all in a nice little

18  paragraph format saying, you know, that this patient had, for

19  example, a depressed diagnosis and what symptoms I was able to

20  gather from -- from what I could gather in the chart.  So they

21  weren't accurate documents at all.

22  Q.   Now, you testified that you worked at Homestead Behavioral

23  and RNS PHP.  Do you recall that?

24  A.  Yes, I do.

25  Q.   Now, you also said you were engaged in training at the West

1    location with Blanca Ruiz and Hortensia Sabates, correct?

2    A.   Correct.

3    Q.   Why was it necessary to train at Health Care Solutions West

4    with Blanca Ruiz and Hortensia Sabates?

5    A.   All of the partial hospitalization programs have their own

6    little intricacies, it's their own little way of doing things,

7    and even though in south Florida at the time all of the

8    agencies that I worked at had their manners of doing fraud,

9    health care was looking for I guess more specific things.

10   Armando Gonzalez and John Thoen wanted to know that I could

11   create, for example, a initial psychiatric evaluation, so

12   that's what they were training me on.  I had never -- I had not

13   done initial psychiatric evaluations at either Homestead or

14   RNS, so they wanted to know that I was able to do that.  So

15   training really meant, can you do what we're expecting you to?

16   Can you create the fraud that we're expecting you to create

17   based on what we have available here?  That was --

18   Q.   And again --

19   A.   -- the training.

20   Q.   I'm sorry.  When you say "they," who are you referring to?

21   A.   Armando Gonzalez and John Thoen.

22   Q.   And who were the ones training you on what the

23   documentation needed to look like?

24   A.   Hortensia, I'm sorry, I can't pronounce her last name,

25   Sabat- -- Sabat- -- Sabates, and Blanca Ruiz.

1    Q.   Now, with respect to the documents, the initial psych

2    evaluations that you were fabricating in the East location, who

3    had to sign them?

4    A.   Dr. Rousseau.

5    Q.   Now, one of the second day-to-day responsibilities you had

6    were reviewing group therapy notes.  Do you recall that?

7    A.   Yes, sir, I do.

8    Q.   Now, big picture, Ms. Haynes, you said you started working

9    at the East location in the fall of 2006.  Approximately how

10   long did you work there?

11   A.   Approximately a year.

12   Q.   Could it possibly be two years?

13            MR. RABIN:  Objection.

14            MR. PRIETO:  Objection, leading.

15            THE COURT:  Sustained.

16   BY MR. MEDINA:

17   Q.   Who were the therapists working there at the time?

18   A.   At the time that I was there, the therapists were Liliana

19   Marks, Angela Salafia, and Doris Crabtree.

20   Q.   Did you review each of their group therapy notes?

21   A.   I reviewed many of their group notes.

22   Q.   Now, before we get into that review, Ms. Haynes, did Angela

23   Salafia, Doris Crabtree, and Liliana Marks complain about the

24   length of stay patients were in the program?

25   A.   Yes, they were aware that the patients were there longer

1   than they needed to be.  The Medicare guidelines I believe

2   state that a patient should be there approximately six weeks,

3   and our patients were there 12, 16, even 20 weeks, and they

4   were writing three and four notes a day for the patients.  So

5   at times they were overwhelmed and they would complain that

6   there were too many patients in their groups, they had been

7   there too much, there wasn't -- there wasn't any more to grasp

8   at.  I mean, how many times can you say the same thing, you

9   know, that a patient is depressed, for example, or is having a

10  bipolar episode in so many different ways?

11          MR. PRIETO:  Judge, I'm going to object to a

12  narrative.

13          THE COURT:  Overruled.

14  A.  In so many ways that it will be believable when Medicare

15  reviews these notes?

16  BY MR. MEDINA:

17  Q.  Ms. Haynes, did Angela Salafia, Liliana Marks, and Doris

18  Crabtree also complain about group size?

19  A.  Yes.  Again --

20  Q.  What would they say?

21  A.  Again, an average group size should be 8, no more than 12

22  people, and even 12 is pushing it.  We had upwards of 15, 16,

23  18, 20, even over 20 patients at times in each group.  And

24  these rooms were small, there was no privacy.  As I remember,

25  sometimes that they couldn't even close the door just because

1    there were so many people in those -- in those rooms.  So yes,

2    they would complain that there were too many patients and that

3    they were overwhelmed.  Because for each patient, if you're

4    writing three or four notes a day, times 20, that's 80 notes a

5    day, that's -- that's a lot of writing to have to do.

