```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
                   MIAMI DIVISION
              CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,           NOVEMBER 12, 2014
                                    10:01 A.M.
               Plaintiff,



     vs.



ROGER ROUSSEAU, et al.,

               Defendants.      PAGES 1 THROUGH 22
_____

                        DAY 7
            EXCERPT OF CRIMINAL JURY TRIAL
   (CROSS-EXAMINATION OF ALEXANDRA HAYNES BY MR. PALOMINO)
         BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:    Mr. Allan J. Medina, AUSA
                      Mr. A. Brendan Stewart, AUSA
                      Mr. Justin Goodyear, AUSA
                      U.S. DEPARTMENT OF JUSTICE
                      Criminal Division
                      Fraud Section
                      1400 New York Avenue NW
                      Washington, DC  20530


FOR THE DEFENDANT:    Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)      LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                      800 Brickell Avenue
                      Suite 1400
                      Miami, Florida  33131


FOR THE DEFENDANT:    Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)      LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                      1221 Brickell Avenue # 900
                      Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

# I N D E X

*Certificate* ----------------------------------------------- 22

## W I T N E S S

ON BEHALF OF THE GOVERNMENT:                              PAGE
ALEXANDRA HAYNES
CROSS-EXAMINATION BY MR. PALOMINO                            4

```
 1        (Before Jury, 10:01 a.m.)

 2              THE COURT:  All right.  Mr. Palomino.

 3              MR. PALOMINO:  May it please the Court.

 4                         CROSS-EXAMINATION

 5    BY MR. PALOMINO:

 6    Q.  Good morning, Ms. Haynes.

 7    A.  Good morning, sir.

 8    Q.  You and I have never had the pleasure of meeting, correct?

 9    A.  No, sir, we have not.

10    Q.  You entered into an agreement with the government, correct?

11    A.  Yes, sir.

12    Q.  In exchange for your testimony, there's certain promises

13    you've made back and forth to each other, correct?

14    A.  No, no promises have been made.

15    Q.  Well, isn't there a promise that they will evaluate your

16    testimony here today to decide whether or not to file a Rule 35

17    on your behalf?

18    A.  No, there is no promise, sir.

19    Q.  You don't think they're going to evaluate that, according

20    to your agreement?

21    A.  I do not know what they will do.

22    Q.  Are you familiar with your agreement?

23    A.  What I am sure of is that my agreement asks that I come

24    here, tell you the truth of what happened at Health Care

25    Solutions.  Beyond that, I do not know what will happen.
```

```
1   Q.  But you -- you have children, correct?

2   A.  Of course.  I have two.

3   Q.  You have two small children.  How old are they right now?

4   A.  One and three.

5   Q.  And you know that the quickest way for you to get back to

6   your children is if the government files a motion on your

7   behalf for a sentence reduction, correct?

8   A.  That's what I'm hoping for, yes.

9   Q.  And before that happens, they have to evaluate your

10  cooperation to see if it reaches the level of substantial

11  assistance, do they not?

12  A.  I'm not sure of that, sir.

13  Q.  Well, that was in your -- that would be in your agreement,

14  wouldn't it be?

15  A.  Again, the only thing I know is that my agreement asks that

16  I tell the truth of what happened here in court today.  Or

17  whenever I'm called to court.

18          MR. PALOMINO:  Could we turn to paragraph 11 of her

19  agreement, which is on page 5?

