```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                            MIAMI DIVISION
                      CASE NO. 13-20505-CR-SCOLA
 3
     UNITED STATES OF AMERICA,              NOVEMBER 13, 2014
 4                                          9:50 A.M.
                          Plaintiff,
 5

 6
          vs.
 7

 8   ROGER ROUSSEAU, et al.,

 9                      Defendants.       PAGES 1 THROUGH 59

10   _____

11                             DAY 8
                   EXCERPT OF CRIMINAL JURY TRIAL
12   (DIRECT EXAMINATION OF PATRICK TRIPLETT, M.D., BY MR. STEWART)
                BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
13                   UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15   FOR THE PLAINTIFF:    Mr. Allan J. Medina, AUSA
                           Mr. A. Brendan Stewart, AUSA
16                         Mr. Justin Goodyear, AUSA
                           U.S. DEPARTMENT OF JUSTICE
17                         Criminal Division
                           Fraud Section
18                         1400 New York Avenue NW
                           Washington, DC  20530
19

20   FOR THE DEFENDANT:    Mr. Samuel J. Rabin, Jr., Esq.
     (Roger Rousseau)      LAW OFFICES OF SAMUEL J. RABIN, ESQ.
21                         800 Brickell Avenue
                           Suite 1400
22                         Miami, Florida  33131

23
     FOR THE DEFENDANT:    Mr. Rene Palomino, Jr., Esq.
24   (Doris Crabtree)      LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                           1221 Brickell Avenue # 900
25                         Miami, Florida  33131
```

```
 1    APPEARANCES (continued):

 2
      FOR THE DEFENDANT:    Mr. Ricardo P. Hermida, Esq.
 3    (Angela Salafia)      LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                            55 Merrick Way
 4                          Suite 212
                            Coral Gables, Florida  33134
 5

 6    FOR THE DEFENDANT:    Mr. Frank A. Prieto, Esq.
      (Liliana Marks)       LAW OFFICE OF FRANK A. PRIETO, P.A.
 7                          One Northeast 2nd Avenue
                            Suite 200
 8                          Miami, Florida  33132

 9
      FOR THE DEFENDANT:    Mr. Juan De Jesus Gonzalez, Esq.
10    (Alina Fonts)         LAW OFFICES OF JUAN DE JESUS GONZALEZ
                            10631 N Kendall Drive
11                          Suite 150
                            Miami, Florida  33176
12

13    FOR THE DEFENDANT:    Mr. Albert Z. Levin, Esq.
      (Blanca Ruiz)         LAW OFFICES OF ALBERT Z. LEVIN, P.A.
14                          Courthouse Tower
                            40 NW 3rd Street
15                          Suite 200
                            Miami, Florida  33128
16

17    COURT REPORTER:       Carly L. Horenkamp, RMR, CRR
                            U.S. DISTRICT COURT
18                          400 N. Miami Avenue, Room 12-3
                            Miami, Florida  33128
19                          (305) 523-5147

20

21

22

23

24

25
```

1                    **I  N  D  E  X**

2   *Certificate* ---------------------------------------- 59

3


4


5                    **W I T N E S S**
    ON BEHALF OF THE GOVERNMENT:                    PAGE
6   PATRICK T. TRIPLETT, M.D.
    DIRECT EXAMINATION BY MR. STEWART                  4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1     (Before Jury, 9:50 a.m.)

2          THE COURT:  Who is the next witness?

3          MR. STEWART:  The government calls Dr. Patrick

4     Triplett.

5        PATRICK T. TRIPLETT, M.D., GOVERNMENT WITNESS, SWORN

6          COURT REPORTER:  Please state your full name, spell

7     your last name for the record, and please use the microphone.

8          THE WITNESS:  My name is Patrick Triplett.  My last

9     name is spelled T-R-I-P-L-E-T-T.

10          THE COURT:  All right.  Go ahead, Mr. Stewart.

11                    DIRECT EXAMINATION

12    BY MR. STEWART:

13    Q.  Good morning.

14    A.  Good morning.

15    Q.  Dr. Triplett, what's your current occupation?

16    A.  I'm a psychiatrist.

17    Q.  What's a psychiatrist?

18    A.  A psychiatrist is someone who assesses patients for mental

19    illnesses, behavioral disorders, and treats them when

20    indicated.

21    Q.  Where are you currently employed?

22    A.  Johns Hopkins.

23    Q.  Where is Johns Hopkins located?

24    A.  Baltimore, Maryland.

25    Q.  Is that also where you currently live?

1  A.  Yes.

2  Q.  You mentioned that a psychiatrist specializes in the

3  treatment of I believe mental and behavioral disorders.  Can

4  you explain that further?

5  A.  Sure.  So we have a -- there's a variety of different

6  conditions that we treat, sometimes behavioral disorders as

7  well, in various settings.

8  Q.  So what are some of those conditions?

9  A.  So we might -- so major depressive disorder, bipolar

10  disorder, schizophrenia.  That's just a few examples.  There

11  are many others.

12  Q.  We'll come back to those in a minute.  At Johns Hopkins,

13  what's your current position?

14  A.  I'm the clinical director for the department of psychiatry.

15  Q.  How long have you held that position?

16  A.  Almost five years.

17  Q.  Is that with Johns Hopkins medical school or the hospital?

18  A.  It's a little bit of both.  I'm employed by the Johns

19  Hopkins University School of Medicine, but we practice at Johns

20  Hopkins Hospital.

21  Q.  Do you have a particular position with the school of

22  medicine?

23  A.  Yes.  I'm -- that's my primary appointment, is with the

24  school of medicine.

25  Q.  Are you an associate professor there?

1    A.  Assistant professor.

2    Q.  Assistant professor, excuse me.  So what are your

3    responsibilities, then, at the hospital?

4    A.  So I really oversee all of our clinical operations, our

5    inpatient services, our partial programs, outpatient services.

6    There are others as well.

7    Q.  We're certainly going to come back to that, but first I

8    just wanted to give -- or have you give, excuse me, the members

9    of the jury a little bit of your educational background.  So

10   where did you go to college?

11   A.  I went to Amherst College.

12   Q.  And what did you do after college?

13   A.  I got a master's degree in diplomacy in international

14   commerce, and then took some other coursework, and then entered

15   the University of Kentucky School of Medicine.

16   Q.  Your master's degree, was that also at the University of

17   Kentucky?

18   A.  It was.

19   Q.  Did you graduate with a medical degree from the University

20   of Kentucky?

21   A.  I did.

22   Q.  When was that?

23   A.  1999.

24   Q.  So what did you do after medical school?

25   A.  I did an internship at Johns Hopkins Bayview.

1  Q.  Johns Hopkins Bayview, is that facility related to the one

2  where you currently are employed?

3  A.  It is.  It's part of the same hospital system.

4  Q.  Is it in the same location?

5  A.  It's a separate hospital.  It's about five miles -- roughly

6  five miles from Johns Hopkins Hospital.  It's a community

7  hospital.

8  Q.  What did you do after that internship?

9  A.  I did a residency at Johns Hopkins Hospital.

10  Q.  Was that also in the area of psychiatry?

11  A.  It was, yes, psychiatry residency.

12  Q.  Following that, did you have a fellowship?

13  A.  I did.  I was -- I did a geriatric psychiatry fellowship at

14  Johns Hopkins.

15  Q.  And so what did you do next after your fellowship?

16  A.  I joined the faculty.

17  Q.  At Johns Hopkins?

18  A.  Yes.

19  Q.  What position did you hold?

20  A.  I was in charge of the operations of our psychiatric

21  emergency services, which is basically -- it's an area of the

22  emergency department where patients with psychiatric issues are

23  assessed.

24  Q.  When was that, approximately?

25  A.  It was about 2004.

1    Q.   And how long did you hold that position before becoming

2    clinical director?

3    A.   That was around five years.

4    Q.   Now, as clinical director, what are your responsibilities?

5    Can you describe them?

6    A.   Sure.  So I -- a lot of crisis management.  I oversee all

7    our clinical operations in the various settings around the

8    hospital.  Part of it, too, is overseeing our -- making sure

9    basically that we're seeing all the patients that we're

10   supposed to see, that we're doing it efficiently, that we're

11   complying with all the rules.

