IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,                NOVEMBER 5, 2014
                                         4:47 P.M.
              Plaintiff,


     vs.

ROGER ROUSSEAU, et al.,

              Defendants.         PAGES 1 THROUGH 18

---

DAY 3
EXCERPT OF CRIMINAL JURY TRIAL
(CROSS-EXAMINATION OF LISSET PALMERO BY MR. HERMIDA)
BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Mr. A. Brendan Stewart, AUSA
                        Mr. Justin Goodyear, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC 20530


FOR THE DEFENDANT:      Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                        800 Brickell Avenue
                        Suite 1400
                        Miami, Florida  33131


FOR THE DEFENDANT:      Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)        LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                        1221 Brickell Avenue # 900
                        Miami, Florida  33131

```
APPEARANCES (continued):


FOR THE DEFENDANT:      Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)        LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                        55 Merrick Way
                        Suite 212
                        Coral Gables, Florida  33134



FOR THE DEFENDANT:      Mr. Frank A. Prieto, Esq.
(Liliana Marks)         LAW OFFICE OF FRANK A. PRIETO, P.A.
                        One Northeast 2nd Avenue
                        Suite 200
                        Miami, Florida  33132



FOR THE DEFENDANT:      Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)           LAW OFFICES OF JUAN DE JESUS GONZALEZ
                        10631 N. Kendall Drive
                        Suite 150
                        Miami, Florida  33176



FOR THE DEFENDANT:      Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)           LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                        Courthouse Tower
                        40 NW 3rd Street
                        Suite 200
                        Miami, Florida  33128



COURT REPORTER:         Carly L. Horenkamp, RMR, CRR
                        U.S. DISTRICT COURT
                        400 N. Miami Avenue, Room 12-3
                        Miami, Florida  33128
                        (305) 523-5138
```

# I N D E X

*Certificate* ------------------------------------------------- 18

# W I T N E S S

| ON BEHALF OF THE GOVERNMENT: | PAGE |
|---|---|
| LISSET PALMERO | |
| CROSS-EXAMINATION BY MR. HERMIDA | 4 |

1         (Before Jury, 4:47 p.m.)
2              THE COURT:  All right.  Mr. Hermida.
3              MR. HERMIDA:  Just a few, Your Honor.
4                         CROSS-EXAMINATION
5    BY MR. HERMIDA:
6    Q.   Ms. Palmero, good afternoon.
7    A.   Good afternoon.
8    Q.   I represent Angela Salafia.  You had stated that towards
9    the end, there was an independent office built for the
10   therapists.
11   A.   Correct.
12   Q.   In fact, when you were explaining to the jury on direct,
13   you were talking about a little layout of Health Care Solutions
14   Network East.  You said that it was built out, I guess, where
15   the receptionist area was?
16   A.   That is correct.
17   Q.   And this was along the time when -- or around the time when
18   I think HCSN received their JCAHO accreditation?
19   A.   That is correct.
20   Q.   And what was that?
21   A.   I don't know what JCAHO stands for, but I believe it has to
22   do with being able to bill other insurances.  I'm not sure.
23   Q.   It was a rigorous process and --
24   A.   Correct.
25   Q.   -- people had to tighten up what they were doing so that

| | |
|---|---|
| 1 | they would get accredited, and they did get accredited, right? |
| 2 | A. Yes. |
| 3 | Q. And so at that time -- and it was about October, right, of |
| 4 | 2010? |
| 5 | A. Yes. |
| 6 | Q. October 2010 is when the therapists' office was eventually |
| 7 | built and computers were brought in? |
| 8 | A. That is correct. |
| 9 | Q. And so by that time Ms. Salafia was long gone, right? |
| 10 | A. I believe so, yes. |
| 11 | Q. Okay. And just to follow up, you never saw my client get |
| 12 | any extra compensation for any fabricated group therapy notes |
| 13 | either, did you? |
| 14 | A. No, sir. |
| 15 | Q. Okay. So let's talk a little bit about the documents that |
| 16 | were actually fabricated. I think you talked about the face |
| 17 | sheets, right? |
| 18 | A. Correct. |
| 19 | Q. Master treatment plans, patient histories, |
| 20 | biopsychosocials, all of these things were fabricated? |
| 21 | A. I believe so, yes. |
| 22 | Q. Even the government showed you the medications and stuff |
| 23 | like that, stuff was whited out? |
| 24 | A. Correct. |
| 25 | Q. My client didn't do any of that, though, right? |

