IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,                NOVEMBER 7, 2014
                                         11:39 A.M.
                    Plaintiff,


        vs.



ROGER ROUSSEAU, et al.,

                    Defendants.      PAGES 1 THROUGH 50
_____

                           DAY 5
             EXCERPT OF CRIMINAL JURY TRIAL
        (CROSS-EXAMINATION OF GEMA PAMPIN BY MR. HERMIDA)
           BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5147
```

1                          **I   N   D   E   X**

2    *Certificate* --------------------------------------------- 50

3

4

5                        **W I T N E S S**

     ON BEHALF OF THE GOVERNMENT:                          PAGE
6    GEMA PAMPIN
     CROSS-EXAMINATION BY MR. HERMIDA                         4
7

8

9

10

11

12
                         **E X H I B I T S**
13   DEFENDANT SALAFIA EX. NO.:               OFFERED ADMITTED
     A - Layout of Office                        --       9
14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Before Jury, 11:39 p.m.)

 2             THE COURT:  All right.  Mr. Hermida.

 3                        CROSS-EXAMINATION

 4   BY MR. HERMIDA:

 5   Q.  Good morning, Ms. Pampin.

 6   A.  Good morning.

 7   Q.  So your testimony here today is that the therapists had

 8   regular access to computers?

 9   A.  Yes.

10   Q.  And your computer wasn't password protected?

11   A.  No, it was not.

12   Q.  And you had an open door policy in your office.

13   A.  Yes, that is correct.

14   Q.  People could come in all the time.

15   A.  That is correct.

16   Q.  So you could -- in theory, since no computer was password

17   protected, you could go to Lisset Palmero's computer and print

18   something out.

19   A.  I would ask her.  I would not do that.  And I do believe,

20   actually, Lisset might have had a password, since she had

21   billing information and things like that, so I believe hers had

22   a password.

23   Q.  Right.  So you were the program director.

24   A.  No, I was not.

25   Q.  What was your title?
```

```
 1    A.   I was a therapist and an assessor.  In the last ten months
 2    of the company, once we were getting ready for joint
 3    commission, I was moved to program coordinator.
 4    Q.   Right.  And that was when they brought in, I think, Bettina
 5    Lozzi?
 6    A.   Well, Bettina had been with the company for a while, but
 7    yes, she started working with the East at that time, but she
 8    had been already working with North Carolina and the West
 9    location, as far as I know.
10    Q.   Just so the jury understands, joint commission is JCAHO --
11    A.   JCAHO, yes.
12    Q.   -- accreditation, right?
13    A.   Yes, that is correct.
14    Q.   And I guess John Thoen was also helping with that?
15    A.   Yes.
16    Q.   Okay.  And that's when you actually started meetings,
17    weekly meetings, or daily meetings, or flash meetings?
18    A.   Yes, the flash meetings, that is correct.
19    Q.   And the watershed moment for that chronologically was,
20    what, October 2010 is when you received the accreditation,
21    right?
22    A.   Yes, uh-huh.
23    Q.   So prior to October 2010, you actually went through a
24    physical makeover of the offices, right?
25    A.   Yes, there was painting --
```

1   Q.  And at that point they --

2              THE COURT:  Hold on a second.

3              MR. HERMIDA:  I'm sorry, Your Honor.

4              THE COURT:  You're talking and asking the next

5   question before she's finished her answer.

6              What did you say?  Yes what?

7   A.  Yes, there was a physical makeover.

8              THE COURT:  I thought you said yes, it was painted.

9   A.  Yes, there was painting and they added a small office for

10  the therapists in the front.  They didn't have that before.

11  Whatever needed to be fixed was fixed in the company, yes.

12  BY MR. HERMIDA:

13  Q.  There was the Safeguard Services on-site audit back in

14  August 2010, right?

15  A.  Yes, that is correct.

16  Q.  Right.  And that's when you guys had relocated because the

17  renovations were taking place at Health Care Solutions Network,

18  U.S. 1, the U.S. 1 location, right?

19  A.  We relocated at the suggestion of the adviser that

20  Mr. Armando had.  According to fung shui, we needed to be

21  relocated in order to prevent Medicare from coming.  That was

22  actually the real reason behind that temporary move.

23  Q.  The fung shui adviser?

24  A.  Yes.  That is what we were told, yes.

25  Q.  All right.  So at that point, the U.S. 1 office was

1    basically being renovated and you guys were working out of the
2    warehouse district?
3    A.   Yes.  The renovation was actually occurring in the front of
4    the building.  That was in our renovation.
5    Q.   Right.  And this, again, chronologically, it's August 2010,
6    and then you received the JCAHO certification I believe in
7    October 2010, right?
8    A.   I'm sorry, I missed the first part of your --
9    Q.   August 2010 is the Safeguard Services on-site.
10   A.   Yes.
11   Q.   And then the JCAHO certification -- which you guys did get,
12   right?
13   A.   Yes, that is correct.
14   Q.   -- came in I believe October 2010.
15   A.   I believe so, yes.
16   Q.   And in that interim, there was the buildout of the
17   therapists' office and I guess a place where they could
18   actually prepare notes, right?
19   A.   Right.
20   Q.   Right.
21   A.   Well, they could always use our computers if they needed
22   to, but yes, this was a separate -- a small area for them.
23   Q.   Right.
24   A.   Otherwise, most of the time, they were in mine and Dana's
25   office because they had nowhere else to be, so that's where

1    they were most of the day.  In the break, they would come into

2    our office, yes.

3              MR. HERMIDA:  If I may have a moment, Your Honor?

4              Your Honor, if I may approach the witness, I have an

5    exhibit, Salafia 1, for ID purposes.

6    BY MR. HERMIDA:

7    Q.  Do you recognize that?

8    A.  Yes.  This is a layout of the office.

9    Q.  Is it -- does it fairly and accurately represent the layout

10   of the office when you were there?

11   A.  Yes.  This is prior to that room being added for the

12   therapists.

13   Q.  And I'll get to that in a minute.

14             MR. HERMIDA:  Judge, I'd like to --

15             MR. GOODYEAR:  Your Honor, if Mr. Palomino could just

16   clarify which of the locations is being noted by that?

17             MR. HERMIDA:  I'm sorry, Mr. Hermida.

18             MR. GOODYEAR:  I'm sorry.

19             MR. HERMIDA:  And it's the U.S. 1 location.

20   A.  The East location.

21   BY MR. HERMIDA:

22   Q.  The East location.  Thank you.

23             MR. GOODYEAR:  No objection.

24             MR. HERMIDA:  If I may approach?

25             THE COURT:  Is that the one that's Defense Exhibit A

1   on your list?

