```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
                            MIAMI DIVISION
                     CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,               NOVEMBER 12, 2014
                                        11:03 A.M.
                    Plaintiff,



        vs.



ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 1 THROUGH 27
_____

                              DAY 7
                EXCERPT OF CRIMINAL JURY TRIAL
        (CROSS-EXAMINATION OF ALEXANDRA HAYNES BY MR. GONZALEZ)
            BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC  20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

```
 1                        I  N  D  E  X

 2    Certificate --------------------------------------- 27

 3

 4

 5                        W I T N E S S
      ON BEHALF OF THE GOVERNMENT:                     PAGE
 6    ALEXANDRA HAYNES
      CROSS-EXAMINATION BY MR. GONZALEZ                   4

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Before Jury, 11:03 a.m.)
 2              THE COURT:  All right.  Mr. Gonzalez.
 3              MR. GONZALEZ:  Thank you, Your Honor.
 4              Good morning, Counsel.
 5              Good morning, ladies and gentlemen of the jury.
 6                      CROSS-EXAMINATION
 7   BY MR. GONZALEZ:
 8   Q.  Ms. Haynes, good morning.
 9   A.  Good morning, sir.
10   Q.  Juan Gonzalez.  I represent Alina Fonts.  You've never
11   really met her, have you?
12   A.  I have never met her, sir, no.
13   Q.  That's because she never worked at the East; is that
14   correct?
15   A.  I worked at the East, not while she was there.
16   Q.  Okay.  Well, you never saw her at the East.
17   A.  I never worked with her.
18   Q.  When did you -- when did you start at the East?
19   A.  In 2006, the fall of 2006.
20   Q.  Okay.  That was about a year before she even went to work
21   there.  Were you aware of that?
22   A.  No, sir.  I've never met your client nor have I ever spoken
23   with her.
24   Q.  Oh, okay, thank you.  I need you to clear up something for
25   me about these reviews.  Now, I understand that Armando
```

1    Gonzalez, no relation, would get a list of patients from

2    Medicare that they wanted to review their files; is that

3    correct?

4    A.  Yes, sir.

5    Q.  All right.  And when he would get that, he would give them

6    to you, Gema, Dana, correct?

7    A.  Sometimes, yes.  Sometimes they would go to Alina Feas,

8    sometimes they would go to John Thoen, but eventually, yes,

9    that list made its way to our office.

10   Q.  All right.  Thoen and Feas were also involved in it, but

11   most of the time it was you, Dana, and Gema.  Would you agree

12   with that?

13   A.  Yes.

14   Q.  Okay.  And you were in charge of making sure that these

15   files were properly documented and that they flowed nice and

16   that everything was written nicely so that, you know, Medicare

17   would get it and they would -- and they would be able to

18   understand it correctly and see if it was correct or not,

19   correct?

20   A.  Yes, that's true.

21   Q.  Okay.  Now, how big were those files?  How many documents

22   are in a typical file?

23   A.  They were pretty large files.  Between the intake and then

24   depending on how long they had been there, I mean, sometimes

25   you were reviewing patients that had been there a week,

1   sometimes you were reviewing a patient that had been there six

2   months, so the size of the chart varied.

3   Q.  So we're talking about hundreds of pages inside some of

4   those files, correct?

5   A.  Yes, sir.  It was difficult.

6   Q.  All right.  So it could be a very thick document --

7   A.  Yes, sir.

8   Q.  -- these files, correct?  And sometimes things were

9   misfiled, one in one file, one in another, things of that

10  nature too, correct?

11  A.  All sorts of things were wrong with them, yes.

12  Q.  Of course.  Absolutely.  Medical records is usually a

13  problem everywhere, isn't it?

14  A.  Yes.

15  Q.  Okay.  Now, you get these files and you determine which

16  ones are okay and those you set aside, and then you determine

17  the other ones which have a number of things missing and those

18  are ones you start working on; is that correct?

