```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION
               CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,              NOVEMBER 7, 2014
                                       1:47 P.M.
                  Plaintiff,



        vs.



ROGER ROUSSEAU, et al.,

                  Defendants.       PAGES 1 THROUGH 22
_____

                        DAY 5
             EXCERPT OF CRIMINAL JURY TRIAL
      (CROSS-EXAMINATION OF GEMA PAMPIN BY MR. PRIETO)
         BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC  20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:      Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)        LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                        55 Merrick Way
                        Suite 212
                        Coral Gables, Florida  33134


FOR THE DEFENDANT:      Mr. Frank A. Prieto, Esq.
(Liliana Marks)         LAW OFFICE OF FRANK A. PRIETO, P.A.
                        One Northeast 2nd Avenue
                        Suite 200
                        Miami, Florida  33132


FOR THE DEFENDANT:      Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)           LAW OFFICES OF JUAN DE JESUS GONZALEZ
                        10631 N. Kendall Drive
                        Suite 150
                        Miami, Florida  33176


FOR THE DEFENDANT:      Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)           LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                        Courthouse Tower
                        40 NW 3rd Street
                        Suite 200
                        Miami, Florida  33128


COURT REPORTER:         Carly L. Horenkamp, RMR, CRR
                        U.S. DISTRICT COURT
                        400 N. Miami Avenue, Room 12-3
                        Miami, Florida  33128
                        (305) 523-5138
```

**I N D E X**

*Certificate* ----------------------------------------------- 22

**W I T N E S S**

ON BEHALF OF THE GOVERNMENT:                          PAGE
GEMA PAMPIN
CROSS-EXAMINATION BY MR. PRIETO                           4

```
 1        (Before Jury, 1:47 p.m.)
 2             THE COURT:  All right.  Mr. Prieto.
 3             MR. PRIETO:  May it please the Court.  Ladies and
 4    gentlemen of the jury.
 5                          CROSS-EXAMINATION
 6    BY MR. PRIETO:
 7    Q.  Good afternoon, ma'am.
 8    A.  Good afternoon.
 9    Q.  My name is Frank Prieto.  I represent Ms. Marks.  Now, just
10    to follow up on a couple of things here.  You did in fact forge
11    signatures of these therapists, correct?
12    A.  Yes.
13    Q.  Okay.  And -- but you indicated you're not sure whether you
14    cut and pasted or whether you just forged them.
15    A.  Exactly.
16    Q.  And you talked about that at length with Mr. Rabin, about
17    tracing them and then getting -- so you got pretty good at it,
18    right?
19    A.  That is correct, sir.
20    Q.  Okay.  Now, you also just testified that the therapists
21    were able to congregate in certain areas, and these were where
22    discussions were apparently had?
23    A.  In our office.
24    Q.  Right.  Do you -- do you recall that Ms. Feas, her nickname
25    was the Wicked Witch of the East?
```

```
1    A.  There wasn't -- there were several names, yes.

2    Q.  What other names were there?

3    A.  Fifi was one.  There were just -- there were different

4    names.

5    Q.  Anything derogatory?

6    A.  The Wicked Witch, that would be.

7    Q.  Is that the only one?

8    A.  Yeah, I remember that.

9    Q.  Okay.  And isn't it true she got that because she was kind

10   of -- kind of mean?

11   A.  She had a difficult personality, yes.  I again personally

12   never had any issues with her, but --

13   Q.  Okay.  And isn't it true in fact that the therapists would

14   show up to do therapy, and then they were kind of ushered out

15   like cattle?

16   A.  They were ushered out?

17   Q.  Right.

18   A.  No, I don't remember --

19   Q.  You don't recall --

20   A.  -- them being ushered.

21   Q.  -- Ms. Feas telling them, this is not a social place, that

22   they need to get out?

23   A.  No, I don't recall.

24   Q.  That wouldn't happen?

25   A.  No, I don't recall that.
```

1   Q.   You don't recall that?  Is that because you're sitting at

2   your desk forging notes all the time?

3   A.   I don't recall because I don't remember her saying that.

4   Q.   And let's look -- and we can look at Defendant's Exhibit A

5   up on the screen here.  Your desk is located to the left as you

6   come in, correct?

7   A.   Yes.

8   Q.   Okay.  And your desk is -- is that accurate where your desk

9   was located?

10   A.   Yes, that is.

11   Q.   Okay.  And you -- you sat facing the wall; isn't that

12   correct?

