```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
                        MIAMI DIVISION
                CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,             NOVEMBER 10, 2014
                                      3:54 P.M.
             Plaintiff,


     vs.


ROGER ROUSSEAU, et al.,

                  Defendants.        PAGES 1 THROUGH 18
_____

                            DAY 6
               EXCERPT OF CRIMINAL JURY TRIAL
        (CROSS-EXAMINATION OF DANA GONZALEZ BY MR. PRIETO)
           BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC  20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:      Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)        LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                        55 Merrick Way
                        Suite 212
                        Coral Gables, Florida   33134


FOR THE DEFENDANT:      Mr. Frank A. Prieto, Esq.
(Liliana Marks)         LAW OFFICE OF FRANK A. PRIETO, P.A.
                        One Northeast 2nd Avenue
                        Suite 200
                        Miami, Florida   33132


FOR THE DEFENDANT:      Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)           LAW OFFICES OF JUAN DE JESUS GONZALEZ
                        10631 N. Kendall Drive
                        Suite 150
                        Miami, Florida   33176


FOR THE DEFENDANT:      Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)           LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                        Courthouse Tower
                        40 NW 3rd Street
                        Suite 200
                        Miami, Florida   33128


COURT REPORTER:         Carly L. Horenkamp, RMR, CRR
                        U.S. DISTRICT COURT
                        400 N. Miami Avenue, Room 12-3
                        Miami, Florida   33128
                        (305) 523-5138
```

# I N D E X

*Certificate* ------------------------------------------------- 18

**W I T N E S S**

ON BEHALF OF THE GOVERNMENT:                                    PAGE
DANA GONZALEZ
CROSS-EXAMINATION BY MR. PRIETO                                    4

```
 1          (Before Jury, 3:54 p.m.)
 2              THE COURT:  All right.  Mr. Prieto.
 3              MR. PRIETO:  May it please the Court.  Ladies and
 4   gentlemen of the jury.  I think I'm going to stab myself with
 5   Mr. Gonzalez's pen here.
 6                         CROSS-EXAMINATION
 7   BY MR. PRIETO:
 8   Q.  Good afternoon, ma'am.  We've never met before, right?
 9   A.  Right.
10   Q.  Okay.  My name is Frank Prieto.  I represent Ms. Marks,
11   okay?
12   A.  Yes.
13   Q.  All right.  Let's -- one thing about Ms. Marks
14   specifically, okay, try to remember, the -- she never taught
15   the fourth group at Health Care Solutions Network, correct?
16   A.  Well, it wasn't that she never.  There was a time I believe
17   she did.
18   Q.  What time would that have been?
19   A.  I know it was until 1:30, I believe, the groups ran --
20   Q.  No, ma'am.  When?
21   A.  Oh, when.
22   Q.  I'm sorry.  When?  Because you're just being --
23              THE COURT:  Don't -- what's your question?
24              MR. PRIETO:  I'm not going to comment, Judge.  I
25   caught myself.
```

```
 1            THE COURT:  You're educable also?
 2   BY MR. PRIETO:
 3   Q.  The dates, when did this fourth group, when did this occur?
 4   A.  I can't remember.  But I know at the beginning it was three
 5   groups, and then at some point we were billing for four groups
 6   and that group was after lunch.
 7   Q.  So is it fair to say that the majority of the time she only
 8   did three groups, right?
 9   A.  I don't know when that changed.  I know at the beginning it
10   was three.  At some point it became four groups a day.
11   Q.  Okay.  So you sitting here today, you can't tell me when
12   that occurred.
13   A.  No, I'm sorry.
14   Q.  Okay.  So what time did the third group end?
15   A.  Before lunch.
16   Q.  Before lunch, right?
17   A.  Three groups before lunch and one group after lunch.
18   Q.  And then after -- well, ma'am, the third group ended before
19   lunch, correct?
20   A.  Before lunch.
21   Q.  Okay.  I'm not talking about the fourth group.  The third
22   group ended before lunch.
23   A.  Correct.
24   Q.  Okay.  Now, let's talk about these pizza parties, okay?
25   When did they occur?
```

```
 1    A.   That was Fridays.
 2    Q.   Okay.  And correct me if I'm wrong, but most people eat
 3    pizza for lunch, right?
 4    A.   Well, not at Health Care Solutions.  We had a menu
 5    throughout the week, but because the menu was mostly for
 6    Hispanics, we decided to have like pizza on Friday for the
 7    English speaking patients.
 8    Q.   Okay.  Would they eat pizza for lunch?
 9    A.   Yes.
10    Q.   Okay.  Fair to say, if Ms. Marks wasn't there, right,
11    because the third session ended before lunch, that she wouldn't
12    be there for the pizza parties, right?
13    A.   She was there for the pizza parties sometimes.
14    Q.   Okay.  And let's -- if you could take a look at the
15    diagram, the layout of the office.
16    A.   Yes.
17    Q.   Okay. And your office is here to the left -- I guess to my
18    left here, I just circled it?
19    A.   Yes.
20    Q.   That's your desk?
21    A.   Yes.
22    Q.   Okay.  And in fact, your desk faced the wall this way,
23    correct?
24    A.   There was a window, and I could see Alina's office.
25    Q.   Right.  And --
```

