IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,               NOVEMBER 17, 2014
                                        1:59 P.M.
                    Plaintiff,


        vs.


ROGER ROUSSEAU, et al.,

                    Defendants.      PAGES 1 THROUGH 27

_____

                        DAY 9
            EXCERPT OF CRIMINAL JURY TRIAL
        (CROSS-EXAMINATION OF JOEL COX BY MR. PRIETO)
         BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Mr. A. Brendan Stewart, AUSA
                        Mr. Justin Goodyear, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC  20530


FOR THE DEFENDANT:      Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                        800 Brickell Avenue
                        Suite 1400
                        Miami, Florida  33131


FOR THE DEFENDANT:      Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)        LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                        1221 Brickell Avenue # 900
                        Miami, Florida  33131

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

1                        **I N D E X**

2     *Certificate* ----------------------------------------- 27

3

4

5                        **W I T N E S S**

      ON BEHALF OF THE GOVERNMENT:                       PAGE
6     JOEL COX
      CROSS-EXAMINATION BY MR. PRIETO                        4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Before Jury, 1:59 p.m.)

 2            THE COURT:  All right.  Mr. Prieto?

 3            MR. PRIETO:  May it please the Court.  Thank you,

 4   Judge.  Good afternoon, ladies and gentlemen of the jury.

 5                        CROSS-EXAMINATION

 6   BY MR. PRIETO:

 7   Q.  Good afternoon, Agent.

 8   A.  Good afternoon.

 9   Q.  Unlike Mr. Hermida's client, you in fact did conduct an

10   interview of my client, correct?

11   A.  Yes, sir.

12   Q.  Okay.  Let's talk about that interview.  Now, you showed up

13   unannounced.  I believe Mr. Rabin's words were an ambush

14   interview, but you showed up unannounced -- I'll use

15   unannounced, okay? -- at her job, correct?

16   A.  Yes.

17   Q.  And that was at Larkin Hospital, correct?

18   A.  Yes, sir.

19   Q.  And you walked in, and I believe initially you may have

20   interviewed Ms. Crabtree, right?

21   A.  Yes, sir.

22   Q.  And then you moved on to Ms. Marks because she happens to

23   work at the same hospital, right?

