IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,        NOVEMBER 18, 2014
                                 9:07 P.M.
            Plaintiff,

    vs.

ROGER ROUSSEAU, et al.,

            Defendants.        PAGES 14 THROUGH 30

---

DAY 10
EXCERPT OF CRIMINAL JURY TRIAL
(CONT'D CROSS-EXAMINATION OF TERENCE REILLY BY MR. PRIETO)
BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Mr. A. Brendan Stewart, AUSA
                        Mr. Justin Goodyear, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC  20530


FOR THE DEFENDANT:      Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                        800 Brickell Avenue
                        Suite 1400
                        Miami, Florida  33131


FOR THE DEFENDANT:      Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)        LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                        1221 Brickell Avenue # 900
                        Miami, Florida  33131

APPEARANCES (continued):

| | |
|---|---|
| FOR THE DEFENDANT:<br>(Angela Salafia) | Mr. Ricardo P. Hermida, Esq.<br>LAW OFFICES OF RICARDO P. HERMIDA, ESQ.<br>55 Merrick Way<br>Suite 212<br>Coral Gables, Florida   33134 |
| FOR THE DEFENDANT:<br>(Liliana Marks) | Mr. Frank A. Prieto, Esq.<br>LAW OFFICE OF FRANK A. PRIETO, P.A.<br>One Northeast 2nd Avenue<br>Suite 200<br>Miami, Florida   33132 |
| FOR THE DEFENDANT:<br>(Alina Fonts) | Mr. Juan De Jesus Gonzalez, Esq.<br>LAW OFFICES OF JUAN DE JESUS GONZALEZ<br>10631 N. Kendall Drive<br>Suite 150<br>Miami, Florida   33176 |
| FOR THE DEFENDANT:<br>(Blanca Ruiz) | Mr. Albert Z. Levin, Esq.<br>LAW OFFICES OF ALBERT Z. LEVIN, P.A.<br>Courthouse Tower<br>40 NW 3rd Street<br>Suite 200<br>Miami, Florida   33128 |
| COURT REPORTER: | Carly L. Horenkamp, RMR, CRR<br>U.S. DISTRICT COURT<br>400 N. Miami Avenue, Room 12-3<br>Miami, Florida   33128<br>(305) 523-5138 |

# I N D E X

*Certificate* ------------------------------------------------ 30


**W I T N E S S**
ON BEHALF OF THE GOVERNMENT:                                  PAGE
TERENCE REILLY
CONT'D CROSS-EXAMINATION BY MR. PRIETO                          17

```
 1            (Before Jury, 9:07 a.m.)
 2              THE COURT:  All right.  Good morning, everyone.
 3    Welcome back and please be seated.
 4              All right.  We'll pick up where we left off last
 5    evening.
 6              And Agent, you're still under oath.
 7              THE WITNESS:  Yes, sir.
 8              MR. PRIETO:  May I query the witness, Judge?
 9              THE COURT:  I'm sorry?
10              MR. PRIETO:  May I query the witness?
11              THE COURT:  Yes, sir.
12              MR. PRIETO:  Thank you.
13              Good morning, ladies and gentlemen of the jury.
14              May it please the Court.
15        TERENCE REILLY, GOVERNMENT WITNESS, SWORN PREVIOUSLY
16                     CROSS-EXAMINATION (Continuing)
17    BY MR. PRIETO:
18    Q.  Good morning, Agent Reilly.
19    A.  Good morning.
20    Q.  I believe where we left off yesterday I had kind of slapped
21    some documents for you to look at.  But is it fair to say those
22    documents reflected the payments made by HCSN to Ms. Marks?
23    A.  That's correct.
24    Q.  Okay.  And just to recap, is it fair for me to say, based
25    upon your review of all of the banking records, that those
```

```
1   checks would reflect a payment to Ms. Marks for a certain
2   number of group therapy sessions provided at a certain rate?
3   A.   Yes, sir.
4   Q.   Okay.
5            MR. PRIETO:  If we could get the ELMO on?
6            THE COURT:  Is this in evidence?
7            MR. PRIETO:  It is not, Judge. It is just a
8   demonstrative aid for the use of the witness.  It's not going
9   to be admitted into evidence, but it is a summary of the bank
10  records.
11  BY MR. PRIETO:
12  Q.   Just for an example, and I'm just picking, while I have it
13  handy there, was 2009, and this is the math that we did, and
14  just we'll go -- use the first entry there.  From 1-3 to 1-16,
15  we had also a total number of days worked, but we have 30 group
16  sessions at the rate at that time was $75 per hour, total paid
17  2425.  So 30 times 75 would equal the 2425.
18  A.   Correct.
19  Q.   And that was the amount of the check that we correlated for
20  that pay period.
21  A.   I agree with that.
22  Q.   Okay.  So basically the math for the paychecks jibes with a
23  number of therapy sessions for a pay rate which I believe
24  fluctuated between 65 to 85 over the years.
25  A.   That's correct.
```