6    Q.   Now, a moment ago you testified about the group therapy

7    rooms themselves being small.  Can you just, in general terms,

8    describe the East location facility, how big it was, how small

9    it was?

10   A.   The East location facility was a small facility.  It was

11   the smallest one that I've ever worked at.  You walked in

12   through the front door, and I think I mentioned it was in a

13   strip mall, so you would walk in and there was a very long

14   hallway that went from front all the way to the back door.  On

15   the left-hand side were the offices where Armando Gonzalez had

16   his office, Alina Faes, followed by me, Dana, and Gema Pampin,

17   who shared an office, the nurses' office, and the

18   administrative office with Lisset Palmero in the back.

19       On the right-hand side were three group rooms, if I

20   remember correctly three, and then there was a little

21   kitchenette area where they would prepare the breakfast or

22   lunch for the patients.

23       When you walked in each room, there was a table that took

24   up some space, and then there were chairs all around that

25   table, and I think these tables were maybe meant for 10, maybe

1    15 people, and you're trying to squeeze 18, 20, sometimes some

2    in wheelchairs, some with walkers, elderly people that have a

3    hard time mobilizing, and, you know, you have to try to shift

4    them around.  It got -- it would get crowded in there.

5    Q.  Now, a moment ago you testified about patient privacy.  How

6    much privacy did staff have?

7    A.  Absolutely none.  There was no privacy.  Armando Gonzalez

8    wanted to be aware of everything that happened in the office.

9    He wanted to be able to walk by, make sure that you were

10   working.  He wanted to make sure and walk by and be able to see

11   that all the patients were coming that he could be -- you know,

12   he wanted a census of a hundred patients, so he wanted to be

13   able to see what was going on.  Not that he came often, but

14   that's how he set up his offices, so that, you know, he could

15   be aware.

16       But the downside to that is that anyone who walked into the

17   office -- for example, like I know that I had flowers delivered

18   there one time, and that person could see all these patients.

19   So there was no privacy for them.  You know, if these were

20   psychiatric patients who maybe were, you know, having issues or

21   paranoid and you have people off the streets coming in, that --

22   that was not right for them.  I don't feel that it was.

23   Q.  Now, did Angela Salafia, Doris Crabtree, or Liliana Marks

24   complain about having to see Dr. Rousseau?

25   A.  I don't remember them ever complaining about having to see

1    him.  And Dr. Rousseau was not there daily, nor weekly, so it

2    wasn't that we were often seeing him.  I know there were a few

3    times they were concerned that certain patients might need

4    medical treatment as far as, you know, if they were having a

5    problem with medication or were oversedated, and he wasn't

6    always available to be able to answer those questions or to

7    talk to them about it.

8    Q.  Now, I want to go back to the review of group therapy

9    notes.  Under what circumstances did you in fact review Liliana

10   Marks, Doris Crabtree, and Angela Salafia's group therapy

11   notes?

12   A.  The main reason that I would have to review their notes was

13   because Medicare put us on review two or three times while I

14   was at the East office that year.  And when Medicare puts you

15   on review, you have to review the entire chart.

16       So the main focus that myself, Dana Gonzalez, and Gema

17   Pampin had was to take this chart, open it from page 1 to page

18   whatever it ended on, and it had to tell a perfect story.  The

19   patient had to have come in, all the demographic information,

20   you needed to know what the crisis was, what their background

21   history was, what the family history was.  Every week they were

22   supposed to have a treatment plan review.  Every week they were

23   supposed to have a physician's progress note done.  Every day

24   they were supposed to have these group notes done.  And all of

25   those had to match perfectly, because Medicare wasn't on-site

1    so all they would see is this chart.

2        So when you brought it in, you wanted them to be able to

3    read the story of, you know, John Smith and say, wow, John

4    Smith really is in crisis.  He really needs this treatment.

5    It's justified that he be there and we need to continue paying

6    so that he can be stabilized.

7        So to do that, it was really a group effort.  It wasn't

8    just what I was writing, but it came from also the group notes,

9    because they would see them daily.  I wouldn't see them.  I

10   mean, I might see them in the hallway, but they were supposed

11   to be interacting with them, you know, four groups a day, so I

12   would need to review those notes so that that whole story

13   matched.

14       And not only that, but I would need to review the notes to

15   make sure that, you know, there was a group for 9:15, 10:15,

16   11:15, that there were the four groups a day.