20          THE COURT:  Is that 203?

21          MR. PALOMINO:  Yes.

22  BY MR. PALOMINO:

23  Q.  Now, if we focus in on the second sentence of that

24  paragraph 11, it says there:  If in the sole and unreviewable

25  judgment of the United States the defendant's cooperation is of
```

1  such a quality and significance to the investigation or

2  prosecution of other criminal matters as to warrant the Court's

3  downward departure from the sentence required by the Sentencing

4  Guidelines, the United States may at or before sentencing make

5  a motion pursuant to 5K1, or subsequent by Rule 35.  Do you see

6  that?

7  A.  Yes, sir, I do.

8  Q.  So they do have to evaluate your cooperation pursuant to

9  this agreement to see if it reaches the level of substantial

10  cooperation, do they not?

11  A.  Yes, sir.

12  Q.  And if they are satisfied that it is, they will file a

13  motion accordingly, correct?

14  A.  Yes, sir.

15  Q.  Now, you were sentenced in this case already, were you not?

16  A.  Yes, sir, I was.

17  Q.  And you were sentenced to 70 months?

18  A.  Correct.

19  Q.  That is the low end of your sentencing guidelines?

20  A.  Yes, sir.

21  Q.  And pursuant to that sentence, did you have to pay a fine?

22  Was a fine imposed?

23  A.  There was a fine imposed.

24  Q.  Okay.  Were any of your assets forfeited?  Any of your bank

25  accounts, any of your personal property, anything of that

1  nature?

2  A.  As far as property or financial?

3  Q.  Yes.

4  A.  Were they taken from me?

5  Q.  Yes.

6  A.  No, sir.

7  Q.  Now, I believe you stated you are not a licensed

8  psychologist, correct?

9  A.  I did.

10  Q.  You are not a licensed psychiatrist.

11  A.  Correct.

12  Q.  You are not a licensed therapist.

13  A.  Correct.

14  Q.  You are not qualified to give diagnoses as far as patients

15  are concerned.

16  A.  Correct.

17  Q.  You are not qualified to give group therapy sessions.

18  A.  For a partial hospitalization program, no, sir, I am not.

19  Q.  Correct.  You need a license for that issued by the state

20  of Florida, correct?

21  A.  Yes, sir.

22  Q.  Have you ever taken the exam for that license?

23  A.  No, I have not.

24  Q.  Now, you began working in 2006 at Health Care Solutions

25  West, correct?

1    A.   I was sent there for training in 2006.

2    Q.   That's where you met with Mr. Thoen and basically he told

3    you what he needed as far as fabrication of documents was

4    concerned.

5    A.   Yes, sir.

6    Q.   Okay.  But they had already known that you had fabricated

7    documents at your other employment, correct?

8    A.   That is true.

9    Q.   You were fabricating documents for Homestead Behavioral?

10   A.   For Homestead Behavioral, uh-huh.

11   Q.   And you also committed fraud while working at RNS?

12   A.   Yes, sir.

13   Q.   Do you expect to be prosecuted for your fraudulent

14   activities at Homestead Behavioral?

15   A.   I don't know what could happen.  That is a possibility.

16   Q.   But do you expect, as you sit here today, to be prosecuted

17   for that?

18   A.   Do I expect to be?

19   Q.   Yes.

20   A.   I hope I'm not prosecuted.  I don't expect to be

21   prosecuted, but I don't know what could happen.

22   Q.   But you hope you will not be prosecuted, as you sit here

23   today, for your fraudulent activities at Homestead Behavioral,

24   correct?

25   A.   Yeah.  No one wants to be prosecuted.

1   Q.   That would be the same for your fraudulent activities at

2   RNS, correct?

3   A.   Yes, sir.

4   Q.   So did you contact Dana Gonzalez before going to work at

5   Health Care Solutions Network?

6   A.   Yes, I called her.  I wanted a new job.  She was someone

7   that I knew and I asked her if she knew of anyone who was

8   hiring at the time.  She told me that they were hiring at

9   Health Care Solutions Network.

10  Q.   And she was already familiar with your fraudulent

11  activities, correct?

12  A.   Yes.

13  Q.   So she knew that you were someone who could come in and,

14  boom, start working on the fraudulent paperwork right away.

15  A.   I don't know what she knew, but she -- she and I had worked

16  together before.

17  Q.   Okay.  Now, the documents that were being fabricated were

18  patient admissions records, correct?

19  A.   They were -- as far as what I -- my part is different in

20  every agency.

21  Q.   Okay.  Did you fabricate initial treatment plans?

22  A.   I did at RNS and at Homestead -- and, I'm sorry, Health

23  Care Solutions.

24  Q.   Did you fabricate master treatment plans?

25  A.   At the same two locations, yes.

1   Q.  Did you fabricate biopsychosocials?

2   A.  Yes.

3   Q.  Did you fabricate screenings?