12   Q.   Are you responsible for patient safety matters?

13   A.   Yes.

14   Q.   Quality of care matters?

15   A.   Yes.

16   Q.   In this role, do you supervise other personnel?

17   A.   I do.

18   Q.   What kinds?

19   A.   Physicians primarily.

20   Q.   These physicians, are they also specialists in the field of

21   psychiatry?

22   A.   They are.

23   Q.   What areas of their let's say professional development are

24   they at?

25   A.   It varies.  We have residents in training who are

1    relatively new graduates from medical school all the way up to

2    people who have been practicing for decades.

3    Q.   In addition to your responsibilities as clinical director,

4    do you also see patients?

5    A.   I do.

6    Q.   In what settings?

7    A.   I see patients in the outpatient settings.  I have -- I see

8    geriatric psychiatry patients.  I see other patients as well.

9    I work on our partial program occasionally.  I also do

10   inpatient attending on a couple of our units -- or actually

11   most of our units.

12   Q.   You mentioned your partial program.  Is that your partial

13   hospitalization program?

14   A.   Yes.

15   Q.   So where are you currently licensed to practice medicine?

16   A.   Maryland.

17   Q.   And are you board certified?

18   A.   I am.

19   Q.   What does that mean?

20   A.   That means I've taken examinations that are an assessment

21   of your I guess -- well, they're assessments of your abilities

22   in psychiatry and also in geriatric psychiatry.

23   Q.   During the course of your career, have you published any

24   writings?

25   A.   I have.

1    Q.  In what areas?

2    A.  A variety of different areas.  Some of it was geriatric

3    psychiatry.  There were other issues as well.

4    Q.  Were these writings published in journals?

5    A.  They were, peer reviewed journals.

6    Q.  Have you also published a book?

7    A.  Yes.

8    Q.  What's it called?

9    A.  *Emergency Psychiatry.*

10   Q.  Are you a member of any associations in the field of

11   psychiatry?

12   A.  I am.

13   Q.  Which ones?

14   A.  So I'm a member of the American Psychiatric Association,

15   Maryland Psychiatric Society.  I've been involved with other

16   societies as well.

17   Q.  Okay.  Do you give lectures in the field of psychiatry?

18   A.  I do.

19   Q.  So let's get back to the facility where you currently work.

20   Can you describe it to the jury?

21   A.  Sure.  So Johns Hopkins has about 1100 inpatient beds.  Of

22   those, 88 are dedicated to inpatient psychiatric care.  We also

23   have an area of the emergency department that's dedicated to

24   the care of patients with psychiatric issues.  We have a very

25   busy consult service.  We have -- we have a community

1    psychiatry service.  We have a variety of specialty psychiatry

2    clinics.

3    Q.  The individuals that you mentioned earlier that you

4    supervise, for example, the residents in training, do they work

5    at this facility that you just described?

6    A.  Yes.

7    Q.  What kind of population does this facility service?

8    A.  It's a pretty broad variety.  We're in -- really in the

9    heart of east Baltimore, which is an economically fairly

10   impoverished part of the -- part of the city.  But we get

11   patients that really come from all over.  We get patients that

12   come from Baltimore, from Washington, D.C.  We get patients

13   that come from really around the world too.

14   Q.  You've mentioned a couple of times partial, inpatient, some

15   terminology, so I'd like to walk through, if you would, the

16   types of services that are offered, psychiatric services, at

17   Johns Hopkins.

18   A.  Sure.  So I think we mentioned the inpatient service first.

19   That's really our most intensive treatment.  We have four

20   floors and a variety of different specialty services.  These

21   are generally locked units because these are the patients that

22   are -- from a psychiatric standpoint, tend to be the sickest

23   and need the most intensive treatment.  There are nurses there

24   24/7.  There are physicians that are there as well.

25       The next level down in terms of the acuity of treatment

1    would be the partial program.  We have five of those, I

2    believe, and those are -- again, they have specialty focuses.

3       Then the next level of treatment would be outpatient care,

4    routine outpatient care.

5    Q.  You mentioned a couple of things.  Acuity.  You said

6    inpatient was the most acute.

7    A.  Yes.

8    Q.  What do you mean by that?

9    A.  Those are the patients that really are the sickest.  These

10   are the ones that really require the most -- the most intensive

11   treatment and observation from our nurses, from our physicians.

12   Q.  I believe you said that the next step down is your partial

13   hospitalization program?

14   A.  Yes.

15   Q.  How does the acuity of a patient there compare with the

16   acuity of a patient who is in inpatient care?

17   A.  So it's less intense but they're -- they're still quite

18   symptomatic.  These are patients who -- they really come to us

19   from two directions.  They're either coming off of the

20   inpatient service, so they're -- they're improving but they may

21   not be all the way well, and this is a way of getting them out

22   of -- into a less restrictive environment.  So they've been --

23   you know, they may have been on a unit where they were locked

24   in 24/7.  This is really the next step down as a kind of a

25   trial to getting back to routine outpatient care.

1    We also have referrals that come from outpatient providers

2  as well, patients who are -- may be doing worse and may need

3  more intensive treatment as a way of keeping them out of the

4  hospital.

5  Q.  You mentioned that some of the patients you're moving from

6  inpatient down to partial hospitalization treatment.  Is that

7  sometimes referred to as stepping down?

8  A.  Yes.  Yes, it is.

9  Q.  And you also mentioned the patients move at times from

10 outpatient up to partial hospitalization treatment.

11 A.  Yes.

12 Q.  Is that sometimes referred to as stepping up?

13 A.  Yes.

14 Q.  So sticking with the partial hospitalization treatment for

15 a moment, what are we talking about on a day-to-day basis for

16 the patients who are in that program?

17 A.  Well, it's not a locked unit.  They're able to come and go.

18 They'll come in the morning.  They'll be engaged in treatment

19 during the daytime hours and then they'll go home in the

20 evening.

21 Q.  During the daytime hours that they're engaged in treatment,

22 what kind of treatment are they getting?

23 A.  It's different things.  So there -- it's really -- it's an

24 opportunity for us to make a lot of rapid changes to try to get

25 them better or to make sure that they are continuing to do

1   well.  So we will make changes to medications, for example.

2   They'll have interactions with the nurses.  They are -- they'll

3   be involved in some kind of psychotherapy groups.  Sometimes --

4   it might be individual psychotherapy, but more often it's

5   really group psychotherapy.  There are other -- other

6   treatments that happen there as well.

7   Q.  The group psychotherapy, how many sessions does a patient

8   typically go through during the course of a day?

9   A.  It's four, but it varies.  Sometimes there are more than

10  that.  There are different activities that they're engaged in.

11  Q.  So briefly I'd like to discuss how that level of intensity

12  compares with the level of intensity for outpatient treatment.

13  Can you describe outpatient for us?

14  A.  Yes, outpatient, they're not going to be seen that

15  frequently.  They're not going to be engaged for that many

16  hours of the day.

17  Q.  Have you testified before as an expert witness?

18  A.  Yes.

19  Q.  Have you been retained by the government to testify in this

20  case?

21  A.  Yes.

22  Q.  And are you being paid for your time?

23  A.  Yes.

24  Q.  How much?

25  A.  For preparation for trial $550 per hour, and for testifying

1  $600 per hour.

2      MR. STEWART:  So at this time the government would

3  move to qualify Dr. Triplett as an expert witness.

4      THE COURT:  Go ahead.

5  BY MR. STEWART:

6  Q.  Dr. Triplett, can you describe for us the extent of your

7  experience -- or your professional experience, excuse me, in

8  the area of partial hospitalization services?

9  A.  Sure.  If you count training time, I've been involved in

10  treating patients in that setting for about 14 years, I would

11  guess.

12  Q.  Have you worked directly with patients in that setting?

13  A.  I have.

14  Q.  Have you received training to work with those patients in

15  formal education?

16  A.  Yes.

17  Q.  Have you received training on the job to work with such

18  patients?

19  A.  Yes.

20  Q.  I've been focusing my questions on partial hospitalization

21  services, but have you received -- excuse me.  Do you have

22  experience working also in the inpatient setting?

23  A.  Yes.

24  Q.  And in the outpatient setting?

25  A.  Yes.

1   Q.  And have you received training, both formal education as

2   well as on-the-job experience, both in the inpatient and

3   outpatient settings as well?