1   A.   She fabricated the notes, the therapy notes, I believe.
2   Q.   I'm asking about the initial stuff.  She had nothing to do
3   with any initial assessments, right?
4   A.   No, sir.
5   Q.   Okay.
6   A.   I don't believe so.
7   Q.   So just go with me for a bit.  So the initial assessment
8   notes were all fabricated.  Are these for existing clients or
9   clients that never existed at all, that never attended at all?
10  A.   These for all the clients that we billed for.
11  Q.   That were there or weren't there?
12  A.   Both, that were there and not there, that we actually
13  billed for.
14  Q.   And you can tell us, you could tell this jury with a
15  hundred percent certainty who was actually there and who
16  wasn't?
17  A.   If I look at the billing sheet, yes.
18  Q.   Okay.  For like a particular day?
19  A.   I could tell you a particular patient.
20  Q.   All the times they were there and weren't there?
21  A.   Yes.
22  Q.   So going along the lines of the documents, right, the
23  sign-in sheets, the sign-in sheets for the group therapy
24  sessions, they were also fabricated, were they not?
25  A.   For the -- Dana's list, correct.

1  Q.  Right.  And I think that's when Migdalia would hit
2  Alejandro Bello's hand, make it look like it was an elderly
3  person that was signing the sign-in sheet?
4  A.  That is correct.
5  Q.  And these were for patients that never really even were
6  there.
7  A.  Correct.
8  Q.  These were patients that everything was fabricated for,
9  right?
10 A.  That is correct.
11 Q.  Okay.  And Dana Gonzalez would fabricate the group therapy
12 notes.
13 A.  For those patients, yes.
14 Q.  And you know she made money doing that, right?
15 A.  I believe she did.  I would think she did.  I'm not sure
16 what her financial status was.
17 Q.  Have you spoken with Dana since you've been arrested, since
18 you've been in prison?
19 A.  Have I spoken with who?
20 Q.  Dana, Gema.
21 A.  No.
22 Q.  So you talk about the case?
23 A.  We don't talk about the case.
24 Q.  You talk about what to say?
25 A.  No, sir.

1  Q. So you were all at Coleman, is that it?
2  A. I was at Coleman with Gema.
3  Q. And so you talked about the case and you reflected about
4  your times --
5  A. We don't talk about the case. We talk about my kids, we
6  talk about the Coleman camp. We don't talk about the case.
7  Q. But you'd agree with me it would sound better for the jury
8  if everybody's stories were straight, right?
9  A. No. What sounds better is the truth.
10 Q. The truth?
11 A. Correct.
12 Q. Right. And the truth is you never sat in on my client's
13 groups, did you?
14 A. Did I sat where?
15 Q. Sat in on my client's therapy groups.
16 A. I didn't sit in anybody's therapy group, no.
17 Q. The truth is that my client didn't have access to any
18 computers there. She would save her work on a USB, right?
19 A. We all did. We all saved our initial work on a USB drive.
20 Q. And then stuff would be printed out -- it would be
21 downloaded first into the system --
22 A. Correct.
23 Q. -- and then someone would print it out, right?
24 A. Correct.
25 Q. All right. And it could be you.

1  A.  No.  It was -- the printer was in my office and it was
2  printed out into the printer in my office.
3  Q.  But it could have been downloaded from, let's say, Gema's
4  computer?
5  A.  I would assume so, yes.
6  Q.  Dana's computer?
7  A.  Yes.
8  Q.  Alina Feas's computer.
9  A.  Yes.
10 Q.  So for all you know, my client could have given that USB
11 drive to either one of those ladies, right?
12 A.  I cannot say so because I haven't -- I never saw her
13 handing her a USB drive or anything.
14 Q.  Right.  You never saw her fabricate any notes either.
15 A.  Not in my eyes, no, I never saw her sitting behind a
16 computer.
17 Q.  Thank you.  Thank you.  So we talked a little bit about the
18 docs.  So you admit to the jury, even the daily sign-in sheets
19 were fabricated, correct?
20 A.  Correct.
21 Q.  All right.  So as far as admissions, because when you
22 started talking, when the government was asking you about your
23 initial -- when you first started, that you saw patients that
24 were lost, that -- my client would never make any determination
25 as to who's admitted, right?