2           MR. HERMIDA:  I believe so.

3           THE COURT:  All right.  So Defense Exhibit A will be

4   received in evidence.

5           MR. HERMIDA:  Judge, I'd like to use the ELMO.

6           THE COURT:  It's on.

7           MR. GOODYEAR:  Could we just clarify for the record,

8   did something just get written on the exhibit?

9           THE COURT:  Was something written on it after it was

10  shown to the witness?

11          MR. HERMIDA:  Yeah, we changed it --

12          MR. PRIETO:  Just to clarify, Judge, I changed --

13          MR. HERMIDA:  -- from 1 to A.  We changed the exhibit

14  number -- or the exhibit notation from the number 1 to A to

15  conform to our exhibit list.

16          THE COURT:  Okay.

17  BY MR. HERMIDA:

18  Q.  Can you see this all right, Ms. Pampin?

19  A.  Yes, I can.

20  Q.  For the last few days, the jurors have heard about Health

21  Care Solutions East, and does this fairly and accurately

22  represent how the layout was of that office?

23  A.  Yes, it does.

24  Q.  Okay.  And you had indicated previously that there was an

25  addition built, I guess, in this area here?

1  A.  Yes, that's correct.

2  Q.  Okay.  And that would be the receptionist area -- or the

3  therapist area that was built in that time period in late 2010?

4  A.  Yes.

5  Q.  Okay.  And at that point, the therapists had a place to

6  actually congregate, work on their notes, and everything else,

7  right?

8  A.  Yes, that is correct.

9  Q.  All right.  And if we were walking in, let's say as a

10  patient would or as a visitor would, the first thing on the

11  right would be the schizophrenic group?

12  A.  Well, it was the English speaking group.

13  Q.  English speaking group?

14  A.  It was the only English speaking group we had, so they

15  weren't just schizophrenics, but yes.

16  Q.  And that's Ms. Marks.

17  A.  Ms. Marks' room, yes.

18  Q.  And that would be directly across from your office, right?

19  A.  Yes, that's correct.

20  Q.  And just so the jury knows, you shared your office with

21  Dana Gonzalez?

22  A.  Yes, that is correct.

23  Q.  And again, she's no relation to Armando Gonzalez.

24  A.  No relation.

25  Q.  And also, I wrote in "Alex" because it's Alexandra Haynes.

1    She was there for a brief period of time, right?

2    A.  Yes, that is correct.

3    Q.  Okay.  And you guys, all three of you, shared that office.

4    A.  Yes.

5    Q.  And all three of you had computers?

6    A.  Yes, we did.

7    Q.  Okay.  And again, your testimony here today is that it was

8    a free access, it was freeware; anybody could log on to any of

9    your all's computers, right?

10   A.  To those computers, yes.

11   Q.  Maybe with the exception of Lisset Palmero, because it kind

12   of had billing information.

13   A.  Yes.

14   Q.  Kickback information.

15   A.  I don't know if it had kickback information.

16   Q.  You didn't know about the kickbacks?

17   A.  I did know about the kickbacks.  I just don't know if she

18   had kickback information in the computer.

19   Q.  Well, she prepared the daily lists, right?

20   A.  Of the patients that were there, yes.

21   Q.  Right, the census.

22   A.  Yes.

23   Q.  The stuff Armando would use to pay the kickbacks to the

24   ALFs.

25   A.  I don't know that.  I don't know what documents she

1   prepared.  I just know about the kickbacks.

2   Q.  All right.  So let's move on.  So the next office -- and

3   again, they all had the opaque glass, right?

4   A.  I'm sorry?

5   Q.  The opaque glass.

6   A.  Well, they were not opaque.  They were transparent.  They

7   were clear.

8   Q.  Okay.  The clear glass.

9   A.  Clear glass.

10  Q.  The clear glass --

11  A.  Uh-huh.

12  Q.  -- is the low functioning group, which we'll talk a lot

13  about this afternoon.

14  A.  Yes.

15  Q.  And that's Ms. Salafia's, my client's patients?

16  A.  Yes.

17  Q.  And across from her is Alina Feas's office, right?

18  A.  Yes.

19  Q.  And again, that office was open, open to anybody that

20  wanted to come in and just bend her ear for a couple minutes of

21  her time, right?

22  A.  It was open and for a time, she started locking it.  It

23  would, you know, come --

24  Q.  But you yourself never locked your office, ma'am?

25  A.  No, because we were there all day, in and out, but the days

1    that Alina was not there, that office was locked.

2    Q.  So the answer is no, you've never locked your office, or

3    did you lock your office?

4    A.  We had to lock it at one point, I can't remember exactly,

5    but that was not the custom, no.

6    Q.  Okay.  Was it customary for therapists to walk in your

7    office unannounced?

8    A.  Yes.

9    Q.  So Ms. Feas ran the show there?

10   A.  She was the clinical coordinator.

11   Q.  Clinical coordinator.  She was a --

12   A.  She was a supervisor.

13   Q.  -- doctor of psychology.

14   A.  Yes.

15   Q.  More importantly, she had her own Medicare provider number,

16   right?

17   A.  I know she had her own private office, yes.

18   Q.  Right.  So she had her own practice, her own provider

19   number, and she would sometimes take patients out of the

20   therapy groups, give them I guess flash therapy, and bill

21   Medicare?

22   A.  There were a couple of times when she met with a patient

23   flash.  I don't know if she billed Medicare or not.  I do not

24   have that knowledge.

25   Q.  And by the way, just so I know, what does "flash" mean,

```
1    just sudden?
2    A.   Yeah.  It would just be a couple of minutes, a few minutes.
3    Q.   So hey, you have a couple of minutes, let's talk forged
4    notes?
5    A.   What, I'm sorry?
6    Q.   Never mind.  Strike that.
7    A.   Okay.  I don't know what they talked about.
8    Q.   So the next office is Ruben Busquets, right?
9    A.   Yes.
10   Q.   And he actually was a psychiatrist in Cuba, so he had
11   medical training.
12   A.   Yes.
13   Q.   And he actually started working with you all at HCSN-West,
14   right?
15   A.   That is correct.
16   Q.   With John Thoen.
17   A.   Yes.
18   Q.   So he knew what to do.
19   A.   I assume so, yes.
20   Q.   Okay.  And across from him is Alejandro Bello, who is like
21   the Wendera Eason of Health Care Solutions Network East, right?
22   A.   He was a tech there.  Wendera Eason was the head of the
23   department.  Alejandro Bello was a tech clerk for medical
24   records.
25   Q.   And you would agree that the medical record component is
```

15

1    probably the key element in this whole operation, right?