19  A.  None of the charts were ever okay.  They were always -- you

20  were always needing to change something, fix something, because

21  they weren't reviewed like they were supposed to.  According to

22  Medicare guidelines, you're supposed to have a records person

23  reviewing them daily, weekly, to make sure everything is up to

24  date.  Charts were far away from that, so they always had to be

25  reviewed.

1    Q.   Okay.  But you just got the file, you know, sometime

2    whenever Manny told you.  You weren't paying attention to that

3    file on a daily basis, correct?

4    A.   That's correct, sir.

5    Q.   All right.  And you said earlier that the therapists were

6    overwhelmed, that sometimes they had 20 patients and they had

7    to take -- and they had to write notes on all these patients

8    and there was a lot of work and very little time, in cramped

9    conditions.  You stated that earlier, didn't you?

10   A.   Yes, everyone was overworked.

11   Q.   Everybody was overworked because there were actual patients

12   there, correct?

13   A.   There were actual inappropriate patients there, yes.

14   Q.   You're a trained psychologist, correct?  You have a

15   master's, right?

16   A.   Sir, I am not a psychologist.  I have a master's in

17   psychology, yes.

18   Q.   A master's in psychology, okay.  So you studied psychology.

19   A.   Yes, sir, I did.

20   Q.   Now, are you aware of the theory that people who are lying

21   tend to elaborate their answers and don't answer directly to

22   the questions that are being asked of them?  Are you aware of

23   that theory?

24   A.   I've heard -- heard of that.

25   Q.   Okay.  All right, good.  So then when I asked you

1    whether -- I mean, that last question I asked you, and you just

2    turned around and answered something else, that could be a sign

3    that you're lying today.

4    A.  No, sir, that's me clarifying to the jury what was actually

5    happening --

6    Q.  Right, okay.

7    A.  -- at the office.

8    Q.  But you do a lot of clarifying and elaborating on your

9    answers, wouldn't you agree?

10   A.  I think in this case, there needs to be clarification of

11   what actually happened, yes.

12   Q.  Yes, of course.  Because when I asked you if the therapists

13   are seeing a lot of patients, you have to clarify that these

14   patients may be inappropriate patients, just to make sure that

15   the government is happy with the answer and it doesn't appear

16   like you're giving an answer that's good for me in front of

17   these South Floridians.

18   A.  No, sir.  I added that so that the jury is aware of the

19   type of patients that were admitted into Health Care Solutions

20   on a weekly, daily basis.

21   Q.  So you're going to answer whatever you want and you're

22   going to disregard whatever question I ask.

23   A.  No, sir, I believe I answered your question.

24   Q.  Okay.  You believe you answered my question.  By the way,

25   you said you wanted to leave South Florida earlier.

1    A.   Yes.

2    Q.   What's wrong with South Florida?

3              MR. MEDINA:  Objection, Your Honor, relevance.

4              THE COURT:  Overruled.

5    A.   It's too crowded.  I wanted a different lifestyle.  I grew

6    up in Virginia.  I missed the north.  I wanted to go back up

7    there.  My brother had recently moved, as I stated before, and

8    I wanted to be closer to him.

9    BY MR. GONZALEZ:

10   Q.   You don't like the South Floridians?

11   A.   I like South Floridians.  I come and vacation yearly.

12             THE COURT:  Hold on a second.  Don't point at the jury

13   when you say you don't like South Floridians, okay?

14             MR. GONZALEZ:  You noticed that.  I apologize.  I'm

15   sorry.

16   BY MR. GONZALEZ:

17   Q.   All right.  So you wanted -- I apologize.  Let me get back

18   to the point.  The therapists were overworked, correct?

19   A.   The therapists, yes, they had a lot of work.

20   Q.   With inappropriate patients, according to you, correct?

21   A.   According to Medicare guidelines, yes.

22   Q.   Of course, right.  Medicare guidelines, whatever.

23   Inappropriate patients like you told the jury earlier, right?

24             MR. MEDINA:  Objection, Your Honor.

25             THE COURT:  Don't make comments.  Ask your next

1    question.

2    BY MR. GONZALEZ:

3    Q.  All right.  Now, you stated to the jury -- you're not a

4    therapist, are you?