13   A.   Yeah, there was a wall in front.

14   Q.   There was a wall.  You would face the wall because you're

15   focused on forging thousands of notes, right, over the -- over

16   the years?  Thousands.

17   A.   When I was doing that, but I got up from my desk quite

18   frequently.

19   Q.   Okay.  And again, you know, you would just walk by these

20   therapy rooms.  You never sat in to a session with Ms. Marks,

21   did you?

22   A.   I did not, but the door was left open on several occasions

23   since the room was so full.  So I could hear sometimes.

24   Q.   Okay.  Now, you also testified when -- I think to several

25   of the attorneys that you didn't have any conversations with

1    Ms. Palmero about this case, right?

2    A.   About this case, no.

3    Q.   No.  But isn't it true you told the government that she

4    knew you had a USB, that you had given a USB to the government?

5    She knew that, right?

6    A.   That -- I'm sorry?

7    Q.   Ma'am --

8    A.   Could you repeat the question, please?

9    Q.   Sure.  Isn't it true that you discussed with the government

10   that Ms. Palmero knew, when you're over at Coleman, that you

11   had given the government a USB?

12   A.   She knew.

13   Q.   She knew, right?

14   A.   I think she knew.  I don't know.

15   Q.   So how did you -- well, how did you know that she knew?

16   Because she told you, right?

17   A.   That she knew?

18   Q.   Yeah.

19   A.   Yes.

20   Q.   She told you.

21   A.   Yes.

22   Q.   So you did talk to her about this case, and you lied to the

23   jury.

24   A.   No, I did not.

25   Q.   Ma'am, if she told you she gave a USB, isn't that talking

```
1    about this case?

2    A.  That's a comment that she made --

3    Q.  The comment --

4    A.  -- but we did not discuss --

5    Q.  Did she walk by you --

6    A.  -- specifics about the case.

7    Q.  -- real quick and say --

8         THE COURT:  Hold on a second.  Let her finish her

9    answer.

10        MR. PRIETO:  I'm sorry.  I apologize, Judge.

11   BY MR. PRIETO:

12   Q.  Did she just walk by you real quick, hey, I know you gave

13   the USB, and then walk away?

14   A.  No, sir.

15   Q.  So you talked to her about the case, didn't you?

16   A.  When we first spoke, she mentioned that she got the

17   discovery and that she knew that I had turned in a USB, but I

18   did not discuss it further.  And that is why I did not spend

19   much time with Ms. Palmero at Coleman.  I tried to stay away

20   from her.

21   Q.  Okay.  But you've been cellmates with her since then,

22   right?

23   A.  I've been cellmates with her?

24   Q.  Right.

25   A.  At Coleman?
```

1    Q.  No.  Here, ma'am.  Here.

2    A.  The first night that we were put on the same room, and we

3    moved right away the second day.  Unfortunately, we have no

4    control over where we're placed when we get here.  It's

5    receiving and discharge and we arrived together.

6    Q.  Ma'am, I'm going to -- I'm going to ask you again what

7    Mr. Rabin asked you.  Isn't it true that you told the

8    government that Ms. Feas ran the show?

9    A.  I do not recall using --

10   Q.  Okay.

11   A.  -- those words --

12   Q.  Would it --

13   A.  -- so I cannot say that.

14   Q.  Would it help refresh your recollection if I showed you a

15   document?

16   A.  It may, yes.

17          MR. PRIETO:  Okay.  May I approach, Judge?

18          THE COURT:  Yes.

19   A.  Yes, I do see that.

20   BY MR. PRIETO:

21   Q.  Okay.  So you did say that, that Ms. Faes ran the show in

22   the East location, right?  That's who you meant?

23   A.  It says Alina Faes was running the show.

24   Q.  Okay.  Thank you, ma'am.

25   A.  But as I mentioned earlier, she is the clinical coordinator

1   and the one that was the supervisor there.  I just did not

2   recall the words.

3   Q.  You didn't recall it, but now you do, right?

4   A.  The specific words -- well, I don't recall saying them.  I

5   must have said them if they're there, but...

6   Q.  Ma'am, the government showed you some group therapy notes

7   that you indicated were copied or cloned, correct, regarding

8   Ms. Marks?

9   A.  Yes.

10  Q.  And that was I think a patient Steve Abbott that you

11  testified to?