1  A.  Yeah.
2  Q.  So there's a window between you and Ms. Feas, right?
3  A.  Uh-huh.
4  Q.  And that window would be open most of the time?
5  A.  No, no.  It was glass.  I'm sorry, not a window, just a
6  glass.
7  Q.  But would it slide open and closed?
8  A.  No.
9  Q.  No, just a glass.
10 A.  Uh-huh.
11 Q.  Just like a window but an interior window?
12 A.  Exactly.
13 Q.  Okay.  And your desk would face that window, right?
14 A.  Yes.
15 Q.  Okay.  So when you testified that you could see into
16 Ms. Marks' room, you're basically just looking through your
17 door into her door, right?
18 A.  Yes.
19 Q.  Okay.  And so you would be -- and please correct me if I'm
20 wrong -- I'm going to draw a line of your line of sight, that
21 would be maybe one-fourth or one-fifth of the corner of her
22 room?
23 A.  Sure.
24 Q.  So you couldn't see what was going on in the rest of the
25 room, right?

1   A.  No.
2   Q.  You talked about some renting of movies.  That you would
3   rent these movies?
4   A.  Right.
5   Q.  Okay.  Where did you rent them from?
6   A.  It was a video store on the same shopping center.  We
7   walked, and we rented the movies.
8   Q.  Okay.  What was the name of the store?
9   A.  I can't remember right now.
10  Q.  Okay.  What -- you had a membership there?
11  A.  I don't recall, but I know we rented it weekly.
12  Q.  Okay.  Well, you would agree with me, in order to rent a
13  movie you had to have some kind of membership with this video
14  store, right?
15  A.  Probably, but it was small, so yeah, probably had a
16  membership.
17  Q.  And it would have been rented under your name, ma'am?
18  A.  I think so.
19  Q.  And what years did you rent movies?
20  A.  I'm sorry?
21  Q.  What years did this occur that you rented movies?
22  A.  Oh, it happened -- I mean, I can't tell you specific time,
23  but it happened over a long period of time.
24  Q.  Well, you started working there in '05, you said?
25  A.  '05.

1  Q.  And you left in 2010?
2  A.  '10.
3  Q.  Okay.  So during those five years, did you -- was it the
4  first year that you started renting movies?
5  A.  Yeah, probably.
6  Q.  Ma'am, I'm not asking you probably.  I want to know if you
7  know.
8  A.  I can't remember.  I know I rented movies all the time like
9  for Fridays.  I remember we had to walk, get a movie, you know,
10  choose what movie.
11  Q.  What -- well, give me a list.  What movies did you rent?
12  A.  Comedies mainly.
13  Q.  What movies specifically?  The title, ma'am, if you know.
14  A.  Oh, like -- I can't remember right now.  I know it was
15  comedies.  Not cartoons, but mainly comedies.  We didn't pay
16  that much attention, as long as they were G-rated.  It was
17  fine.  Sometimes even the therapists brought a movie that they
18  thought, you know, it was G-rated, no cursing, nothing, no sex,
19  whatever, they would bring the movie themselves.
20  Q.  Ma'am, what movie?  Give me the name.
21  A.  I don't know.  I never watched it.  I mean, I can't
22  remember right now.
23  Q.  You never watched it because you were never in the group
24  therapy sessions, correct?  You testified you were never there.
25  A.  Of course, no, huh-uh.