24   A.  Yes, sir.

25   Q.  Okay.  Well, in fact, your first point of contact was one
```

1  of Ms. Marks' supervisors, correct?

2  A.  That seems correct, yes, sir.

3  Q.  Okay.  So all Ms. Marks knows at that point is, hey -- from

4  her supervisor, hey, hey, the feds are here to see you, you

5  know, and she's telling her to come out of her group therapy

6  session, right?

7  A.  I don't know what their conversation was.

8  Q.  Okay.  And she was taken into a little small room inside

9  the office at Larkin Hospital, right?

10 A.  We met with her, yes, in a room within Larkin Hospital,

11 yes.

12 Q.  Okay.  And it's two agents, yourself and Agent Reilly?

13 A.  Yes, sir.  That's correct.

14 Q.  And that's that handsome gentleman sitting over there?

15 A.  That's him right there.

16 Q.  Okay.  And so you guys are in there in an office and you --

17 it reflects in the report that you explained to her what the

18 purpose of the interview was, right?

19 A.  Yes.

20 Q.  What is it exactly that you explained to these people?

21 A.  During each of the interviews, we explained that we were

22 there to talk about their employment at Health Care Solutions.

23 Q.  That's it?

24 A.  That's how we usually get it started, yes.

25 Q.  That's how you get it started.  Okay.

 1     So the -- there comes a time, in fact, where you told my

 2   client that, oh, don't you know Ms. Pampin and Ms. Gonzalez

 3   have already pled guilty in a related case?  Do you remember

 4   telling her that?

 5   A.  I don't recall that.

 6   Q.  Okay.  And would that be something that would be noted in

 7   your reports?

 8   A.  Probably.

 9   Q.  Okay.  Well, it's not in there.  Would you take my word for

10   it?

11   A.  Yes.

12   Q.  Okay.  So you go in there and tell her:  Hey, we've

13   arrested these people.  You're kind of setting a mood like,

14   hey, you know, you might be in trouble here, right?

15   A.  Sir, you're saying we did say that?

16   Q.  I'm saying you did, correct.

17   A.  Okay.  I don't recall that.

18   Q.  Okay.  But -- well, we'll get back to what you recall in a

19   minute.  The issue here is, is that you're interviewing this

20   lady.  You don't read her her rights, do you?

21   A.  No.

22   Q.  No, because according to you she was free to leave, right?

23   A.  Because why?

24   Q.  She was free to leave at any time?

25   A.  True, yes.

1   Q.  Okay.  This is a consensual interview, right?

2   A.  Yes, it is.

3   Q.  Okay.  And after doing these -- you know, you get some

4   background on her, right?

5   A.  Yes, sir, we do.

6   Q.  And in -- and you want to be careful about the background

7   and make sure that, you know, the background you're getting is

8   100 percent accurate, correct?

9   A.  We'll ask her her background, and she'll tell us her

10  background --

11  Q.  Right.  And one --

12  A.  -- if she wants to.

13  Q.  And one of the things she indicated was that she worked for

14  Alliance for psychological services, correct?  Do you remember

15  that?

16  A.  I remember the name Alliance, yes.

17  Q.  Okay.  And I believe in your report you referred to it as

18  Alliance Forensic Services.  Do you remember that in your

19  report?

20  A.  I do remember that in the report, yes.

21  Q.  Okay.  So you got that wrong.

22  A.  Okay.  I didn't write the report, but I did review the

23  report.

24  Q.  Okay.  Well, then you and Agent Reilly got that wrong,

25  right?  It's not Alliance Forensic Services, is it?

1    A.  Well, I remember Alliance.

2    Q.  Okay.  You remember Alliance.  And you put "no commentary

3    provided."  That was in the report.  Do you remember that?

4    A.  Yes, I do remember that in the report.

5    Q.  Okay.  So it really wasn't important to you, right?

6    A.  That was important.  There was just no commentary provided.

7    Q.  Okay.  Well, it was so important you got it wrong.

8    A.  Sir, do you have a question?

9    Q.  Is that -- am I right by making that statement?  If -- do

10   you want to see it?

11   A.  I remember the report saying that, Alliance Forensics, I

12   believe, but --

13   Q.  Do you remember my client also telling you that she worked

14   for the Department of Corrections?

15   A.  I don't recall.

16   Q.  That she worked with sex offenders?

17   A.  I don't recall that.

18   Q.  That she worked with the state -- court-ordered batterers

19   intervention program?

20   A.  I don't recall that.

21   Q.  Okay.  You don't recall that, but, you know, she told you