1  Q.  Okay.  Now, as part of your analysis, I think Mr. Hermida
2  touched on it, but you didn't do any kind of demographic study
3  or demographic analysis of what a standard psychotherapist
4  providing partial hospitalization program therapy would be paid
5  in the Miami area, correct?
6  A.  No.  I just looked at the Health Care Solutions bank
7  accounts.
8  Q.  Okay.  But it's fair to say in different areas of the
9  country perhaps people are paid at different rates for the same
10 job, right?
11 A.  I would imagine so.
12 Q.  And we had talked a little bit about your background when
13 you were an accountant, I believe.  You know, it wouldn't be
14 uncommon for, let's say, the New York office to get paid more
15 or less than perhaps an office in Wichita, Kansas, for example.
16 A.  That would be correct.
17 Q.  Okay.  And again, the FBI, right, a more senior agent
18 probably gets paid a little bit more versus a less senior
19 agent, correct?
20 A.  That's correct.
21 Q.  And I think you guys work on like GS levels and those go up
22 over the years, over time?
23 A.  Yes.
24 Q.  Okay.  And, you know, I'm sure, you know, administrative
25 assistants, legal -- paralegals that work with you guys

1   probably get paid less than the agents, or more depending on
2   their experience as well?
3   A.  They're on a scale as well, yes.
4   Q.  Okay.  So fair to say the chart that was shown by the
5   government showing, you know, therapists being paid X amount
6   for the years and other staff being paid, it's simply that
7   these people have different positions within a company,
8   correct?
9   A.  Yes.
10  Q.  So just to kind of summarize.  So, you know, all the charts
11  that the government showed, the charts that you worked on, it's
12  a kind of clinical, a cold analysis of bank records, correct?
13  A.  Yes.
14  Q.  Okay.  Now, there was some mention, I believe -- and I
15  believe it's in your 302 that you authored, okay? -- that there
16  was a statement that Ms. Marks recognized some patients from
17  her other job and at -- from HCSN, correct?
18  A.  Correct.
19  Q.  Okay.  And were able to verify that she, in fact, did also
20  substance abuse at this other -- at ATC, which is the other
21  company.
22  A.  That was my understanding.
23  Q.  Okay.  So it's not indicated or was never investigated
24  whether or not she recognized patients that may have been
25  perhaps in the substance abuse program that were also receiving

| | |
|---|---|
| 1 | partial hospitalization at HCSN, correct? |
| 2 | A.  Simply that she recognized patients at both places. |
| 3 | Q.  Correct.  And speaking of that, it wouldn't be illegal if a |
| 4 | person enrolled in a partial hospitalization program at perhaps |
| 5 | a hospital then switches and would receive partial |
| 6 | hospitalization treatment at another location after they've |
| 7 | finished their cycle there, right? |
| 8 | A.  Well, they would have to have an acute episode happen for |
| 9 | them to be readmitted into another -- |
| 10 | Q.  Right. |
| 11 | A.  -- partial hospitalization program. |
| 12 | Q.  Assuming they qualify -- let me -- let me say that. |
| 13 | Assuming they qualify for services, right, they could go from |
| 14 | one -- |
| 15 |       MR. MEDINA:  Objection, speculation. |
| 16 |       THE COURT:  I don't know what the question is. |
| 17 | BY MR. PRIETO: |
| 18 | Q.  Assuming a patient qualified, because I think that was your |
| 19 | problem with my questioning, assuming they qualified for |
| 20 | services, right, there's nothing wrong with a patient going |
| 21 | from Larkin Hospital to Baptist Hospital to receive partial |
| 22 | hospitalization treatment, correct? |
| 23 |       MR. MEDINA:  Objection, speculation, lacks personal |
| 24 | knowledge. |
| 25 |       THE COURT:  I'm sure he's well able to tell us whether |