17       That the quotes that were written in the notes weren't all

18   saying the same thing.  Every day the patient can't say "I miss

19   my family" because that wouldn't make any sense.  So I needed

20   to review to make sure that, you know, like the chart flowed,

21   that there was a reason for them to pay us.  And that was why I

22   would have to review them.

23   Q.  Now, you touched on this a bit, but were different people

24   responsible for different portions of the chart under review?

25   A.  Of when it came to review, no.  The only ones that really

1    focused on them, again, were myself, Gema, and Dana, but we

2    were given a list of, say, 15 or 20 patients by Armando

3    Gonzalez.  He would come in and say, we're placed on review.

4    These are the 20 people that Medicare wants us to send in.  So

5    we would say, okay, 20.  Okay, Alex, you do the first three,

6    Dana will do the other five.  You know, we would divide them

7    like that, just in group sums.

8         So I would go to medical records, I would say to the person

9    who was there, I need these -- these charts today, and I would

10   sit them and do them from page 1 to the end.  And that's how we

11   worked it there.

12   Q.  Under what circumstances, Ms. Haynes, would you have to

13   interact with the therapists?

14   A.  When it came to the notes, if notes were missing, if I

15   didn't understand, if I needed more information on a patient,

16   if group notes were missing.  For whatever reason, let's say,

17   on the date of Monday, June 3rd, I only had one note and I know

18   I needed four notes, I would have to go to that therapist and

19   say, oh, I'm missing these three notes.  I don't know why

20   they're not here.  Can you please bring them in for me?

21        Or if, you know, I noticed that on the May 5th note the

22   quote is the exact same as the May 3rd note, I would say, you

23   know, is this accurate?  Can you maybe rewrite this so that it

24   reflects something differently?  And they would.  They would

25   help us with that.

1  Q.  Now, would you just orally tell the therapists to write it

2  or would you make corrections on the group therapy note

3  themselves?

4  A.  No, I would do it orally.  I never corrected the notes

5  themselves because I was focused on the first part and I knew

6  that they were capable of doing their part.  And -- and they

7  always helped us.

8  Q.  How many times did Angela Salafia, Liliana Marks, or Doris

9  Crabtree complain about having you tell them to make

10  corrections to their group therapy notes?

11  A.  I never heard them complain to me.  They never complained

12  to me directly, so...

13  Q.  Did they agree to fix their notes?

14  A.  Yes, they did.

15  Q.  Who signed the group therapy notes?

16  A.  They signed their notes themselves.  When they were fixed,

17  before they turned them in, they printed, signed, and they

18  would turn them in, either to myself or to medical records.

19  Q.  Now, Ms. Haynes, are you aware of how groups were divided

20  at Health Care Solutions East?

21  A.  Yes, they were divided by the level of -- functioning level

22  of the patient.  I'm sorry.  So there was the high functioning,

23  medium function, low function group.

24  Q.  And when you talk about low functioning, what do you mean

25  by that?

1    A.   They were the patients who were the slowest, you could say,

2    who had the hardest time understanding, a harder time being

3    able to communicate, who needed maybe a little bit more

4    attention than the others.

5    Q.   Do you recall any specific examples of low functioning

6    patients?

7    A.   Not specifically.  But remembering the patients, there were

8    patients who were into -- you know, they had Alzheimer's or

9    dementia, would get confused easily.  There were patients who

10   were overmedicated, would fall asleep easily, had a hard time

11   staying awake, focusing, paying attention.  Those were the

12   types of patients in the low functioning group.

13   Q.   Now, beginning in the fall of 2006 and the time frame you

14   were at the East location, who was in charge of the low

15   functioning group?

16   A.   Angela Salafia.

17   Q.   Now, Ms. Haynes, did you ever have to cover Angela

18   Salafia's low functioning group?

19   A.   There were a few times when she would be called --

20   called -- I'm sorry, called out of group.  Like I said earlier,

21   Armando Gonzalez, the owner, was never there consistently, and

22   if on a whim he would decide he's going to come in and meet

23   with the therapists, he would pull them all out of the -- out

24   of the group, but they couldn't be left alone, per se.  So I

25   would be asked to cover in that group.  And I do remember

1   sitting in on Ms. Salafia's group.

2   Q.  And when you would sit in on Angela Salafia's low

3   functioning group, please describe to the jury what you did.