4   A.  Yes.

5   Q.  And did you fabricate group therapy notes?

6   A.  Only at RNS.

7   Q.  Okay.  You did not fabricate notes for patients that were

8   being treated up in North Carolina with Gema Pampin and Dana

9   Gonzalez?

10  A.  No, sir, but I do want to state that I did fabricate notes

11  in North Carolina on my own with a small group when we first

12  started there, and Paul Layman helped me with that.

13  Q.  Well, there were notes being fabricated at the Miami office

14  by Dana Pampin -- excuse me, Gema Pampin and Dana Gonzalez and

15  yourself that were being shipped up to North Carolina, were

16  there not?

17  A.  No, sir, that's not.  I was not part of that.

18  Q.  You were not part of that.

19  A.  No.

20  Q.  So that may have been just Dana Gonzalez and Gema Pampin

21  who were doing that?

22  A.  I know that Dana Gonzalez was fabricating notes.  I don't

23  know what Gema's part was.

24  Q.  Well, you all worked and shared the same office, did you

25  not?

1    A.   Sir, when they were doing the fabrication at the North

2    Carolina office --

3    Q.   Ma'am, please answer my question --

4            MR. MEDINA:   Your Honor --

5    Q.   -- and then you can elaborate and explain the answer.   But

6    were you all not sharing one single office at Health Care

7    Solutions East?

8    A.   When I worked in the Miami office, yes.

9    Q.   Yes.   Yeah, I'm just talking to you right now about the

10   Miami office.

11   A.   But you asked about the North Carolina notes that were

12   being fabricated.

13   Q.   Well, there were notes at the Miami office that were being

14   sent up to North Carolina, were they not?

15   A.   Not until after I had left the Miami office.

16   Q.   So it's your testimony that from the fall of 2006 through

17   the fall of 2007 while you were at the Miami office, that there

18   were no notes being -- or no documents being fabricated from

19   that office by Gema Pampin or Dana Gonzalez or yourself that

20   were being shipped off to North Carolina?

21   A.   No, sir.   The North Carolina office did not exist at that

22   time.

23   Q.   Okay.   So that all started when the North Carolina office

24   opened?

25   A.   It started about two years after it opened.

1  Q.  Okay.  And the individuals who were fabricating those

2  documents, shipping them to you in North Carolina, you were --

3  A.  They were not shipped to me at all.

4  Q.  How did the documents get up there?

5  A.  They were sent.  As far as I understand, Dana Gonzalez was

6  sending them directly to Wendera Eason, and I was not aware at

7  the beginning that that was happening.  I found out about it

8  shortly before I left North Carolina.

9  Q.  So you were not -- so the years that you were working at

10 North Carolina, you were not aware that documents were being

11 prepared down here in the East and being shipped off to

12 Ms. Eason?

13 A.  I don't know where they were being prepared, and the only

14 ones that I was aware were the ones that I had asked this Will

15 person to -- to do that I had sent the faxes to.  I knew those

16 were being fabricated.  As to who wrote them, I don't know.

17 Q.  Okay.  So you have no idea who prepared those documents.

18 A.  No.  I just know Will was my contact person.

19 Q.  And who gave you those lists of patients to seek those

20 files?

21 A.  The North Carolina?

22 Q.  Yes, yes.

23 A.  I created them.

24 Q.  You composed that list yourself?

25 A.  This list that we went over earlier?

1    Q.  Yes.

2    A.  Yes, sir, I did.

3    Q.  Okay.  Was that done at the direction of anyone or was that

4    just part of your responsibilities?

5    A.  That was at the direction of Armando Gonzalez when I told

6    him how far behind I was.

7    Q.  Okay.  Now, you were being paid extra to fabricate

8    documents, were you not?

9    A.  No, sir, I was not.

10   Q.  Gema Pampin -- were you aware that Gema Pampin and Dana

11   Gonzalez were being paid extra to fabricate documents?

12   A.  No, sir, I was not.

13   Q.  Were you aware that they had a side business where they

14   would fabricate documents for other clinics here in the Miami

15   area?

16   A.  I was not aware of what Dana and Gema did.  I knew Dana

17   worked for other agencies, but that's the extent of what I

18   knew.

19   Q.  They kept pretty much their activities to themselves; is

20   that what you're telling me?

21   A.  I lived in a different state, sir.

22   Q.  While you were down here, ma'am, while you were all working

23   together, while you were all working together down here, you

24   were not aware?

25   A.  Again, the only thing I was aware of was that Dana also