4   A.  Yes.

5           MR. STEWART:  Just a moment, Your Honor.

6       (Off-the-record discussion.)

7   BY MR. STEWART:

8   Q.  So, focusing now on partial hospitalization specifically,

9   what kind of patients -- excuse me, what kind of symptoms and

10  conditions does a patient need to have to be properly admitted

11  to a partial hospitalization program?

12  A.  It's a pretty broad variety of conditions that we treat

13  there.  I think I had mentioned a few conditions earlier.

14  Those -- I mentioned major depressive disorder, bipolar

15  disorder, schizophrenia.  Those are examples of conditions we

16  would -- we would likely see in that setting.

17  Q.  At what level of acuity does a patient need to be

18  experiencing their condition in order for a partial

19  hospitalization service to be appropriate?

20  A.  So they're -- they can't be so acute that they are -- or so

21  psychiatrically sick they would need to be in the hospital.

22  You know, an example might be somebody who is really at risk of

23  hurting themselves or hurting somebody else.  That's somebody

24  who really needs a higher level of care, and they would be

25  better treated on an inpatient setting.  But they still --

1    they're still quite symptomatic.  These are people, again, who

2    are right on the brink of needing to come into the hospital.

3    Q.  To be properly admitted to such a program, does the patient

4    need to be able to participate and benefit?

5    A.  They do, yes.

6    Q.  Can you describe that for us.

7    A.  Sure.  So they're -- it requires a fairly -- fairly high

8    level of engagement.  We are tasked with -- again, we're trying

9    to get them better, and for some of our treatments that

10   involves a pretty high level of engagement with the patient.

11   Q.  You mentioned a couple of different mental illnesses which

12   are appropriately treated in the partial hospitalization

13   setting.  I believe you mentioned schizophrenia, bipolar, and

14   major depression?

15   A.  Uh-huh.

16   Q.  Would you briefly describe what each of those disorders are

17   for the members of the jury.

18   A.  Sure.  So a major depressive disorder, it's not just

19   sadness.  It's really -- it's a cluster of symptoms that can

20   kind of travel together.  So it might be mood, but not always.

21   So a patient might have a low mood, they might have issues with

22   anxiety, poor sleep, changes in their appetite, trouble with

23   concentration, trouble with energy, irritability, guilty

24   feelings.  As it gets worse, they may have thoughts that they'd

25   be better off dead or want to kill themselves or sometimes they

1   even have hallucinations, unusual experiences like that.

2        Bipolar disorder is -- the name suggests two poles.  So

3   there's -- on the one hand there's depression, major depressive

4   disorder like I just described.  On the other end, the other

5   pole would be what we call mania, which is a lot of very

6   restless energy, not needing to sleep, they might be talking

7   very fast, might be getting involved in relationships that they

8   shouldn't get involved in, spending all kinds of money, doing

9   all kinds of thing that they wouldn't typically do.  People

10  with bipolar disorder, the risk is that they go back and forth

11  between those two states.

12       Schizophrenia is a pretty complex condition.  It's -- often

13  patients with schizophrenia may have hallucinations.  So

14  they're hearing things, seeing things that other people

15  wouldn't hear or see.  They might have other unusual

16  experiences.  They can have what we call delusions.  They might

17  be paranoid, thinking that people are following them around,

18  tapping their phone, when none of that is actually happening.

19  It's not -- it's not real, but that's the perception that they

20  have.

21  Q.  If PHP treatment didn't exist, would individuals suffering

22  from these disorders at a high level of acuity need to be

23  treated in the hospital?

24  A.  They would.  They would probably stay in the hospital

25  longer or the threshold for admission might be lower so they --

1    you know, again, we'd be more concerned about them and we'd be

2    probably more likely to put them into the hospital earlier.

3    Q.  You mentioned earlier that in order to benefit from partial

4    hospitalization treatment, a patient needs to be able to

5    participate.

6    A.  Yes.

7    Q.  Can you describe what that really means on a practical

8    level?

9    A.  Yeah.  So there's -- there's a fair amount of give and

10   take.  The psychotherapy sessions, they can vary in their

11   approach and in what happens in the setting, but we still need

12   to -- our efforts are to engage the patient.  Again, we're

13   trying to get them better as quickly as we can, and this is one

14   of our -- one of our useful treatments for that.

15   Q.  So let's walk through how a patient gets admitted to a

16   partial hospitalization program.  Does it begin with a

17   referral?

18   A.  Yes.

19   Q.  Okay.  Where in your experience do referrals typically come

20   from?

21   A.  So we most often will get referrals from psychiatrists and

22   other mental health specialists that are seeing a patient, know

23   them pretty well, and are concerned about how they're doing so

24   they'll make the decision, you know, this is a patient that

25   needs a higher level of treatment.  They make the referral to

1    us.

2        Or alternatively, it's somebody, it's a patient who is on

3    our inpatient service and they need something -- they're not

4    quite ready for discharge back to routine care, so the

5    inpatient service will make a referral to us.

6    Q.   In your professional experience, how often do you see

7    referrals for a partial hospitalization treatment from

8    individuals who are outside of the mental health field?

9    A.   It's pretty unusual.  I can think of one case offhand where

10   someone who was not -- not a mental health provider made a

11   referral to us.

12   Q.   And did you treat that referral any differently than the

13   ones that you had received from mental health providers?

14   A.   We did.  It was an internal medicine doctor who we knew.

15   This person -- primary care doctors are able to treat some

16   psychiatric conditions to some -- to some degree.  As they get

17   more complex, they usually make referrals to us.

18       This was -- it was a bit unusual.  When we heard about it,

19   we kind of put the case through more scrutiny than we probably

20   usually would if it was a mental health provider.

21   Q.   So why did you do that?  Why did you put the case through

22   more scrutiny?

23   A.   Well, it's -- again, it's a very smart person, a good

24   doctor, but they're -- they were not trained in psychiatry.

25   They didn't have the -- they don't have the background to say

1    this is a patient that would be appropriate for that setting.

2    So we kind of walked through it to make sure that the patient

3    was going to benefit from that level of treatment.

4    Q.  You mentioned one such referral from someone outside of the

5    mental health field.  Can you give us a sense of how many

6    referrals you've received during the course of your career?

7    A.  I mean, that's over a period of many years, so it's

8    probably hundreds of referrals.

9    Q.  Now, when a patient actually arrives at the PHP facility,

10   in your experience, what's the first step in the admissions

11   process?

12   A.  So we get the information.  If it's somebody that is being

13   referred from -- inside or outside, usually there's a referral

14   form they fill out.  It's a very brief description of what

15   their diagnosis is, what the symptoms are, and, you know,

16   contact information, that sort of thing.  That goes to our

17   admissions office and that kind of starts the process.

18   Q.  Who's the first medical professional that the patient sees?

19   A.  Usually, like right when they walk in the door, it will

20   be -- well, the administrative staff will take them to the

21   unit.  It's usually the nurse that they see first.

22   Q.  Okay.  What kind of information does the nurse collect from

23   the patient?

24   A.  They have -- they have a variety of different screening

25   questions they ask, so they might go through medications and

1  symptoms.  They might have -- sometimes they'll ask about

2  coping skills.  It's a variety of different things.  They'll

3  ask about medications.  They'll -- might get vital signs, start

4  doing some of the basic workup.

5  Q.  Now, this nurse who's collecting this information, does she

6  have training to do so?

7  A.  Yes.

8  Q.  Who is the next medical professional that the patient will

9  see?

10  A.  In our setting, it's usually the resident in training.  So

11  this is somebody who has graduated medical school, has done an

12  internship, and is learning how to become a psychiatrist.  So

13  they'll start taking some of the history.  They'll -- if we

14  have records, if this is somebody that we've -- if we've seen

15  before in our setting or that's being referred from somebody

16  else, they'll start going through all the paperwork to get a

17  sense -- so really start collecting the whole history and put

18  it together.

19  Q.  The resident in training that you just mentioned, is that

20  person a medical doctor?

21  A.  Yes.

22  Q.  Who does the patient see next?

23  A.  Well, usually -- that's kind of a long step, actually.  So

24  the resident starts pulling all of that information together.