1  A.  I don't believe so.
2  Q.  My client wouldn't make any determination as to who was
3  placed in her group, right?
4  A.  I don't believe so.
5  Q.  That was Alina's job.
6  A.  Correct.
7  Q.  She was the clinical director, right?
8  A.  Yes.
9  Q.  So she was, I guess, one step below Armando, right?
10 A.  Yes.
11 Q.  She was one step below Manny?
12 A.  Yes.
13 Q.  And she kind of ran the show there, did she not?
14 A.  Yes.
15 Q.  She had a real strong personality, did she not?
16 A.  Yes.
17 Q.  It was either her way or the highway, right?
18 A.  Correct.
19 Q.  And she also fabricated group therapy notes, did she not?
20 A.  I don't know that part.
21 Q.  But you know Dana did.
22 A.  Yes.
23 Q.  Do you know if Gema did?
24 A.  Yes.
25 Q.  So she fabricated group therapy notes as well and she

```
 1    received extra compensation as well, right?
 2    A.  I don't know.
 3    Q.  Do you know how much they made for these notes?
 4    A.  I don't know.
 5    Q.  Do you know how much they made for patient files?
 6    A.  Who is "they"?
 7    Q.  Gema, Dana.
 8    A.  No, I don't know.
 9    Q.  Do you know if they were doing this for other PHPs?
10    A.  I believe Dana was doing it for another PHP.
11    Q.  In fact, Dana was doing it for HCSN-West, HCSN-East, HCSN
12    North Carolina, and other PHPs, right?
13    A.  Correct.
14    Q.  Do you remember Alexandra Haynes ever sitting in on my
15    client's group therapy?
16    A.  No, sir.
17    Q.  Do you remember my client ever speaking to Armando Gonzalez
18    as he was walking down the halls, if you remember?
19    A.  I never saw it.
20    Q.  In fact, Manny didn't go a lot to HCSN-East, right?
21    A.  That is correct.
22    Q.  You would talk primarily over the phone.
23    A.  Correct.
24    Q.  Almost on a daily basis, four times, five times a day.
25    A.  With Armando Gonzalez?
```

```
 1    Q.   Yes.
 2    A.   No, sir.
 3    Q.   Manny wouldn't call you all the time to see if the census
 4    was up to date?
 5    A.   Not every day, no.  It was a weekly thing.
 6    Q.   And just so the jury knows, the census's purpose was really
 7    to keep track of what you had to pay the ALFs, correct?
 8    A.   No, the census -- the census?
 9    Q.   Yeah.  Who got what?  Who got what?
10    A.   Can you ask the question again?  Because I didn't
11    understand it.
12    Q.   When you kept track of patients, you kept track of where
13    the patients came from.
14    A.   Correct.
15    Q.   And that was a huge responsibility because it's something
16    you didn't want to do.  You had to call every day, made sure --
17    account for where they were, correct?
18    A.   Correct.
19    Q.   And when you did that, a lot of time, it was very time
20    consuming and you didn't really like to deal with the ALF guys,
21    right?
22    A.   Correct.
23    Q.   And in fact, some would show up and say, where's my money?
24    A.   No, they didn't show up.
25    Q.   That never happened?
```

1  A.  They would call, but they didn't show up in the center.
2  Q.  Nobody ever showed up, you know, demanding payment?
3  A.  No.
4  Q.  You don't remember that.
5  A.  No.
6  Q.  Okay.  All right.  Wasn't that a way, the census, of
7  keeping track of ALF payments, kickbacks?
8  A.  And it was also used for billing purposes as well, for him
9  to get paid.
10 Q.  Got it.  And again, my client had nothing to do with the
11 compilation of that census, right?
12 A.  No, because that was my position.  That's what I had to do.
13 Q.  And you got that data daily from the ALFs.
14 A.  Correct.
15 Q.  And then you would call Armando, let him know?
16 A.  No.
17 Q.  You would fax him?
18 A.  No.
19 Q.  Fax his wife?
20 A.  The monthly report for the kickbacks was done monthly.
21 Q.  Got it.
22 A.  I didn't have to report to Armando on a daily basis and let
23 him know we had five absences on Monday and, you know, two on
24 Tuesday, no.
25 Q.  Right.  Now, when they -- strike that.