2    A.  Of course, yes.

3    Q.  So that office --

4    A.  Everybody -- everybody was the key component in this --

5    Q.  Right.

6    A.  -- operation.

7    Q.  That office is closed.

8    A.  The medical records?

9    Q.  Yes.

10   A.  The door was closed.  Not locked, unless there was nobody

11   in there for the day, then -- but if not, it was open.

12   Q.  So anybody could come in there and pull a file?

13   A.  Yes.

14   Q.  Anybody can go in there and pull a file.

15   A.  Yes.

16   Q.  Okay.

17   A.  I could go in.  I had to many times --

18   Q.  Well, you weren't --

19   A.  -- when I needed to work.

20   Q.  -- anybody, right?  You weren't anybody.

21   A.  Anybody that was in the office could go in there.

22   Q.  Ms. Pampin, you guys were known as Manny's girls.  You knew

23   that, didn't you?  Manny's girls.

24   A.  No, I did not know that I was known as Manny's girl, no.

25   Q.  They didn't say the girls would take care of it.  The girls

```
 1   would take care of it.  If there's a problem in North Carolina,

 2   the girls will take care of it.

 3   A.  I don't know about that.

 4   Q.  Dana and Gema.

 5   A.  I don't know if they said those words, "the girls will take

 6   care of it."  I don't know about that.

 7   Q.  All right.  And then, finally, we have Doris Crabtree's

 8   office?

 9   A.  Yes.

10   Q.  And that's the high functioning group.  And across is the

11   nurse station, right?

12   A.  That is correct.

13   Q.  Because you have patients, as you testified on direct,

14   that, you know, had physical issues.

15   A.  Yes, that is correct.

16   Q.  You would agree with me that they're on psychotropic

17   medication that may or may not cause incontinence, depending on

18   the dosage, right?

19   A.  May or may not.

20   Q.  May or may not.

21   A.  May or may not.

22   Q.  And you have the last office, Lisset Palmero, who is, I

23   guess, the receptionist or the office administrator?

24   A.  Something -- office manager, office -- yeah.  I mean,

25   titles weren't always very clear at Health Care Solutions
```

1    Network, as I'm sure you've noticed.

2    Q.  Can you come again?  I'm sorry.

3    A.  Titles weren't always very clear at Health Care Solutions

4    Network, as I'm sure you've noticed.

5    Q.  Yes, I noticed early on.

6         THE COURT:  Don't tell us what you've noticed or not

7    noticed.

8         MR. HERMIDA:  Sorry, Judge.

9         THE COURT:  Just ask questions.

10   BY MR. HERMIDA:

11   Q.  And Lisset -- just by looking at this, and you said this

12   was accurate, again, Lisset Palmero's office is nowhere near

13   Angela's office, is it?  It's not across.

14   A.  It's not across, no.

15   Q.  Okay.  And again, your testimony here today is that you

16   guys had open access computer systems, right?

17   A.  To my computers, yes, and to the ones in our office, yes.

18   I don't know about everybody else's computer.  I can talk to

19   you about mine.

20   Q.  So the way I understood it is that the therapists would

21   save their notes on a USB, right?

22   A.  Uh-huh, yes, that is correct.

23   Q.  They'd bring them in and they'd give them to you?

24   A.  No.

25   Q.  Why not?  It's open.

1    A.  Give me what --

2    Q.  The notes, print them out.

3    A.  -- the USB drive?

4    Q.  Gema, print them out.

5    A.  No, I never did that, no.

6    Q.  You never helped out, print them out?

7    A.  No, I did not.

8    Q.  So who did they give them to?

9    A.  As far as I know, they printed their own notes.  If they

10   gave them to someone else, I don't know about that, and they

11   would turn them in to medical records.

12   Q.  Okay.

13   A.  I did not --

14   Q.  Where was --

15   A.  -- collect the notes.

16   Q.  I'm sorry, I didn't mean to talk over you.  But where was

17   the printer?

18   A.  There was a printer in my office and I believe there was a

19   printer as well in Lisset Palmero's office.

20   Q.  And your testimony is that they'd give the USB with the

21   group therapy note information to someone?

22   A.  No, that is not my testimony.  I do not know of them giving

23   their USB to someone.  I know of them turning in their notes to

24   medical records.

25   Q.  Okay.  So the notes would go to Alejandro Bello?

1    A.  Once they were printed, yes.

2    Q.  Right.  Okay.  I gotcha.  And you don't know where they

3    were printed at.

4    A.  Well, they would sometimes sit at my computer and print

5    their notes.

6    Q.  Do you recall my client sitting at your computer and

7    printing her notes?

8    A.  Yes.  All of the therapists, as I said --

9    Q.  All of the therapists.

10   A.  -- they all have access to our computers, so they would

11   ask, can I please use the computer a few minutes?  Yes.  And

12   they would print their notes.

13   Q.  Okay.  And at that point the notes would be uploaded,

14   right?

15   A.  They had -- what do you mean?

16   Q.  Well, think about it.  It's a USB, right?  So you had to

17   upload it into the general system.

18   A.  Uh-huh.

19   Q.  Right?

20   A.  Yes.

21   Q.  And you testified earlier that you had thousands of

22   uploaded notes there that you and Dana would regularly alter if

23   there was a pending review, right?

24   A.  Yes, that is correct.

25   Q.  So there was a bank, right?  There was a bank of notes.

1    A.  Yes, that is correct.

2    Q.  All right.  So they would upload the notes, and so it's

3    there in whatever HCSN file sharing device that was created

4    there, right?  And it would be printed at that point, right?

5    A.  I'm confused about the file sharing.  I'm not sure what

6    you're --

7    Q.  Well, it would be saved somewhere, is what I'm saying.

8    A.  If they saved it to our computer, yes, but they needed to

9    save it.  It wasn't automatically saved, but yes.

10   Q.  Right.  So they plug in the USB, right, they save it or

11   whatever it is they do, they print them out, they walk down the

12   hall to medical records, and they submit it.

13   A.  Correct.

14   Q.  Unless it's one of those times where you say, hey, look,

15   we've got a pending review, I need you to sign these.

16   A.  That is correct.

17   Q.  And this is about right.  This is what they would get,

18   because let's say there's ten patients, four groups, that's 40

19   patients, 40 notes, right, a day?

20   A.  If there was a medical review, it depended on how many

21   charts were being requested and which ones had to be changed.

22   I can't give you a set number.

23   Q.  Do you recall any medical reviews on or about

24   December 2007?

25   A.  I'm sorry, sir, no.

1   Q.   Do you recall any ADRs on or about December 2007?

2   A.   What is an ADR, sir?

3   Q.   Additional document request.

4   A.   Oh, I'm sorry, I didn't know what you're -- do I -- I don't

5   get your question.