5    A.  I am an unlicensed therapist -- I was an unlicensed

6    therapist.

7    Q.  Is that a yes or a no?

8    A.  Could you ask your question again?

9    Q.  Are you a therapist?

10   A.  I was a therapist.

11   Q.  Okay.  Did you do therapy at HCSN?

12   A.  I did not do actual therapy at HCSN.

13   Q.  Correct.  You were management at HCSN.

14   A.  I was a document writer at HCSN.  I was not management.

15   Q.  Well, you weren't doing therapy, correct?

16   A.  Correct.

17   Q.  So you were doing something else, right?

18   A.  I was documenting false reports.

19   Q.  Documenting, all right.  And the only thing that -- the

20   only business that was going -- that was taking place at HCSN

21   was therapy; is that correct?

22   A.  That's what was supposed to be happening at HCSN.

23   Q.  Right.  Inappropriate therapy, but therapy, correct?

24   A.  Yes.

25   Q.  All right.  Thank you.  Thank you so much.

1          THE COURT:  Don't thank her for questions.  Are you

2     going to not thank her for questions you don't like?  Just ask

3     questions.

4     BY MR. GONZALEZ:

5     Q.  All right.  So now -- now, you stated earlier that

6     therapists, of which you did not do any therapy at HCSN, are

7     supposed to get up and leave and abandon their patients?  Is

8     that what you suggested to this jury?

9     A.  No, sir, I did not suggest that.

10    Q.  You didn't suggest it?

11    A.  They do not --

12    Q.  Well, did you state to this jury that people should not

13    have been taking care of their patients and should have walked

14    out, rather than complaining to Manny or you or whoever else

15    was running that place?

16    A.  No, sir, I did not suggest that.  There are proper ways of

17    leaving an employment site that could have been done.  I

18    suggested that if someone didn't want to commit fraud, they

19    could have worked elsewhere.

20    Q.  Well, but they were treating the patients at that time,

21    patients that you and Manny and whoever else was in charge was

22    assigning to them to take care of.  Correct?

23    A.  They -- excuse me, they were employed as therapists to run

24    therapy groups, and that is what they were choosing to do.

25    Despite the fact that they knew that the groups were wrong,

1    against Medicare guidelines, they chose to stay and run those

2    groups.  But yes, they did -- they did run the groups and they

3    were doing the best that they could in the situation, but that

4    does not make it right.

5    Q.  It sounds like you practiced that answer.  How many times

6    have you been practicing those answers?

7    A.  I have never said that sentence.

8    Q.  All right.  Is there a reason why you can't answer me yes

9    or no until like the end of your long answers?

10   A.  Because those questions aren't yes or no questions.

11   Q.  Of course.  Because you don't want to tell the ladies and

12   gentlemen of this jury that these people would not walk out on

13   their patients; is that correct?

14   A.  I don't think they would walk out on a patient, but no one

15   asked them to.

16   Q.  If it doesn't matter, why don't you just say they didn't

17   walk out on their patients?

18   A.  Because that implies something other than what we're

19   discussing.

20   Q.  What do you care what it implies or not?  You're just here

21   to answer questions, aren't you?  My questions, the

22   government's questions, are you not?

23   A.  Sir, implying that they would walk out on patients would

24   imply that they're not good people.  There's a difference

25   between being a good person and breaking the law.  You can be a

1   good person and still break the law and go against Medicare.

2   They're good people.  They were good to the patients.  That

3   does not change the fact that they were lying and telling

4   Medicare things that weren't happening, and that's fraud.

5   Q.  Of course.  Absolutely.  Thank you for the explanation.

6        THE COURT:  Don't thank her.  Ask the next question.

7   BY MR. GONZALEZ:

8   Q.  Are you arguing to the jury what it is that's going on?  Is

9   that what you're doing here today?