12  A.  Today, notes for Steve Abbott?

13  Q.  You didn't testify today about Steve Abbott?

14  A.  I didn't see notes about Steve Abbott.  You just mentioned

15  notes.  I saw a picture of Steve Abbott --

16  Q.  Okay.

17  A.  -- and we talked about him --

18  Q.  Right.

19  A.  -- but I did not see notes about Steve Abbott.

20  Q.  Okay.  Oh, that's the gentleman you said thought he was an

21  FBI agent, right?

22  A.  Yes, that is correct.

23  Q.  Is he an FBI agent?

24  A.  Not as far as I know.

25  Q.  Does he know the FBI agent over there?

1  A.  I'm sorry?

2  Q.  Does he know the gentleman sitting at the table over there?

3  A.  I would not be able to answer that question.

4  Q.  It wouldn't -- it wouldn't be unusual for somebody who is

5  diagnosed with schizophrenia to have some kind of delusions

6  like that, would it?

7  A.  It would not be unusual, but they would not benefit from

8  the PHP treatment.

9  Q.  Did you ever conduct any therapy sessions with Mr. Abbott?

10  A.  Did I conduct -- no, I did not.

11  Q.  Okay.  And isn't it true -- I mean, you're a licensed

12  therapist, right?

13  A.  I was licensed.

14  Q.  Okay, and --

15  A.  Not any longer.

16  Q.  Right, not a doctor --

17  A.  I'm not licensed any longer.

18  Q.  But you have -- you have a master's degree?

19  A.  I do have a master's degree.

20  Q.  Okay.  So going back to your studies -- and I think you

21  indicated your mom put you through school, your family put you

22  through school?

23  A.  No, I paid.  I never indicated that and, no, I had school

24  loans that I paid for my schooling.

25  Q.  You -- you didn't previously testify at another hearing

1  about how your parents put you through school, your mom put you

2  through school?

3  A.  Through private school, through high school, yes, but I

4  paid for my master's degree.

5  Q.  Okay.  And that you were ashamed about what you've done?

6  A.  Yes, I am, very much so.

7  Q.  So your mom did help you pay for school?

8  A.  Up to college, yes.

9  Q.  And during your studies and through your certifications you

10  know that obviously you can't diagnose or treat a patient

11  without having a face-to-face with them, right?

12  A.  That is correct.

13  Q.  Okay.  Prior to becoming -- working at HCSN -- well, let's

14  go back.  What did you do in high school?  Did you work in high

15  school?

16  A.  I worked in a clothing store --

17  Q.  In a clothing store.

18  A.  -- my junior and senior year.

19  Q.  Okay.  And after that, did you work while you were doing

20  college?

21  A.  I worked in a doctor's office temporarily as a secretary.

22  I worked in a psychologist's office as well as a secretary for

23  a while.

24  Q.  Okay.  And while you were at those jobs and there was

25  people that worked with you, did they ever complain about their

1    job?

2    A.  I don't remember.

3    Q.  You don't remember?

4    A.  That was several years ago.  If they complained about --

5    people generally complain about their jobs, but I don't

6    remember --

7    Q.  People generally --

8    A.  -- a specific time.

9    Q.  -- complain about their job, right?

10          THE COURT:  Hold on.  Let her finish her answer.

11          MR. PRIETO:  Sorry, Judge.

12   A.  Just, yeah, people generally complain, but I don't -- I

13   can't tell you I remember that back then.

14   BY MR. PRIETO:

15   Q.  And so it wouldn't be uncommon if some of the therapists

16   complained about their patients, right?

17   A.  No, it would not be uncommon.

18   Q.  Now, let's talk about -- I don't have what government

19   exhibit it was, but the check that you were shown --

20   A.  Yes.

21   Q.  -- that was -- I just wrote the check number down, Check

22   No. 5200.  The check the government showed you, right, it had a

23   memo in the -- it had something written in the memo section,

24   correct?

25   A.  Yes, it did.

```
 1    Q.  It said notes and review --

 2    A.  Notes and review.

 3    Q.  -- is that correct?

 4    A.  That is correct.

 5    Q.  And that clearly indicated that was for notes, right?

 6    A.  And review, yes.

 7    Q.  Okay.  Do you know, sitting here today, whether or not that

 8    check is from forging, faking notes for North Carolina or

 9    Miami?

10    A.  I do not know because it said notes and review.

11    Q.  But --

12    A.  So I don't know which review, if it was a review from the

13    West or a review -- or for North Carolina or for the East.  I'm

14    not -- I would need to see the sheet that's prepared -- that we

15    prepared beforehand specifying everything for those dates.

16    Q.  Right.  So you have no idea.

17    A.  I do not know, no.

18    Q.  And that's because over the years you forged thousands of

19    documents, right?

20    A.  Yes, I did.

21    Q.  Both Dr. Rousseau, right?

22    A.  Yes.

23    Q.  Ms. Crabtree?

24    A.  Whatever signature needed to be done.  If it needed to be

25    submitted and it needed to be completed, I did.
```

1  Q.  Right.  Because you were one of Manny's girls, right?

2  A.  Again, I do not remember being called Manny's girls, but I

3  did work for Health Care Solutions and Manny was the owner,

4  yes.