1  Q.  So you don't know what happened in these group therapy
2  sessions, fair to say?
3  A.  Well, the doors were not soundproof.  I could see and I
4  could hear they were playing a movie.  And the patients would
5  be coming in and out, like I said.  The therapists would be
6  stepping in and out.  They were not sitting there watching the
7  movie.
8  Q.  Ma'am, you made a comment about a patient named Steven
9  Abbott, correct?
10 A.  Yes.
11 Q.  Okay.  You seem to have a pretty good memory of him, right?
12 A.  I know, because he was admitted for so long.
13 Q.  Right.  And you said he was a schizophrenic, correct?
14 A.  Yeah, I believe so.
15 Q.  Would it be unusual for a schizophrenic to get up and down
16 during a group therapy session?
17 A.  I'm sorry?
18 Q.  Would it be unusual for a schizophrenic to have a short
19 attention span?
20 A.  Well, I mean, sometimes he sat there.  There were days when
21 he didn't, and that was normal for him.  So he obviously did
22 not belong in the PHP.  That setting was not appropriate for
23 him.
24 Q.  Ma'am, and who makes the decision whether a patient is
25 appropriate or not?

1  A.  It should have been the doctor, but it was actually us
2  making that decision.  And to us everybody met criteria, we
3  made it happen.  I mean, we wrote and fabricated everything so
4  that every patient met criteria when they actually didn't,
5  so...
6  Q.  That's right.  You and Ms. Gonzalez fabricated everything,
7  right?
8  A.  Me and Ms. Pampin.
9  Q.  And you testified you got really good at it.
10 A.  I'm sorry?
11 Q.  You said you got really good at it, right, with
12 Ms. Gonzalez?
13 A.  Yes.
14 Q.  And you -- how many community mental health centers did you
15 fabricate notes for?
16 A.  Throughout the years?  Like ten.
17 Q.  And you said you fabricated all the fake group therapy
18 notes for North Carolina, correct?
19 A.  The absent patients, yes.
20 Q.  And, in fact, you ended up moving up to North Carolina,
21 correct?
22 A.  Yes.
23 Q.  Let me ask you:  With all these group therapy notes, it's
24 in the thousands, isn't it?
25 A.  Yeah.

1  Q.  Okay.  And you can't specifically point to one note or look
2  at it and say, yeah, that one's fake, that one's real, right?
3  You couldn't do that.
4  A.  I could.  If I looked at the quote and it was very short,
5  I'd know that one's a cookie cutter.  If it was for review, I
6  can tell because it was lengthy.
7  Q.  Okay.  So it's your testimony that if it was short, it's
8  fake?
9  A.  Most probably.
10 Q.  And that would be the notes that you faked, right?
11 A.  Everybody did fake notes.  I mean, everybody went
12 through -- to their pool of notes.
13 Q.  Ma'am, I know that's your testimony, that everybody did it.
14 I get it.  I'm asking you what you did.
15 A.  I did it too.
16 Q.  I'm asking you what you did.
17 A.  I did it too, uh-huh.
18 Q.  Okay.  What kinds of phrases did you make up?  Give me an
19 example.
20 A.  If they were cookie cutter, I didn't care.  I'm feeling
21 good.  Everything is all right.  I'm taking my medication.  If
22 it was review, then you would get -- first of all, you would
23 describe the symptoms, like patient presented with sad mood,
24 tearful, anxious.  Then you would go into the quote and it
25 would be a lengthy quote, I'm not sleeping at night.  I need to