22   all these things, but you put in your report "no comment

23   provided."

24        You also indicate -- well, not you, but you reviewed the

25   report, which I believe was authored by the other agent, that

1   at some point Ms. Marks became a full-time employee at HCSN.

2   Do you remember that?

3   A.  Yes, I do believe that's in there.

4   Q.  Okay.

5   A.  I'm not quite sure, though.  I'd have to review it to be

6   positive.

7   Q.  Okay.

8           MR. PRIETO:  May I approach, Your Honor?

9           THE COURT:  Yes.

10  BY MR. PRIETO:

11  Q.  Do you recognize the report?

12  A.  Yes, sir, I do.

13  Q.  And is your recollection refreshed now as to that

14  statement?

15  A.  Yes.

16  Q.  So that then my statement is accurate.  She did in fact --

17  or you noted that she indicated that she became a full-time

18  employee?

19  A.  That was our impression, yes.

20  Q.  Okay.  Sitting here today you know that that's not true, is

21  it?

22  A.  I'm not aware of that.

23  Q.  You're not aware that she was never a, quote-unquote,

24  "employee" of HCSN?

25  A.  I know that she worked at HCSN, and she received payments

 1    from HCSN.

 2    Q.   Right.  But she was a contract therapist, right?  She was

 3    not an employee.

 4    A.   Okay.

 5    Q.   I'm asking you.  I mean, is that correct?

 6    A.   I'm not quite sure.

 7    Q.   You're telling this jury that you don't know if she was a

 8    contract employee or an actual employee?

 9    A.   Well, I guess in my -- from my understanding she was a

10    therapist at Health Care Solutions and she got money from

11    Health Care Solutions, so she was employed by Health Care

12    Solutions.

13    Q.   Okay.

14    A.   Whether -- maybe she was just contract.

15    Q.   Right.

16    A.   I'm not sure.

17    Q.   And the truth of the matter, it really doesn't matter, does

18    it?

19    A.   (No response.)

20    Q.   It's not really important, is it?

21    A.   It's possibly important.

22    Q.   Okay.  Well, the point is I'm trying to make -- I mean, you

23    use very specific language in your report, right?

24    A.   Yes.

25    Q.   And you want to make sure that that report is accurate,

1  right?

2  A.  Yes.

3  Q.  So there would be a difference, then, between a contract

4  employee and an employee, right?

5  A.  Yes, I guess so.

6  Q.  Now, you also testified as to one of the slides here that

7  the government showed you.  I believe it was one of the

8  government exhibits you actually indicated wasn't accurate,

9  right?

10  A.  Right.

11  Q.  Do you remember that?  We were trying to clarify which

12  patient note, and it was just somebody -- it's a different

13  patient note that they showed you that was on the display,

14  right, that you had initially testified about, right?

15  A.  Correct.

16  Q.  Okay.  And was that your mistake or was that the

17  government's mistake?  Did you create that slide?

18  A.  Well, after -- and I may have misunderstood his question,

19  so I'm not sure there was a mistake or not.  What I thought it

20  was referring to was the exact patient response/benefit section

21  that we had just previously looked at through the patient file,

22  but I'm not sure if that was his exact question or not, if it

23  was that, or if his question was, is this from the patient file

24  in total that you reviewed?  If that was the question, it

25  was -- it was an accurate report -- accurate chart.

1    MR. PRIETO:  Sorry, could you please put up Government

2  Exhibit 110 as to Count 10?  Thank you.

3  BY MR. PRIETO:

4  Q.  I believe you had indicated perhaps this was not accurate,

5  but clearly when we're looking at this -- these cutting and

6  pastings here, clearly the notes say exactly the same thing,

7  right?

8  A.  Yes.

9  Q.  And I think that was -- that was the point of what the

10  government was trying to say, they're, quote-unquote, "cloned

11  notes," right?

12  A.  Yes.

13    MR. PRIETO:  Now, could you isolate the signatures on

14  both, please, put them side by side?

15  BY MR. PRIETO:

16  Q.  Okay.  When you went -- well, there's -- the question is

17  which notes did you show her when you interviewed her.  But do

18  these signatures look the same to you?

19  A.  Yes.

20  Q.  Okay.  And you base that on what, your training and

21  experience as a handwriting expert?

22  A.  No.  They just resemble each other.

23  Q.  Okay.  Now, let's assume you're right, that they resemble

24  each other.  Can you tell if they were cut and pasted onto that

25  document?