1  he's able to answer the question or not.  If you can answer the
2  question, tell us the answer.  If you don't know the answer,
3  tell us that you don't know.
4  A.  So the question is if a patient was at a PHP in one
5  program, could they be readmitted into another PHP?
6  BY MR. PRIETO:
7  Q.  Correct.
8  A.  Yes.
9  Q.  Correct.  There's nothing wrong with that.
10 A.  Well, under the circumstances, if they qualify.
11 Q.  If they qualify, right?  And it's not the judgment call of
12 the therapist to determine if a patient qualifies, correct?
13 A.  No, that would be the psychiatrist.
14 Q.  Just going back, substance abuse programs, they're --
15 generally they're not Medicaid and Medicare programs, correct?
16 A.  I'm not sure if they're Medicaid.  They're definitely not
17 Medicare, though.
18 Q.  Okay.  And your investigation didn't reveal whether or not
19 Ms. Marks was aware of her -- of whether her patients were
20 Medicare, Medicaid, privately insured?
21 A.  That's correct.
22 Q.  So she -- you don't know if she was aware or not, right?
23 A.  I do not.
24 Q.  Now, there's some -- now, I believe some of Ms. Marks'
25 checks are actually made out to a company that she formed,

1  correct?
2  A.  Yes, Mental Health Solutions.
3  Q.  And, you know, being a, quote-unquote, independent
4  contractor, there's nothing wrong with a person forming their
5  own company to provide services to different health care
6  providers, correct?
7  A.  No.  That's correct.
8  Q.  Okay.  In fact, it kind of makes sense -- and you have an
9  accounting background, it may make sense tax-wise to do
10 something like that, correct?
11 A.  Yes, does.
12 Q.  They can actually -- at that point you can probably deduct
13 certain things that you couldn't deduct as an employee.
14 A.  Write off business expenses.
15 Q.  Right.  But the downside would probably be, especially
16 today, is the cost of private health care.  It's pretty
17 expensive, right?
18 A.  Yes, it is.
19 Q.  Okay.  So a person that has their own company probably has
20 to buy their own health care, right?
21 A.  Yeah, unless their husband or someone else provides the
22 health care for them.
23 Q.  Right.  So it's -- you know, it's a cost benefit analysis
24 basically of figuring out whether it would be beneficial for
25 one to have their own company, right?

1  A.  Yes.  But Health Care Solutions didn't -- to my
2  understanding didn't provide health benefits to anyone whether
3  they were a contractor or not.
4          MR. PRIETO:  Okay.  One moment.  This has been
5  admitted into evidence.  These are the actual bank records from
6  HCSN.  I'll give the jury a Bates stamp number.
7          THE COURT:  What exhibit are they in?
8          MR. PRIETO:  Government's Exhibit -- the bank records?
9          MS. ZAFERIS:  Which account?
10         MR. PRIETO:  HCSN 2009.
11 A.  It's probably 5171.
12     (Off-the-record discussion.)
13         MR. PRIETO:  I believe it was Exhibit 5171.
14         MS. ZAFERIS:  No, it's Exhibit 14.  The account is
15 5171.
16         MR. PRIETO:  I'm sorry, Exhibit 14, 5171, okay.
17 BY MR. PRIETO:
18 Q.  And just -- I can't even see.  I'm getting old.  Okay.
19 Going to have to zoom in here.  Okay.  We're looking here at it
20 appears to be Check 4397, and this is a check, I believe it's
21 1-9-09, but it's 2009, and it is made out to Mental Health
22 Solutions, correct?
23 A.  That's correct.
24 Q.  I'll try to zoom in a little more.
25     Okay.  And that's the company Ms. Marks has, right?

1  A.  Yes, sir.
2  Q.  Okay.  And that amount -- you know what, I can't even read
3  the amount.  It looks like $1,800 to me?
4  A.  Yeah.  If you look underneath it, it's got the amount.
5  Q.  Oh, excellent.  So specifically in the memo section, right,
6  it has a pay period, correct?
7  A.  Yes.
8  Q.  And there's no indication of a, quote-unquote, "notes"
9  here, is there?
10 A.  No.
11 Q.  Okay.  And rather than go through one by one, every single
12 one, is it fair to say that a review of every single check paid
13 to her reflects a pay period, never an indication of "notes,"
14 correct?
15 A.  That's correct.
16 Q.  Okay.  Finally, as part of your investigation, you
17 indicated that you seized a bunch of -- a warehouse full of
18 boxes, right --
19 A.  Yes, sir.
20 Q.  -- in there?  Now, amongst all those materials that were
21 seized, we're talking -- I mean, we're talking a lot of
22 records, correct?
23 A.  That's correct.
24 Q.  Okay.  And in there, for example, there's like employee
25 manuals?  There was insurance binders for all of the vehicles