4   A.  I would basically entertain them, and by that it was just

5   try to keep them in the room.  I know that I would tell them

6   stories, fairy tale-type stories, such as, you know, like

7   *Cinderella* or *Little Red Riding Hood*, something like that.  One

8   time I walked in and there was a game of Hangman that had been

9   started, so I just continued playing that with them.  Those

10  were the types of things that I would do while she was out of

11  the group.

12  Q.  And Ms. Haynes, why was it necessary to tell fairy tale

13  stories like *Cinderella*, *Little Red Riding Hood*, and play games

14  like Hangman in Angela Salafia's low functioning group?

15  A.  Because they just couldn't do the therapy.  And, I mean, I

16  realize that I was unlicensed, but I do have a master's in

17  therapy, and they just, they couldn't follow whatever I was

18  trying so I would just say, you know, let's just keep them

19  happy, let's just entertain them.  They're here, you know,

20  these little old people, sick people, let's make them laugh a

21  little bit, and that's why I would do that.

22  Q.  Now, did group therapy notes ever reflect that stories like

23  *Little Red Riding Hood* and *Cinderella* and games of Hangman were

24  played during group sessions?

25  A.  No, they never reflected that those things happened.

1  Q.  Why was that?

2  A.  Because Medicare would not pay for those.  That was an

3  unacceptable thing to write down.  I mean, for that, if the

4  therapists wrote that, Mr. Gonzalez would have just had to shut

5  down.  There's no way to be reimbursed for those things.  It's

6  against Medicare guidelines to do that.

7  Q.  Ms. Haynes, did Doris Crabtree ever complain to you about

8  having to entertain patients at Health Care Solutions Network?

9  A.  She did not -- it wasn't her thing to do -- that she liked

10  to do, I'm sorry.  She wanted to do therapy, but the patients

11  and the amount of patients and the -- and the circumstances

12  that we worked under just didn't allow that to happen.  So she

13  would have to entertain patients sometimes.  And, no, she

14  didn't care for it, but yet she still did it.

15  Q.  Now, you testified that you started working at the East

16  location beginning in fall 2006.  Did there come a point in

17  time, Ms. Haynes, that you worked at the North Carolina office

18  of Health Care Solutions Network?

19  A.  Yes, sir, there did.  In the fall of 2007, I found out that

20  Mr. Gonzalez was opening up a third location in North Carolina.

21  My brother had recently moved up to Raleigh and I was desperate

22  to move up there.  He and I are very close.  And I was tired of

23  living in south Florida.  And an opportunity arose, it was

24  easy, I had job security, and Mr. -- and I asked Mr. Gonzalez

25  if I could go and help them open the new office, and he agreed

1    to it, and in the fall of 2007 I relocated to Hendersonville,

2    North Carolina.

3    Q.  Now, Ms. Haynes, what were your day-to-day responsibilities

4    at the North Carolina facility?

5    A.  In the North Carolina facility I had to do the same intake

6    paperwork as in the Miami office.  I had to coordinate with the

7    drivers, make sure patients were being picked up.  I had to

8    answer the phones.  I had to make sure meals were provided for

9    these patients.  I had to oversee that the therapists were

10    showing up and doing their groups.  And on top of that, there

11    was a time when even I was running a group at the beginning of

12    the -- of the program.

13    Q.  Now, Ms. Haynes, did there come a point in time when

14    auditors conducted an on-site investigation at the North

15    Carolina facility?

16    A.  Yes.

17    Q.  Did you lie to them on that day?

18    A.  Yes.  Yes, I did.

19    Q.  Why was that?

20    A.  Because they came in, we had been operating maybe two,

21    three years at the time, and we had been telling this whole

22    story that started -- you know, in January of 2008 we opened

23    up.  And from the first day we said, you know, we have these

24    patients who are in crisis and this is why they need to be here

25    and we're writing these charts and I'm falsifying these

1  documents, the same as I did it in Florida, and then all of a

2  sudden they show up at the door, I can't all of a sudden be

3  like, oh, no, that's not true.  This is what we really do.  So

4  no, Armando Gonzalez wasn't there, so I was the front person

5  that day, and I had to make them believe that we were actually

6  doing what we were telling them we were doing in writing,

7  through the charts, and all of these correspondence things that

8  were going on with them and Mr. Gonzalez.  So yes, I had to lie

9  to them, and I did.

10         MR. MEDINA:  Your Honor, may I approach the witness?

11         THE COURT:  Okay.

12  BY MR. MEDINA:

13  Q.  Now, Ms. Haynes, in front of you are Government

14  Exhibits 70, 71, 72, 73, and 74.  Please take a look and let me

15  know if you recognize those documents.