1  worked for a different program.

2  Q.  Did you know that that work involved creating fraudulent

3  documents for other programs?

4  A.  I don't know what she was doing.  I just know that Dana was

5  working at the other agency.

6  Q.  That's not something she went around telling everybody at

7  the office, hey, I'm committing fraud here at other agencies or

8  other clinics, correct?

9  A.  No.

10  Q.  That's something she basically kept to herself.

11  A.  Yes.

12  Q.  Between her and Ms. Pampin, correct?

13  A.  Yes.

14  Q.  Mr. Gonzalez, Armando Gonzalez, never promised to

15  compensate you for -- I'm not telling if he actually did, but

16  did he ever promise to compensate you for fabricating

17  documents?

18  A.  No, sir, he did not.

19  Q.  Do you know why he would pay Dana and Gema and not pay you

20  extra money for fabricating documents?

21  A.  Whatever agreement they had was between them.  I had

22  nothing to do with what they had between them.

23  Q.  So you knew that the moment you started working, that part

24  of your salary -- well, part of your responsibilities included

25  fabricating documents, correct?

1    A.  When I started at Health Care Solutions --

2    Q.  Yes.

3    A.  -- I was paid a salary to do a job, and that job was to

4    create fraudulent work, yes.

5    Q.  You were already aware that once you started working there,

6    it was going to be fraudulent.

7    A.  When they interviewed me, no.  When I stepped into the

8    door, yes.

9    Q.  Okay.  Now, the therapists at Health Care Solutions had no

10   say in the admission process of the patients, correct?

11   A.  Yes, that is correct.

12   Q.  The therapists at Health Care Solutions had no say in the

13   discharge of patients, correct?

14   A.  That is correct.

15   Q.  What the therapists did was bring this fact to the

16   attention of upper management, saying, hey, some of these

17   people should be discharged already, correct?  They would

18   complain about it.

19   A.  They would complain about --

20   Q.  They would complain about --

21   A.  -- the length of stay.

22   Q.  -- the size of the groups because they felt that these

23   patients, some of these patients should have been discharged

24   already, correct?

25   A.  They complained, but continued to work on the -- on the

1  groups.

2  Q.  Well, they had no say on who was going to be discharged,

3  correct, ma'am?

4  A.  No, but they still chose to do their groups and stay there

5  and work for Manny Gonzalez --

6  Q.  They chose --

7  A.  -- knowing what he was doing.

8  Q.  -- to do their jobs, correct, ma'am?

9  A.  They chose to work the groups that they knew were oversized

10  and to write notes that were incorrect, yes.

11  Q.  And the best and the only thing they could do when things

12  were -- groups were oversized was to complain to upper

13  management, correct, ma'am?

14  A.  They could have, but they could have also chosen to go work

15  elsewhere and not commit fraud.

16  Q.  They complained to upper management, did they not, ma'am?

17  A.  Yes.

18  Q.  And those complaints fell upon deaf ears, did they not,

19  ma'am?

20  A.  Most of the time, yes.

21  Q.  Whether it be the size of the groups or when patients

22  should have been discharged, they were complaining, were they

23  not?

24  A.  Not always.  Sometimes they did with some patients.

25  Sometimes when the groups got too big.  But not every day.

1    Q.   There's only so much a person can complain, and when they

2    see nothing is done about it, what would you expect them to do?

3    A.   I would expect people who don't want to commit fraud to go

4    work elsewhere.

5    Q.   And that's something you didn't do, correct, ma'am?

6    A.   That's true, but I took responsibility and have admitted

7    that I've committed fraud and I'm currently incarcerated.

8    Q.   And that's when you yourself know you are committing fraud,

9    correct, ma'am?

10   A.   I knew that I was committing fraud, that what I was doing

11   was wrong, yes.  I did and I chose to do it.  I chose to stay.

12   Q.   You never sat in one of Doris Crabtree's groups, did you,

13   ma'am?

14   A.   I could see her through the glass.

15   Q.   Did you sit in one of her groups, ma'am?  That is my

16   question to you.

17   A.   No, sir, I did not.

18   Q.   Never, throughout that entire year that you were down here,

19   did you ever sit in one group therapy session involving Doris

20   Crabtree, correct?

21   A.   No.  That is correct.

22   Q.   In fact, she did the Spanish speaking high functioning

23   group.  That was her group, correct, ma'am?

24   A.   As far as I remember, yes.