25  They'll do their own assessment.  They'll run through a bunch

1   of questions.  We take a fairly exhaustive history.  The

2   details do matter in that setting.  So they -- they spend a

3   fair amount of time with that.

4       And then the next step is they'll present that -- all the

5   information that they've gathered to the attending physician,

6   and the attending physician will ask questions, and then

7   they'll usually see the case together at that point -- see the

8   patient together.

9   Q.  You mentioned that it's a fairly extensive process.  So I'd

10  like to walk through with you how long you would estimate it

11  would take, this entire admissions process, from beginning to

12  end if you were dealing with a patient who wasn't familiar to

13  you previously.

14  A.  Well, if it's somebody we know, it doesn't take quite as

15  long.  But for somebody that we're really starting from

16  scratch, you know, worst case scenario, there's scant paperwork

17  and we're kind of pulling it all together, calling -- we might

18  be calling out to the referring source, talking to family

19  members, talking to the patient, it can take an hour and a

20  half, two hours.  It can take longer than that, too, sometimes.

21  Q.  You mentioned that the resident in training and the

22  attending physician meet together with the patient.

23  A.  Yes.

24  Q.  The attending physician, is that person a psychiatrist?

25  A.  Yes.

1    Q.   Why is it important for the two of them to meet together

2    with the patient?

3    A.   Well, it's a teaching setting, so we need to make sure that

4    the resident is able to observe the attending and the

5    interactions that they're having with the patient.  It's a good

6    way for them to learn technique and what they -- what the

7    attending considers to be critical information.  If there are

8    things that need to be followed up on, more probing, more

9    in-depth questions, that's an opportunity for the resident to

10   learn how to do those things.

11   Q.   If there is anything to follow up on, if there is anything

12   that needs more probing, as you just described, is it the

13   responsibility of the attending physician to do so in that

14   setting?

15   A.   Yes, yeah.

16   Q.   I'd like to discuss where this should happen physically in

17   the facility.

18   A.   So the nursing assessment is done.  There's usually a

19   separate room where they start doing all the kind of intake

20   questions and getting vital signs.  The resident -- and we've

21   got a handful of these different places -- they may see them in

22   their office or they may see them in the office for the -- for

23   the partial program.

24   Q.   Are these private settings?

25   A.   Yes.

1    Q.   Are these settings, these locations, away from other

2    patients?

3    A.   Yes.

4    Q.   Why is that important?

5    A.   Well, these are psychiatric histories so we're asking

6    pretty sensitive questions.  There are -- as you can imagine,

7    there are questions that people don't want to ask in front of a

8    group of other people, or to answer them.  And we want them to

9    be able to speak freely, to tell us what might be embarrassing

10   information.  Oftentimes these are details we really do need to

11   know.  It's going to inform our treatment and help us figure

12   out what the right treatment plan is going to be for the

13   patient.

14   Q.   If you don't ask these questions in a private setting, what

15   kind of problems can arise?

16   A.   We can miss details.  Again, these might be embarrassing

17   things that they don't want to talk about, and it might be

18   information that we need to know.  And that's -- and again,

19   it's a pretty intensive level of treatment.  We've got a lot of

20   work we're trying to do fairly rapidly, so it's important for

21   us to make sure that we've got all the information we need.

22   Q.   Each of the people that you've just mentioned, each of the

23   doctors, the nurse, do each of them have training in the mental

24   health field?

25   A.   They do.

1  Q.  What kind of problems can arise if individuals who did not

2  have training in the mental health field try to collect this

3  type of information from patients?

4  A.  Well, one of the problems would be that they wouldn't -- I

5  had mentioned before sort of probing on some questions.  There

6  are questions where, you know, a yes or no answer probably

7  isn't enough, where we need to kind of follow up with more

8  details, and that's part of the kind of skill set that you

9  develop as you -- as you get further along in training and

10  experience.

11  Q.  I believe you mentioned it before, but I just wanted to

12  confirm one thing.  How long have you been working since

13  graduating from medical school in a clinical capacity?

14  A.  Fifteen years.

15  Q.  And during that time, have you ever encountered a situation

16  where an individual employed by a PHP, such as a driver, is

17  responsible for collecting information from the patient,

18  medical information from the patient, during the admissions

19  process?

20  A.  Medical information, no.

21  Q.  Same question, but for someone employed, let's say, by the

22  kitchen staff at a PHP.  Have you ever experienced a situation

23  where a person like that was responsible for collecting medical

24  information from a patient during the admissions process?

25  A.  No.

1   Q.  Would it be acceptable for any individual like that,

2   drivers, kitchen staff, to collect such -- excuse me -- to

3   collect such information from patients in a public setting of a

4   PHP?

5   A.  Well, that gets back to that same issue.  Privacy does

6   matter when you're collecting psychiatric information.

7   Q.  Let's switch gears a little bit.  Once a patient is

8   admitted, does the PHP program begin creating documentation for

9   them?

10   A.  Yes.

11   Q.  What kind of documentation?

12   A.  It's a variety of different things.  So the nurses might

13   start with the screening assessments that they do, vital signs,

14   things like that.  We do an admission; we call it an H and P.

15   So it's basically a history and a list of -- not a list, but a

16   description of all the symptoms that they're having, our

17   assessment of the patient, plans like that.  A treatment plan

18   is put together.  There are notes put in from a variety of

19   different providers that all go into the chart.

20   Q.  I'm going to ask you a few questions about the procedures

21   that should be taken when working with hard copy, with paper

22   patient files, okay?

23      If you need to make, let's say, a change to admissions

24   information that is stored in hard copy in a patient's files,

25   how do you do that?

1    A.  When we were -- on paper you would put a line through it

2    and initial.  If you're writing along and you make a mistake,

3    you put a line through it, initial it, and then keep going.

4    Q.  Where did you learn to do that?

5    A.  Medical school.

6    Q.  Why does it have to be done that way?

7    A.  Well, you're -- you know, that's a good question.  We're

8    all taught to do that, that you put the line through it,

9    initial it.  Some people are told, put the word --

10            MR. RABIN:  Objection.

11   A.  -- "error" on top of it.

12            MR. RABIN:  Excuse me.  Objection to "we're all taught

13   to do that."

14            THE COURT:  Overruled.

15   A.  Oh, I'm sorry.  That's a good -- maybe I was speaking to my

16   medical school, but that's what we were taught to do in that

17   setting, was put a line through it, and that's also been our --

18   the other standard that I've been -- that I've experienced.

19   BY MR. STEWART:

20   Q.  When you referred to we all, who are you referring to?

21   A.  Physicians.

22   Q.  When you put a line through it, are you still able to see

23   what the original information was?

24   A.  Yes.

25   Q.  When you sign and date, does that record who made the

1  change?

2  A.  Yes.

3  Q.  If you know who made the change, could a physician later

4  consult with that person?

5  A.  Sure.  They can go back and ask them about what was -- what

6  was lined through; and if they had questions about it, they can

7  ask.

8  Q.  So if instead you were to use Wite-Out to make a change to

9  a hard copy written file, would you be able to tell what the

10  original information was?

11  A.  No.  I mean, that would kind of obliterate everything on

12  the line.

13  Q.  If you were to use Wite-Out instead, would you be able to

14  tell who made the change?

15  A.  Not unless they wrote a little note saying that they had

16  done that.

17  Q.  Let's talk about treatment plans in the PHP -- partial

18  hospitalization program -- setting.  Do treatment plans need to

19  be tailored to the specifics of individual patients?

20  A.  They do.

21  Q.  And why is that important?

22  A.  Again, so it's a fairly intensive level of treatment.

23  Patients are coming with a variety of different disorders and

24  we have to tailor the treatment to kind of where they are and

25  what we're going to do to help them.

1  Q.  Does the treatment plan need to take into account the

2  patient's -- the person's, excuse me, medication history?

3  A.  It does, yes.

4  Q.  And why is that important?

5  A.  We need to know that.  If we're, you know, treating them

6  for some condition, making medication changes, we need to know

7  if there's going to be some drug/drug interaction that we need

8  to worry about that can have very serious repercussions for a

9  patient.

10  Q.  In developing a treatment plan, do you need to take into

11  account outpatient treatment the patient may have received?