1    You also coordinated the drivers?  The drivers.
2  A. I would coordinate with them the pick-up for patients.  I
3  would hand them the addresses --
4  Q. You state --
5  A. -- the location where to pick up the patients.
6  Q. I'm sorry, I didn't mean to cut you off.  But one of the
7  things that struck me was the drivers seemed to have more
8  responsibility than just being drivers, right?
9  A. Yes.
10 Q. Because they would also gather the patients if some
11 strayed, right?
12 A. Correct.
13 Q. And they'd bring them back to the center.  And you told the
14 jury about what a daily -- I guess a typical day was like.  The
15 drivers would get out at 6:00 a.m. and they'd bring them
16 sometimes 9:30, sometimes 10:30, right?
17 A. Correct.
18 Q. That wasn't every day, was it?
19 A. It was about three or four times a week, because they had
20 to pick up all the way in Broward.
21 Q. And in those groups that started late, wouldn't they also
22 end late?  Didn't they work through the break time?
23 A. No, sir.
24 Q. Wasn't the breakfast also served while they were in the
25 group?

```
 1    A.   The breakfast was served before they would start the
 2    session.
 3    Q.   Okay.  And then the session would start, and you're saying
 4    that the session --
 5    A.   The session had already started and then they would arrive,
 6    breakfast would be served, and that's how they would take care
 7    of that.
 8    Q.   And you're saying this happened with frequency for all the
 9    groups three times a week, two times a week?
10    A.   About three to four times a week, yes.
11    Q.   Okay.  And of course none of this was ever reported, right?
12    A.   Reported to who?
13    Q.   In the group therapy notes.
14    A.   I don't believe so, because I billed for them.  Regardless
15    of the time that they came in, I --
16    Q.   Did you ever go over any of those group therapy notes?
17    A.   No, sir.
18    Q.   You yourself, sitting here today, did you ever go over any
19    of those group --
20    A.   I read a few.  I read a few when I would look at the files.
21    Q.   All right.  So let's talk about what you said wasn't on
22    those group therapy notes, and one of those things was the fact
23    that my client played music.
24    A.   Correct.
25    Q.   And you, I guess, overheard that through the door, right?
```

```
 1    A.   The music?
 2    Q.   Yes.
 3    A.   Yes.  And I also witnessed a patient carrying the radio
 4    around the facility.  She would walk around the facility with
 5    the radio.
 6    Q.   A patient.
 7    A.   Yes.
 8    Q.   But not my client, right?  My client wasn't actually
 9    playing the music.  It was a patient.
10    A.   In her therapy session.  She would play music in her
11    therapy session.
12    Q.   And let's talk about the audiovisual capability that you
13    all had.  I mean, you had, what, an eight track or you had a
14    record player?
15    A.   Just a small radio.  And her therapy room was right across
16    my office.
17    Q.   No, I get that.  But it was a radio, so -- and there was
18    also movies that were played?
19    A.   Movies were played in Lily Marks' therapy room.
20    Q.   So there's a DVD player?
21    A.   There was a TV with a VCR.
22    Q.   With a VCR.  And the radio and the TV with the VCR and all
23    of that would be in evidence because when the FBI raided it in
24    February of 2011, all of this was seized, right?
25    A.   I don't know that.
```

```
 1              MR. GOODYEAR:  Objection, Your Honor.
 2              THE COURT:  Sustained.
 3     A.   I don't know.
 4     BY MR. HERMIDA:
 5     Q.   Who is Migdalia?
 6     A.   She was the CNA.
 7     Q.   That's certified --
 8     A.   Nursing --
 9     Q.   -- nursing assistant?
10     A.   -- assistant, yeah.
11     Q.   Okay.  And earlier you identified an ALF as an adult living
12     facility?
13     A.   Correct.
14     Q.   Isn't it an assisted living facility?
15     A.   Yes.
16              MR. HERMIDA:  Okay.  If I may have a moment, Your
17     Honor?
18         (Off-the-record discussion.)
19     BY MR. HERMIDA:
20     Q.   One last question.  Are you aware of who collected the
21     sign-in sheets after every group therapy session, if you know?
22     A.   No, I don't.
23              MR. HERMIDA:  All right.  Thank you.
24              THE WITNESS:  You're welcome.
25                           *   *   *   *   *
```

1  UNITED STATES OF AMERICA                                    )
                                                               ) ss:
2  SOUTHERN DISTRICT OF FLORIDA                                )

3

4                      C E R T I F I C A T E

5      I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 5th day of November, 2014, in the above-mentioned

10 court; and that the foregoing transcript is a true, correct,

11 and complete transcript of my stenographic notes.

12     I further certify that this transcript contains

13 pages 1 - 18.

14     IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 14th day of November, 2014.

16

17

                        /s/ Carly Horenkamp
18                      _____
                        Carly L. Horenkamp, RMR, CRR
19                      Certified Shorthand Reporter

20

21

22

23

24

25