6   Q.   Well, do you recall, on or about December '07, any pending

7   medical reviews or Medicare reviews, on-site audits, anything

8   like that that would precipitate a mass printing of group

9   therapy notes?

10  A.   I can't -- I don't remember exactly when the reviews were

11  occurring, so no.

12  Q.   Okay.  Okay.

13  A.   There were several throughout the years, so the exact

14  dates, I don't know -- remember them offhand.  That was quite a

15  few years ago.

16  Q.   I have to switch spots.  Ms. Pampin, quick question before

17  we move on.  The two bathrooms on the left-hand side, were they

18  always open too?

19  A.   No.  The staff bathroom was locked.  I believe the patient

20  bathroom was open, but the staff bathroom was locked.

21  Q.   Isn't it true, ma'am, that sometimes the patients had to

22  cross the street or go to other places in the little strip mall

23  to go to the bathroom?

24  A.   Yes, there were times.

25  Q.   Okay.  So we talked about the chronology, August 2010,

1  Safeguard Services, the on-site, they hire Manny's consultant

2  so that they get JCAHO certified, right?

3  A.  You mean -- who are you referring to, Bettina Toscano, or I

4  don't know what you're --

5  Q.  Was it Bettina?

6  A.  I don't know who you're referring to.  I know Bettina

7  started assisting us for joint commission, yes.

8  Q.  And joint commission, what benefit did that provide Health

9  Care Solutions Network?

10  A.  It's an additional accreditation that most hospitals get,

11  and Armando was trying to obtain a Medicaid provider and this

12  would look good.

13  Q.  Did Armando ever get invited to testify before the U.S.

14  Congress?

15  A.  I don't know about that.

16  Q.  Did you know about Armando's past, by the way?

17  A.  No, I did not.

18  Q.  Okay.  When you started, you were unaware that he was a

19  convicted drug trafficker.

20  A.  I did not find that out until he was arrested and it came

21  out in the news.

22  Q.  Okay.  And after you guys got arrested, you talked to

23  Armando?

24  A.  No, I did not.

25  Q.  You talked to Dana.

1   A.   She called me once after we were arrested.

2   Q.   How about Alina?

3   A.   Alina, after we were arrested, no.  And when Dana called

4   me, by the way, after the arrest, we did not -- I told her we

5   could not speak and we did not have a conversation.

6   Q.   And you haven't spoken to either Dana or Alina or Lisset,

7   anybody, since your arrest and incarceration about this case.

8   A.   Oh, about the case?  No.

9   Q.   About this case.

10  A.   But I have spoken to them, but not about the case.  I have

11  spoken to them because, as you mentioned earlier, or someone

12  mentioned earlier, Lisset Palmero and I are in the same

13  facility, and now Dana is also here as well, so yes, we have

14  spoken, but not about the case.

15  Q.   So are you guys sharing a pod at FDC, you, Dana, Lisset,

16  or --

17  A.   A pod?  We're in the same unit.

18  Q.   A unit.

19  A.   But no, we're not in the same room, but in the same unit.

20  There's only one women's floor here, one women's unit, so --

21  Q.   Did you talk to Lisset after her testimony here?

22  A.   Yes.  I asked her to see how she was doing.

23  Q.   Did you ask her, well, what did they say?

24  A.   No, I did not.

25  Q.   All right.  So going back, we talked a little bit about the

1   chronology, the computer access, the office layout.  Now, going

2   back, on what you did, did you actually diagnose patients?

3   A.  We gave diagnoses, sure.  We weren't supposed to, but yes,

4   we gave diagnoses.

5   Q.  So as far as --

6   A.  At times, depending.  I'm sorry.

7   Q.  It's okay.

8   A.  If we were given some general -- if we were given any

9   general information or sometimes a medication, that would kind

10  of help us to come up with a diagnosis.

11  Q.  You said --

12  A.  If the doctor wasn't there that day and we couldn't -- you

13  know, we would just --

14  Q.  Okay.

15  A.  -- come up with our own.

16  Q.  Are you done?  Let me ask you about initial assessments.

17  You testified, I think when it was either on direct or cross,

18  that you and Dana would divvy up patients, the new ones that

19  were coming in, and you would actually do the initial

20  assessments, right?

21  A.  That is correct.

22  Q.  So what would that involve?

23  A.  We would meet with them, kind of try to get some

24  information from them, basic demographic information and

25  some -- and if they had any mental history, mental health

1    history, information about their families.

2    Q.  Is that the biopsychosocial?

3    A.  That was included also for the biopsychosocial, but we

4    needed it for the initial assessment as well.  And if they were

5    experiencing any symptoms, we would try to get whatever they

6    gave us to then add to it.

7    Q.  So based on the symptomology and I guess the presentation,

8    the affect, everything else --

9    A.  All of that, yes.

10   Q.  -- you would come up with a clinical impression or

11   diagnosis.

12   A.  Yes, that is correct.

13   Q.  And these were real patients, though.

14   A.  They were patients.

15   Q.  But you also did this for people that didn't exist, right?

16   A.  Yes.

17   Q.  All right.  So you did this for people that didn't exist.

18   And you did this kind of a lot.  In fact, your first day you

19   did it three times.

20   A.  My first day I did it three times?

21   Q.  Isn't it true, ma'am, you testified that the first day on

22   the job --

23   A.  I testified that the first day -- I don't know how many

24   times, but I did testify that, yes, I fabricated documents on

25   the first day.

```
1    Q.  Now, you had come in there with a rich history of

2    fabrication, right?  I mean, you had done this before.

3    A.  I fabricated prior to that, yes.

4    Q.  And where did you come from as far as -- I wasn't real

5    clear.  Did you come from --

6    A.  I worked at New Era.

7    Q.  Or was it New Concepts?

8    A.  No, at New Era.  New Concepts was after.  That was a --

9    Q.  With Sara.

10   A.  -- program that was opened by Sara, yes.

11   Q.  Okay.  So then you worked at New Era and someone kind of

12   taught you how to do that there, right?

13   A.  That is correct.

14   Q.  Because it really isn't easy to do that, right?

15   A.  There's specific details to it that you need to be aware of

16   in order to do it correctly, yes.

17   Q.  Right.  The buzzwords.

18   A.  Exactly.

19   Q.  What to leave in.

20   A.  And what to leave out.

21   Q.  What to leave out.

22   A.  You're correct.

23   Q.  All right.  So during the whole time you're at Health Care

24   Solutions Network, and I won't belabor this, but you fabricated

25   records for Health Care Solutions North Carolina, Health Care
```

1   Solutions West, New Concepts, right?

2   A.   Yes.

3   Q.   Improving Lives, New Life, Coral, Magenta?  And again, just

4   so the jury understands, you would make how much per, let's

5   say, new patient file?