10  A.  Sir, I'm not arguing anything.

11  Q.  It sounds like you're arguing.

12  A.  Not to me.

13  Q.  Well, I'm asking you a question and you don't care about my

14  question, you want to go out on a little rambling answer --

15       MR. MEDINA:  Objection, Your Honor.

16  BY MR. GONZALEZ:

17  Q.  -- as to what everybody else (cross-talking) --

18       THE COURT:  Members of the jury, please go into the

19  jury room.

20  BY MR. GONZALEZ:

21  Q.  -- is that not correct?

22       THE COURT:  Please go into the jury room.

23      (Jury not present.)

24       THE COURT:  All right.  We're here outside the

25  presence of the jury, but everybody else is here.

1      Mr. Gonzalez, I thought I made it very clear, okay,

2  way before today and now several times during your

3  cross-examination, and I find it very strange, okay, this woman

4  never mentioned your client and specifically disavowed having

5  any contact with her, okay, and yet you use the opportunity to

6  cross-examine her to make one of the most low blow comments

7  I've ever heard in 34 years.  When a person says, "I didn't

8  want to live in South Florida anymore," you ask her, "Oh, you

9  didn't like South Floridians," as you're pointing to the jury.

10      And now you continue to ask questions and make

11  comments during your cross-examination after like three times

12  during this cross-examination.

13      So what are you trying to accomplish here with

14  somebody who hasn't even mentioned your client and specifically

15  disavowed any knowledge of her, other than making a totally

16  inappropriate comment to the jury and completely not following

17  my order not to make comments?

18      MR. GONZALEZ:  I apologize, Judge.  I'll move on.

19      THE COURT:  I thought at sidebar I made it clear to

20  you all, okay, that the next time there were comments, okay, I

21  was not going to have this conversation, I'm going to have a

22  contempt proceeding.  Do you really want me to do that?

23      MR. GONZALEZ:  No, I do not want you to do that,

24  Judge.

25      THE COURT:  Bring in the jury.

```
 1        (Jury Present.)
 2             THE COURT:  All right.  Thank you.  Be seated.
 3   BY MR. GONZALEZ:
 4   Q.  Ms. Haynes, you went up to --
 5             MR. GONZALEZ:  May it please the Court.
 6   BY MR. GONZALEZ:
 7   Q.  Ms. Haynes, you went up to North Carolina at the behest of
 8   Manny Gonzalez to start running the operation there?
 9   A.  No, sir, I did not.  I requested to be transferred to the
10   North Carolina office.
11   Q.  Okay.  And Mr. Gonzalez granted your transfer and sent you
12   up to North Carolina in order to -- so that you would run the
13   operation there?
14   A.  So that I could help them up there and work for him, yes,
15   he did.
16   Q.  Okay.  So you were not running the operation there.
17   A.  When he was out of town, yes, but he was ultimately always
18   in charge of everything that happened.
19   Q.  Okay.  Was Mr. Layman and Mr. Thoen also running the
20   operation in North Carolina?
21   A.  Again, they were helping Mr. Gonzalez and they were in and
22   out of the office.
23   Q.  Were they -- they were above you in the corporate
24   structure, correct?
25   A.  Yes, they were.
```

1    Q.   All right.   And Mr. Thoen and Mr. Layman would go there,

2    correct?

3    A.   Yes.

4    Q.   So when they were there, they had seniority over you over

5    what happened and what was done, correct?

6    A.   Yes, regardless of where they were, they always had --

7    Q.   Pardon me?

8    A.   Regardless of where they were, they were always supervising

9    me.

10   Q.   Okay.   All right.   That is Mr. Layman.   Did he have a

11   specific title in North Carolina?

12   A.   He was the clinical director.

13   Q.   The clinical director.

14   A.   Yes.

15   Q.   What did that entail?

16   A.   That entailed overseeing all of the clinical procedures

17   that happened, making sure that the groups were being

18   conducted, that patients were being treated well, if there was

19   an issue with a specific patient he was supervising, all of

20   that.

21   Q.   Did he participate in fraud in North Carolina?

22   A.   Yes.

23   Q.   What kind of fraud was it that Mr. Layman participated in

24   in North Carolina?