5  Q.  If somebody else came in and testified that you were one of

6  Manny's girls, you wouldn't dispute that, right?

7  A.  I don't know.  How would I dispute it?  I don't know where

8  you're getting that.  I was not called -- referred to as

9  Manny's girls as far as I know.

10  Q.  Well, you weren't Manny -- you testified you're not -- you

11  weren't Manny's girl, right?  You weren't his -- his girl on

12  the side.

13  A.  No.  You were just talking about Manny's girls, Dana and

14  myself, and that is what I was referring to.

15  Q.  Okay.  Would -- would Ms. Feas be one of Manny girls --

16  Manny's girls?

17  A.  I don't -- I never remembered that terminology being used

18  of "Manny's girls," so I cannot say that.

19  Q.  Ma'am, isn't it true that you invent stories?

20  A.  That I invent stories?  Yes, I have said that I fabricated

21  stories and made up stories.

22  Q.  You're -- you're a liar, right?

23  A.  Yes, I am.

24  Q.  You're a story teller?

25  A.  Yes.

1   Q.  And you got pretty good at that, didn't you?

2   A.  I did get good at it, yes.

3   Q.  And in fact, you would get together with Ms. Gonzalez to

4   get your stories straight, right?

5   A.  To get our stories straight on a chart --

6   Q.  On whatever.

7   A.  -- you're talking about?  Because, I mean, as I mentioned

8   earlier, we each had our own caseload.  I didn't have to

9   discuss with her what I was doing on my case.  We knew what to

10  do.

11  Q.  Is it your testimony, ma'am, that you never got together

12  with Ms. Gonzalez to get your stories straight?

13  A.  I don't know what story you're referring to.  If you could

14  be specific I may be able to answer your question correctly.

15  Q.  Talk about a patient file, to make sure that the patient

16  file was doctored up.

17  A.  We discussed patients.  We knew -- we knew patient files

18  were doctored up.  But as I said, I did mine, she did hers.  So

19  I didn't have to consult with her over what I was writing.  Did

20  we discuss in general the fabrication of the documents?  Yes,

21  we did.

22  Q.  Would it refresh your memory, ma'am, to show you a report

23  wherein, in fact, you did say that?

24  A.  Sure.

25          MR. PRIETO:  May I approach?

```
 1          THE COURT:  Yes.
 2   A.  Yes, I see that.  We would discuss, as I mentioned -- as I
 3   said, we would discuss charts and files and everything in
 4   general.  And what I was writing specifically, if it was my
 5   patient and it was only my chart, I didn't have to discuss that
 6   one with her.  Now, if I did one and then she followed up on
 7   another one --
 8   BY MR. PRIETO:
 9   Q.  Ma'am, I didn't ask you a question yet.
10          THE COURT:  Let her finish her answer.
11          THE WITNESS:  Thank you, Your Honor.
12          THE COURT:  You did ask her a question.  Go ahead.
13   A.  If I'm doing one chart and then that chart was requested by
14   her, it was requested again and then she worked on it after,
15   then we may have needed to confer.  But if it was mine only, I
16   did not have to confer with her on what I was doing.
17   BY MR. PRIETO:
18   Q.  Ma'am, the question was:  Did you ever meet with
19   Ms. Gonzalez to get your stories straight?
20   A.  In this circumstance we discussed, yes, what was happening
21   in the case.
22   Q.  In fact, ma'am, you've had 18 months in jail, right?
23   A.  Yes, I have.
24   Q.  And you've had 18 months to get your story here today
25   straight; isn't that true?
```

1  A.  To get my story here straight?  No.  The story here is the

2  story that occurred.  The 18 months had nothing to do with

3  that.  I had to think about a lot of other things in those 18

4  months.