1  see the doctor.  I need some medication to go to sleep.  I'm
2  tired right now.  So it would be like a lengthy note.
3       And then at the bottom you would describe progress, what
4  kind of progress was the patient making.  If it was cookie
5  cutter, everything was the same and we didn't bother to change
6  the quote or the symptoms or we didn't bother to show progress
7  or anything like that, so...
8  Q.  So basically if it was for review or any -- any outsider
9  coming in would look at these group therapy notes and they'd
10 look real, right?
11 A.  No.  If any outsider actually walked in the office and
12 grabbed a chart, they could tell 'cause one note might be
13 similar to the next one or ten notes down.  If they were not
14 fixed, then they were not appropriate.
15 Q.  Right.
16 A.  So if somebody came in --
17 Q.  Right.
18 A.  -- that was a different story.
19 Q.  Correct, ma'am.  And it was your job to fix them, right?
20 A.  When the -- when we went into review.
21 Q.  Right.  And you and Dana -- we've already heard that
22 testimony, you and Dana were the fixers, right?
23 A.  I'm sorry?
24 Q.  You and Ms. Gonzalez -- I'm sorry, Ms. Pampin.
25 A.  Oh, right, right.  I'm Gonzalez, yes.

```
 1   Q.  Now, you -- ma'am, where are you currently housed?
 2   A.  Here at FDC Miami.
 3   Q.  And before you came to FDC, where were you?
 4   A.  North Carolina.
 5   Q.  Did you ever share a cell with any of the other persons
 6   indicted?
 7   A.  Here?  Yes.
 8   Q.  Okay.  And who's that?
 9   A.  Alexandra Haynes, and there's others in the unit as well.
10   Q.  Who are these others?
11   A.  Oh, Gema Pampin, Lisset Palmero, Alexandra Haynes, and
12   myself, and there's -- Alina Faes is in the unit now.
13   Q.  Okay.  You saw Ms. Pampin, right, while you've been here?
14   A.  Yes.
15   Q.  Okay.  And you guys talked?
16   A.  Of course, yeah.
17   Q.  And you talked about this case?
18   A.  No.
19   Q.  No?  You didn't talk to her about this case?
20   A.  I was specifically, I mean, told by my lawyer, prosecutor,
21   we cannot discuss the case.
22   Q.  Okay.  Did you say hi?
23   A.  I'm sorry?  Oh, of course.  I gave her shampoo, everything
24   that she needed, but we don't talk about the case.
25   Q.  Right.  She's your friend of 18 years, right?
```

1   A.   Absolutely.
2   Q.   Your partner in crime, right?
3   A.   Uh-huh, you could say that.
4   Q.   You ever hear of the term "Manny's girls"?
5   A.   I didn't -- I didn't know what -- probably some -- like
6   other people would refer to us like that.
7   Q.   Okay.  So it's fair to say you were referred to as one of
8   Manny's girls, right?
9   A.   Probably.
10  Q.   Ma'am, did you know that -- do you recall Ms. Marks leaving
11  Health Care Solutions Network in June of 2010?
12  A.   I'm sorry?
13  Q.   Do you recall Ms. Marks leaving Health Care Solutions in
14  June of 2010?
15  A.   Not -- I don't -- I can't remember.
16  Q.   There came a time when you actually had to conduct her
17  therapy sessions, correct?  Do you remember that?
18  A.   To do what?  I'm sorry.
19  Q.   That you had to conduct her therapy sessions.  Do you
20  remember that, at some point?
21  A.   The fourth group.
22  Q.   And you were -- and again, you had access to all of the
23  data bank of notes, right?
24  A.   Yes.
25  Q.   Right.  And it was just easy for you to go in there and cut

```
 1   and paste or -- and forge signatures, right?
 2   A.  Well, cut and paste mainly.  I mean, for them, I didn't
 3   have to forge signatures most of the times, they were there.
 4   Q.  And you --
 5   A.  They were available.
 6   Q.  -- testified previously you forged Ms. Marks' signature,
 7   correct?
 8   A.  Maybe once or twice just for review purposes, but not on a
 9   daily basis.
10   Q.  And you could cut and paste those parts of those pages as
11   well if they were in PDF, right?
12   A.  How do you mean cut and paste?  In the computer --
13   Q.  Ma'am, you also testified when you were talking to
14   Mr. Rabin that -- when he was mentioning Rule 35s.  Do you
15   remember having a discussion with him about Rule 35s?
16   A.  Yes.
17   Q.  All right.  And you said -- I believe it says:  People lie
18   and exaggerate, those people up there.  Right?
19   A.  Exactly.
20   Q.  Right.
21   A.  People in the unit.  I listen -- I try to listen to my
22   lawyer.
23   Q.  Right.  And ma'am, in fact, you're one of those people,
24   aren't you?
25   A.  Why would I be one of those people?  I don't talk about my
```

1    Rule 35.  I try not to talk about the case in the unit.
2            MR. PRIETO:  One moment, Judge.
3       (Off-the-record discussion.)
4            MR. PRIETO:  I have nothing further, Judge.  Thank
5    you.
6                          *   *   *   *   *

```
1    UNITED STATES OF AMERICA                              )
                                                           ) ss:
2    SOUTHERN DISTRICT OF FLORIDA                          )

3

4                       C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 10th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 1 - 18.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 19th day of November, 2014.

16

17

                          /s/ Carly Horenkamp
18                       _____
                          Carly L. Horenkamp, RMR, CRR
19                        Certified Shorthand Reporter

20

21

22

23

24

25
```