```
 1   A.  No.
 2   Q.  Okay.  Can you tell if they were traced?
 3   A.  On this document or --
 4   Q.  On the original that's out of the patient file.  I'm
 5   assuming this is exactly what's in the patient file.
 6   A.  Correct.
 7   Q.  Okay.  That's what you're representing to the jury, that
 8   these are group therapy notes taken out of Steven Abbott's
 9   patient file, correct?
10   A.  Correct.
11   Q.  Okay.  Do you have any reason to think the government
12   altered these?
13   A.  No.
14   Q.  Okay.  So then it is fair to say that these are copies of
15   the notes that are in the patient files.
16   A.  Correct.
17   Q.  And again, as Mr. Hermida pointed out, you don't have the
18   raw file itself in digital format, right?
19   A.  No.  We just have the hard copies.
20   Q.  You have the hard copy, which is -- you have a piece of
21   paper, right?
22   A.  Yes.
23   Q.  And you can't tell originally where that piece of paper
24   came from, who signed it, right?
25   A.  Correct.
```

1    Q.  You don't know if it was a cut and paste job, right?

2    A.  You're right.

3    Q.  You -- you actually don't know who the author of the

4    document is, right?

5    A.  Well, it says who the therapist is.

6    Q.  Right.  It says it.  It's printed on the form, right?

7    A.  Yes.

8    Q.  So does that make it so?

9    A.  I have no reason to believe otherwise on this document.

10   Q.  You have no other reason to believe except for your

11   investigation as to the massive fabrication going on by Dana

12   Gonzalez, right?

13   A.  There was -- yes, there was fabrication by Dana Gonzalez.

14   Q.  Right.  Gema Pampin.

15   A.  Correct.

16   Q.  Alexandra Haynes.

17   A.  Correct.

18   Q.  Right.  And let's talk about Alexandra Haynes a little bit.

19        MR. PRIETO:  You can take that down.  Thank you.

20   BY MR. PRIETO:

21   Q.  You know, I believe -- were you very aggressive with her in

22   the interview?  When you interviewed her?  I believe you did.

23   A.  Which interview are you referring to?

24   Q.  In one of them.

25   A.  Okay.

1    Q.  Did you ever yell at her in one of her interviews?

2    A.  No.

3    Q.  Did you get aggressive with her in one of your interviews?

4    A.  Not that I can recall, no.

5    Q.  Did you get aggressive with Ms. Marks in the interview?

6    A.  No, not that I recall.

7    Q.  Were you ever frustrated during her interview?

8    A.  No, not that I can recall.

9    Q.  Okay.  And when you interviewed Ms. Marks, you showed her a

10   copy of two notes by Steven Abbott, correct, group therapy

11   notes?

12   A.  Yes.

13   Q.  That you purported had her signature on it, right?

14   A.  That's correct.

15   Q.  And you say that she admitted she signed those documents,

16   right?

17   A.  Yes.

18   Q.  Actually, in your report I think it says that she confirmed

19   her signature.  Do you recall that, using that language?

20   A.  I believe that's correct.

21   Q.  Okay.  What does "confirmed her signature" mean, anyway?

22   A.  From what I remember of the interview, we showed her the

23   group therapy notes from those two days.  She said that was her

24   signature.

25   Q.  Okay.  So she said, That's my signature.  But in your

1  report you decided to say she confirmed it.  Is it possible she

2  said "it looks like my signature"?

3  A.  I'd have to --

4  Q.  Would that be confirming it?

5  A.  I'd have to review the report to make sure it said

6  confirmed, but --

7  Q.  Would you like to?  I'll bring it up to you again.

8  A.  Just to be sure.

9  Q.  (Hands witness document.)

10  A.  Okay.  Yes, I see that.

11  Q.  Okay.  So basically you don't know or you can't

12  independently recall exactly what she said, right?

13  A.  What I recall is that she said that was her signature.

14  Q.  Okay.  Did you tell her before you asked her those

15  questions, hey, make sure you look at it real carefully because

16  we know people have been forging stuff as HCSN?  Did you tell

17  her that?

18  A.  I don't recall telling her that.

19  Q.  No.  And isn't it also true that in fact you showed her the

20  reports and then you said:  How do you feel about working in a

21  place that was committing fraud?

22  A.  No, I don't recall.

23  Q.  Right?  Do you remember my client saying, Well, I'm not

24  proud of this?  I think you said that on direct.

25  A.  Yes.

1  Q.  Okay.  And that came after you confronted her with the

2  notes and said:  How do you feel about working somewhere there

3  was fraud?

4  A.  I don't -- I don't recall saying those exact words, but her

5  statement of that did come after we presented her with a

6  patient file and allowed her to review it.  And when she

7  noticed that there were duplicated statements for all these

8  files, she said she was not proud of it.

9  Q.  Right.  To work at a place where this obviously was going

10  on.  Right?

11  A.  No.

12  Q.  Okay.  So you didn't tell her anything about all this

13  fabrication that was going on, you just showed her the group

14  notes, told her there's fraud going on at HCSN, and she said

15  I'm not proud of it, right?

16  A.  I don't -- I don't think that's correct.

17  Q.  Well, we would know if that was correct if you had

18  tape-recorded the interview, right?  Like you said, it would be

19  a verbatim transcript of what occurred as opposed to your best

20  recollection.

21  A.  That's -- that's correct.

22       MR. PRIETO:  Could we put up Government Exhibit 110,

23  please?  Page 1 is fine.

24  BY MR. PRIETO:

25  Q.  Now, Agent, I think you went over this with the government