1  that were owned by HCSN that picked up patients, correct?
2  A.  That's correct.
3  Q.  There were phone bills, correct?
4  A.  I believe so.
5  Q.  There were patient lists, patient medical records, clearly;
6  a whole bunch of them, right?
7  A.  Yes, sir.
8  Q.  There was invoicing for services provided to HCSN, like
9  trash services and all these kind of things, contracts?
10 A.  Yes.
11 Q.  There was some office supplies, I'm assuming?
12 A.  I'm not sure if there was office supplies in there, but --
13 Q.  Okay.  Well, there were -- let's say there were bills for
14 their computer services?
15 A.  Oh, yeah.
16 Q.  Did you see some of those?
17 A.  Yeah.
18 Q.  Alarm company contracts?
19 A.  Company contracts?
20 Q.  Correct.
21 A.  Yeah.
22 Q.  There was a business -- a business licensing from the
23 county, from the state, correct?
24 A.  Yes, that's correct.
25 Q.  Okay.  So, I mean, there was a lot of stuff here that any

1    normal office would have, right?
2    A.  Yes.
3    Q.  Now, of those materials -- again, I think we've gone over
4    it -- but there was no computer forensics done, correct, in
5    this case?
6    A.  Well, just so you understand, Health Care Solutions wasn't
7    raided by the FBI.  We got these files after Health Care
8    Solutions was closed down by Medicare and there was no
9    computers left in -- from the Miami offices.
10   Q.  Okay.  There was some computers from the North Carolina
11   office, though, right?
12   A.  That's correct.
13   Q.  Okay.  So no computer forensics were done there, right?
14   A.  No.  We had examinations of those computers done.
15   Q.  Okay.  And did that reveal anything about how documents
16   were created and where?
17   A.  No, it didn't.
18   Q.  And there was some interchange of documents between North
19   Carolina and Miami, correct?
20   A.  You know, we couldn't find any emails.  Most of the
21   documents were either Fed-Ex'd up or carried by John Thoen.
22   Q.  Okay.  So there was -- basically, you're saying that
23   computer forensics was not able to be done.
24   A.  Computer forensics was done, but not on the group therapy
25   notes --

1  Q.  Okay.
2  A.  -- or the patient file documents.
3  Q.  Didn't review anything.  So basically all you have to rely
4  on is the paper file itself --
5  A.  Yes, sir.
6  Q.  -- right?  And no handwriting analysis was ever done on any
7  of the group therapy notes, correct?
8  A.  That's correct.
9  Q.  No comparison was done between HCSN sign-in logs and the
10 group therapy notes, correct?
11 A.  Sign-in logs for whom?
12 Q.  The patient sign-in logs.
13 A.  Well, I don't think the patient would sign the group
14 therapy note.
15 Q.  No.  I'm asking if there was not a handwriting comparison,
16 but a comparison between actual attendance versus this forged
17 attendance, correct?
18 A.  Well, they billed for everybody, so --
19 Q.  Well, so the answer to my question is?
20 A.  That -- what's the question again?
21 Q.  The question is:  There was no comparison done between the
22 actual attendance versus nonattendance, right?
23 A.  Of the sign-in sheets?
24 Q.  Correct, sir.
25 A.  Yes.

```
1  Q.  Okay.  And there's no way that you can tell us which
2  patient was actually there and which wasn't, right?
3  A.  That's correct.
4          MR. PRIETO:  I have nothing further.
5                    *   *   *   *   *
```

```
1   UNITED STATES OF AMERICA                        )
                                                    ) ss:
2   SOUTHERN DISTRICT OF FLORIDA                    )

3

4                      C E R T I F I C A T E

5       I, Carly L. Horenkamp, Certified Shorthand

6   Reporter in and for the United States District Court for the

7   Southern District of Florida, do hereby certify that I was

8   present at and reported in machine shorthand the proceedings

9   had the 18th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 14 - 30.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 19th day of November, 2014.

16

17
                        /s/ Carly Horenkamp
18                      _____
                        Carly L. Horenkamp, RMR, CRR
19                      Certified Shorthand Reporter
```