16  A.  No. 70 is a list of North Carolina patients on the first

17  page, as well as the second page.  It asks for their patient

18  name, their medical record number, their admission date, and

19  then a list of the intake documents, the initial treatment

20  plan, initial psychiatric evaluation, screening,

21  biopsychosocial, master treatment plan, and the treatment plan

22  review, and it's all in columns.

23  Q.  Ms. Haynes, without getting into the substance of the

24  documents themselves, do you recognize those exhibits?

25  A.  Yes, sir, I do.

1    Q.  And are all the exhibits similar to the one you just

2    described?

3    A.  Yes, sir.

4           MR. MEDINA:  The government moves into evidence

5    Government Exhibits 70 through 74 and requests permission to

6    publish.

7           THE COURT:  All right.  Those will be received in

8    evidence and you can publish them.

9           MR. MEDINA:  Ms. Zaferis, can you please pull up

10   Government Exhibit 72?

11   BY MR. MEDINA:

12   Q.  Now, Ms. Haynes, can you please describe generally what the

13   first page of Government Exhibit 72 is?

14   A.  It is a fax cover sheet that I sent to someone named Will

15   and it --

16   Q.  And Ms. Haynes, before you continue, who is Will?

17   A.  He was someone who worked in one of the Florida locations.

18   Due to all the responsibilities that I had up in North

19   Carolina, I was overwhelmed, and the paperwork fell behind and

20   again was not where it needed to be.  I complained to it --

21   about it to Mr. Gonzalez and his solution was to contact

22   someone named Will in Miami, let him know what I needed, and

23   that they would write up these documents and send them to me.

24   Q.  Have you ever met Will?

25   A.  No, sir, I have not.

1    Q.   What is the date of this document?

2    A.   6-16-2009.

3    Q.   And in the fall of 2007 when you were in North Carolina,

4    that's when you started?

5    A.   Yes, sir.

6    Q.   How long did you stay?

7    A.   I was there until June of 2011.

8    Q.   Now, during that time frame, did you ever see anyone by the

9    name of Will at the North Carolina facility?

10   A.   No, sir, I did not.

11          MR. MEDINA:   Now, Ms. Zaferis, can you please

12   highlight the sentence where it starts, "I would prefer to get

13   some of these in the charts" to the bottom?

14   BY MR. MEDINA:

15   Q.   Ms. Haynes, can you please read starting with "I would

16   prefer to get some of these in the charts"?

17   A.   Yes, sir.  "I would prefer to get some of these in the

18   charts as they are old cases and several of them have been

19   closed already.  Let me know what further information you need.

20   I had previously sent you the face sheets and background

21   information on all of them but if you need it again I will be

22   glad to re-send it."

23   Q.   Now, in this document it says "the charts as they are old

24   cases."  What does that mean?

25   A.   That meant that I was behind.  So if these are patients who

1   had been discharged two or three months ago, they needed to

2   have been closed, so they were old cases.  They were no longer

3   the current cases of the patients who were there.

4           MR. MEDINA:  Now, Ms. Zaferis, can you please go to

5   the next page of Government Exhibit 72 and just zoom in on the

6   box, please?  Thank you.

7   BY MR. MEDINA:

8   Q.  What is this document?

9   A.  It's a list of North Carolina patients.

10  Q.  And can you read the -- what it says at the top of the

11  second page of Government Exhibit 72?

12  A.  June 16th, 2009, patient list, Will.

13  Q.  And Ms. Haynes, is the June 16, 2009 date the same as what

14  was listed on the first page of Government Exhibit 72?

15  A.  Yes, sir, it is.

16  Q.  Now, can you -- I think you've testified about this a

17  moment ago, but can you just read from left to right the

18  different columns that are on the second page of Government

19  Exhibit 72?

20  A.  Yes.  It's patient name, medical record number, admission

21  date, date of birth, initial treatment plan, initial

22  psychiatric evaluation, screening, biopsychosocial, master

23  treatment plan, treatment plan review.

24  Q.  Now, Ms. Haynes, were these the same sort of documents that

25  you were creating in the North Carolina office?

1   A.  Yes.

2   Q.  And also the same types of documents you were creating down

3   in Miami.

4   A.  Yes.

5   Q.  Now, looking at this chart, Ms. Haynes, are you aware if

6   the patients listed were Miami patients or North Carolina

7   patients?