25   Q.   She didn't need your assistance at all to run her groups,

1    correct, ma'am?

2    A.  No, she did not need my assistance.

3    Q.  She didn't need your assistance while she was writing up

4    her group therapy notes, correct?  She never asked you to help

5    her with group therapy notes, correct, ma'am?

6    A.  No, she didn't, because she knew what she was supposed to

7    write in those notes and she did not need my assistance.

8    Q.  She is a licensed therapist and you are not, correct,

9    ma'am?

10   A.  That is correct.

11   Q.  There was nothing that you could teach Doris Crabtree to

12   do, as far as giving group therapy sessions was concerned,

13   correct, ma'am?

14   A.  I could not teach her, no.

15   Q.  You couldn't supervise her, even if you wanted to, because

16   you weren't licensed, correct?

17   A.  That is correct.

18   Q.  However, she could supervise you if you were going to do a

19   group because she is a licensed therapist.

20   A.  That is correct.

21   Q.  You never spoke to Doris Crabtree about any extra

22   compensation as far as that she may have been receiving for

23   fabricating notes, correct, ma'am?

24   A.  I knew that the patient -- that the therapists were paid

25   extra when the groups got too big, that they were paid extra to

1    compensate.  That was general knowledge in the office.

2    Q.  When groups grow bigger, there's more work, correct?

3    A.  That is correct.

4    Q.  And when employees do more work, it's common for the

5    employees to be compensated extra for that, correct, ma'am?

6    A.  In some places.  Not all people are always compensated

7    extra.

8    Q.  But if you ask someone to take on more responsibilities and

9    that person requests more money and that money is given to

10   them, there's nothing unusual about that, is there, ma'am?

11   A.  Not unless it also involves the content of what was written

12   in that -- in that paperwork.

13   Q.  You were -- you had no knowledge of any conversations

14   between Doris Crabtree and Armando Gonzalez regarding the

15   fabrication of group therapy notes.

16   A.  Not between them, but --

17   Q.  You had no --

18         THE COURT:  Hold on a second.  Hold on a second.  Let

19   her finish the answer.

20         MR. PALOMINO:  Sorry, Judge.

21   A.  I never sat in on the conversation she had with

22   Mr. Gonzalez, but I was there when I asked her to fabricate

23   notes and she willingly did so.

24   BY MR. PALOMINO:

25   Q.  Were you there when she had any conversations with Ms. Feas

1    regarding fabrication of notes?

2    A.  No, sir, not with Ms. Feas.

3    Q.  Now, you're saying that you're the one who asked her to

4    fabricate notes, correct?

5    A.  Yes.

6    Q.  And which patients were these?

7    A.  The patients who were under review.

8    Q.  And who were they?

9    A.  Sir, I don't remember.  That was over seven years ago.

10   Q.  You can't give me dates -- dates, times, names of patients

11   that you specifically requested Ms. Crabtree or any therapist

12   to fabricate notes for, correct, ma'am?

13   A.  That's correct, not specifics, but I know that we asked for

14   fabricated notes during review time, we spoke with the

15   therapists directly, and they were more than willing to help

16   us.

17   Q.  But you can't tell us -- you can't even name one.  You just

18   told us you don't remember.

19   A.  I can't name them specifically.  That does not mean it did

20   not happen.  If they -- those notes were done, they were false,

21   they were fabricated notes.

22   Q.  You're making a general accusation here, are you not,

23   ma'am?

24   A.  I am not making a general accusation.  That actually

25   happened.

1  Q.  And you cannot specifically say when it happened and to

2  whom it happened to.

3  A.  Not right now, no.

4          MR. PALOMINO:  I've got nothing further, Your Honor.

5                  *   *   *   *   *

```
1  UNITED STATES OF AMERICA              )
                                          ) ss:
2  SOUTHERN DISTRICT OF FLORIDA          )

3

4                 C E R T I F I C A T E

5      I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 12th day of November, 2014, in the above-mentioned

10 court; and that the foregoing transcript is a true, correct,

11 and complete transcript of my stenographic notes.

12     I further certify that this transcript contains

13 pages 1 - 22.

14     IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 16th day of November, 2014.

16

17

18                    /s/ Carly Horenkamp

19                    Carly L. Horenkamp, RMR, CRR
                       Certified Shorthand Reporter

20

21

22

23

24

25
```