12  A.  Yes.

13  Q.  Do you need to take into account inpatient treatment the

14  patient may have received?

15  A.  Yes.

16  Q.  How about treatment that they have experienced at other

17  partial hospitalization programs?

18  A.  Yes.

19  Q.  So why is that psychiatric history of treatment important

20  in developing the treatment plan?

21  A.  Well, we're -- if there are things that have worked in the

22  past, things that they've not tolerated in the past, we need to

23  know that, because time is pretty valuable in that setting.

24  We're making decisions, we're trying to get them better, keep

25  them out of the hospital, so we need to know that our

1    information is correct.  Also, you know, we don't want to make

2    a mistake that's going to hurt a patient.

3    Q.  Is a one-size-fits-all treatment plan ever appropriate in

4    the PHP setting?

5    A.  No.

6    Q.  Now, moving from treatment plans to the treatment team,

7    who's responsible for pulling together the treatment plan?

8    A.  The physician.

9    Q.  And who does the physician work with in creating a

10   treatment plan?

11   A.  It's -- it can vary, but -- so we've described some people

12   already.  So it's the physician, the resident -- the

13   psychiatrist, the resident in training, nurses, occupational

14   therapy might be involved, social workers.  There are others as

15   well.

16   Q.  What's the role of the doctor in coming up with the

17   treatment plan?

18   A.  We're -- we're really in charge of making sure that it

19   happens.

20   Q.  And what does that mean on a practical level?

21   A.  That's really, you're in charge of oversight.  We read

22   through it, make sure that we agree with everything that the

23   team is proposing to do to get the patient better.

24   Q.  You mentioned some of the other individuals who the doctor

25   will interact with in formulating a treatment plan.  Will the

1  doctor talk to therapists?

2  A.  Yes.

3  Q.  Okay.  Why?

4  A.  The therapists are often a good source of information for

5  us.  Particularly as we're going along through the course of

6  treatment, we need to know from them are they -- what are they

7  noticing?  Is the patient -- do they think the patient is doing

8  better, do they think they're no better, are they getting

9  worse?  They're able to observe and kind of report it back to

10  us.

11  Q.  Does a responsible therapist need to understand what is

12  happening with their patients during the course of PHP

13  treatment?

14  A.  Yes.

15  Q.  And what does that mean?  What is the therapist responsible

16  for understanding?

17  A.  Well, again, they're part of the team.  They --

18  communication is very important in that setting.  They're --

19  they need to have some sense of what we're planning to do, what

20  we think -- how we think the patient is doing.  So again, those

21  feedback loops are really important.

22  Q.  Do they need to understand -- does the therapist need to

23  understand what's in the patient's medical files?

24  A.  Yes, to some degree they need to understand some -- I mean,

25  there are different -- we're talking about different levels of

1  training, different areas of expertise.  So it's -- but they

2  need to at least have a sense of what's going on with the

3  patient.

4  Q.  And is it routine when a doctor sits down and meets with

5  therapists and other people who are responsible for the

6  treatment of the patient, for them to review the patients'

7  files together?

8  A.  Yes.  So we have interdisciplinary -- multi-disciplinary

9  rounds is what we call it.  So we sit down as a team.

10  Q.  So what's the goal of all of this?  What's the goal of PHP

11  treatment?

12  A.  Get them better as fast as we can, try to stabilize their

13  symptoms, keep them out of the hospital.

14  Q.  Is PHP treatment a bridge to some other form of psychiatric

15  care?

16  A.  Yeah, it's -- I mean, you can look at it as a bridge in

17  both directions.  So if they're -- if they're not doing well,

18  it's a bridge to the inpatient service.  If they're doing well,

19  if things, you know, are heading the right direction, then

20  ideally they're going back to routine outpatient care.

21  Q.  So in your professional experience, how long does a patient

22  typically stay in a PHP program?

23  A.  In our setting it's about roughly two to three weeks on

24  average.

25  Q.  Is it sometimes more?

1    A.  Sometimes.

2    Q.  Is it sometimes less?

3    A.  Yep.

4    Q.  In your professional experience, would it be unusual for a

5    patient to stay in a PHP program for several months in a row?

6    A.  Unusual but not unheard of.

7    Q.  Can you quantify how many times you've experienced or

8    encountered a patient like that in your time as a doctor?

9    A.  Three months in a row it does -- it happens once in a

10   while.  There are -- I mean, there are patients where, again,

11   they're -- for whatever reason, they're kind of stuck.  It's

12   clear they're not ready for the transition back to routine

13   care, but they're not at the point where they're getting --

14   where we need to bring them into the hospital.  As it gets

15   longer and longer, you start thinking, gee, we're not -- we're

16   doing something wrong here.  We got to get this patient turned

17   around faster.

18   Q.  So when you think you're doing something wrong with a

19   patient, what does the team do?

20   A.  That's when we're really kind of putting our heads together

21   and thinking about, do we need to do something more aggressive.

22   There are times when we think, gee, maybe we're reading this

23   wrong or maybe it's, you know, time to bring the patient into

24   the hospital.

25   Q.  Is just simply keeping the patient in PHP therapy

1   indefinitely a solution?

2   A.   No.   No, I mean, again, we want to get them back to routine

3   outpatient care.   This is -- we have, you know, demand for

4   these slots in the day hospital, so we're -- we really want to

5   get them back to routine care as fast as we can.

6   Q.   And the patients you were describing, those who seem stuck,

7   are they the exception or the rule?

8   A.   Those are the exception.

9   Q.   And the patients you were just describing who seem stuck,

10  are they given additional attention by the treatment team?

11  A.   Oh, yeah, yeah.   We're trying to get creative to figure

12  out, is there something, you know, in their home setting, is

13  there some other approach we haven't thought of, do we need to

14  have a case conference where we bring in other doctors to talk

15  about it.

16  Q.   So let's talk next about discharge.

17          THE COURT:   Before we get to that, since you're

18  changing the topic, we've been here for an hour and a half, so

19  let's take our first morning break.   Since we're going straight

20  through lunch, let's take a little bit longer.   So let's take a

21  20-minute break and we'll see you at ten of 11:00.

22          (Recess, 10:30 a.m. to 10:51 a.m.)

23          THE COURT:   All right.   Everybody is here.   Let's

24  bring in the jury.   Are we going to finish with this witness

25  today?

36

1          MR. STEWART:  We're certainly going to finish the

2     direct.  I would estimate maybe another 30 to 45 minutes.

3          THE COURT:  So are you staying or are you going to

4     come back?

5          THE WITNESS:  I'll come back if I have to.

6        (Jury Present.)

7          THE COURT:  All right.  Welcome back, everybody.

8     Please be seated.

9          All right.  Mr. Stewart.

10          MR. STEWART:  Thank you.

11     BY MR. STEWART:

12     Q.  So Dr. Triplett, before the break I believe we were talking

13     about -- or switching to discharge.  From admission to

14     discharge, from start to finish, who is ultimately responsible

15     for the care of a patient in a PHP program?

16     A.  So it's the attending of record, the physician.

17     Q.  By the attending of record, by the physician, do you mean

18     the psychiatrist?

19     A.  Yes.

20     Q.  And is it ultimately the responsibility of this

21     psychiatrist to make discharge decisions for a PHP patient?

22     A.  Yes.

23     Q.  Would it raise concerns for you to learn if a PHP program

24     was discharging patients, and then after a preset period of

25     time readmitting them to another of its locations?

1    A.   A preset -- yes, it would.

2    Q.   Okay.  What kinds of concerns?

3    A.   Well, the primary concern would be that given that it was a

4    preset time, that it wasn't clinical factors, it wasn't the

5    patient's needs that were determining when they were being

6    readmitted.

7    Q.   And what do you mean by that, that it wasn't the patient's

8    clinical needs?

9    A.   That's what's driving all this.  It's the -- you know,

10   we're trying to get the patient better.  Our decisions are

11   based on what's going to help the patient.

12   Q.   And so by the patient's clinical needs, you're referring to

13   what's best for the patient.

14   A.   Yes.

15   Q.   Can you describe for us what some appropriate topics are

16   for PHP treatment?