6   A.   The rate in Health Care Solutions was $200 if it was a new

7   patient, and if it was a repeat, it was 150.

8   Q.   Okay.  And was Manny kind of known as a bad pay, that he

9   kind of did not pay up to what was going in South Florida?

10  A.   You mean the rate?

11  Q.   Yeah.

12  A.   He wasn't paying at a good rate?

13  Q.   Yeah.

14  A.   There were times where he reduced salaries and rates and

15  people were complaining about that, yes.

16  Q.   And so --

17  A.   But not -- I can't say that personally, but --

18  Q.   And the group therapy notes were paid at about a buck fifty

19  per page, right?

20  A.   I know I was paid at 1.25 --

21  Q.   1.25 --

22  A.   -- for the notes that I --

23  Q.   -- per page?

24  A.   -- was fabricating for North Carolina.

25  Q.   Right.  So it wasn't uncommon for you to supplement your

1    paycheck, your weekly paycheck, by what, 400, $500, or more.

2    A.  Yes.  It was not uncommon, no.

3    Q.  And because they were real meticulous record keepers, I

4    think the government showed you a check where it said

5    "fabricated notes."

6    A.  It said "notes in review," yes.

7    Q.  And was that a check over and above your salary check?

8    A.  Yes, it was.

9    Q.  Okay.  So you would get your salary check and then you'd

10   get notes and review checks, right?  And just so the jury

11   knows, how much was your base salary?

12   A.  I started off at $28 an hour.  Eventually I went up to $39

13   an hour.

14   Q.  Okay.  And were you also a 1099 employee or were you hired

15   staff?

16   A.  I was a hired staff.

17   Q.  Okay.  So unlike my client who, you know, basically, if she

18   didn't show up, she wouldn't get paid, right?

19   A.  That is correct.

20   Q.  Right.  By the way, did you ever see any paychecks with any

21   notation for notes or file review for my client?

22   A.  No, I did not.

23   Q.  Okay.  All right.  So my understanding is that of the notes

24   you fabricated -- and we talked a little bit about the intake

25   notes.  Let's walk the client through the whole process.  You

1    would basically fabricate weekly treatment notes, right, or

2    weekly treatment plans?

3    A.  Weekly treatment plan reviews, yes.

4    Q.  Okay.

5    A.  It's a review of the objectives and the treatment plan.

6    Q.  And that had to, of course, comport to the master treatment

7    plan, right?

8    A.  Of course, yes.

9    Q.  Which you guys would also fabricate.

10   A.  Yes.

11   Q.  Right?  Okay.  So -- and then you kind of had to fit in the

12   group therapy note, right?

13   A.  If it was going to a review and it needed to be adjusted,

14   yes.  Otherwise, no.

15   Q.  Okay.  And when you say "adjusted," you wanted to have

16   that, you know, initial diagnosis confirmed, right?

17   A.  Correct.

18   Q.  Symptomology, flat affect, withdrawn, isolated, and then

19   marked improvement as the therapy continued over the six-week

20   course, right?

21   A.  They were usually there longer than six weeks, but yes, as

22   it progressed, yes.

23   Q.  And by the way, who made the notes as to who would be there

24   longer?  Like in the census, wouldn't Manny write an E or tell

25   you guys, extend?

1  A.  As far as I know, Manny would tell Lisset how many patients

2  he wanted to have as a census, and Alina -- and between Alina

3  and Lisset, Alina would let her know what -- Alina Feas would

4  decide what patients.

5  Q.  Right, right.  Okay.  So --

6  A.  She would say a number, let's say, I want -- I need to have

7  the census at this number, so --

8  Q.  It was just sort of like a target number, I need this

9  number because we're not making enough money for this

10  particular week.  And was this every day he would call Lisset?

11  A.  I don't know if he called her every day.  I know they spoke

12  often, but I don't know if it was every single day.

13  Q.  Wasn't it like three, four times a day?

14  A.  I don't know if it was every single day.

15  Q.  Okay.  And, I mean, we're talking about North Carolina and

16  the West going on too, right?

17  A.  Yes.  I know about the East mostly because that's where I

18  was.

19  Q.  Right, right.  And correct me if I'm wrong, he had a

20  different Medicare provider number for the West too, right?

21  A.  I believe so.  I'm not a hundred percent sure of that, but

22  I believe, yes, that there was another --

23  Q.  So he had two provider numbers.  And then you had Feas with

24  three provider numbers.  And everybody is billing at all times,

25  basically, right?

1    A.  I don't know about Ms. Feas outside Health Care Solutions

2    Network.

3    Q.  How about inside Health Care Solutions?

4    A.  What do you mean?  She couldn't -- she wouldn't bill

5    separately.  Health Care Solutions Network billed.  Now, I

6    don't know about her personal, private, I don't know.

7    Q.  Wouldn't she pull out patients from groups, give them

8    therapy, right, and then bill Medicare Part B?

9    A.  I don't know if she billed Medicare.  Our understanding was

10   since this was -- in order to make this fraud look more

11   legitimate, the partial hospitalization program needed to be a

12   mental health center, not just a partial, which meant it needed

13   to have other kinds of service, not just group, but individual.

14   And so we were told that that was why these individual

15   therapy -- it needed to appear that we were providing

16   individual therapy.  Whether she billed outside of that, I do

17   not know.

18   Q.  And who told you all this?  Because we were -- who told

19   you, Manny?

20   A.  Armando, yes.

21   Q.  Manny would tell you.  Was Manny very hands on?

22   A.  Very hands on?  No, but he would visit the office.  But not

23   very --

24   Q.  HCSN-East?

25   A.  Yes.

1    Q.  Was he there a lot?  Other than the fung shui activity, you

2    know, and the salt and whatever else was done, would he be

3    there a lot?

4    A.  Not a lot.  I think once the West office opened, the West

5    location, he was mostly in the West, but he would visit the

6    office.

7    Q.  Did you ever see my client speaking to him?

8    A.  Angela Salafia?

9    Q.  Yes.

10    A.  I'm sure they spoke at some point.  I don't -- I can't tell

11    you if I can remember a specific day that she sat to speak with

12    him, but --

13    Q.  Okay.  So let's talk about the patient pool, because I

14    think the government makes this big thing about, well, they all

15    came from ALFs.

16         THE COURT:  Hold on.  Don't tell us what you think the

17    government thinks.

18         MR. HERMIDA:  Sorry, Judge.

19         THE COURT:  Just ask a question.

20    BY MR. HERMIDA:

21    Q.  They came from ALFs, the patients.

22    A.  The majority of them did, yes.

23    Q.  There's nothing wrong with patients coming from ALFs,

24    right?