25   A.   I cannot say specifics.   What I can say is that they asked

1  me to run a group and he would sign the notes as if he had run

2  the group.  Beyond that, what he did or what Mr. Gonzalez asked

3  him to do, I cannot say.

4  Q.  Okay.  All right.  Now, would it be fair to say that

5  Mr. Layman knew that there was fraud going on in North

6  Carolina?  He was the clinical director there, and he

7  participated in it and advanced it, correct?

8  A.  He participated in it, yes.

9  Q.  Okay.  And obviously, he was signing off notes on things

10  that had nothing that he did not -- you know, I mean, that he

11  did not participate in, so he was committing fraud as well in

12  that regard?

13  A.  Yes.

14  Q.  Okay.  And he never treated any patients in North Carolina,

15  correct?

16  A.  That's correct, sir.

17  Q.  All right.  But he was the clinical director in North

18  Carolina.

19  A.  Yes, sir.

20  Q.  Okay.  Now, Mr. Thoen -- you know Mr. Thoen as well,

21  correct?

22  A.  Yes, sir.

23  Q.  All right.  Mr. Thoen also participated and committed

24  numerous acts of fraud in North Carolina, correct?

25  A.  He committed fraud, yes.

1  Q.  All right.  He forged doctors' signatures, correct?

2  A.  Yes.

3  Q.  He did?

4  A.  I saw him do it one time.

5  Q.  Okay.  He, you know, wrote out papers and fabricated GTNs

6  for nurses in North Carolina?

7  A.  Sir, I don't know all the specifics of what he did.  I can

8  only comment on what I saw.  But yes, there was fraud being

9  committed by everyone who worked there.

10  Q.  Okay.  All right.  Now, Mr. Thoen was in charge of the

11  reviews as well, was he not?

12  A.  Yes, sir.  He oversaw all the reviews.

13  Q.  Okay.  And it is correct that you, Dana, and Gema would

14  prepare a lot of the documents for the files from a template

15  that Gema made for you.

16  A.  No.  Gema never made a template for me.

17  Q.  Never made a template?

18  A.  There was a template provided for me when I was in my

19  so-called training.

20  Q.  I'm sorry, I didn't hear you.  There was a template

21  provided from who?

22  A.  There was a template provided for things when I was in my

23  training the first few weeks, but that was a general template

24  that was used so that all the documents would match from one

25  person to the other.  Otherwise, everyone would use different

1  formats.

2  Q.  All right.  On August 13th, 2012 -- I know you've been

3  through this a number of times, but on August 13th, 2012, did

4  you state to the government --

5            MR. MEDINA:  Objection, Your Honor.  Improper

6  impeachment.  It looks like he's going to be reading from the

7  report itself.

8            THE COURT:  Overruled.

9  BY MR. GONZALEZ:

10  Q.  Did you state to the government -- this is Mr. Reilly and

11  Mr. Quezada and trial attorney Bill Parente, did you tell them

12  specifically, Haynes -- I, Alexandra Haynes, fabricated missing

13  documents and patient files using templates you received from

14  Gema Pampin?

15  A.  I don't recall saying Gema Pampin.

16  Q.  Well, if I show it to you, do you think that might refresh

17  your recollection?

18  A.  Sir, I don't know what was written in those reports.  I do

19  know that Gema Pampin never gave me a template, but they were

20  provided by Health Care Solutions, yes, there were, and yes,

21  there were templates used.  But I don't think it matters who

22  gave it to me.  I'm letting you know there was a template that

23  was used for the documents that we used.

24  Q.  Okay.  Now, you stated that you used to receive documents

25  from Wilson; is that correct?

1    A.   I used to receive documents via fax from Florida.  Will

2    Wilson was the contact person.  Where those documents were

3    coming from, I cannot say.

4    Q.   Oh, okay.  All right.  So then you don't know where those

5    documents came from, whether Dana got them or Layman or Thoen

6    or anybody else, correct?

7    A.   Anybody who worked for Health Care Solutions could have

8    written them.

9    Q.   All right.  And you've never met this Wilson gentleman,

10   correct?