5  Q.  Great.  Let's talk about that, ma'am.

6  A.  Such as my remorse --

7  Q.  Right. You --

8  A.  -- and my shame.

9  Q.  You never saw Ms. Marks create a fake note, correct?

10 A.  Did I never see her create a fake note?

11 Q.  You never saw that, right?

12 A.  I saw her create -- saw her print documents that she had --

13 Q.  Ma'am, the question is:  Did you ever see her fake a note?

14        MR. GOODYEAR:  Your Honor, the witness wasn't finished

15 answering the question.

16        THE COURT:  Did you finish your answer?

17        THE WITNESS:  No.

18        THE COURT:  All right.  Go ahead.

19 A.  Could you repeat the question, please?

20 BY MR. PRIETO:

21 Q.  It's a fact you never saw Ms. Marks or any of these other

22 therapists fake any therapy notes.

23 A.  See her sit down and write it at the moment and then -- no,

24 I reviewed them after --

25 Q.  Right.  So you're assuming --

1    A.  -- and see they were fabricated.

2          THE COURT:  Let her finish her answer.

3    A.  I reviewed the charts after and see that the notes are not

4    accurate.

5    BY MR. PRIETO:

6    Q.  Ma'am --

7    A.  And they were made by her.

8    Q.  Ma'am, you testified you never stood into her sessions.

9    You wouldn't know if it's accurate or not.

10   A.  Well, as I said, her office was right in front of me.  I

11   could see what happened and the door was open on many

12   occasions, so I could hear what was actually occurring in the

13   sessions.

14   Q.  Ma'am, do you have some kind of super human hearing?

15   A.  No, sir, I do not.

16   Q.  You can hear through glass doors?

17   A.  No.  Our door would be open as well.  If not, I would not

18   be hearing.

19   Q.  Ma'am, you have problems with codependency, don't you?

20   A.  Yes, I do.

21   Q.  Okay.  And you've testified to that in the past, right?

22   A.  I'm not sure if I've testified to it, but I do have it.

23   Q.  Okay.  And you felt that you were -- Mr. Gonzalez, I guess,

24   took advantage of you?

25   A.  I felt he knew what to say in order to get everybody to do

1   what was necessary.

2   Q.  And in fact, you went to some kind of therapy to help you

3   with your codependency?

4   A.  I went to a couple of 12-step program session -- a couple

5   of sessions for 12-step of codependency, yes, I did.

6   Q.  Okay.  And you realize you have codependency issues and

7   that Manny Gonzalez, you were codependent with him, right?

8   A.  I was codependent, yes.

9   Q.  Right.  And you wanted to please him, right?

10  A.  Yes.

11  Q.  And you wanted to make him happy, right?

12  A.  Yes.

13  Q.  And in return you got paid, right?

14  A.  Yes, I did.

15  Q.  And you made lots of money, right?

16  A.  Yes, I did.

17  Q.  Okay.  And now you're codependent on the government, right?

18  A.  No, I'm not.

19  Q.  You're not.

20  A.  How am I codependent on the government?

21  Q.  You want to make them happy, don't you?

22  A.  No, sir.  I'm trying to just get through this day by day.

23  Q.  Ma'am, isn't it true they're the gatekeeper to your

24  sentence reduction?  Isn't that true?

25  A.  I do not know that, sir.  There is a possibility, as I said

1    earlier, of me getting a reduction.

2    Q.   Ma'am, you don't know --

3    A.   Whether they give it or not --

4    Q.   The question is, ma'am:  Do you know that they're the

5    gatekeeper to your sentence reduction?

6    A.   And my answer would be, yes, I know that they are the ones

7    that can give me a reduction at one point.

8    Q.   Right.  The only ones, right?

9    A.   Yes.

10            MR. PRIETO:  Okay.  I have nothing further.

11            Well, Judge, let me have a second.  I have no further

12   questions.

13                        *   *   *   *   *

```
 1  UNITED STATES OF AMERICA                    )
                                                ) ss:
 2  SOUTHERN DISTRICT OF FLORIDA                )

 3

 4              C E R T I F I C A T E

 5      I, Carly L. Horenkamp, Certified Shorthand

 6  Reporter in and for the United States District Court for the

 7  Southern District of Florida, do hereby certify that I was

 8  present at and reported in machine shorthand the proceedings

 9  had the 7th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 1 - 22.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 19th day of November, 2014.

16

17

                   /s/ Carly Horenkamp
18
                   Carly L. Horenkamp, RMR, CRR
19                 Certified Shorthand Reporter

20

21

22

23

24

25
```