```
1    indicating -- and I know Mr. Hermida went over it.  I don't

2    want to beat a dead horse here, but just again, taking line 1,

3    you have a duplicate note dated 2-16-10 and an earliest version

4    of 2-9-10, and these are the cloned notes that you're saying

5    are cloned, right?

6    A.   Yes, sir.

7    Q.   Okay.  So if I'm going to make a clone of you using your

8    DNA, it should be the same guy, right?

9    A.   Excuse me?  Sorry, could you rephrase that?

10   Q.   Sure.

11   A.   What do you mean "same guy"?

12   Q.   I mean, if I clone you --

13   A.   Oh, I would be the same.

14   Q.   If I clone you, assuming we had the science, if I clone

15   you, it should be identical, right?

16   A.   When we say "clone," we mean the patient response/benefit,

17   the section that's the group therapy, the note.

18   Q.   Okay.

19   A.   That part of the note --

20   Q.   Just that part.

21   A.   -- is exactly the same.

22   Q.   Just that -- just that part, right?

23   A.   That's all we confirmed was exactly the same.

24   Q.   Okay.

25   A.   Most --
```

1    Q.  And you know the other portions on that form have I guess

2    fields, little checked boxes on the group therapy notes, right?

3    A.  Yes.

4    Q.  Just by way of example --

5         MR. PRIETO:  If I can use the ELMO?  And this has

6    already been entered into evidence as part of the Steven Abbott

7    patient file which I believe is Government Exhibit 110?

8    BY MR. PRIETO:

9    Q.  Okay.  If we look at part of this note, it looks like from

10   2-11-2010.

11        THE COURT:  And what Bates number is that?  Just so if

12   anybody wants to --

13        MR. PRIETO:  The Bates stamp on this is HCSN 157-822.

14        THE COURT:  Okay.

15   BY MR. PRIETO:

16   Q.  Right.  And in this particular one, you didn't go over this

17   one with the government, but I'm going to show it.  It

18   indicates he was -- the patient was playing domino, right?

19   A.  It says, the patient stated "playing domino."

20   Q.  Okay.  And up above that, where we have observed during

21   group, we have some boxes here that could be checked, right,

22   like specifically hygiene?

23   A.  Yes.

24   Q.  Do you see that on the document?

25   A.  Yes.

1   Q.  And then we have no improvement, do you see that?

2   A.  Yes.

3   Q.  All right.  And out of that same patient file, this one

4   now -- and this is Bates stamped HCSN 157-801, which is already

5   in evidence.  The date on the top of this one is 2-18-2010,

6   correct?

7   A.  Yes, that's correct.

8   Q.  And again, the times that you're getting on that exhibit

9   that you did, the summary of all the group notes, the times

10  you're getting are from the upper left, right?

11  A.  Yes.

12  Q.  And that's -- but again, that's not the actual time this

13  actual digital document was created.  Just that's the time on

14  this note, right?

15  A.  That's correct.  I don't know when the digital --

16  Q.  You don't know --

17  A.  Yeah.

18  Q.  -- right?

19  A.  No.

20  Q.  You could never tell us, right?

21  A.  Correct.

22  Q.  Okay.  And on this document, again, hygiene seems to have,

23  you know, checked with a downward thing and it says no

24  improvement, right?  And again, right here, "playing domino."

25  Right?  It's exactly the same.  Would you agree with me?

1  A.   The quote is the same, yes, that's correct.

2  Q.   Okay.  And we got another one, different date, 2-25, and

3  it's HCSN Bates stamp 157-781, 2-25-10, right?  It says, again,