8   A.  They were all Miami -- I'm sorry, they were all North

9   Carolina patients.

10  Q.  Now, what, if anything, was Will supposed to do with this

11  documentation?

12  A.  He was supposed to create the paperwork, the forms that I

13  just listed, the initial treatment plan and so forth.  The ones

14  that I was not able to complete, he was supposed to complete or

15  fabricate.  Because he wasn't there, so he had to make

16  something up so that I could put it in the chart and close the

17  chart.

18  Q.  Now, did Will in fact send back documentation to you?

19  A.  Yes.

20  Q.  And how would he send it?

21  A.  By fax.

22        MR. MEDINA:  Ms. Zaferis, can you please pull up

23  Government Exhibit 73?

24  BY MR. MEDINA:

25  Q.  Ms. Haynes, what is this document, Government Exhibit 73?

1  A.  This is a fax cover sheet that came from Health Care

2  Solutions, the West office.

3  Q.  And can you please read the date on this document,

4  Government Exhibit 73?

5  A.  July 1st, 2009.

6  Q.  Now, I want to focus your attention, you said the fax came

7  from the West location.  Is that in Miami?

8  A.  Yes, sir, it is.

9  Q.  And it's for Health Care Solutions Network?

10  A.  Yes.

11  Q.  Do you see the fax number on the top left corner in the

12  "To" box?

13  A.  Yes.

14  Q.  You see the area code, 828?

15  A.  Yes, sir.

16  Q.  What is the area code for?

17  A.  That's the area code to Hendersonville, North Carolina.

18  Q.  Where was Health Care Solutions Network North Carolina

19  located?

20  A.  Hendersonville, North Carolina.

21  Q.  Do you recognize the patient James Hester?

22  A.  Yes, I do.

23  Q.  Was he a Miami patient or a North Carolina patient?

24  A.  He was a North Carolina patient.

25  Q.  Please read what it says in the comments box, Ms. Haynes.

1   A.  "Any questions please let me know.  Thank you.  Wilson."

2           MR. MEDINA:  Ms. Zaferis, you can take the exhibit

3   down.  Thank you.

4   BY MR. MEDINA:

5   Q.  Ms. Haynes, while you were in North Carolina, did there

6   come a time, yes or no, when you met with Armando Gonzalez

7   about Blanca Ruiz?

8   A.  Yes.

9   Q.  Where did this meeting take place?

10  A.  At the Cracker Barrel.

11  Q.  And who was present at this meeting?

12  A.  Myself, John Thoen, and Paul Layman, and Armando Gonzalez.

13  Q.  And can you describe to the jury what was discussed during

14  this meeting with Armando Gonzalez, John Thoen, and yourself?

15  A.  Yes.  They had come up -- they were in North Carolina that

16  week.  The way that it worked was that I was supposed to cover

17  the North Carolina office and the three of them came back and

18  forth.  So they had just come up from Miami, and Manny was

19  concerned about something going on in the West office between

20  Blanca Ruiz and Hortensia, and he needed to let one of them go.

21  He was essentially going to fire one of them.  And he wanted my

22  opinion, which surprised me because I no longer worked there

23  and really hadn't worked all that long in the West office.  But

24  they came to me and they asked me what I thought, and I said,

25  you know, I really don't even know what's going on down there.

1    I said, you know, they're both good workers.  I know that

2    Blanca Ruiz very much cares for you and Health Care Solutions,

3    she wants to do her best work for you, she had told me that

4    previously, and I knew that John Thoen had a very good

5    relationship with Hortensia, so I could see kind of why they

6    wanted an impartial person.  And they were concerned.

7        And ultimately they decided that they were going to let

8    Blanca Ruiz go because at the end of the day -- what Manny said

9    was at the end -- Armando -- I'm sorry, Armando Gonzalez said

10   at the end of the day, he knew that he could trust Blanca Ruiz

11   to not turn him in to Medicare because she was aware of all the

12   fraud that had been committed, everything that we did wrong,

13   and he knew that she was a good person and that she would cover

14   for him at the end of the day.  And he felt bad about it, but

15   he -- Health Care Solutions was what he really cared about.

16             MR. MEDINA:  No further questions, Your Honor.

17                       *   *   *   *   *

1    UNITED STATES OF AMERICA                    )
                                                  ) ss:
2    SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 12th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 17 - 43.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 16th day of November, 2014.

16

17

                       /s/ Carly Horenkamp
18
                       Carly L. Horenkamp, RMR, CRR
19                     Certified Shorthand Reporter

20

21

22

23

24

25