17   A.   Sure.  So it's -- again, we treat a variety of conditions.

18   There are a lot of different approaches that you can take.  So

19   we'd mentioned depression earlier.  So for that, for example,

20   you might have a psychotherapy group that incorporates elements

21   of what we call cognitive behavioral therapy.  So it's how do

22   you handle thoughts, feelings, and behaviors.  So often

23   patients who are depressed or have other issues have trouble in

24   those arenas.  Their feelings might determine how they act

25   instead of thinking first and then acting.

1   I'm describing it in very broad terms.  But that's kind of

2   the thing that you might get into in that setting, helping them

3   try to come up with different coping skills, different ways of

4   approaching issues that might come up in their life.

5   Q.  So that's the topic.  How does the therapy work?

6   A.  So it's -- say it's in a group setting, for example, the

7   person that's leading the group will -- there are different

8   approaches to this, but they'll talk about the topic broadly.

9   They may bring up specific examples, ask for people that are in

10  the room to share examples from their own life or things that

11  maybe the group has experienced together and talk about those.

12  Q.  So this back and forth between the patient and the

13  therapist or between different patients during group therapy

14  sessions, is it recorded in some way by the therapist?

15  A.  Yes.  So the person leading the group takes -- they leave

16  notes afterwards.

17  Q.  The notes that they take, are they ultimately documented in

18  the patient's file?

19  A.  Yes, that's where the notes go.

20  Q.  So we'll come back to notes in a minute.  First, since

21  we've covered what topics are appropriate for PHP therapy, I'd

22  like to shift and ask you what doesn't qualify as PHP therapy.

23  So do recreational activities qualify as legitimate PHP

24  therapy?

25  A.  No.

1    Q.  Why not?

2    A.  It's -- those are -- those are the rules.  And I guess the

3    way to think about it, too, is that this is a fairly intensive

4    level of treatment.  Recreation has its place, but our

5    primary -- we need to be using everything we can at our

6    disposal to try to get the patient better as fast as we can.

7    Q.  You mentioned it's in the rules.  Which rules?

8    A.  The Medicare guidelines.

9    Q.  And the Medicare guidelines, do they apply to all PHPs

10   operating inside the United States?

11   A.  They do.

12   Q.  You mentioned that this is an intensive setting.  Is PHP

13   therapy hard work?

14   A.  Can be, yes.

15   Q.  Did you say it can be?

16   A.  Yes.

17   Q.  Does PHP therapy require patients to focus?

18   A.  It does usually.

19   Q.  Does it require them to avoid distractions?

20   A.  Yes.

21   Q.  Does music qualify as legitimate PHP therapy?

22   A.  Just music?

23   Q.  Just music.

24   A.  No.

25   Q.  So it would not be appropriate to just play music in a

1   therapy session and call it legitimate PHP therapy.

2   A.   That -- if it's just music, that sounds like it would be

3   recreational.

4   Q.   How about games such as Hangman, would it be appropriate to

5   just play a game like that in a PHP group therapy session and

6   call it therapy?

7   A.   So, again, if it's -- primarily recreational is what that

8   sounds like.

9   Q.   You mentioned documentation a moment ago.  Let's turn back

10  to it.  If you provide recreation such as music, such as games,

11  in a PHP group therapy session, is it ever appropriate to

12  document in your notes that instead you were providing

13  legitimate PHP therapy?

14  A.   So to make sure I understand the question, so you play a

15  game -- have done some recreational activity and said that it

16  was some form of psychotherapy.

17  Q.   That's exactly right.  What I'm asking is:  Is it ever

18  appropriate to play music, let's say for an entire therapy

19  session, but instead say in your notes and in the documentation

20  in that patient's file that instead you were engaging in, let's

21  say, a psychotherapy session with the patient?  Is that ever

22  appropriate to document?

23  A.   Right.  So if it's lacking a therapeutic approach, no, that

24  would not be appropriate.

25  Q.   So whatever you do in the session, that's what you're

1    supposed to document --

2    A.  Yes.

3    Q.  -- correct?  So if you're doing recreation --

4           MR. RABIN:  I'm going to object to leading at this

5    point.

6           THE COURT:  Sustained to that question.

7    BY MR. STEWART:

8    Q.  If you provide recreation, what do you document in your

9    notes?

10   A.  That it was recreation, if anything.  Sometimes you don't.

11   It's sort of like recess, I guess.

12   Q.  If you provide legitimate therapy, what do you document in

13   your notes?

14   A.  So it's a variety of different things that go in there.  So

15   the therapist that leads the group has to document for a

16   particular patient what their level of participation was.  It's

17   not enough to say, well, the patient slept through the whole

18   group.  If they did fall asleep, you have to -- there has to be

19   some kind of intervention.  If they did fall asleep, what did

20   you do?  And after you did that, what was the response?

21       So it's -- there's a fair amount of stuff that we end up

22   writing down, and it's really our way of kind of keeping track

23   of what's happening in the groups as well.  So it's a source of

24   communication for us.  If patients are acting in bad ways or it

25   looks like they're getting better, looks like they're getting

1   worse, that's a forum for that.

2   Q.  So if I understand you correctly, if a patient were to fall

3   asleep during a group, you would need to write in the group

4   therapy notes that that in fact happened.

5   A.  I'm sorry, could you repeat that?

6           THE COURT:  I didn't hear your question.

7   BY MR. STEWART:

8   Q.  Sure.  If a patient were to fall asleep in a group therapy

9   session, would you need to document that in fact that happened

10  during the group therapy session, that the patient fell asleep?

11  A.  Yes.

12  Q.  Is that because the group therapy notes need to be

13  accurate?

14  A.  Yes.

15          MR. RABIN:  Objection to leading.

16          THE COURT:  Overruled.

17  BY MR. STEWART:

18  Q.  Is that because the group therapy notes need to be

19  accurate?

20  A.  Yes.

21  Q.  And why is it important that the group therapy notes are

22  accurate?

23  A.  As we -- we base a lot of -- you know, our decisions are

24  based on the information that we're getting.  We need to know

25  that the information we're getting is accurate.

1   Q.  Let's talk about the doctor and the doctor's responsibility

2   during PHP therapy.  Is it important for the doctor to have

3   direct interaction with a patient during the patient's course

4   of PHP therapy treatment?

5   A.  Yes.

6   Q.  Why is that important?

7   A.  As we're making decisions about medications, we're -- we're

8   responsible for taking care of the patient, so it's important

9   that we are seeing, ourselves, how the patient is doing.

10  Q.  Is it important that during the course of a patient's PHP

11  therapy treatment that the doctor interact also with the

12  treatment team?

13  A.  Yes.

14  Q.  And why is that important?

15  A.  They're a great source of information for us.  We can't

16  make these decisions in a vacuum.  We need to know how the

17  patient's doing.

18  Q.  Would it concern you about the legitimacy of a PHP program

19  if you were to learn that patients were routinely admitted

20  without having been seen by a psychiatrist?

21  A.  It would.

22  Q.  Why?

23  A.  Again, we're tasked with overseeing the treatment of the

24  patient during their time with us and we're -- you know, we're

25  a very important part of the team.  We have responsibilities to

1    the patient.

2    Q.   Would it concern you about the legitimacy of a PHP program

3    to learn that patients were routinely discharged without having

4    been seen by the psychiatrist?

5    A.   It would.  That's a -- kind of a critical juncture, the

6    discharge.

7    Q.   What do you mean by that?  Why is it critical?

8    A.   It's -- you're making a decision to send them back to

9    routine care, or you could also be making the decision to bring

10   them into the hospital.  Those handoffs are important to the

11   next provider.  The -- you know, these are -- we're responsible

12   for that decision.  It's an important decision.

13   Q.   If a patient were to be sent, for example, to outpatient

14   therapy before they are ready, what could happen?

15   A.   Either they could get -- if you haven't really gotten

16   control of their symptoms, they're no better than when they

17   came into the program, the risks are still there.

18   Q.   What kind of risks are we talking about with these types of

19   patients?

20   A.   Well, if they persist or worsen, we're talking, you know,

21   depression -- we've been using the example of depression,

22   somebody could kill themselves.

23   Q.   I'd like to switch gears and talk about the types of

24   patients for whom PHP therapy is not appropriate.  Is PHP

25   therapy appropriate for someone who is suffering from severe

 1    dementia or Alzheimer's?