25    A.  If they meet criteria for PHP.

1    Q.   Right.  And the fact is, who decided if they made criteria?

2    A.   It should be the psychiatrist, but the fact is that they

3    were all admitted.

4    Q.   Okay.

5    A.   The majority were admitted.

6    Q.   They're admitted, a decision is made on admission, but that

7    decision wasn't made by Angela Salafia.  She had no say as to

8    patient recruiting, patient pool, anything like that.

9    A.   No, she didn't.

10   Q.   Okay.  Alina Feas would then assign a group, right?

11   A.   Yes.

12   Q.   So again, none of these therapists here today made any

13   decision regarding who would be in their particular group.

14   A.   No.  It was kind of a given.  Depending if it was an

15   English speaking patient, they would obviously go to Liliana's

16   group.  If they were the lower, lower functioning that they

17   were, they would go to Angela Salafia's group, so...

18   Q.   Okay.  And if it was schizophrenic, they would -- they

19   would deal with Liliana Marks, right?

20   A.   If they spoke English.

21   Q.   If they spoke English.  And the group numbers varied,

22   right?

23   A.   Yes.

24   Q.   Do you recall any fighting, Dr. Busquets breaking up

25   fights?

```
 1    A.  No.

 2    Q.  Okay.

 3            THE COURT:  Let's take our luncheon recess now.  It's

 4    almost 12:15.  Let's take a little bit less time than we've

 5    been taking and hopefully we can leave a little bit earlier at

 6    the end of the day.  So let's come back at 1:30, all right?

 7    1:30 everybody, not 1:45.  1:30.

 8        (Luncheon Recess, 1:19 p.m. to 1:28 p.m.)

 9            THE COURT:  All right.  Everybody is here.  Are the

10    jurors ready?

11        (Jury Present.)

12            THE COURT:  All right.  Good afternoon, everyone.

13    Welcome back and please be seated.  All right.  We're going to

14    continue with the cross-examination of Mr. Hermida.

15            MR. HERMIDA:  May it please the Court, Your Honor.

16            Good afternoon, ladies and gentlemen.

17    BY MR. HERMIDA:

18    Q.  Good afternoon, Ms. Pampin.

19    A.  Good afternoon.

20    Q.  The last question I asked you was about Dr. Busquets, and

21    whether you had -- if you remembered if he had broken up any

22    fights over at Health Care Solutions Network East, right?

23    A.  No, I do not remember that.

24    Q.  Okay.  And we could say with a certainty that you never

25    once sat in on Mrs. Salafia's groups, right?
```

1    A.  I did not.

2    Q.  And I think the government made an issue about

3    over-the-shoulder supervision.  Do you remember that?

4    A.  Yes, I do.

5    Q.  Now, over-the-shoulder supervision was really an internal

6    Health Care Solutions Network thing, wasn't it?

7    A.  No.  That is customary in any PHP.  If someone does not

8    have a license, there needs to be a licensed person providing

9    the over-the-shoulder supervision.

10   Q.  Okay.

11   A.  Is that what you mean?

12   Q.  Are you familiar with First Coast Service Options?

13   A.  Yes, I've heard of that.

14   Q.  Okay.  And they audited Health Care Solutions Network

15   around 2005-2006.

16   A.  I'm not aware of that.  I do not know.

17   Q.  Were you aware that one of the recommendations from that

18   audit was that over-the-shoulder supervision be implemented?

19   A.  No, I was not aware of that.

20   Q.  Are you aware that local -- do you know what an LCD is?

21   A.  LCE?

22   Q.  LCD.

23   A.  No, I do not.

24   Q.  Local coverage determinations.  You know, the Medicare

25   guidelines, right?

1   A.  Right.  I knew them as Medicare guidelines.  I did not know

2   the letters that stood for it, but...

3   Q.  They defer licensing, interns, that whole process to state

4   law.  Are you aware of that?

5   A.  I'm aware that there was a law.  I'm not sure what

6   you're...

7   Q.  Are you aware of Florida statute 491.005(3)(d)?

8   A.  Yes, I know there is a statute, yes.

9   Q.  And nowhere in the statute does it require

10   over-the-shoulder supervision a hundred percent of the time.

11   A.  I never said it was a hundred percent of the time.

12   Q.  I understand.  I think you said, what, 50?

13   A.  No, I heard -- what I was informed is that it needs to be

14   15 to 20 minutes of every session.

15   Q.  Would you be surprised if you don't have to be in the same

16   room at all with the person you're supervising as long as

17   you're on the same premises?

18   A.  That would be a surprise to me, yes.  My understanding was

19   that I needed to be in the room.

20   Q.  So you're not familiar with the statute.  Would you like to

21   read it?

22   A.  No.  I can tell you that I'm not aware of that, so -- if

23   you need me to read it, I can, but...

24   Q.  All right.  But we know that you were not in Mrs. Salafia's

25   group, were you?

1  A.  No, I was not.

2  Q.  And in fact, you never sat in on any of the groups, did

3  you?

4  A.  No, I did not.

5  Q.  All right.  Yet you testified that you heard music.

6  A.  Yes.

7  Q.  Okay.  And this was a regular occurrence?

8  A.  What's regular?

9  Q.  I don't know.  You tell me.

10  A.  Sir, in occasions, yes, there was music played.

11  Q.  Okay.  And --

12  A.  I could hear it.

13  Q.  -- was a CD player brought in?  Was a tape recorder?  A

14  record player?

15  A.  I don't remember now.  It was something probably the

16  therapist brought.  I don't believe us having one there.

17  Q.  Or was it a client that brought a transistor radio?

18  A.  I really do not recall how the music got there right now.

19  I can just tell you what happened, that music was played to try

20  to trigger memories, just like the movies that were played, as

21  with the TV that was there.

22  Q.  Do you recall specifically what type of music?

23  A.  Spanish music.  The music of a long time ago to try to

24  trigger memories.

25  Q.  Was it rap music?

1   A.  Rap music?  I do not recall rap music, no.

2   Q.  Now, when the FBI shut it down back in, I think it was

3   February 2011?

4   A.  Close.  2011, when we were placed under a hundred percent

5   review.

6   Q.  Right.

7   A.  The federal did not -- the feds did not show up in our

8   office.

9   Q.  When you all began shredding documents, did you also throw

10   away the phonograph, the record player, the CD player, things

11   like that?

12   A.  No.

13   Q.  What about the TV set?

14   A.  I don't know.  That was there when I left.  I did not get

15   rid of that.