11   A.   No, sir.

12   Q.   All right.  Okay.  Now, you stated earlier that you had the

13   hope that you were going to get a sentence reduction.

14   A.   Yes, I did.

15   Q.   Okay.  Now, also, I understood -- and I didn't understand

16   this correctly, so I'm going to ask you a few questions about

17   it before I sit down.

18        You also stated to I believe Mr. Rabin that you were -- you

19   lied on a number of occasions to the government and that they

20   called you out on it.

21   A.   Yes, I did, and yes, they did.

22   Q.   Now, let me see if I understand this correctly.  You would

23   tell the government X and they would say that's not true,

24   that's a lie, and then you would change it to something else.

25   A.   No, it was never that direct, but the same way as you do,

1  show me things to recollect my memory, tell me, could this have

2  happened instead, I would remember -- these are events that

3  happened seven years ago.  Between then, I've worked in other

4  offices, I've had a lot of things happen, I've been in prison,

5  traumatizing events, and sometimes I don't remember details.

6  Sometimes things, just like you telling me something or the

7  other lawyers here, will -- I'll remember something maybe more

8  clearly, more vividly.  That does happen.

9  Q.  But I think you said that you lied.  I don't think you told

10  Mr. Rabin that you had -- you know, had a problem with your

11  memory.  You told him directly that you lied about a number of

12  things to the government and that they would call you out on

13  it.  Is that what you said this morning?

14  A.  I did.

15  Q.  Okay.  So that's different than the other attorneys showing

16  you things to refresh your recollection.  You said you lied.

17  Then you said something else.  And then everybody was happy

18  with whatever it is that you said in the second time.

19  A.  I don't know that they were happy with what I said, but I

20  said what I had to say.

21  Q.  The point is, you told them whatever it is eventually that

22  they wanted to hear.

23  A.  No.  I told them what had actually happened.

24  Q.  Well, they stopped as soon as they heard what they wanted

25  to hear, correct?

1    A.  I don't know why they stopped.  I don't know how -- I can't

2    say how they work, why they decide to accept things than

3    others.

4    Q.  But that's another common psychological situation, isn't

5    it?  You try to determine what it is that somebody wants to

6    hear by the questions that they ask, and eventually you come up

7    with what it is that they want to hear.  No?

8    A.  I'm not sure.  Perhaps my answers weren't long enough.

9    Perhaps they were looking for more details.  Perhaps -- I mean,

10   so many different things could have happened over all these

11   occasions.

12   Q.  Now, I understand that you're somewhat of a religious

13   person; is that correct?

14   A.  I don't know that I'm religious, but I have a lot of faith.

15   Q.  Okay.  And you also have hope.

16   A.  Of course, we all do.

17   Q.  And hope is what moves people forward.  Would you agree

18   with that?

19   A.  Yes.

20   Q.  All right.  So when you stated here today that you hope

21   that the government will file a motion and that you will

22   eventually get a Rule 35 and a reduction in your sentence, it's

23   because you hope to be reunited with your children soon.

24   A.  Of course.  I miss my children.  They're little.  They need

25   their mother.  So I need to do what's right to get home to

1    them.  I need to come here and tell the truth, as I stated in

2    my plea agreement, and have the hope that I'll be able to raise

3    my children.  I left my son when he was three months old.  Yes,

4    I want to get back to him.  I miss him every minute of every

5    day.

6    Q.  Okay.  So that based upon that hope, it is that you're

7    testifying here today in the hope that that testimony will move

8    the government into filing a motion and getting you back in

9    with your children.

10   A.  No, sir.  I'm here to testify to let this Court know the

11   truth of what happened.  What happens after that is not up to

12   me.  I may have hope in a good outcome, but my sole purpose

13   here is to tell the truth.  I'm done with the lying.  I want to

14   be honest.  I want my children to respect me.  And the only way

15   that I can achieve that is to tell the truth here.