4  "playing domino," right?

5  A.   Yes, it says, "playing domino."

6  Q.   Okay.  So if we go up to the "observed during group" area,

7  actually, this one is a little bit different, right?  It says

8  hygiene increase, not decrease.  You see where I'm pointing to?

9  A.   Yes.

10  Q.   You'd agree with that?

11  A.   Yes.

12  Q.   Okay.  And this one, instead of saying no improvement, says

13  minimal improvement, right?

14  A.   That's right, that's why I --

15  Q.   So just so we're clear, when you talk about what's being

16  cloned, you don't mean every single thing on this form, do you?

17  A.   No.  That's why I said the patient response/benefit

18  section.

19  Q.   Okay.  What about -- but you've attributed all of these to

20  my client, right, as being cloned notes in that summary?

21  A.   Yes.

22  Q.   Okay.  And up here we have another one, 3-11-2010, again at

23  11:15.  This one also indicates hygiene up, minimal

24  improvement, and this one I believe here also says, "playing

25  domino," right?

1   A.  Yes.

2   Q.  Okay.  And this one is not signed, is it?

3   A.  No, it's not signed.

4   Q.  Okay.  But it does have Ms. Marks' name down there, right?

5   A.  Yes.

6   Q.  But unsigned, right?

7   A.  Correct.

8   Q.  You don't know who authored this?

9   A.  From my understanding it would be Liliana Marks since her

10  name is on there.

11  Q.  I know what your understanding is.  But you can't tell this

12  jury 100 percent who created this document, can you?

13  A.  No.

14  Q.  Okay.  And again, because her preprinted signature is on

15  there, you're attributing it to her, right?

16  A.  Yes, and the repeated duplications of -- and the earlier

17  documents were signed.

18  Q.  You -- you guys -- the FBI didn't seize any computers in

19  relation to HCSN-East?

20  A.  Not to my knowledge, no.

21  Q.  Let me ask you this.  We've heard testimony about group

22  therapy notes being faked down in Miami, being shipped up --

23  there was a big prayer before they shipped these documents up

24  to North Carolina, so they were fake group therapy notes

25  created here or fake files being shipped up to North Carolina,

1    right?

2            MR. STEWART:  Objection, Your Honor, misstates facts

3    that are not in evidence.

4            THE COURT:  Overruled.  If it does, then he can

5    correct him.  Go ahead.

6    A.  Yeah, I don't -- from my understanding throughout the

7    investigation, the prayers they had had nothing to do with

8    North Carolina.  It was for the files that were --

9    BY MR. PRIETO:

10   Q.  Sending to Medicare, right?  Sending them to Medicare?

11   A.  Yes, that's correct.

12   Q.  Either way.  So -- but there were therapy notes created for

13   North Carolina, is my understanding.  Right?

14   A.  Yes.  There were therapy notes created for North Carolina.

15   Q.  Okay.  And those -- you said you seized computers from

16   North Carolina, right?

17   A.  Yes, we did.

18   Q.  Okay.  Was any analysis done on those computers

19   specifically dealing with cloned notes as to the origin of

20   those files?

21   A.  Not to my knowledge.

22   Q.  Okay.  Let's talk about one thing that the government

23   brought out on your direct.  That in fact you guys reviewed

24   your raw notes before testifying here, and you said that my

25   client indicated that she in fact didn't duplicate any notes,

1   right?

2   A.   No.  I think it was, on the raw notes, it said that she

3   never created notes for absent patients.  I believe that's