 2    A.  Severe dementia, no.

 3    Q.  Okay.  And why not?

 4    A.  Again, we've talked a little bit about the level of

 5    intensity of the treatment.  There's a fair amount of give and

 6    take that happens there.  With dementias, particularly as they

 7    progress and get more severe, their ability to participate in

 8    any meaningful way, it goes away.

 9    Q.  If they are suffering from such a condition, are they able

10    to interact in the way in which they need to with the

11    therapists?

12    A.  No.

13    Q.  If they're suffering from -- excuse me, if they are

14    suffering from such a condition, are they able to benefit from

15    the therapy?

16    A.  No.  They're -- from psychotherapy in particular, these are

17    often patients with severe dementia, they're better treated in

18    a different setting.

19    Q.  If a person's condition has deteriorated to the point that

20    they are mistaking strangers or inanimate objects like dolls

21    for family members, would a person with conditions like that be

22    able to benefit from PHP therapy?

23    A.  I would have serious concerns about their ability to

24    participate.

25    Q.  Why is that?

1    A.   Again, I don't know all the details of that, but they're --

2    that suggests a fairly high level of impairment.

3    Q.   And because that level of impairment is so high, as you

4    describe it, would such a patient be able to engage in a way

5    they need to to benefit from PHP therapy?

6    A.   I wouldn't think so.

7    Q.   Similar question, but for a patient who no longer can

8    recall their name, would a patient like that be able to benefit

9    from PHP therapy?

10   A.   If this is because of Alzheimer's disease or -- again, I

11   don't know all the details of this.  But for someone with,

12   say -- I'm just using Alzheimer's as an example -- who has

13   gotten to the stage where they don't know their own name, that

14   also suggests a very -- that's a severe level of impairment, if

15   it's just Alzheimer's.

16   Q.   Let's talk about someone who has a physical condition,

17   let's say who is hard of hearing or deaf.  If no accommodation

18   is made for them, can such a person participate and benefit

19   from PHP therapy?

20   A.   I wouldn't think so, unless they're expert at lip reading.

21   There has to be some kind of accommodation for somebody with

22   severe impairment like that.

23   Q.   Yeah.  And why do you say that?  Why does there need to be

24   some sort of accommodation?

25   A.   It gets back to that give and take that happens in that

1    setting.  I would have worries that a person with a disability

2    like that is just not able to hear what's going on in the

3    groups to participate in any meaningful way.

4    Q.  Let's look at this from big picture.  Why do you need to be

5    able to hear and participate in PHP therapy?  Why is that

6    important to benefit from the therapy?

7    A.  Again, it's a lot of verbal communication that's going on,

8    and to learn from and benefit from the experience of those

9    psychotherapies, you have to be able to participate.

10   Q.  Would it concern you about the legitimacy of the PHP

11   program if you were to learn that patients like the ones we've

12   been discussing were routinely admitted for PHP therapy?

13   A.  It would.

14   Q.  Let's switch gears a little bit.  Are you familiar with

15   assisted living facilities?

16   A.  Yes.

17   Q.  Heard the term ALFs, I assume?

18   A.  Uh-huh.

19   Q.  What are they?

20   A.  So those are -- that's a living setting, people aren't

21   living in their home anymore.  They usually need some kind of

22   assistance with daily activities.  It might be getting around,

23   keeping their place clean, getting medications in order,

24   getting to and from appointments, things like that.

25   Q.  Is there anything wrong with a person coming from an ALF to

48

1    engage in PHP therapy?

2    A.  No.

3    Q.  But is it ever appropriate for someone to pay a kickback to

4    an ALF owner in return for referring a patient for PHP therapy?

5    A.  No.

6    Q.  And why not?

7    A.  You know, it's medical ethics.  You don't pay kickbacks for

8    patients.

9    Q.  And why don't you pay kickbacks for patients?

10   A.  It sets up all kinds of, well, bad relationships and bad

11   incentives.

12   Q.  What kind of incentives?

13   A.  It sets up incentives for people to refer patients that

14   don't need treatments.  They might get treatment that they

15   don't need.  That's -- that can be dangerous.

16   Q.  Why is that dangerous?

17   A.  Our medications all have side effects.  They interact with

18   other medications.  Again, most of them are fairly well

19   tolerated, but there are times when they aren't, and if a

20   patient doesn't need that treatment, you're putting them at

21   unnecessary risk.

22   Q.  Let's turn back to documentation.  What kinds of

23   documentation are generated during the course of a patient's

24   treatment in a PHP program?

25   A.  So it's all kinds of things.  It's progress notes from the

1    physician.  There are notes from the social worker, nursing,

2    occupational therapy.  You know, sometimes when it's available

3    even physical therapy.  Orders.  There are forms that end up

4    getting filled out.  There's all kinds of stuff that goes into

5    the chart.

6    Q.  I think we talked about some of these things before.

7    Admissions paperwork, group therapy paperwork, all of this is

8    part of the documentation that's generated.  What's this

9    documentation used for?

10   A.  It's our way of communicating.  It's how we keep track of

11   what we do.  So if you're, just as an example, in a partial

12   program, if I -- you know, if I'm seeing a patient for five

13   days in a row, I'm making decisions on their medications, I'm

14   making decisions about other elements of their treatment, kind

15   of where the direction of the treatment is going, it's

16   important for me to know, to be able to go back and see, you

17   know, it's Friday, what happened on Tuesday, and that's a way

18   for us to do that.  If you've got a lot of patients there at

19   the same time, it's too much to keep in your head at one time.

20   Q.  You said it's your way of communicating.  Is it the

21   responsibility of a professional who is treating a patient to

22   refer back to the patient file --

23   A.  Yes.

24   Q.  -- during the course of treatment?

25   A.  Yes.

1  Q.  Is it fair to say that documentation is important?

2  A.  Yes.

3  Q.  Is it important for documentation in a patient's file to be

4  accurate?

5  A.  Oh, yes.

6  Q.  Okay.  And why?

7  A.  Again, it's our -- it's our way -- I was talking about

8  communication.  There are times when we hand off the care of a

9  patient to another provider.  They will often base their

10  decisions on what's in the record.  It's important for that to

11  be accurate.  Otherwise, they can make mistakes.

12  Q.  Okay.  And what happens if mistakes are made?

13  A.  In extreme cases, patients can die.

14  Q.  Let's talk about one particular type of documentation that

15  you I think believe -- I believe just mentioned, the physician

16  progress note.  What's a physician progress note?

17  A.  So that's where we keep track kind of on a day-to-day basis

18  of how the patient's doing, sort of their -- what their

19  observations are, if they're having physical issues, our

20  impressions of how the patient's doing, and what our plan is.

21  Q.  Does a psychiatrist complete a physician's progress note?

22  A.  Oh, yeah.  That's where we do our sort of daily -- daily

23  documentation.

24  Q.  I believe I just mentioned psychiatrist.

25  A.  Uh-huh.

1    Q.  But I want to switch gears.  What's a psychologist?

2    A.  A psychologist also studies mental disorders and can

3    provide treatment in the form of therapy, but they don't --

4    they don't go to medical school.

5    Q.  Okay.  So they haven't gone to medical school.  What does

6    that -- what does that really mean on a practical level?

7    A.  So they're -- they don't have the experience and training

8    in medicine and the medical aspects of psychiatry.

9    Q.  Are they able to prescribe medication?

10   A.  I don't believe so, no.

11   Q.  Getting back to physician progress notes, can a

12   psychologist write a physician's progress note?

13   A.  A psychologist write a physician's progress note.  No.  The

14   physician writes the physician progress notes.

15   Q.  Can someone with a background in marriage and family

16   therapy write a progress note for a physician?

17   A.  If they're not a physician, no.

18   Q.  Can someone with advanced education, let's say a master's

19   degree in social work, write a progress note for a physician?

20   A.  I'm sorry, could you repeat the question?  And actually, I

21   need to clarify something I said before.  I think there are

22   movements in other states to have psychologists prescribe, so

23   what I said was probably not correct.  I was speaking to the

24   Maryland experience.

25   Q.  So in your professional experience, just to make sure I

1   understand correctly, where you work psychologists cannot

2   prescribe medication?

3   A.   That's correct, yes.

4   Q.   And I believe you were mentioning that a psychologist does

5   not have medical training the way a psychiatrist does.