16   Q.  What about the DVR?

17   A.  I don't know what happened to it.

18   Q.  So it would likely be in evidence in this case, right?

19   A.  I have no idea, sir.

20   Q.  Okay.  All right.  So we walked through this whole process,

21   almost from admissions to the fact that they're in the group

22   therapy rooms and what's going on in the group therapy rooms,

23   right?

24   A.  Yes.

25   Q.  And we talked a little bit about whether there were fights,

```
 1   the music.  You also testified that some of these patients

 2   weren't appropriately dressed.

 3   A.  Right.  That is correct.

 4   Q.  Isn't that a common feature of schizophrenia, ma'am?

 5   A.  For some schizophrenics, yes, that could be a feature.

 6   Q.  Right.  Inappropriate responses to what you and I consider

 7   appropriate.

 8   A.  I'm sorry?

 9   Q.  Inappropriate responses to what you and I would consider

10   appropriate in certain situations, right?

11   A.  Yes, correct.

12   Q.  Because they're in their own reality.

13   A.  Yes.  If they have schizophrenia, yes.

14   Q.  Do you remember instances of these folks relieving

15   themselves -- or, I'm sorry, relieving themselves in office

16   furniture or an office plant?

17   A.  Yes.

18   Q.  Was it a plant?

19   A.  There was a plant in Alina Feas' office.

20   Q.  Do you remember someone relieving themselves in a drawer?

21   A.  Yes.

22   Q.  Okay.  All right.  Now --

23   A.  And in a bucket that was in the corner also with the salt.

24   That was also mentioned earlier.

25   Q.  The feng shui bucket.
```

1    A.  Yes.

2    Q.  All right.  So we're in the groups and at some point the

3    groups end, do they not?

4    A.  Yes.

5    Q.  And the therapists go home, do they not?

6    A.  Yes.

7    Q.  They don't stick around and type up their notes, do they?

8    A.  Sometimes they would.

9    Q.  Did Ms. Salafia do that?

10   A.  I can't say a hundred percent that she did, but that was

11   something they could do.  Yes, they could --

12   Q.  Okay.  My under- --

13   A.  -- sit there or they could take it home.

14   Q.  I'm sorry.

15   A.  No, that's okay.  They could do their documentation at home

16   or they could do it there.  It was easier for them to take it

17   home, but...

18   Q.  Right.  Because until you built out the office, right, the

19   little therapists' room in the front, and we saw that in the

20   chart, until that time, there was really no place to go.

21   A.  Right.  They would have to ask one of us for the computer,

22   or in the nurses' office, sometimes if the nurse was not there,

23   which there wasn't always a nurse, they could use that computer

24   as well.

25   Q.  Right, okay.  And again, your testimony is that none of

1    these things were ever password protected, right?

2    A.  I don't recall them having that, except for Ms. Lisset.

3    Q.  Lisset's, okay.  Quick question before we move on about the

4    computers.  One of the things you did was that you downloaded

5    every single document you could, correct, before the place was

6    raided.

7    A.  Actually, I had that from before.

8    Q.  Just in case.

9    A.  Well, no, I had that on me because sometimes I would work

10   from home and it was easier to have the bank on me.

11   Q.  Okay.  And you had it just in case something would go sour

12   with Manny, if he threw you under the bus?

13   A.  That was not the reason I had it, but I did have it.

14   Q.  All right.  So group notes were eventually printed out and,

15   I guess, signed by you, right?

16   A.  Cosigned.

17   Q.  Or cosigned.  And that ended after a while because

18   Mrs. Salafia became fully licensed.

19   A.  That is correct.

20   Q.  And did you cosign anybody else's or --

21   A.  Yes.  There was another therapist, Rosa Bermudez.

22   Q.  Okay.  And she's Ruben Busquets' wife, right?

23   A.  That is correct.

24   Q.  And both of them came from HCSN-West, my understanding,

25   right?

1    A.   I remember Ruben worked in the West.  I'm not sure if Rosa

2    worked in the West or not.

3    Q.   Okay.  And everybody would, at some point, print out the

4    notes and give them to, I think you said Alejandro Bello,

5    right?

6    A.   To medical records.

7    Q.   The guy in medical records.  And that's that, right?

8    A.   Yes.

9    Q.   And just so the jury understands, none of these notes were

10   really submitted to Medicare, right?  The notes themselves.

11   A.   Sent in?

12   Q.   Sent in.

13   A.   Not unless they requested it.

14   Q.   Unless there was additional document requests, an ADR, or

15   unless there was one of those scrambled audits, right?  A

16   review team was put together.

17   A.   A review team?

18   Q.   Yeah, when there was a review.

19   A.   Right.  Myself and Dana or Alexandra, when she was there,

20   were the ones that would prepare the documents for the review,

21   yes.

22   Q.   So you guys would coordinate the review -- you guys were

23   the review team, right?

24   A.   If you want to make it that, yes.

25   Q.   What about Alina Feas?

1  A.  She had to sign the document as well, but we were pretty

2  much the ones that would prepare the documentations for the

3  review.

4  Q.  Just curious, do you guys get advance notice of a review?

5  A.  No.

6  Q.  And so --

7  A.  Matters that are submitted from Medicare to the facility

8  informing the names of the patients and the dates that they are

9  requesting.

10  Q.  So if you got, you know, let's say, Dulce de la Torre,

11  you'd have to scramble, compile all Dulce de la Torre, get it

12  all ready, have Alina Feas sign off, have it all compiled, get

13  it all ready to go, because we're under review.

14  A.  Exactly.

15  Q.  And that's what the review team would do, right?

16  A.  Yes, what Dana and myself would do, yes.

17  Q.  It's like a troubleshooting team, right?

18  A.  I guess you could look at it that way, yes.

19  Q.  And my understanding is that none of these therapists were

20  ever in a review team.

21  A.  No.  Sometimes we used their notes if they matched what we

22  needed.  We didn't always have to change them.

23  Q.  No, and I understand that.  I'm glad you said that, because

24  when we talk about fabrications, we're talking about a variety

25  of things that could be done, right?

1    A.  What do you mean?

2    Q.  Well, some notes were created from scratch, the person was

3    never there.

4    A.  Exactly.

5    Q.  Right?  Some notes were duplicated.

6    A.  Exactly.

7    Q.  They were cloned.  In other words, just the date was

8    changed, but everything else was the same.

9    A.  Correct.

10   Q.  And some notes were altogether altered, like if -- since

11   you guys knew which -- what to leave in and what to leave out,

12   you would go over and say, hey, look, we got to tighten this

13   one up, make it comport to the master treatment plan, something

14   is out of sequence here, right?

15   A.  Right, uh-huh.

16   Q.  So fabrication was, it's delicate.  I mean, it's not

17   something like, hey, let's just copy and send it in.  No.  It

18   was much more than that, right?