16   Q.  Right.  Tell the truth here today.

17   A.  And everywhere from now on.  To not live the life that I

18   led for years and years, doing what I did at Health Care

19   Solutions.  Yes, I lied at work.  I lied when I worked at the

20   PHPs.  That does not make me an ongoing liar or this or

21   whatever label you want to give me.  I made a huge mistake.  I

22   pay for it every second of every day.  My children pay for it.

23       So am I going to come here and tell the truth and do what I

24   was required to do by my plea agreement?  Yes.  What the

25   government chooses to do after that, that's up to them.  I can

1    only hope that I will be back with my children.

2    Q.  You wouldn't lie for your children, Ms. Haynes?

3    A.  No, sir.  I would not lie for my children.  Lying has

4    gotten me away from my children.  Lying has kept me from seeing

5    my child grow up.  I will not lie anymore.

6    Q.  You won't lie to be close to your children, Ms. Haynes?

7    A.  Lying has kept me away from raising my children.  I will

8    not fall into that trap again.

9    Q.  Well, it was actually stealing and fraud that got you away

10   from your children.

11   A.  It was lying.  It was lying on documents, lying to

12   Medicare, which allowed someone else to use that information to

13   steal.  It was a whole scheme.  All of Health Care Solutions

14   participated in it.  And that lifestyle has cost me raising my

15   son, and I will not, absolutely will not fall back into that.

16   I will be the person that I have been my whole life up until I

17   started work in 2000.

18       When I started working in PHPs, I learned the system wrong,

19   and then I justified it, I accepted it, and I said, oh, it's

20   just documents, we're just going to write it, I'm going to go

21   along with this and make good money.  And I didn't look at the

22   future.  I didn't see myself having a child 11 years later and

23   another one two years later and having to walk away from him

24   when he was three months old.

25       So no, sir, I will not lie to make anyone happy.  I'm going

1  home to my children, whether it be today, in two months, or in

2  December of 2017, but I'm going with my head held up high so my

3  children will respect me for the rest of their lives.  I will

4  not lie to make anyone happy anymore.

5  Q.  So then to make money and to live a lifestyle, you will

6  lie.

7  A.  No, sir, I will not.

8  Q.  But you're telling us today that, today, you're telling us

9  the truth.

10  A.  I did that in the past, yes, and I was younger and I was

11  stupid and, yes, I lied.  And I will say that to you.  I went

12  in front of my judge and I said, Judge Altonaga, I lied, and

13  now I'm facing a 70-month jail sentence away from my family.

14     I have disappointed my parents, my brother, my entire

15  family.  So why would I repeat that mistake?  The point of

16  being in prison, the point of all this is to learn from your

17  mistakes and not hide in the corner and say, oh, no, they did

18  it, I didn't do it.  No, we all did it.  And I am willing to

19  take responsibility for that because I want to look both my

20  boys in the eye and say, look, I made a mistake and someday

21  you'll make a mistake too and it's okay, you move on.  I am

22  paying the consequences of it.  I fell for it one time.  I will

23  not do it again.

24  Q.  So then you're not lying here today.

25  A.  No, sir.

1    Q.  You're not lying.

2    A.  I'm being as honest as I can be today.

3    Q.  As you can be?

4    A.  Yes.  I'm not perfect.  I am human.  I don't remember

5    things from 2007 and 2006.  I barely tell you what I did, you

6    know, last week, despite my routine.  That's human, that's how

7    we all are.  Anyone in this room can say that.  But right now

8    I'm sitting here and I'm thinking of my two boys and I'm being

9    as honest as I can be, because that's the only thing that I can

10   do anymore, that when I get home, I can look at them and still

11   be the mom that I want to be.

12            MR. GONZALEZ:  Thank you.  Thank you very much.

13            No more questions, Judge.

14                       *   *   *   *   *

1    UNITED STATES OF AMERICA                    )
                                                 ) ss:
2    SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 12th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 1 - 27.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 19th day of November, 2014.

16

17

                    /s/ Carly Horenkamp
18
                    Carly L. Horenkamp, RMR, CRR
19                  Certified Shorthand Reporter

20

21

22

23

24

25