4   right.

5   Q.   Okay.  And that was something kind of -- I mean, that's

6   pretty significant, right?

7   A.   Yes, but -- yes, that is.  But she clarified in the

8   interview that -- of how -- the exact process of how she did

9   produce notes for absent patients.

10  Q.   Right.  That's what you guys say she said later, right?

11  A.   Yes.

12  Q.   Where in the raw notes was that notation made?

13  A.   I don't recall.

14  Q.   You don't recall if it was before or after your other

15  notations in the notes, do you?

16  A.   I don't recall exactly where that notation was made in the

17  notes.

18  Q.   And again, you're not the one who took the notes, right?

19  A.   That's correct.

20  Q.   So -- and you're -- so you have to rely a great deal on the

21  other agent's memory, right, at the time?

22  A.   His memory, his notes, and also my memory.

23  Q.   And again, just so it would be 100 percent dead-on

24  accurate, you didn't record this in any shape or form, right?

25  A.   The interview was not recorded.

1    MR. PRIETO:  Okay.  One moment.  Could we put up

2  Government Exhibit 110 one more time as to Count 11?

3  BY MR. PRIETO:

4  Q.  Now, this is -- I believe this is a little bit different

5  from the first one I showed you, but the government entered

6  both of these.  Now, look at these two signatures.  Are you

7  telling me those two are exact -- are they the same, they look

8  familiar to you?

9  A.  Familiar?  They -- yes, they look like similar --

10  Q.  They look the same?

11  A.  They look similar, yes.

12  Q.  Okay.  Well, similar or the same?

13  A.  They look similar.

14  Q.  Okay.  Despite the big looping L at the end on one and not

15  on the other, it looks the same to you, or similar enough?

16  A.  They look like similar signatures.

17  Q.  I mean, the fact of the matter is, you didn't hire any

18  handwriting experts, did you?

19  A.  No, sir.

20  Q.  You could have done that, right, in your investigation?

21  A.  I've never done that before in my experience.

22  Q.  You don't have the computers, you don't have handwriting

23  analysis, you don't have the original files, data files.  All

24  you have here are defendants that have plea agreements with the

25  government saying, hey, they signed it, right?  I mean, that's

1 | really what you got here.
2 | A.  That's incorrect.  That's why we asked them if it was their
3 | signature or not.
4 | Q.  Right.  Without telling them of all the forgeries,
5 | ambushing them at work, throwing something in their face and
6 | they have to make a split-second decision, right?  That's when
7 | you gave them the opportunity.
8 | A.  That's incorrect.
9 |         MR. PRIETO:  I have no further questions.
10 |                 * * * * *

```
 1  UNITED STATES OF AMERICA                    )
                                                ) ss:
 2  SOUTHERN DISTRICT OF FLORIDA                )

 3

 4              C E R T I F I C A T E

 5      I, Carly L. Horenkamp, Certified Shorthand

 6  Reporter in and for the United States District Court for the

 7  Southern District of Florida, do hereby certify that I was

 8  present at and reported in machine shorthand the proceedings

 9  had the 17th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 1 - 27.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 20th day of November, 2014.

16

17

18                    /s/ Carly Horenkamp

19                    Carly L. Horenkamp, RMR, CRR
                      Certified Shorthand Reporter

20

21

22

23

24

25
```