6   A.   Right, so they don't go to medical school.

7   Q.   Right.  And so what other differences are there?  Can you

8   describe some of them?

9   A.   It's a different realm of expertise that they have.  There

10  are similarities, but they are -- there are different tasks

11  that they -- in our setting, in particular, there are different

12  tasks that they perform.

13  Q.   So I was -- we were talking a moment ago about that

14  physician's progress note.  I want to understand the types of

15  people who can write it.  It must be written by a physician,

16  very simply?

17  A.   Yes.

18  Q.   I'd like to switch gears and talk a little bit about the

19  timing of documentation.  Is it important to prepare patient

20  documentation close in time to the event that's being

21  documented?

22  A.   It is, yeah.

23  Q.   Okay.  And so let's get specific on that.  Is it important,

24  for example, to prepare a physician progress note close in time

25  to the encounter between patient and physician?

1    A.   Yeah, to the degree that we're able, yeah.

2    Q.   So why is that important?

3    A.   Again, you know, I mentioned remembering on Friday what

4    happened on Tuesday, it's -- you know, if you're doing all the

5    notes kind of well after the fact, it's very hard to keep in

6    your head what happened on particular days and keep track of

7    all that.  So it -- you know, an effective way of -- of

8    avoiding that is doing the documentation in as timely a way as

9    you can.

10   Q.   What are the risks of not doing it in a timely manner?

11   A.   Then you -- you miss things or you, you know, mistake when

12   things happen.

13   Q.   Now, does accurate, timely documentation become even more

14   important for a psychiatrist who is working at more than one

15   PHP at the same time?

16   A.   I would think so.

17   Q.   Okay.  Why is that?

18   A.   There's a fair number of patients that you're seeing in two

19   different settings.

20   Q.   I believe you said a moment ago it's hard to keep track of

21   things.

22   A.   It can be, yeah.

23   Q.   So if you're seeing patients on a regular basis, why is it

24   important to be able to keep track of what's going on with one

25   patient as compared to another?

1    A.   Again, we need to be able to make our decisions with

2    information that's as accurate as it can be.  Otherwise, we can

3    make mistakes.

4    Q.   Try to make this question simple enough for you.  Is it

5    ever --

6              MR. RABIN:  Objection to the comment.

7              THE COURT:  Sustained.  Although --

8              MR. RABIN:  I just had to get it out.  I'm sorry.

9              THE COURT:  -- there is a saying that might apply to

10   that objection.

11             MR. RABIN:  That's why I recognized it, Judge.

12             THE COURT:  Okay.  So maybe that's one way of

13   learning.

14             MR. RABIN:  Learning through doing and seeing others.

15             THE COURT:  All right.  Go ahead.

16             MR. STEWART:  Thank you.

17   BY MR. STEWART:

18   Q.   Is it ever appropriate, based on your professional

19   experience, to prepare patient documentation long after the

20   event that's being documented, but to sign and date that

21   documentation to make it look like you prepared it earlier in

22   time?

23   A.   No.

24   Q.   Why not?

25   A.   These are standards of care.  If you are putting in a late

1   note, it has to be recognized as a late note.  A lot of us have

2   gone to electronic records, which is -- causes its own

3   problems, but one of the things that it does do fairly well is

4   it keeps track of when we put our notes in.  Before that, it

5   relied on us to put the accurate time and date of when we did

6   the documentation.

7   Q.   So before that, before electronic records, if we're just

8   talking about a facility that was maintaining its records in

9   hard copy form, why would it be inappropriate to sign and date

10  documentation on a date other than in fact when it's being

11  created?

12  A.   Just, it's an inaccurate reflection of when it's being

13  done.

14  Q.   Very general question.  What does the date and signature

15  signify in documentation?

16  A.   It's when you're actually doing the documentation.

17  Q.   And does it also say who is responsible for it?

18  A.   Yes.  So those are -- in electronics, you know, there are

19  stamps that identify who puts the notes in, but before that it

20  was -- we would put our names on those.

21  Q.   With paper documentation, that's the purpose of the

22  signature, to explain who is responsible for it, correct?

23  A.   Yes.

24  Q.   Is it ever appropriate to knowingly place false information

25  in a patient's file?

1   A.  No.

2   Q.  Is it ever ethical for someone to sign medical

3   documentation saying they had direct contact with the patient

4   when they didn't?

5   A.  No.

6   Q.  Let's say a patient arrives late for a group therapy

7   session.  Are you required to put that down in the group

8   therapy note?

9   A.  It has to reflect what their participation was, yes.

10  Q.  Let's say a patient isn't in group therapy and is instead

11  having breakfast during the therapy session.  Are you

12  required -- would it be inappropriate to write in the group

13  therapy notes that in fact they were in the group therapy

14  session when they weren't?

15  A.  They weren't in the same room?

16  Q.  They weren't in the same room.

17  A.  No, it would not be appropriate.

18  Q.  And so when preparing such a note, you'd have to write down

19  where they really were when the therapy session was happening.

20  A.  Yes.

21  Q.  Is it ever appropriate to simply just make up out of thin

22  air the details that you're writing about a patient in a group

23  therapy note?

24  A.  No.

25  Q.  Is it ever appropriate to write a quotation in a group

1  therapy note for a particular patient from a group therapy

2  session that contains a statement that the patient never made?

3  A.  No.

4  Q.  And why might that be a problem?

5  A.  I guess it would depend on what the -- what the quotation

6  was, but again, it gets back to this idea of accuracy.  We base

7  our decisions on information like that.  It's important that it

8  be accurate.

9  Q.  And what if it's not accurate?

10  A.  Again, we can make mistakes, bad mistakes.

11  Q.  And could you make a mistake like that if the wrong

12  quotation is attributed to a particular patient?

13  A.  I guess you could.

14  Q.  And why is that?

15  A.  Well, you know, in various notes we will put down the

16  patient's exact complaint or observation.  You know, I'm not

17  ginning up examples right this second but, you know, again, we

18  can base decisions on what the patients tell us, so it, again,

19  needs to be very accurate.

20  Q.  Could you give the wrong treatment if the wrong quotation

21  is attributed to a patient?

22  A.  You could, yeah.

23  Q.  Is it ever ethical to create group therapy notes for

24  patients who were not in group therapy sessions, absent

25  patients?

1    A.   Not unless the notes say they were just absent.

2    Q.   Is it ever ethical to create a group therapy note for a

3    therapy session that never took place?

4    A.   No.

5    Q.   Is it ever appropriate for someone in the PHP setting,

6    doctor, therapist, to sign medical documentation without first

7    reading it?

8    A.   I'm sorry.  This is their own note that they're signing?

9    Q.   Correct.

10   A.   I'm trying to figure out how that would happen, I mean, if

11   you've just written your own note and then you sign it.

12   Q.   Let's say somebody else had prepared the note for them.

13   A.   Uh-huh.

14   Q.   Is it the responsibility of the medical professional, the

15   doctor, the therapist, to read that note before they sign it?

16   A.   Yes.  Okay, I understand.  So you're attesting to the

17   accuracy of what you're signing to by putting your name on it.

18   Q.   What happens if you don't read documents like that?

19   A.   Oh, boy, then you miss things.  You can be attesting and

20   agreeing with things that may be completely wrong.

21   Q.   Could patients get hurt?

22   A.   They sure can.

23            MR. RABIN:  Objection, leading.

24            THE COURT:  Overruled.

25            MR. STEWART:  Thank you.  No further questions.

```
 1   UNITED STATES OF AMERICA                    )
                                                  ) ss:
 2   SOUTHERN DISTRICT OF FLORIDA                 )

 3

 4              C E R T I F I C A T E

 5        I, Carly L. Horenkamp, Certified Shorthand

 6   Reporter in and for the United States District Court for the

 7   Southern District of Florida, do hereby certify that I was

 8   present at and reported in machine shorthand the proceedings

 9   had the 13th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12        I further certify that this transcript contains

13   pages 1 - 59.

14        IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 16th day of November, 2014.

16

17

                  /s/ Carly Horenkamp
18
                  Carly L. Horenkamp, RMR, CRR
19                Certified Shorthand Reporter

20

21

22

23

24

25
```