19   A.  That is correct.

20   Q.  And you guys would meet regularly to discuss this stuff,

21   right?

22   A.  We would meet regularly?

23   Q.  Well, you know, when there was a problem.

24   A.  No.  We each had our own case of -- whatever therapist -- I

25   mean, whatever patients were being requested.  Say there were

1    ten patients that were being requested, just to give an

2    example, and if it was myself or Dana, then it would be

3    divided.  She would do half, I would do half.  We didn't really

4    need to talk about that.

5    Q.  One of the things that I asked you when we were talking

6    about the types of fabrications is that, you know, some

7    patients just didn't exist.

8    A.  Exactly.

9    Q.  And those were the Dana's list patients, right?

10   A.  That is correct.

11   Q.  And she would take care of all of those, right?

12   A.  Of the notes.  But if there was a review and, again, it

13   would just be divided, if I needed to do that, I would.

14   Q.  So sometimes you would do that.

15   A.  Yes.

16   Q.  And -- but she primarily, that was her -- that was her

17   responsibility, because it wasn't called Angela's list, right?

18   A.  That is correct.

19   Q.  It wasn't called Doris's list.  It wasn't called Liliana's

20   list.  It was Dana's list.

21   A.  Yes, that is correct.

22   Q.  So they had nothing to do with these ghost patients.

23   A.  With the notes.

24   Q.  With the notes.  Other things were also fabricated, right?

25   The sign-in sheets.

1    A.  Uh-huh, yes.

2    Q.  You guys would leave sign-in sheets, right, when groups

3    would start and they would be collected when groups ended?

4    A.  Or at the end of the day.

5    Q.  My understanding is that these sign-in sheets were often

6    forged.

7            MR. GOODYEAR:  Your Honor, that's a comment.  He just

8    stated his understanding.

9            MR. HERMIDA:  Let me rephrase.

10   BY MR. HERMIDA:

11   Q.  Were these sign-in sheets often forged?

12   A.  They were at times, yes.

13   Q.  Was that when Migdalia would hit Bello's hand so it would

14   appear like an elderly person was signing?

15   A.  Would hit whose hand?

16   Q.  Alejandro Bello.

17   A.  Oh, I don't know if she did that, but I know they were

18   forged sometimes.  I don't know if she was banging his hand.  I

19   didn't see that, so I can't say that.

20   Q.  All right.  So we talked a little bit about the docs that

21   were forged, everything from admission to group therapy notes,

22   and we talked about the forgers -- or fabricated, I'm sorry,

23   because I think they were forged, fabricated, altered, because

24   we left out the forgeries.  You guys regularly forged other

25   people's names.

1    A.   Regularly, no.  When documents needed to be submitted in a

2    timely manner and the person was not there to sign, then we

3    would.

4    Q.   Sorry.  As needed.

5    A.   As needed.

6    Q.   As needed, it would be forged.

7    A.   Yes.

8    Q.   Okay.  And I guess we could come up with a forgery 1A

9    category where you would cut and paste the signature line from

10   a particular therapist to a particular note.

11   A.   The cut and paste, I remember that more with Dr. Rousseau's

12   signature.  That was more towards the beginning of the opening

13   of the clinic.  I don't remember cutting and pasting with the

14   therapists' signatures.

15   Q.   You don't remember testifying to that on direct exam?

16   A.   Cutting and pasting forging, yes, but cutting and pasting

17   specifically the therapists, I don't remember.  It was more

18   just signing it.

19   Q.   Okay.  So again, we talked about who was responsible for

20   forging, the documents that were forged, the process from

21   admission to therapeutic treatment, I suppose, and now we'll

22   talk about the recycled patients, because it's done, right?

23   After six weeks, nine weeks, depending on what Manny wanted to

24   do, you were essentially done, right?

25   A.   I'm sorry, what was done?

1    Q.  Well, patients got to be discharged at some point, right?

2    A.  Right.  Discharged.

3    Q.  You couldn't hold them forever, right?

4    A.  They were usually there three to four months.

5    Q.  Okay.  And your testimony was that these patients were

6    recycled from Health Care Solutions Network West.

7    A.  That's correct.

8    Q.  Or other places?

9    A.  Or other places as well.

10   Q.  My client never worked at the West, right?

11   A.  No, not as far as I know, no.

12   Q.  And according to the PHP guidelines, you could be

13   readmitted.  There's no set time.  You've got to have an

14   episode, right?

15   A.  You just need to have the actual symptoms that justify the

16   need for that treatment.

17   Q.  It's a step up or a step down program, right?

18   A.  Right.  It's either to prevent a hospitalization or a step

19   down from a hospitalization.

20   Q.  Right.  You stated that this was discussed openly, the

21   recycling of patients?

22   A.  Yes.

23   Q.  And my client participated in that discussion?

24   A.  Yeah.  These were comments that were made between all

25   therapists and Dana and myself, yes.

1   Q.  But she never worked at Health Care Solutions Network West.

2   A.  But we would still discuss it.  We knew the patients that

3   came from the West.

4   Q.  She never worked at American Therapeutic Corporation.

5   A.  American Therapeutic?  No.

6   Q.  She never worked at any PHP prior to this.

7   A.  No, but we were all in the conversations.  As I said

8   earlier, everybody was in our office.  And the conversations --

9   Q.  It was always open --

10  A.  And the conversations -- that's where they would

11  congregate.  They had nowhere else to congregate.  It was in

12  our office.

13          MR. HERMIDA:  Okay.  All right.  If I may have a

14  moment.

15      (Off-the-record discussion.)

16  BY MR. HERMIDA:

17  Q.  On the payment.  You talked about being compensated for

18  group therapy notes.

19  A.  That's correct.

20  Q.  Dana was also compensated, right?

21  A.  Yes, that is correct.

22  Q.  Alina Feas was also compensated, right?

23  A.  I don't know exactly how the compensation was for Alina

24  Feas, the additional compensation, if there was.  I'm not sure.

25          MR. HERMIDA:  I have nothing further, Your Honor.

1   UNITED STATES OF AMERICA                    )
                                                ) ss:
2   SOUTHERN DISTRICT OF FLORIDA                )

3

4                   C E R T I F I C A T E

5       I, Carly L. Horenkamp, Certified Shorthand

6   Reporter in and for the United States District Court for the

7   Southern District of Florida, do hereby certify that I was

8   present at and reported in machine shorthand the proceedings

9   had the 7th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 1 - 50.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 15th day of November, 2014.

16

17

18                  /s/ Carly Horenkamp

19                  Carly L. Horenkamp, RMR, CRR
                    Certified Shorthand Reporter

20

21

22

23

24

25